## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **MICHAEL S. ZUMMER,** | * | **CIVIL ACTION NO. 17-7563** |
| **PLAINTIFF,** | * | **SECTION: "J" (2)** |
| **V.** | * | |
| | | **JUDGE: BARBIER** |
| **JEFFREY S. SALLET, ET AL.,** | * | |
| **DEFENDANTS.** | * | **MAGISTRATE: WILKINSON** |

\* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF THE
## OFFICIAL CAPACITY DEFENDANTS' MOTION TO DISMISS

**MAY IT PLEASE THE COURT:**

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendant the Federal Bureau of Investigation; and Defendants Jeffrey S. Sallet, Laura A. Bucheit, Michelle Ann Jupina, David M. Hardy, and Valerie Parlave, as sued in their official capacities, submit this memorandum in support of their motion to dismiss.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...........................................................................................iii

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................ 1

LEGAL STANDARDS ..................................................................................................... 6

ARGUMENT ..................................................................................................................... 7

I.      COUNTS ONE AND TWO FAIL FOR LACK OF SUBJECT MATTER
        JURISDICTION.......................................................................................... 8

        A.      The Civil Service Reform Act Precludes Judicial Review
                Of The Claims Asserted In Counts One And Two ................................ 8

        B.      Judicial Review Of The Claims Asserted In Count Two
                Is Precluded by *Department of the Navy v. Egan* ................................ 11

II.      THE COMPLAINT FAILS TO STATE A CLAIM FOR
        THE VIOLATION OF A FIRST AMENDMENT RIGHT .............................. 14

CONCLUSION ............................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Arron v. United States*,
113 F.3d 1245 (10th Cir. 1997) ......................................................................... 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................ 7

*Barrera–Montenegro v. United States*,
74 F.3d 657 (5th Cir.1996) ................................................................................. 6

*Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*,
518 U.S. 668 (1996) .......................................................................................... 15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................ 7

*Broadway v. Block*,
694 F.2d 979 (5th Cir. 1982) ...................................................................... 10, 11

*Bush v. Lucas*,
462 U.S. 367 (1983) ..................................................................................... 8, 10

*Bush v. Lucas*,
647 F.2d 573 (5th Cir. 1981) ........................................................................... 10

*Connick v. Myers*,
461 U.S. 138 (1983) .......................................................................................... 19

*Dep't of the Navy v. Egan*,
484 U.S. 518 (1988) .................................................................................... 11, 12

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) .......................................................................................... 8, 9

*Fernandez–Montes v. Allied Pilots Ass'n*,
987 F.2d 278 (5th Cir.1993) .............................................................................. 7

*Filebark v. U.S. Dep't of Transp.*,
555 F.3d 1009 (D.C. Cir. 2009) ........................................................................ 10

*Fornaro v. James*,
416 F.3d 63 (D.C. Cir. 2005) ........................................................................... 10

*Funk v. Stryker Corp.*,
    631 F.3d 777 (5th Cir. 2011) ............................................................... 5, 6

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006) ............................................................... 14, 15, 19

*Gonzalez v. Manjarrez,*
    558 F. App'x 350 (5th Cir. 2014) ............................................................... 8

*Graham v. Ashcroft,*
    358 F.3d 931 (D.C. Cir. 2004) ............................................................... 10

*Guitart v. United States,*
    3 F.3d 439 (5th Cir. 1993) ............................................................... 10, 11

*Hill v. Dep't of Air Force,*
    844 F.2d 1407 (10th Cir. 1988) ............................................................... 13, 14

*Hitt v. City of Pasadena,*
    561 F.2d 606 (5th Cir. 1977) ............................................................... 7

*In re Katrina Canal Breaches Litig.,*
    495 F.3d 191 (5th Cir. 2007) ............................................................... 7

*Kentucky v. Graham,*
    473 U.S. 159 (1985) ............................................................... 1, 2, 3, 4

*McAuliffe v. Rice,*
    966 F.2d 979 (5th Cir. 1992) ............................................................... 10, 11

*McConathy v. Dr.Pepper/Seven Up Corp.,*
    131 F.3d 558 (5th Cir.1998) ............................................................... 7

*McDaniel v. United States,*
    899 F. Supp. 305 (E.D. Tex.1995) ............................................................... 7

*Morales v. Dep't of the Army,*
    947 F.2d 766 (5th Cir. 1991) ............................................................... 8

*Perez v. FBI,*
    71 F.3d 513 (5th Cir. 1995) ............................................................... 12, 13, 14

*Ramming v. United States,*
    281 F.3d 158 (5th Cir. 2001) ............................................................... 7

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*
    391 U.S. 563 (1968) ................................................................................ 14, 15, 19

*Rankin v. McPherson,*
    483 U.S. 378 (1987) ............................................................................................. 19

*Reinbold v. Evers,*
    187 F.3d 348 (4th Cir. 1999) ............................................................................. 13

*Rollins v. Marsh,*
    937 F.2d 134 (5th Cir. 1991) .......................................................................... 9, 11

*Ryan v. Reno,*
    168 F.3d 520 (D.C. Cir. 1999) ........................................................................... 13

*S. Christian Leadership Conference v. Supreme Court of State of La.,*
    252 F.3d 781 (5th Cir. 2001) ................................................................................ 7

*Smith v. United States,*
    375 F.2d 243 (5th Cir. 1967) ........................................................................ 19, 20

*Snepp v. United States,*
    444 U.S. 507 (1980) ........................................................................................ 15, 16

*Stephens v. Dep't of Health & Human Servs.,*
    *901 F.*2d 1571 (11th Cir. 1990) ......................................................................... 11

*Taylor v. Books A Million, Inc.,*
    296 F.3d 376 (5th Cir. 2002) ................................................................................ 7

*United States v. Aguilar,*
    515 U.S. 593 (1995) ............................................................................................. 15

*United States v. Armstrong,*
    517 U.S. 456 (1996) ............................................................................................. 21

*United States v. Fausto,*
    484 U.S. 439 (1988) ..................................................................................... 9, 10, 11

*United States v. Flemmi,*
    225 F.3d 78 (1st Cir. 2000) ................................................................................ 20

*Waters v. Churchill,*
    511 U.S. 661 (1994) ............................................................................................. 15

*Wayte v. United States,*
   470 U.S. 598 (1985)....................................................................................... 21

*Williams v. Reilly,*
   743 F. Supp. 168 (S.D.N.Y. 1990) ............................................................... 14

**Statutes**

5 U.S.C. § 701................................................................................................. 10, 12

5 U.S.C. § 702..................................................................................................... 6

5 U.S.C. § 706................................................................................................. 6, 22

5 U.S.C. § 2303.................................................................................................. 18

28 U.S.C. § 535................................................................................................. 17

Rules

Fed. R. Civ. P. 12(b)(1)................................................................................. 1, 6, 7

Fed. R. Civ. P. 12(b)(6).................................................................................... 7

Regulations

28 C.F.R. § 27.1............................................................................................. 17, 18

28 C.F.R. § 50.2............................................................................................. 16, 18

Other Authorities

5 Fed. Prac. & Proc. Civ. § 1216 pp. 235-236................................................... 7

Attorney Gen.'s Role as Chief Litigator for the United States,
   6 U.S. Op. Off. Legal Counsel 47, 1982 WL 170670 (1982)........................... 19

60 FR 40245,
   Exec. Order No. 12968, 1995 WL 17211630 ................................................ 11

# INTRODUCTION

The crux of this lawsuit is the Federal Bureau of Investigation's ("FBI") decision to suspend the security clearance of Special Agent ("SA") Michael Zummer in response to Zummer's unauthorized disclosure of FBI information, which in turn resulted in his indefinite suspension from the FBI. SA Zummer alleges that the suspension of his security clearance and FBI employment, as well as the FBI's refusal to allow Zummer to publicly disclose certain FBI information violated his rights under the First Amendment. Zummer has sued the FBI and five current and former FBI employees in their official capacities: Jeffrey S. Sallet, Special Agent-in-Charge ("SAC"), FBI New Orleans Division; David M. Hardy, Section Chief ("SC"), FBI Records Management Division ("RMD"); Laura A. Bucheit, (former) Assistant Director (AD), FBI Security Division ("SecDiv"); Michelle Ann Jupina, (former) AD, FBI RMD; and Valerie Parlave, Executive Assistant Director ("EAD"), FBI Human Resources Branch.[1] Because a suit against an official in his or her official capacity is actually a suit against the employing government entity, *Kentucky v. Graham*, 473 U.S. 159, 165–67 (1985), and a suit against the Federal Bureau of Investigation is actually a suit against the United States, the sole defendant in this matter is the United States.

As will be shown below, SA Zummer's Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and pursuant to Rule 12(b)(6) for failure to state a claim for which relief can be granted.

# FACTUAL BACKGROUND

## Plaintiff's Allegations[2]

In June 2009, while he was employed as an FBI Special Agent in the New Orleans Division,

---

[1] Defendants Sallet, Jupina, Hardy, Parlave, and Bucheit have also been sued in their individual capacities. All of the individual capacity claims are addressed in a separate motion.

[2] For purposes of this motion, the allegations of SA Zummer's Complaint are presumed to be true.

SA Zummer was assigned to initiate an investigation into Harry J. Morel, Jr., who was then the

district attorney of Louisiana's 29th Judicial District. Complaint ("Compl.") ¶ 18. Morel was

ultimately prosecuted by the U.S. Attorney's Office for the Eastern District of Louisiana (the

"USAO"). On April 20, 2016, Morel pled guilty to a single count of obstruction of justice with a

maximum sentence of three years. *Id.* ¶ 20. Zummer was disturbed by what he considered to be a

"lenient" plea deal offered to Morel and by statements made by the USAO which Zummer

perceived as "blaming" the "lenient" sentence on Morel's victims and evidentiary issues with the

case. *Id.* ¶ 22. Zummer drafted a letter (the "First Letter") to U.S. District Judge Kurt Engelhardt,

who was presiding over Morel's case, to inform the judge of his concerns. *Id.*

On May 3, 2016, SA Zummer gave a copy of the First Letter to Daniel Evans, Assistant

Special Agent-in-Charge ("ASAC"), FBI New Orleans Division, for review and approval. *Id.* ¶ 23.

On May 31, 2016, SAC Sallet directed Zummer not to send the First Letter to the judge but rather

to contact the Justice Department entities that accepted whistleblower complaints – the Office of

the Inspector General ("OIG") and the Office of Professional Responsibility ("OPR") – to ask for

permission to send the letter to the judge. *Id.* ¶ 24.  On June 2, 2016, Zummer sent the First Letter

to DOJ OIG. *Id.* ¶ 25. DOJ OIG informed Zummer that it had referred the matter to DOJ OPR. *Id.*

On August 11, 2016, DOJ OPR advised Zummer that it would be inappropriate for it to comment

on whether he should send the First Letter to Judge Englehardt. *Id.* ¶ 29.

On August 8, 2016, SA Zummer submitted the First Letter to the FBI prepublication review

office at the FBI's Records Management Division ("RMD"). *Id.* ¶ 26. On August 12, Michael G.

Seidel, Assistant Section Chief ("ASC"), FBI RMD, advised Zummer that FBI RMD would not

review the First Letter because the disclosure fell within Zummer's official duties. *Id.* ¶ 30. Zummer

appealed that determination to AD Jupina. *Id.* On August 15, 2016, ASC Seidel clarified that FBI

RMD would review the First Letter for release to the media but not for release to the judge. *Id.* ¶ 31.

On August 15, 2016, SA Zummer sent the First Letter to Judge Englehardt. *Id.* ¶ 32. On August 16, 2016, Zummer notified FBI management in the New Orleans Division that he had sent the letter. *Id.* ¶ 33. Chief Division Counsel for the New Orleans Division sent Zummer an email urging him to retract the First Letter. *Id.* Zummer refused to do so. *Id.* ¶ 34. On August 24, 2016, David M. Hardy, Section Chief, FBI RMD, denied Zummer's request to release the First Letter to the public. *Id.* ¶ 35.

On August 30, 2016, SA Zummer was informed by his supervisor that he was suspended from investigative activity because of the unauthorized disclosure of the First Letter. *Id.* ¶ 36. Zummer was informed that the decision had been made by SAC Sallet and ASAC Evans. *Id.* On September 16, 2016, Zummer submitted the First Letter to FBI RMD for prepublication review. *Id.* ¶ 42. Zummer also submitted a Second Letter to Judge Englehardt, dated September 6, 2016, for release to the public. *Id.*

On September 16, 2016, SA Zummer sent an e-mail to ASAC Evans asking to be returned to investigative work, stating that he would not send letters to any more judges on other cases. *Id.* ¶ 41. Zummer informed Evans that he would continue with the prepublication review process to seek the public release of the First and Second Letters. *Id.* On September 23, 2016, SA Zummer asked ASAC Evans for an update on the questions he asked on September 16, 2016. *Id.* ¶ 43. Zummer received an e-mail from ASAC Evans stating that the following was the FBI's response: "Unfortunately, because you have taken the position that information you personally gather in the performance of your duties as an FBI Special Agent may be disclosed by you as a private citizen should you determine there is a need despite being instructed not to do so and without authorization, you have made it impossible for us to assign you investigative work. This is not a punishment." *Id.* On September 30, 2016, SA Zummer was advised that his security clearance had been suspended indefinitely pending an investigation and that, accordingly, he was suspended from

work without pay. *Id.* ¶ 45.

On January 26, 2017, SC Hardy approved a redacted version of the First Letter for release to the public. *Id.* ¶ 50. On February 14, 2017, Zummer appealed the redactions. *Id.* ¶ 51. On May 8, 2017, SC Hardy approved a redacted version of the Second Letter for release to the media. *Id.* ¶ 54. On May 15, 2017, AD Jupina denied Zummer's appeal of the redactions to the First Letter. *Id.* ¶ 58.

On April 3, 2017, Zummer received a letter from the FBI's Human Resources Division notifying him that the FBI had failed to provide him with a veterans' preference for which he was eligible. *Id.* ¶ 52. The preference entitled Zummer to administrative leave without pay pending review of the decision to suspend him without pay. *Id.* Zummer provided a written submission to the Human Resources Division contesting his suspension without pay. *Id.* ¶ 53.

On May 12, 2017, EAD Parlave and other FBI officials had a telephone conference with SA Zummer to provide him an opportunity to argue against the proposal to suspend him without pay. *Id.* ¶ 55. Zummer referred to his written submission; the FBI officials had no questions for him. *Id.* On May 22, 2017, SA Zummer received a letter from EAD Parlave notifying him that he was suspended indefinitely without pay. *Id.* ¶ 56.

DOJ's prepublication review policy states in part:

The prepublication review provision [of a nondisclosure agreement] will require Department of Justice employees and other individuals who are authorized to have access to Sensitive Compartmented Information to submit certain material, described further in the agreement, to the Department prior to its publication to provide an opportunity for determining whether an unauthorized disclosure of Sensitive Compartmented Information or other classified information would occur as a consequence of it[s] publication.

*Id.* ¶ 60 (citing 28 C.F.R. § 17.18(a)).

**Additional Background**

Additional FBI policies on the disclosure by FBI employees of information acquired from or relating to FBI files or operations, or acquired by virtue of employment with the FBI are set forth in

the FBI Employment Agreement, which all FBI employees are required to sign as a condition of employment or continued employment with the FBI. *See* FBI Employment Agreement.[3] Pursuant to these policies, FBI employees assume a duty of confidentiality as a condition of employment with the FBI, the breach of which is subject to potential criminal sanction, disciplinary action (including dismissal), or personal civil liability. *Id.* ¶ 7. FBI employees acknowledge that information they acquire in connection with their official duties with the FBI remains the property of the United States of America. *Id.* at ¶ 2. FBI employees agree to "not reveal, by any means, any information or material from or related to FBI files or any other information acquired by virtue of [their] official employment to any unauthorized recipient without official written authorization by the FBI." *Id.* ¶ 3. FBI employees acknowledge that the "[u]nauthorized disclosure . . . of information contained in the files . . . of the FBI or which [they might] acquire as an employee of the FBI could impair national security, place human life in jeopardy, result in the denial of due process, prevent the FBI from effectively discharging its responsibilities, or violate federal law." *Id.* at ¶ 1. They also acknowledge that by being granted access to such information, they are "accepting a position of special trust" and are "obligated to protect such information from unauthorized disclosure." *Id.* FBI employees also acknowledge that an employee's security clearance can be revoked if the employee engages in an unauthorized disclosure of information from FBI files or information acquired as a result of his or her position at the FBI. *Id.* FBI employees also acknowledge that they "have read and understand the guidelines on prohibited disclosures that are attached" to the Agreement. *Id.* Among those prohibited disclosures are "[i]nformation that relates to any sensitive operational details or the

---

[3] The current version of the FBI Employment Agreement is available at https://www.fbi.gov/file-repository/fd-291.pdf/view. The Court may take judicial notice of relevant publicly-available documents. *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011). The terms of the Employment Agreement cited herein are identical in all material respects to the terms contained in the version of the Employment Agreement that SA Zummer signed as a condition of his FBI employment.

substantive merits of any ongoing or open investigation or case," and "[a]ny other information that the FBI would have discretion to withhold from disclosure pursuant to civil discovery obligations, the Freedom of Information Act and Privacy Act, or any other statute, law, or regulation." *Id.* at p.2.[4]

**Legal Claims**

In Count One of his Complaint, SA Zummer alleges that his right to freedom of speech was violated by the suspension of his security clearance and the resulting suspension from FBI employment without pay as a result of his decision to send the First and Second Letters to Judge Englehardt. *Id.* ¶¶ 67-69. In Count Two, SA Zummer alleges that the FBI's initial refusal to permit the public release of any portion of the First and Second Letters, the subsequent decisions to redact portions of the First and Second Letters prior to approval for public release, and the failure to make these decisions in a timely manner violated Zummer's right to freedom of speech. *Id.* ¶¶ 70-72. Both Counts are asserted under the Administrative Procedure Act (the "APA").[5]

## LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(1) allows a party to challenge the subject matter jurisdiction of the district court to hear a case. Lack of subject matter jurisdiction may be found based upon: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Barrera–Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir.1996). The plaintiff

---

[4] The prohibited disclosures cited herein are identical in all material respects to those referenced in the FBI Employment Agreement that SA Zummer signed.

[5] The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Judicial review is allowed for agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "(B) contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2).

asserting jurisdiction bears the burden of proof for a Fed. R. Civ. P. 12(b)(1) motion to dismiss. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *McDaniel v. United States*, 899 F. Supp. 305, 307 (E.D. Tex.1995)). When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. *Id.* at 161 (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (per curiam)).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege a set of facts in support of his claim which would entitle him to relief. *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002) (citing *McConathy v. Dr.Pepper/Seven Up Corp.*, 131 F.3d 558, 561 (5th Cir.1998)). The plaintiff must plead "enough facts to state a claim for relief that is plausible on its face." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."); 5 Fed. Prac. & Proc. Civ. § 1216 pp. 235-236 (3d ed.) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"). "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *S. Christian Leadership Conference v. Supreme Court of State of La.*, 252 F.3d 781, 786 (5th Cir. 2001) (quoting *Fernandez–Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir.1993)).

## ARGUMENT

All of the constitutional claims asserted by SA Zummer in Counts One and Two of his Complaint arise from Zummer's federal employment. The Civil Service Reform Act precludes

judicial review of such claims. Count Two's challenge to the decision to suspend Zummer's security clearance and his resulting suspension from FBI employment is further not subject to judicial review because the decision to suspend Zummer's security clearance was committed by law to the discretion of the FBI. For these reasons, the Court lacks subject matter jurisdiction over the claims asserted in Counts One and Two, and both claims fail as a matter of law. Count One and Count Two also fail as a matter of law because neither count states a claim for the violation of a First Amendment right.

## I. COUNTS ONE AND TWO FAIL FOR LACK OF SUBJECT MATTER JURISDICTION

### A. The Civil Service Reform Act Precludes Judicial Review Of The Claims Asserted In Counts One And Two

In Counts One and Two of SA Zummer's Complaint, he alleges that his First Amendment rights were violated by the manner in which his federal employer responded to his effort to publicly disclose information he learned during the course of his federal employment – information that belonged to the United States. The Supreme Court has held that the Civil Service Reform Act (the "CSRA") provides the exclusive means of redressing employment disputes involving federal employees, even when these disputes are styled as constitutional claims. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 12-14 (2012); *see also Gonzalez v. Manjarrez*, 558 F. App'x 350, 354-55 (5th Cir. 2014) (request for declaratory judgment concerning Fourth Amendment violation properly denied because it would interfere with comprehensive remedy of CSRA); *Morales v. Dep't of the Army*, 947 F.2d 766, 768 (5th Cir. 1991) (CSRA and collective bargaining agreement provided exclusive remedy for administrative tort claim which included allegation of constitutional violations); *cf. Bush v. Lucas*, 462 U.S. 367 (1983) (holding CSRA was the exclusive remedy for federal civil service employee alleging retaliatory employment action).

As the Supreme Court explained in *United States v. Fausto*, 484 U.S. 439 (1988), "[t]he CSRA established a comprehensive system for reviewing personnel action taken against federal employees." *Id.* at 455. Prior to the enactment of the CSRA, federal employment law consisted of an "outdated patchwork of statutes and rules built up over almost a century." *Id.* at 444 (internal quotation marks and citation omitted). Congress responded by enacting in the CSRA "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *Id.* at 445. The CSRA regulates virtually every aspect of federal employment by, among other things: setting merit systems principles to guide federal personnel management; establishing various agencies and entities to administer federal employment matters; describing numerous bases on which personnel actions are prohibited; and specifying the administrative and judicial remedies available to various categories of employees in response to such prohibited personnel practices and limited types of adverse actions taken for any reason. Chapter 23 of the CSRA sets out the merit-system principles that govern civil-service employment and prohibited personnel practices. "The merit-system principles include treating employees fairly and equitably and 'with proper regard for their privacy and constitutional rights.'" *Rollins v. Marsh*, 937 F.2d 134, 137 (5th Cir. 1991) (quoting 5 U.S.C. 2301(b)(2)) (footnote omitted). Prohibited personnel practices include the taking of any "personnel action" that violates merit-system principles. *Id.* The CSRA accordingly provides a "comprehensive" scheme of protections and remedies for federal employment disputes, *Fausto*, 484 U.S. at 448, and "prescribes in great detail the protections and remedies applicable[,] . . . including the availability of administrative and judicial review," *id.* at 443.

Because the remedies provided by the CSRA are the exclusive means of obtaining judicial review of claims arising out of federal employment disputes, the CSRA precludes district court jurisdiction for such claims. *See Fausto*, 484 U.S. at 448-51, 455; *Elgin*, 132 S. Ct. at 2133-34; *see also*

*Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) (exclusivity of CSRA remedy precluded mandamus relief); *Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (CSRA precluded judicial review of claim that FBI violated its own regulations in taking personnel action against FBI Special Agent).[6] Accordingly, the Fifth Circuit has repeatedly held that federal employees cannot "circumvent the detailed scheme of the CSRA by invoking the more general APA."[7] *Broadway v. Block*, 694 F.2d 979, 986 (5th Cir. 1982); *McAuliffe v. Rice*, 966 F.2d 979, 981 (5th Cir. 1992). As explained in *Broadway*,

> Some agency actions are reviewable by circuit courts, some by district courts, and some by no court at all. We decline to allow an employee to circumvent this detailed scheme governing federal employer-employee relations by suing under the more general APA. The reasoning of *Bush* in denying a constitutional right of action is applicable here, for allowing suit under the APA would likewise "encourage aggrieved employees to bypass the statutory and administrative remedies in order to seek direct judicial relief and thereby deprive the Government of the opportunity to work out its personnel problems within the framework it has so painstakingly established."

694 F.2d at 986 (quoting *Bush v. Lucas*, 647 F.2d 573, 577 (5th Cir. 1981), *aff'd* 462 U.S. 367 (1983)).[8] The CSRA precludes APA review even for employees "specifically excluded from the panoply of procedures under CSRA." *McAuliffe*, 966 F.2d at 981.

---

[6] "In fact, a federal employee's personnel-related complaints are preempted 'even if no remedy [is] available . . . under the CSRA.'" *Fausto*, 484 U.S. at 448-49. In *Fausto*, the Supreme Court held that the deliberate exclusion of particular federal employees from CSRA review "[was] not an uninformative consequence of the limited scope of the statute, but rather manifestation of a considered congressional judgment that they should not have statutory entitlement to review." 484 U.S. at 448-49. *See also Guitart v. United States*, 3 F.3d 439 (5th Cir. 1993) ("Hence, we arrive at this seemingly anomalous result: Because he is a federal employee, the Appellant's sole remedy for his employment-related claims is the CSRA. Due to his employment status, however, Appellant is excluded from pursuing his claims under the CSRA. Due to the exclusivity of the CSRA, judicial review is ousted, even when no other remedy is available.").

[7] While the APA establishes a general presumption of reviewability for persons "suffering a legal wrong because of agency action," 5 U.S.C. § 701(a), the Act recognizes that this presumption does not hold where a statute precludes judicial review. 5 U.S.C. § 701(a)(1). Thus, to the extent that SA Zummer intends the jurisdictional averment in his Complaint, see Compl. ¶ 1, to suggest a claim under the APA for Count One or Count Two, any such implied or suggested claim is barred. *See Fausto*, 484 U.S. at 448-51, 455.

[8] The Fifth Circuit's view that the CSRA precludes APA review is in accord with numerous other circuits. *See Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1011 (D.C. Cir. 2009) ("[W]e have held

The constitutional claims asserted in Counts One and Two arise from SA Zummer's federal employment.[9] Regardless of whether Zummer is entitled to judicial review under the CSRA, the CSRA provides the exclusive remedy for the actions which are the bases for Counts One and Two. *Broadway*, 694 F.2d at 984; *Guitart*, 3 F.3d at 439. Therefore, both Count One and Count Two fail for lack of subject matter jurisdiction. *Broadway*, 694 F.2d at 986; *McAuliffe*, 966 F.2d at 981.

### B. Judicial Review Of The Claims Asserted In Count Two Is Precluded by *Department of the Navy v. Egan*

The Supreme Court has made clear that "the grant of security clearance to a particular employee, a sensitive and inherently discretionary judgment call, is committed by law to the appropriate agency of the Executive Branch." *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988). The President has constitutional authority "to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information." *Id.* at 527. The President has delegated that authority to various agencies in the Executive Branch, including the FBI. *See* **60 FR 40245, Exec. Order No. 12968, 1995 WL 17211630**. As the Court explained in *Egan*, "an outside nonexpert body" cannot "review the substance of such a judgment, nor "determine

---

that this comprehensive employment scheme preempts judicial review under the more general APA even when that scheme provides no judicial relief—that is, what you get under the CSRA is what you get.") (internal quotation omitted); *Stephens v. Dep't of Health & Human Servs.*, 901 F.2d 1571, 1575-76 (11th Cir. 1990) (rejecting argument that APA was designed to provide an additional remedy for federal employees to that provided by CSRA); *Arron v. United States*, 113 F.3d 1245 (10th Cir. 1997) (whether constitutional claims were construed as *Bivens* claims or APA claims for equitable relief, both claims complained of activities prohibited by the CSRA and, thus, were preempted).

[9] *See Rollins v. Marsh*, 937 F.2d 134, 138 (5th Cir. 1991) ("We have little doubt but that [suspension from employment and suspension of a security clearance] constitute personnel decisions under the CSRA."); 5 U.S.C. § 2302(a)(2)(A)(xii) (listing "any other significant change in duties, responsibilities, or working conditions" as a "personnel action" covered by statute); *see* 5 U.S.C. § 2302(a)(2)(A)(xi) (listing "the implementation or enforcement of any nondisclosure policy, form, or agreement" as a "personnel action" covered by statute).

what constitutes an acceptable margin of error in assessing the potential risk" to national security inherent in granting any particular individual access to classified information. *Egan*, 484 U.S. at 529.

Based on *Egan* and subsequent decisions applying that case, it is clear that Zummer's challenge to the decision to suspend his security clearance and his resulting suspension from FBI employment is not subject to judicial review under the APA or otherwise, because the decision to suspend his security clearance was committed to the discretion of the FBI "by law." *See* 5 U.S.C. § 701(a)(2). *See also Egan*, 484 U.S. at 527 (stating that the presumption of reviewability "runs aground" in cases involving security clearance decisions). The Fifth Circuit's decision in *Perez v. FBI*, 71 F.3d 513 (5th Cir. 1995), is squarely on point. In that case, the Fifth Circuit found that it lacked subject matter jurisdiction to address a Title VII claim by an FBI agent that the revocation of his security clearance and his subsequent firing were retaliatory. The Court reasoned that because the agent's claim would require an examination of the legitimacy and the possibly pretextual nature of the FBI's proffered reasons for revoking the agent's security clearance, the agent's challenge to the revocation "would of necessity require some judicial scrutiny of the merits of the revocation." *Id.* at 514. "As the Supreme Court and several circuit courts have held that such scrutiny is an impermissible intrusion by the Judicial Branch into the authority of the Executive Branch over matters of national security, neither [the court of appeals] nor the district court have jurisdiction to consider those matters." *Id.* at 514-15.

As was the case with the FBI agent in *Perez*, adjudicating the claim SA Zummer asserts in Count One for the suspension of his security clearance would inevitably require an examination of the legitimacy of the reasons proffered by the FBI for its actions against Zummer. This is clear from the allegations of the Complaint. About one week before his security clearance was suspended, FBI officials informed Zummer that he could no longer be assigned investigative work because Zummer had taken the position that he was free to publicly disclose information he gathered during the

course of his official duties as an FBI Special Agent. Compl. ¶ 43. FBI officials believed that it was Zummer's position that this information, which was the property of the United States, could be disclosed without first receiving authorization from the FBI even though Zummer was obligated by the terms of the FBI Employment Agreement to seek and obtain authorization prior to disclosing FBI information. *Id.* ¶ 43. Zummer was specifically told that the FBI's inability to assign him investigative work was not a punishment. *Id.* But Zummer claims that he was being punished in retaliation for his actions. *Id.* ¶¶ 67-69. Thus, Zummer's claim would require this Court "to examine the legitimacy" and the allegedly "pretextual nature" of the FBI's security clearance decision, and thus to second-guess the merits of that decision – precisely what *Egan* prohibits. *Perez*, 71 F.3d at 514.

Indeed, plaintiffs' challenge to the suspension of his security clearance is, if anything, even more clearly barred by *Egan* than the claim found unreviewable in *Perez*. "If the merits underlying a revocation cannot be examined, there are even stronger reasons why the merits underlying an interim action such as a suspension cannot be examined." *Hill v. Dep't of Air Force*, 844 F.2d 1407, 1411 (10th Cir. 1988); *see also Reinbold v. Evers*, 187 F.3d 348, 354, 358-59 (4th Cir. 1999) (recognizing that *Egan* bars review of suspension of security clearance). The same prohibition on judicial review applies to the resulting suspension from employment, since that decision was likewise based on the loss of Zummer's security clearance. *See Ryan v. Reno*, 168 F.3d 520, 523 (D.C. Cir. 1999) (explaining that *Egan* bars review of an "adverse employment action resulting from an agency security clearance decision") (citing cases).

Count One fails for lack of subject matter because judicial review of the suspension of SA Zummer's security clearance and the suspension of his FBI employment is barred by *Egan*. Examining the legitimacy of the suspension of Zummer's security clearance, including whether the FBI's security concerns were just a pretext for retaliating against Zummer for sending his letters

"would of necessity require some judicial scrutiny of the merits" of the suspension – an inquiry

barred by *Perez* and *Egan*. *Perez*, 71 F.3d at 514 & n.6. The fact that Zummer's challenge is wrapped

in a constitutional claim does not alter this conclusion. *See Perez*, 71 F.3d 513; *Hill*, 844 F.2d at 1411

(stating that if *Egan* could be "bypassed simply by invoking alleged constitutional rights, it makes the

authority of Egan hardly worth the effort"); *Williams v. Reilly*, 743 F. Supp. 168, 171-72 (S.D.N.Y.

1990) ("If the statutory constraints imposed by *Egan* could be bypassed simply by alleging illegal

discrimination [in violation of the constitution], Egan would be vitiated.").

## II.     THE COMPLAINT FAILS TO STATE A CLAIM FOR THE VIOLATION OF A FIRST AMENDMENT RIGHT

At the core of Counts One and Two is the question of whether SA Zummer had a right

under the First Amendment to disclose to a federal judge and the general public, at his discretion,

information he obtained while acting in the capacity of a case agent on a federal criminal

investigation – information he was obligated by the terms of his federal employment to keep

confidential. As shown below, the answer to this question is no.

"When a citizen enters government service, the citizen by necessity must accept certain

limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). "Government

employers, like private employers, need a significant degree of control over their employees' words

and actions; without it, there would be little chance for the efficient provision of public services." *Id.*

In *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, the Supreme Court reasoned that

in cases where the government seeks to limit the speech of its employees, determining whether the

employee's interest or the government's interest prevails requires "balanc[ing] ... the interests of the

[public employee], as a citizen, in commenting upon matters of public concern and the interest of

the State, as an employer, in promoting the efficiency of the public services it performs through its

employees." 391 U.S. 563, 568 (1968). In striking that balance, "[t]he government's interest in

achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate

interest when it acts as sovereign to a significant one when it acts as employer." *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 676 (1996) (quoting *Waters v. Churchill*, 511 U.S. 661, 675 (1994) (plurality opinion)).

When considering the actions of the government employer, the question is whether the employer's interest in limiting an employee's opportunity to contribute to public debate is greater than its interest in limiting a similar contribution by any member of the general public. *Pickering*, 391 U.S. at 573. "The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 419. When making this assessment, the Supreme Court has "consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large." *Id.* (quoting *Waters*, 511 U.S. at 673).

In this case, there was more than adequate justification for the FBI to treat Zummer differently from any other member of the general public. And the FBI's interest in the effective functioning of its law enforcement mission outweighed any interest SA Zummer might have had in making the speech at issue.

**1.** The Supreme Court has recognized that where a government employee has "voluntarily assumed a duty of confidentiality, governmental restrictions on disclosure are not subject to the same stringent standards that would apply to efforts to impose restrictions on unwilling members of the public." *United States v. Aguilar*, 515 U.S. 593, 606 (1995); *see also Snepp v. United States*, 444 U.S. 507, 511-16 (1980) (per curiam) (rejecting First Amendment challenge to injunction against Central Intelligence Agency employee's future violation of prepublication review obligation and imposing constructive trust on profits attributable to the employee's breach of that obligation). As an FBI employee, SA Zummer was subject to contractual restrictions governing the disclosure of any

information he acquired during the course of the Morel investigation. Zummer knowingly and willingly assumed a duty of confidentiality as a condition of his employment with the FBI, the breach of which was subject to potential criminal sanction, disciplinary action (including dismissal), or personal civil liability. *See* FBI Employment Agreement at ¶ 7. As a condition of his federal employment Zummer acknowledged that information he acquired in connection with his official duties with the FBI remained the property of the United States of America. *Id.* ¶ 2. Zummer agreed to "not reveal, by any means, any information or material from or related to FBI files or any other information acquired by virtue of [his] official employment to any unauthorized recipient without official written authorization by the FBI." *Id.* ¶ 3. Zummer acknowledged that the "[u]nauthorized disclosure . . . of information contained in the files . . . of the FBI or which [he might] acquire as an employee of the FBI could impair national security, place human life in jeopardy, result in the denial of due process, prevent the FBI from effectively discharging its responsibilities, or violate federal law." *Id.* ¶ 1. Zummer also understood that by being granted access to such information, he was "accepting a position of special trust" and was "obligated to protect such information from unauthorized disclosure." *Id.* Zummer knew that engaging in an unauthorized disclosure of information from FBI files or information acquired as a result of his position at the FBI was of sufficient concern to the FBI that his security clearance could be revoked for doing so. *Id.* ¶ 7.

SA Zummer was also subject to federal regulations specifically limiting his ability to publicly release the sensitive information he obtained related to the Morel criminal investigation. For example, 28 C.F.R. § 50.2, which is titled "Release of information by personnel of the Department of Justice relating to criminal and civil proceedings," provides guidelines for Department of Justice personnel which govern the public release of information relating to criminal and civil proceedings. With respect to criminal proceedings, the guidelines provide that:

> At no time shall personnel of the Department of Justice furnish any statement or information for the purpose of influencing the outcome of a defendant's trial, nor

> shall personnel of the Department furnish any statement or information, which
> could reasonably be expected to be disseminated by means of public communication,
> if such a statement or information may reasonably be expected to influence the
> outcome of a pending or future trial.

*Id.* § 50.2(b)(2). These guidelines apply "from the time a person is the subject of a criminal

investigation until any proceeding resulting from such an investigation has been terminated by trial

or otherwise." *Id.* § 50.2(b)(1). A public communication by an FBI Special Agent concerning the

evidence gathered during that agent's investigation of alleged criminal conduct by a local official and

the propriety of the plea deal offered to that official by the U.S. Attorney's Office would certainly

fall within the scope of these guidelines.

SA Zummer had ample ability to report the prosecutorial misconduct he perceived in the

Morel matter in a manner that did not compromise the sensitivity, confidentiality, or privileges

associated with information which belonged to the United States. Under the terms of the FBI

Employment Agreement, Zummer was allowed to disclose information to proper entities under

governing statutes, regulations, and Executive Orders. FBI Employment Agreement at ¶ 6. DOJ

regulations identify a number of authorized recipients for information from FBI employees who

wish to report "a violation of any law, rule or regulation; or mismanagement, a gross waste of funds,

an abuse of authority, or a substantial and specific danger to public health and safety." 28 C.F.R. §

27.1(a)(1)-(2).[10] Authorized recipients for such information include: DOJ's Office of Professional

Responsibility, DOJ's Office of Inspector General, the FBI Office of Professional Responsibility,

the FBI Inspection Division Internal Investigations Section, the Attorney General, the Deputy

Attorney General, the Director of the FBI, the Deputy Director of the FBI, and the highest ranking

---

[10] To the extent that Zummer believed that the prosecutorial misconduct associated with the Morel matter constituted violations of criminal law, he was allowed, and arguably obligated, to report the information to the Attorney General. *See* 28 U.S.C. § 535.

official in any FBI field office. 28 C.F.R. § 27.1(a).[11] It is worth noting that rather than trying to bury Zummer's allegations of prosecutorial misconduct, the FBI officials Zummer has sued for allegedly violating his First Amendment rights directed Zummer to take his concerns to two of these authorized recipients – OIG and OPR. Compl. ¶ 24; *see also* 5 U.S.C. § 2303 (prohibiting reprisal against FBI employees for disclosures to OIG and OPR).

The obvious difficulties associated with allowing unauthorized disclosure of government information provide a strong reason for this Court to resolve Zummer's claims by giving substantial and conclusive weight to the United States' interest in requiring FBI employees to adhere to official policies concerning the disclosure of FBI information, as those policies are set forth in the FBI Employment Agreement and federal statutes and regulations. Unlike a member of the general public, SA Zummer, by virtue of the Special Agent position he held with the FBI, had access to sensitive and confidential information that belonged to the United States. Zummer had voluntarily accepted both contractual and regulatory restrictions on the manner in which he could disclose that information outside of the FBI. Zummer had authorized means to report any concerns that information raised about official misconduct in a way that would safeguard the sensitivity and confidentiality of the information. And Zummer had protection from reprisal for reporting those concerns through authorized channels. Accordingly, the FBI was wholly justified in not treating Zummer as a member of the general public.

**2.** As noted above, a public employee is properly subject to speech restrictions that are necessary for his or her public employer to operate efficiently and effectively. *Garcetti*, 547 U.S. at

---

[11] The guidelines provided in 28 C.F.R. § 50.2 recognize that there will be situations when they will limit the release of information which would not be prejudicial under the particular circumstances. Accordingly, the guidelines allow for DOJ personnel who believe that "in the interest of the fair administration of justice and the law enforcement process" information beyond the guidelines should be released, to request permission to do so from the Attorney General or the Deputy Attorney General. *Id.* § 50.2(b)(9).

419. Pertinent considerations which can justify a public employer's actions to impose restrictions on the speech of an employee include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (citing *Pickering*, 391 U.S., at 570-73). Courts must also give substantial weight to a government employer's interest in enforcing office policy. *Connick v. Myers*, 461 U.S. 138, 153 n.14 (1983). Zummer's attempted and actual public disclosures of FBI information fit at least three of these criteria.

By disclosing or publicizing FBI information related to the Morel investigation (or even attempting to do so), Zummer was injecting himself and the FBI into prosecutorial matters which are exclusively reserved to the United States Attorney General. It is well established that the Attorney General has exclusive authority over the legal positions taken by the United States in all manner of litigation, including criminal matters. As DOJ's Office of Legal Counsel summarized in a detailed memorandum on the issue:

> [T]he Attorney General, as the chief litigation officer for the United States, has broad plenary authority over all litigation in which the United States, or its federal agencies or departments, are involved. This authority is wideranging, embracing all aspects of litigation, including subpoena enforcement, settlement authority, and prosecutorial discretion. The reservation of these powers to the Attorney General is grounded in our common law tradition, Acts of Congress…, various executive orders, and a long line of Supreme Court precedent. These powers can be eroded only by other Acts of Congress, and the Executive's constitutional command to faithfully execute the laws.

The Attorney Gen.'s Role as Chief Litigator for the United States, 6 U.S. Op. Off. Legal Counsel 47, 61–62, 1982 WL 170670 (1982). In federal criminal investigations such as the Morel matter, it is the Attorney General who is responsible for determining whether charges will be brought, whom charges will be brought against, and whether to resolve those charges by trial or plea bargain. *See Smith v. United States*, 375 F.2d 243, 247 (5th Cir. 1967) ("The discretion of the Attorney General in

choosing whether to prosecute or not to prosecute, or to abandon a prosecution already started, is absolute.").

The "position of special trust" which Zummer occupied as an FBI Special Agent, gave him access to privileged, confidential, or otherwise protected information related to the Morel investigation that a member of the general public would not have. Zummer was fully aware that his First and Second Letters contained information that the United States considered to be privileged. *See* Compl. ¶ 39 ("Zummer also supplemented his prior submission to address various privileges he expected the government would assert."). This information, which Judge Englehardt described as "considerations regarding the decision to prosecute the Defendant, on what charges, and the evidentiary basis for such considerations," Compl. ¶ 39, was necessarily part of the deliberative process associated with the charging and sentencing decisions made by the United States Attorney's Office handling the Morel prosecution.

FBI Special Agents routinely work closely with United States Attorney's Offices conducting criminal investigations. It is a relationship that obviously requires a great deal of mutual trust and confidence. A rule that allows an individual FBI Special Agent to share, without qualification or limit, the deliberative processes associated with the United States Attorney's prosecution and charging decisions in a federal criminal matter would undermine that trust and confidence. This would be a heavy price to pay in order to enable a Special Agent to substitute his views on the manner in which a federal criminal matter should be prosecuted for the views of the United States Attorney. *Cf. United States v. Flemmi*, 225 F.3d 78, 86-87 (1st Cir. 2000) ("it is clear that the FBI's performance of its investigatory duties is meant to complement, not curb, the United States Attorneys' performance of the prosecutorial function") (citations omitted). That is particularly so because even federal courts do not scrutinize a prosecutor's charging decisions except in narrow circumstances, such as when there is clear evidence that it violated some constitutional constraint.

*See United States v. Armstrong*, 517 U.S. 456, 464 (1996). As the Supreme Court stressed in *Armstrong*, "[e]xamining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Id.* at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985). In this case, Zummer's disclosures did not allege that Morel's rights were violated by prosecutorial misconduct; his complaint was that Morrel was not prosecuted severely enough. This is precisely the kind of discretionary prosecutorial decisionmaking that is not subject to "outside inquiry." *Id.* at 465. Thus, it was not surprising that the federal judge to whom Zummer sent his First and Second Letters concluded that the sentencing of Morel "[did] not encompass the airing of [Zummer's] grievances, no matter how legitimate . . . ." Compl. ¶ 40.

It should be evident that a rule granting FBI Special Agents unfettered ability to publicly disclose information they acquire during the course of a criminal investigation would interfere with regular FBI operations. It is hard to imagine how a federal law enforcement and intelligence gathering organization could function efficiently and effectively if its investigators can take the position that information they personally gather in the performance of their duties can be publicly disclosed should they subjectively determine that a need for disclosure exists. *See* Compl. ¶ 43. It is harder still to imagine the efficient and effective operation of an agency like the FBI when supposing that such a disclosure can occur even in the face of determinations by superiors that the disclosure should not be made because of sensitivity, confidentiality, privilege, or any other facially legitimate reason. And that is what happened here. *Id.*

\*　　　\*　　　\*

Zummer did not have a First Amendment right to disclose government information to a federal judge without limit or qualification – a right founded upon Zummer's subjective beliefs that

the information was relevant to a criminal sentencing and that federal prosecutors had not given the information sufficient consideration. Nor did Zummer have a First Amendment right to disclose such information, without limit or qualification, to the general public. Zummer willingly accepted a position of special trust within the federal government and accepted the obligations associated with that position. One of those obligations was to "not reveal, by any means, any information or material from or related to FBI files or any other information acquired by virtue of [his] official employment to any unauthorized recipient without official written authorization by the FBI." The United States had a compelling interest in restricting Zummer's unauthorized communication of information that belonged to the United States – information to which a member of the general public would not have had access, and to which Zummer would not have had access but for his federal employment. The United States also had a compelling interest in not allowing an FBI Special Agent to inject himself into prosecutorial matters which are exclusively reserved to the United States Attorney General.

There was more than adequate justification for the United States not to treat SA Zummer like any other member of the general public. In addition, the speech restrictions to which Zummer was allegedly subjected were necessary to the efficient and effective operation of his federal employer, the FBI. Therefore, neither Count One nor Count Two state a claim for a Fourth Amendment violation.[12]

## CONCLUSION

For the reasons stated above, Counts One and Two of Zummer's Complaint should be dismissed.

---

[12] To the extent that SA Zummer intends the jurisdictional averment in his Complaint, see Compl. ¶ 1, to suggest a claim under the APA for agency action that is "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), any such claim fails for the same reasons Zummer has failed to state a claim for a violation of a First Amendment right.

Dated: January 11, 2018

Respectfully Submitted,

CHAD READLER
Acting Assistant Attorney General

DUANE A. EVANS
Acting United States Attorney

C. SALVATORE D'ALESSIO
Director, Torts Branch

RICHARD MONTAGUE
Senior Trial Counsel

/s/ *Glenn S. Greene*
GLENN S. GREENE
(New York State Bar No. 2674448)
Senior Trial Attorney
U.S. Department of Justice, Civil Division
Constitutional and Specialized Tort Litigation
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-4143
Fax: (202) 616-4314
Email: Glenn.Greene@usdoj.gov

Attorneys for Defendant the Federal Bureau
of Investigation, and Defendant Sallet,
Bucheit, Jupina, Hardy, and Parlave in their
official capacities

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been served upon all counsel of record to this proceeding by ECF, facsimile, or mailing the same by first class United States mail, postage prepaid on this 11th day of January, 2018.

/s/ *Glenn S. Greene*