

**U.S. Department of Justice**

Federal Bureau of Investigation

Records Management Division

Winchester, VA 22602-4843

January 26, 2017

Mr. Michael S. Zummer
2337 Magazine Street Unit D
New Orleans, LA 70130

Re:  Misconduct Letter and its Release to the Media

Dear Mr. Zummer,

This letter is in response to your request of September 22, 2016, for review of the above referenced letter for publication pursuant to the Federal Bureau of Investigation's (FBI) Prepublication Review Policy (PRP) and Prepublication Review Policy Guide (0792PG)

This letter was reviewed pursuant to the terms of the PRP and we have made the appropriate redactions for its public release to the media.

Our findings are based on Bureau publication and security policy and extend only to the release of information contained in your submission.  This, however, does not constitute approval by the FBI for you to engage in publication for compensation, sale, or other commercial use of your work.  In that regard, you must also comply with the Standards of Ethical Conduct for the Executive Branch.

The Standards limit the circumstances under which an employee may accept compensation for the sale or publication of written works.  The Standards also limit the extent to which you may use your official title, position, FBI status, or other indicia of your FBI employment in connection with publishing, advertising or marketing your work, to include mention in any biographical statement related to the work, such as in a "dust jacket."  If you intend to mention in your biographical statement that you work for the FBI, you should consult the Office of Integrity and Compliance (OIC).

Again, compliance with the prepublication policy does not relieve you of the obligation to comply with the Standards and other applicable FBI and Office of Government Ethics regulations or policies.  Prior to taking any further action with respect to this work, consider applicable regulations as set forth in the FBI Ethics and Integrity Program Policy Guide (0454PG), with particular attention to Sections 4.8. and 4.9.  You may also be required to submit an FD-331 Outside Employment Form depending on how you intend to sell or market your work. Please contact the OIC if you have any questions regarding these regulations.

As your work may also impact the mission of the Office of Public Affairs, a copy of this letter has been forwarded to that office for their information.

Should you have any questions, please do not hesitate to contact Kristopher Weart at (540) 868-1697 or via e-mail at fbiprepub@ic.fbi.gov.  Thank you for your participation in the FBI's prepublication review process.

Sincerely,

David M. Hardy
Section Chief
Record/Information
 Dissemination Section

-2-

Michael S. Zummer
2337 Magazine St. Unit D
New Orleans, LA 70130

August 15, 2016

The Honorable Kurt D. Engelhardt
United States District Court
  for the Eastern District of Louisiana
C-367 Hale Boggs Federal Building
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

Re:  *United States v. Harry J. Morel, Jr.*, Criminal No. 16-050

Dear Judge Engelhardt:

Although I am the Federal Bureau of Investigation (hereinafter "FBI") case agent on the current investigation into Harry Morel (hereinafter "Morel"), I am writing this Court in my capacity as a private citizen under the First Amendment. I do not represent the FBI or U.S. Government in any way. The views in this letter are mine alone. The purpose of my letter is to report misconduct by the United States Attorney's Office for the Eastern District of Louisiana (hereinafter "USAO") which has affected the prosecution of Morel. I believe that the USAO's misconduct has resulted in a plea agreement with Morel based more on its own interest in covering up its misconduct than in advocating for a just result. I believe these matters are of public concern and deserve First Amendment protections.

I am not alleging misconduct by every Assistant U.S. Attorney (hereinafter "AUSA") who has participated in the case. Some have performed admirably and ethically, including ██████████████████

With the exception of ████████████ statements to the media about now-deceased witness Danelle Keim and me, which are not the subject of this letter, I am not alleging any misconduct on the part of Morel's attorneys.

When I asked to report the misconduct to this Court in my official capacity, I was barred from doing so. I was informed that the FBI does not communicate directly with the courts without permission from the Justice Department. At the FBI's direction, I submitted the letter to Justice Department entities to ask for permission to send the letter. The Justice Department entities determined that they were not in the position to grant me permission. The FBI then notified me that I could not submit the letter in my official capacity.

1

When I asked to disclose this letter to this Court as a private citizen under the First Amendment, I was notified that the FBI would not review this letter for prepublication review which FBI policy requires prior to any release. Even though I wrote in the letter that I was writing in my capacity as a private citizen under the First Amendment, the FBI determined that the disclosure to this Court was in the performance of my official duties and could not be reviewed. The FBI's position essentially asserts that I have no First Amendment right to disclose prosecutorial misconduct on a case to the presiding judge. Although the FBI's administrative appeals process has not been completed, I gave the FBI until the close of business on August 15, 2016 to make a final decision citing the August 17, 2016 sentencing hearing in this case. The FBI did not make a final decision. The FBI's refusal to authorize the release of this letter under its prepublication review policy violates my First Amendment rights which will be irreparably harmed if I do not take action before the August 17, 2016 sentencing hearing. I must treat their position on August 15, 2016 as a final decision.

Because this matter involves a dispute over Constitutional rights, it can only be resolved in the Federal courts. In the course of litigation, the disclosure would be submitted to a court anyway for a decision. Because the disclosures in dispute are letters to a court and part of my reason for disclosure under the First Amendment is to notify this Court of prosecutorial misconduct which is relevant to a hearing on August 17, 2016, I am submitting the full misconduct letter to this Court for a judicial determination on whether this disclosure is deserving of First Amendment protections. To that end, I am notifying the FBI of the submission to allow the FBI the opportunity to dispute the issue. If the FBI maintains the position it has taken, that this disclosure is within the performance of my official duties and not protected under the First Amendment, the FBI, after seeking permission from the Justice Department, can argue that issue before this Court and ask to have the letter returned or sealed. Although, by asserting that this letter is not within my First Amendment rights I believe the FBI has forfeited its opportunity to raise matters involving its prepublication review, the FBI will have an opportunity to raise those issues before this Court. If the FBI does not assert itself before this Court, or this Court determines that the FBI's legal position is incorrect, I request that this Court place the letter in the public record. I will not submit this letter to the media, unless this Court puts it in the public record. Therefore, any public release of this letter will be a judicial decision after the FBI has had the opportunity to communicate with this Court, if it chooses to do so.

Although this is not the normal procedure to handle this sort of legal issue, the FBI's conduct has left me no choice. I have consistently told FBI officials of Morel's sentencing hearing on August 17, 2016, which is when my disclosure is most important to this Court, although the larger public concerns will remain. Submitting the letter in this manner is the only way to allow a judicial determination over the legal question posed by the FBI's decision to deny me my First Amendment rights in time for my speech to get to the public entity immediately affected by it.

## 1. Background and Experience

I was first employed as an FBI special agent in 1999 after serving as a Marine Corps infantry officer. I was assigned to investigate white collar crime in New Orleans. My investigations resulted in twenty-one convictions. In 2003, I left the FBI to attend Stanford Law School. After my first year of law school, I interned at the Ministry of the Interior for the Republic of Georgia where I provided advice on combating corruption. I then volunteered to serve a tour in Al Anbar Province, Iraq as a Marine reservist where I was responsible for the development of the Iraqi Security Forces. During my tour, I also investigated corruption by Iraqi officials.

After graduating from Stanford Law School in 2007, I clerked for Judge Edith Brown Clement of the U.S. Court of Appeals for the Fifth Circuit from 2007 to 2008. I returned to the FBI as a special agent in 2008 and was assigned to investigate public corruption. My investigations have, so far, resulted in nine convictions, not including Morel's. I have also taught classes on public corruption investigations overseas to investigators, prosecutors, judges, and other public officials from thirteen countries. During the course of this instruction, I have been exposed to corruption problems in those countries.

In 2015, I was reassigned to the International Terrorism squad in New Orleans after making public comments critical of the USAO, but I continued to teach about corruption overseas and continued as the lead case agent on two corruption investigations, including the Morel case. Recently, I was reassigned to the Law Enforcement Corruption squad in New Orleans.

I have been continuously assigned as the lead case agent on the Morel investigation since the current case was opened in 2009.

## 2. Legal Issues

### A. First Amendment

The Supreme Court has "identified two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (internal citations omitted). "When an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences. When, however, the employee is simply performing his or her job duties, there is no warrant for a similar degree of

3

scrutiny." *Id.* at 423. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.

My situation is substantially different from the facts in *Garcetti*, where a prosecutor, Ceballos, alleged retaliation after conveying his opinion and recommendation to his supervisor regarding a search warrant affidavit that he believed contained serious misrepresentations. *Id.* at 420. The Court determined that the Ceballos "did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee." *Id.* at 422.

My disclosure to this Court is not part of my official duties. I have made specific assertions that I am writing this letter as a private citizen under the First Amendment, which Ceballos never did. This assertion by a government employee is important, because it tells the reader that the disclosure is not the official government position. Also, it is a decision by the employee about which form of legal protection the employee seeks, the First Amendment or whistleblower protections. Although I reported this prosecutorial misconduct to the appropriate authorities for whistleblowers, I am not claiming that protection in this disclosure to this Court.

Most importantly, the FBI has told me that I cannot make this disclosure in my official capacity without permission from the Justice Department and the Justice Department has not given me that permission. Therefore, according to the FBI, I do not have the authority to make this disclosure to this Court in my official capacity as an FBI agent. However, the FBI has also apparently decided that, despite my assertions to the contrary, any disclosure that I make to this Court about this case is within my official duties. The FBI is taking contradictory positions which prevent me from making this disclosure. Because I am reporting misconduct by the Justice Department, of which, the FBI is a part, the FBI has every reason to take such a position to prevent this letter from being disclosed to this Court and, ultimately, the public. The FBI's position essentially gives the Justice Department unbridled power over whether its employees can report misconduct by Justice Department prosecutors to a court affected by the misconduct.

If the FBI argues that I lost my First Amendment rights when I attempted to report this misconduct in my official capacity by following the process it outlined to me, I only followed that process because I was directed to do so. I have followed the FBI's procedures and orders, but the FBI has refused to follow its own policy and refused to review this letter even though I asserted my First Amendment rights. The vast majority of time writing this disclosure, even when I was attempting to make it in my official capacity, has been spent outside of working hours. The vast majority of time and resources spent at work on this matter have been expended

to follow the FBI's procedures to make this disclosure, whether in my official or private capacity.

My situation is close to the one in *Lane v. Franks*, 134 S.Ct 2369, 2378 (2014), where the Court held that, "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes. That is so even when the testimony relates to his public employment or concerns information learned during that employment." Although *Lane* involved sworn testimony under a subpoena, I am providing information to a court regarding a matter before it. Like the testimony in *Lane*, I believe this disclosure provides information relevant to this Court's upcoming decision and public policy matters far beyond it. (The only reason I am not providing this letter to the media at this time is because the FBI has refused to review this letter for prepublication review and I am attempting to give the FBI the opportunity to address this Court before it is placed in the public record.) "[P]ublic employees are uniquely qualified to comment on matters concerning government policies that are of interest to the public at large." *Id.* at 2380 (internal citations and quotations omitted). To quote *Lane*, "[t]he importance of public employee speech is especially evident in the context of this case: a public corruption scandal."

The purpose of my disclosure to this Court is not to address the facts of the Morel case but to notify this Court of corruption in the Justice Department over the handling of the case and the FBI in trying to prevent disclosure of the misconduct. This is not a personal grievance. I am not asking for any relief from this Court except to make it aware of what happened and to allow the public to see that. This Court should know the pattern of misconduct that led to the plea agreement before it. The prosecutorial misconduct in this case also concerns the victims and witnesses who have been attacked in public statements by defense counsel. It concerns the Saint Charles Parish Sheriff's Office which put itself at great risk to assist the investigation. The victims, witnesses, and investigative team should know, and they deserve to have the public know, why this plea agreement was made. In public statements, U.S. Attorney Kenneth Polite has blamed the victims in part for the decision to make the plea agreement. If the U.S. Attorney can publicly blame the victims, the victims deserve to have the prosecutorial misconduct by U.S. Attorney Polite and his office which led to the plea agreement aired in the public sphere. Finally, the public should know when there is corruption in the criminal justice system and attempts by the FBI to conceal that misconduct from public scrutiny.

I cannot forecast what the FBI will do to me. So, it is difficult to answer the Court's second question from *Garcetti* of "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti* at 418. However, after the FBI determined that I had no First Amendment right to make this disclosure, I took the only reasonably available route to make a limited disclosure to the entity which needed the information in a timely manner while giving the FBI the opportunity to assert itself to this Court. The FBI created this problem and this Court would have been

prejudiced if I did not make this disclosure. This Court should be involved in the decision-making and see the information at issue before the hearing on August 17, 2016.

I do not believe the FBI can have any justification, let alone an adequate one, if it takes administrative action against me for making this limited disclosure to this Court. I have shown far more respect for the FBI's policies and procedures than the FBI is showing for my assertion of my First Amendment rights. On August 15, 2016, another FBI agent informed me that an FBI manager allowed him to write a letter to a court in similar circumstances to my own without going through the procedures I was forced to follow. The FBI appears to pick and choose which disclosures it scrutinizes.

### B. Grand Jury Material

As a general matter, I believe it is well-established that many Federal investigations include Grand Jury material which cannot be disclosed under Federal Rule of Criminal Procedure 6(e). The factual basis filed with this Court discloses that a Grand Jury subpoena was issued in the Morel case. To the best of my knowledge and understanding of Rule 6(e), I am not including anything in this letter that would violate my obligation as someone to whom there have been disclosures made under Rule 6(e)(3)(A)(ii).

The Supreme Court has "noted several distinct interests served by safeguarding the confidentiality of grand jury proceedings. First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment. Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule." *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 218-19 (1979).

The Fifth Circuit has described the Rule 6(e) secrecy requirement as applying "not only to information drawn from transcripts of grand jury proceedings, but also to anything which may tend to reveal what transpired before the grand jury." *In re Grand Jury Investigation*, 610 F.2d 202, 216 (5th Cir. 1980) (internal citations and quotations omitted). The court also "construe[d] the secrecy provisions of Rule 6(e) to apply not only to disclosures of events which have already occurred before the grand jury, such as a witness's testimony, but also to disclosures of matters which will occur, such as statements which reveal the identity of persons who will be called to testify or which report when the grand jury will return an indictment." *Id.* at 216-17.

However, the Fifth Circuit noted that "the disclosure of information obtained from a source independent of the grand jury proceedings, such as a prior government investigation, does not violate Rule 6(e). A discussion of actions taken by government attorneys or officials E.g., a

recommendation by the Justice Department attorneys to department officials that an indictment be sought against an individual does not reveal any information about matters occurring before the grand jury. Nor does a statement of opinion as to an individual's potential criminal liability violate the dictates of Rule 6(e). This is so even though the opinion might be based on knowledge of the grand jury proceedings, provided, of course, the statement does not reveal the grand jury information on which it is based." *Id.* at 217 (internal citations omitted).

Although FBI agents often receive disclosures under Rule 6(e)(3)(A)(ii), we also testify as fact witnesses. "Rule 6(e) does not prevent disclosures by a witness who testifies before the grand jury." *Id.* at 217 (internal citations omitted).

The D.C. Circuit has stated "internal deliberations of prosecutors that do not directly reveal grand jury proceedings are not Rule 6(e) material." *In re Sealed Case No. 99-3091*, 192 F.3d 995, 1003 (D.C. Cir. 1999). "It may be thought that when such deliberations include a discussion of whether an indictment should be sought, or whether a particular individual is potentially criminally liable, the deliberations have crossed into the realm of Rule 6(e) material. This ignores, however, the requirement that the matter occur before the grand jury. Where the reported deliberations do not reveal that an indictment *has been* sought or *will be* sought, ordinarily they will not reveal anything definite enough to come within the scope of Rule 6(e)." *Id.* at 1003 (emphasis in original).

This letter will not disclose any witnesses, whether or not they testified before a Grand Jury, and Morel has been charged and pleaded guilty, although to a lesser offense. My knowledge of his conduct comes from the FBI investigation. This letter will disclose potential charges discussed and approved by Justice Department attorneys, but none of the discussions or approvals I mention will be definite enough to come within the scope of Rule 6(e).

C. Privacy Act

Because I am now submitting this letter through the FBI's prepublication review process, I will briefly address the potential Privacy Act issues. Simply stated, I am not disclosing anything in this letter that was retrieved from a system of records using personal identifiers. Most of what is in this letter has not even been entered into any system of records of which I am aware. I was a firsthand witness to anything in this letter that was placed into any system of records before a record was created or submitted.

This letter is primarily a description of the prosecutorial actions that I observed or of which I was told. I have attempted to remove factual issues about the case, but some issues have to be described to give context to the prosecutors' actions. The only possible witness named in this letter, Danelle Keim, aka Danelle McGovern (hereinafter "Keim"), is now deceased and has already been named publicly by the FBI and others as a witness. The details of her activity as a witness are part of the factual basis filed in the public record of this Court. Furthermore, several

public officials have made public statements about the results of the investigation into Morel's conduct.

### D.  U.S. Attorney's Manual on Recusal

Although I do not believe that the Justice Department's rules for its attorneys are enforceable by the courts, they are instructive in showing when prosecutors have failed to follow the appropriate standards.

"When United States Attorneys, or their offices, become aware of an issue that could require a recusal in a criminal or civil matter or case as a result of a personal interest or professional relationship with parties involved in the matter, they must contact General Counsel's Office (GCO), EOUSA. The requirement of recusal does not arise in every instance, but only where a conflict of interest exists or there is an appearance of a conflict of interest or loss of impartiality." *United States Attorneys' Manual*, 3-2.170 – Recusals, Feb. 2004. "The same circumstances which require that a United States Attorney recuse himself/herself (see USAM 3-2.170) apply to an Assistant United States Attorney. Ordinarily, the fact that an Assistant United States Attorney recuses will not require that the United States Attorney or the office recuse itself and the case or matter may be reassigned to another Assistant." *United States Attorneys' Manual*, 3-2.220 – Recusals, Feb. 2004.

### 3.  Conduct of Prosecution

### A.  Case Declination

The current investigation into Morel was initiated in June 2009.  On November 29, 2012, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ told me he was assigned to the case.  ▮▮▮▮▮▮▮▮▮▮













### B.  OIG Complaint

During May 2013, I met with the Department of Justice Office of Inspector General (OIG).  I agreed to file a complaint against ▮▮▮▮▮▮▮▮▮ for failing to recuse himself from matters involving ▮▮▮▮▮

During June 2013, I provided an affidavit to the OIG.  I also agreed to have my identity revealed, because I was told it would assist the course of the investigation.  The OIG asked for other examples of ▮▮▮▮▮▮▮▮▮▮  I provided two.

First, I had heard from another FBI agent about ▮▮▮▮▮▮▮▮▮▮

Second, I had heard from another agent about a case ▮▮▮▮▮▮▮▮

I had limited contact with the OIG.  After filing my complaint, an OIG agent told me that

<span style="background:black"> </span>

### C.  Continued Investigation and Reaction to OIG Complaint

Despite the declination of the Morel case, FBI management and I discussed

<span style="background:black"> </span>

During August 2013, I received a telephone call from

<span style="background:black"> </span>

On August 29, 2013, the *Saint Charles Herald Guide* quoted <span style="background:black"> </span> as saying that the case against Morel had been declined.  Based upon my conversations with

<span style="background:black"> </span>





Around this time period, FBI management offered to send me to the USAO as a Special Assistant U.S. Attorney (hereinafter "SAUSA") to prosecute FBI cases. I was later told that USAO management had refused to accept me as a SAUSA. USAO management had told FBI officials that my assignment there as a SAUSA would be "too much too soon" for the USAO. I understood that comment to mean that I was too controversial of a figure because of my OIG complaint.



I never received notification from the OIG about the results of their investigation.  FBI management told me the OIG reported the results to the Justice Department Public Integrity Section and later the Executive Office of United States Attorneys.

### D.  USAO Reopens Its File on Morel







### E.  Preparation of RICO Charge





**F. Plea Negotiations**







24



At the press conference after Morel's plea on April 20, 2016, SAC Sallet called Morel a "sexual predator" and officials disclosed that there were more than twenty witnesses against Morel.

The press logically asked why Morel received the plea agreement he did, if his conduct was as significant as described. When USA Polite was asked by one reporter how he told victims the plea agreement was "justice", the USA responded, "In many of these circumstances, we are dealing with very significant evidentiary concerns. We are dealing with vulnerable victims that if exposed to the scrutiny of the media or the scrutiny of the courtroom would prove to be very difficult witnesses and may ultimately lead to no justice for this defendant."

After Morel pleaded guilty on April 20, 2016, I notified FBI management again of my intention to write the misconduct letter to this Court. I was ordered to submit the misconduct letter to the FBI New Orleans Division's Chief Division Counsel. I submitted the misconduct letter for review on May 3, 2016. Although the Chief Division Counsel finished reviewing the misconduct letter that same day, I was not given an official response from the FBI's Office of General Counsel (hereinafter "OGC") for four weeks. I was instructed by OGC to send the misconduct letter to Justice Department entities that accepted complaints from whistleblowers,

such as the OIG or Office of Professional Responsibility (hereinafter "OPR"), and request permission to send the misconduct letter. On June 2, 2016, I expressed my desire to send the misconduct letter concurrently through prepublication review for disclosure as a private citizen under the First Amendment, but an FBI manager advised me against doing so. I submitted the misconduct letter to the OIG on June 2, 2016, approximately two days after receiving instructions from OGC. The OIG quickly acknowledged receipt of the letter and shortly thereafter advised me that the matter was transferred to OPR. (Throughout the past three years, the OIG has acted professionally and has been supportive of efforts to reform the Justice Department.) On August 11, 2016, OPR advised that it would be inappropriate for it to comment on whether I should send the letter to this Court and, consequently, the FBI advised me that I could not send the letter in my official capacity.

Because of the delay in a response from OPR, I began a concurrent process to disclose the misconduct letter to this Court under the First Amendment on August 8, 2016 by submitting two letters to the FBI's prepublication review program. One letter, a shorter notification letter, was submitted for review which was intended to notify this Court of the existence of the misconduct letter in case it could not be reviewed in time for the hearing on August 17, 2016. Both letters included the wording that I intended to make disclosures to this Court and the media as a private citizen under the First Amendment. In my e-mail submitting the letters for prepublication review, I wrote "I previously attempted to disclose this misconduct in my official capacity. I assumed the process outlined to me by management and OGC [FBI Office of General Counsel] would have worked. The process has not worked. I have received no word from DOJ, so I have chosen to do this in my personal capacity." I also wrote in the e-mail, "[s]ince I am being forced to send this in my personal capacity under the First Amendment, I intend to submit the letters to members of the media as well as the court." FBI agents are not authorized to make disclosures to the media as part of their official duties.

On August 12, 2016, I was notified that the FBI would not review either of the two letters that I submitted for prepublication review because the FBI took the position that the disclosures would be made in the performance of my official duties and were outside the scope of the prepublication policy guide. I immediately asked what basis was used to make that determination considering I specifically asserted my First Amendment rights. I also asked if it was the FBI's position that an FBI employee has no right under the First Amendment to report prosecutorial misconduct to a Federal judge because that employee witnesses the misconduct in his official duties. I also requested an appeal of the decision as the agency's final determination on the matter. I asked for an answer by close of business on August 15, 2016 and cited the August 17, 2016 sentencing hearing as a reason for the short deadline. On August 15, 2016, I was notified that the FBI's August 12, 2016 decision only pertained to my request to disclose letters to this Court and that my request to disclose the letters to the media were under review. I replied that, because of the August 17, 2016 sentencing hearing, although the administrative

appeals process was not complete, I had to treat the FBI's position on August 15, 2016 as its final decision.

<u>Conclusion</u>

Based upon the above, with respect to the Morel case, I believe the following:



6. This prosecutorial misconduct is relevant to this Court's consideration of the case, but the Justice Department and FBI has failed to notify this Court even though I requested to do so in my official capacity. Furthermore, the FBI managers have violated my First Amendment rights by refusing even to review my request to disclose this letter to this Court in my capacity as a private citizen.

Because I am writing this letter as a private citizen, I will make additional observations and recommendations that go beyond the scope of the case. The mishandling of the Morel matter is not an isolated incident. I have experienced firsthand, or heard from other agents, numerous examples of prosecutors mishandling cases especially, but not only, in corruption cases. Based upon what I have seen and heard, I believe that there is systemic corruption in the Justice Department. The FBI uncovers corruption, and the Justice Department covers it back up again. FBI managers advocate for prosecution of cases, but stifle attempts by agents to make the public aware of this systemic corruption in the Federal criminal justice system.

The law, in the form of Rule 6(e) and the Privacy Act, allows prosecutors to obscure their inaction on prosecutable cases. For example, one of the purposes of Rule 6(e) is to protect those

determined to be innocent by the Grand Jury, but the supposed independence of the Federal Grand Jury is a myth. Prosecutors decide what the Grand Jury hears and whom it considers as a target. If prosecutors do not put a case before the Grand Jury, the material collected in its name remains secret unless those same prosecutors seek authorization for its release. In reality, Rule 6(e) has the perverse effect of allowing one or a handful of Federal prosecutors to bury evidence of criminal behavior without even giving the Grand Jury the opportunity to determine a target's guilt or innocence. I have seen this several times---evidence of criminal conduct by public officials and contractors sealed from the public by Federal prosecutors using Rule 6(e). None of the evidence of which I write would identify or jeopardize a single witness, another important purpose of Rule 6(e).

Justice Department and FBI policies regarding whistleblowing and disclosing facts of investigations to the public also protect prosecutors. From my own experience, I can only describe the procedures as Byzantine and a concerted effort to conceal government misconduct. My most recent attempt to disclose prosecutorial misconduct to the judge presiding over the case was met with a bureaucratic runaround that had the effect of reducing my time to pursue my option to report under the First Amendment. That option was never presented to me by FBI OGC, although I never had direct contact with them. Ultimately, when I asserted my First Amendment rights, the FBI made contradictory assumptions that I could not disclose the misconduct as part of my official duties but any disclosure, even when made as a private citizen, was a part of my official duties. I believe this decision was an intentional effort by the FBI to keep these severe problems in the Federal criminal justice system from being disclosed.

The subtle punishment for speaking out and the antipathy against those who dare to try is daunting, even to someone with a law degree and experience as a Federal judge's clerk. Many of the best agents are disillusioned, angry, and demoralized, because of how prosecutors mishandle cases.

While these laws and policies have a valid purpose, they have become a refuge for scoundrels who are more interested in collecting a paycheck they have not earned than in zealously advocating for the United States. To borrow a phrase from Lord Acton, which was correctly applied to the FBI in the Whitey Bulger fiasco, "Every thing secret degenerates, even the administration of justice; nothing is safe that does not show how it can bear discussion and publicity." This decision-making shrouded in darkness has created a department which, at best,

is not working at optimal efficiency, or, as in the case of the USAO in the Eastern District of Louisiana, is one of the most corrupt government entities in its judicial district. I base that statement on having conducted or participated in corruption investigations in all thirteen parishes in the district, and using a broader definition of corruption to mean serving one's own interest over that of the public's, as opposed to outright bribery.

An effective USAO is desperately needed here. In the past few days alone, I have spoken with people from three parishes who have suffered at the hands of public officials abusing their power. There are some fantastic AUSAs at the USAO who can make a difference. I can think of several who bravely withstand withering fire in court to seek justice for the people of this district. Many of these talented dedicated AUSAs have been hired by USA Polite. However, the USAO cannot function properly if the USA does not have the courage to stand up to middle managers with conflicts of interest in cases, if the USA and First AUSA harbor a blame-the-victim mentality, and if other middle managers are more concerned about the office's reputation than seeking justice for victims.

The root cause of this systemic corruption is human nature. Human beings would rather not have their actions and decisions scrutinized. If prosecutors move forward with a case, they will be scrutinized, oftentimes unfairly, by defense attorneys, judges, and the media, especially if they dare to prosecute a powerful public official or other individual with connections. If Federal prosecutors do not take a case, there is little scrutiny and none of it is public. The secrecy of Federal prosecutorial decision-making lets Federal prosecutors take the easy way out if they choose. In the state system, on the other hand, where the police arrest and the district attorneys prosecute, the public can see what cases are and are not being prosecuted. There is public accountability for state prosecutors.

The lack of accountability for Federal prosecutors exacerbates the disparities in the Federal criminal justice system. Because Federal prosecutors can ignore the tougher cases without consequence, the less-committed prosecutors focus on the easier cases with less formidable defendants or more easily proven cases against the more formidable ones. I am convinced that if a police officer had done what Morel did, he would have been in prison a long time ago for much longer than the maximum three year sentence that the former district attorney faces, even with the exact same "evidentiary concerns" and "vulnerable victims" cited by USA Polite. Morel's conduct was far more odious than former District Attorney Walter Reed, but the USAO pounced on the fraud case which was already reported in the media. (I took no official part in the Reed case and base my comparison solely on what has been reported in the media.)

In the Marine Corps, I was taught to provide solutions when identifying a problem. I have three recommendations:

First, and most importantly, when Justice Department prosecutors decline a case which an investigative agency determines is prosecutable, the agency should be required by law to

provide a report to the public outlining the evidence against the subject. The report should be written in a manner which protects witnesses, sources, and methods. The American people should know when prosecutors and investigators disagree, so they can make their own decision about the effectiveness of both. In public corruption investigations, this recommendation would also shed light on the behavior of public officials believed by investigators to have committed a crime. Let the people see what their public "servants" are doing.

From my experience, management at investigative agencies will likely pressure case agents to agree with prosecutorial decisions in order to maintain peaceful working relationships with prosecutors. Therefore, case agents should have the legal duty to provide the report to a judge to decide whether it can be released, just like police officers who go directly to judges for warrants. Also, there should be serious consequences for managers who put undue pressure on agents to go along with prosecutors. A case agent who goes to a judge should receive whistleblower protections. He or she should not be sent on a fool's errand obtain permission from the Justice Department.

Second, U.S Attorneys should not have any influence on public corruption or civil rights cases. Political partisans with ambitions to become a mayor, congressman, or other official are the last people who should be making these decisions. Certainly, there are honest U.S. Attorneys, but the current system allows some foxes, or at least bravery-challenged watchdogs, to guard the henhouse.

Third, the Justice Department should hire prosecutors nationally instead of locally and force prosecutors to start out away from home. Also, it should rotate its managers within the local U.S. Attorney's Offices. This practice patterns the FBI and other Federal agencies. The FBI is far from perfect, but managers with fresh eyes and experience elsewhere in the nation can help turn around a rotting institutional culture. If the Justice Department is going to have career prosecutors, then it needs to take the same steps to combat their corruption as the investigative agencies have taken.

This letter will anger many powerful people, prosecutors, former prosecutors, defense attorneys, politicians, and FBI management. I have made more mistakes than I can count, and I am certain all of them, and some I have not made, will be used to discredit me. In reality, I mean nothing in all of this. I am just a messenger. If I am wrong, then I urge the Justice Department to prove it. Open up the files and let the American people see for themselves. I have a few cases in mind already which can be disclosed without violating Rule 6(e) or the Privacy Act.

I love fighting corruption in Louisiana. This is where I belong, but this letter most likely means my time is over here and possibly in the FBI. I am tired of having to accept corruption in order to fight corruption. I am tired of FBI managers pressuring me to accept corruption and cover up corruption by Federal prosecutors. More importantly, when I was in the Marine Corps, I learned the simple leadership lesson that I could not ask my Marines to do something that I

would not do myself.  I see witnesses like I saw my Marines.  I cannot ask others to expose corruption if I am not willing to do it myself. ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

The victims, the witnesses, the ones who told the truth in this case, deserve nothing less than the same from me.  They certainly deserved better from the U.S. Department of Justice and the FBI.


Michael S. Zummer

31