MICHAEL ZUMMER                    CIVIL ACTION

VERSUS                           No.: 17-7563

JEFFREY SALLET, ET. AL.          SECTION: "J"(2)


## ORDER & REASONS

Before the Court are two *Motions to Dismiss* **(Rec. Doc. 63 and 64).** The motions were filed by Defendant, Jeffery Sallet, along with other current and former FBI employees, in their official and individual capacities as FBI employees ("Defendants"), and oppositions thereto (Rec. Doc. 68), filed by Plaintiff, Michael Zummer ("Plaintiff). Defendants also filed replies in support of their motion to dismiss. (Rec. Doc. 73 and 74). Having considered the motion and legal memoranda, the record, and the applicable law, the Court finds that the motion should be **GRANTED** as to the *Individual Capacity Defendants Motion to Dismiss* **(Rec. Doc. 64)** and **GRANTED** as to Count One for the *Official Capacity Defendants Motion to Dismiss* **(Rec. Doc. 63)** and **DENIED** as to Count Two for the *Official Capacity Defendants Motion to Dismiss.*


## FACTS AND PROCEDURAL BACKGROUND

This litigation arises from Plaintiff's allegations that Defendants suspended his security clearance and then suspended him from the FBI without pay in response

to Plaintiff distributing a letter to Honorable Judge Kurt Englehardt, then a federal district judge in the Eastern District of Louisiana. Plaintiff was the lead agent in an FBI investigation into Harry Morel Jr., the then district attorney of Louisiana's 29th Judicial District. As a result of this investigation, FBI and state law enforcement officials concluded that Morel had been using his position as District Attorney to obtain sexual favors from defendants and members of defendants' families. After initially declining to prosecute Morel, the US Attorney's Office for the Eastern District of Louisiana later decided to prosecute Morel. Morel eventually plead guilty to one count of Obstruction of Justice with a maximum three-year sentence.

The Plaintiff was upset by the lenient plea deal and what he viewed as corruption and conflicts of interest in the US Attorney's Office. Therefore, Plaintiff decided to draft a letter to Judge Englehardt, presiding over the case, detailing Plaintiff's concerns over the happenings in the US Attorney's Office.

On May 13, 2016, Plaintiff gave a copy of the letter to Daniel Evans, one of the Defendants in this case, for review and approval. On May 31, Plaintiff asked Evans about the status of the letter, at which time Evans told Plaintiff that the FBI's Office of General Counsel advised not sending the letter to the Judge, but rather to send the letter to various Federal entities that protect whistleblowers and ask them for permission to send the letter. On June 2, 2016, Plaintiff sent the letter to the Office of the Inspector General ("OIG"), one of the offices responsible for whistleblower complaints. The OIG then forwarded Plaintiff's letter and resolution of the matter to the Department of Justice's Office of Professional Responsibility ("DOJ OPR").

On August 3, 2016, Plaintiff reached out to the DOJ OPR for a response in time for Morel's upcoming August 17 sentencing. Upon getting no response, Plaintiff initiated the FBI's pre-publication review process. The pre-publication review process is the process FBI employees must go through when attempting to publish any information related to their employment with the FBI outside of their official duties, such as publishing a memoir. On August 11, the DOJ OPR told Plaintiff it would not comment on whether sending the letter to the Judge was advisable. On August 16, the FBI told Plaintiff it would review his letter for publication for the public but not to the Judge, as it viewed disclosure to the Judge as disclosure within his official duties.

On August 16, Plaintiff sent the letter to Judge Englehardt and informed the FBI of his actions. The Chief Counsel of the FBI's New Orleans Division responded urging Plaintiff to retract the letter. Plaintiff refused to do so. On August 30, 2016, Plaintiff was removed from investigative activity. On September 6, Plaintiff sent Judge Englehardt a second letter, further explaining his first letter. On September 16, 2016, Plaintiff asked to be returned to investigative work, and said he intended to continue with the pre-publication process for his letter to be released to the public. On September 23, 2016, Plaintiff received an e-mail from an FBI official stating that he could not be returned to investigative work because he had chosen to disclose information gathered in the performance of his FBI duties despite express instructions to refrain from doing so. On September 30, Plaintiff was told that his

security clearance had been suspended, and that accordingly he was suspended from work without pay.

On April 3, 2017, Plaintiff learned that the FBI failed to provide him with the veteran-preference status for which he was eligible. Due to this status he was entitled to administrative leave with pay until a hearing was held about the decision to suspend him without pay. On May 12, a telephone conference was held between Plaintiff and various FBI officials. After the conference, the Plaintiff's suspension without pay was reinstated. The FBI also refused to allow the Plaintiff to publish his letter to the public in full, leaving the majority of the letter heavily redacted.

On January 3, 2018, Plaintiff received a letter from the FBI's Assistant Director of the Security Division, stating the rationale for revocation of Plaintiff's security clearance was Plaintiff's disclosure to Judge Englehardt of the letter. The disclosure raised serious concerns about Plaintiff's ability and willingness to safeguard classified information. As of the filing of this motion, Plaintiff was still suspended without pay pending the result of the FBI's final decision on his security clearance.

Plaintiff is suing for two related, but distinct, violations of his First Amendment rights. Count One seeks relief for the revocation of Plaintiff's security in clearance in retaliation for sending the letter to Judge Englehardt. Count Two seeks relief for the FBI's refusal to allow Plaintiff to publish his full, unredacted letter to the public.

Plaintiff filed this complaint along with a jury demand in the Eastern District of Louisiana (Rec. Doc. 1.) Defendants' then filed a *Motion to Dismiss* in their Official Capacities and Individual Capacities (Rec. Doc. 50-51).[1] Subsequent to the motion to dismiss, the plaintiff filed a First Amended and Supplemental Complaint (Rec. Doc. 53). The Defendants' then filed two new *Motions to Dismiss* (Rec. Doc. 63-64), again in their Official and Individual Capacities, regarding the Amended and Supplemental Complaint. Plaintiff responded with an opposition memorandum (Rec. Doc. 68), to which the defendants replied (Rec. Doc. 73).

## PARTIES' ARGUMENTS

### I.    *Individual Capacity Defendant's Motion to Dismiss*

Defendants make several arguments in favor their Individual Capacity *Motion to Dismiss*, but only two need be considered in detail here.

Defendants assert two theories in support of their 12(b)(6) motion to dismiss. First, Plaintiff's claim against Defendants constitutes a new *Bivens* claim, and an analysis of the "special factors" elucidated by the Supreme court in *Ziglar v. Abbasi*, 137 S. Ct. 1843, (2017), should result in this Court refusing to extend *Bivens* to the present case. (Rec. Doc. 64 at 2). Specifically, Defendants' urge the Court to focus on two factors: 1) the preclusive effect of the Civil Service Reform Act as proof that Congress thought about statutory remedies for federal employees, and specifically

---

[1] The Plaintiff sued every one of the Defendants, all FBI employees in managerial positions, in both their individual and official capacities. Defendant decided to utilize two different motions to for the two different capacities.

chose not to include a remedy for Plaintiff's claim, and 2) the discretion provided to the executive branch on all matters of national security in general, and *Bivens* claims in particular. (Rec. Doc. 64 at 13-14).

Plaintiff counters Defendants' first argument by urging this Court to create a new *Bivens* remedy for Plaintiff's claim. Specifically, Plaintiff argues that the lack of Congressionally created judicial review for the instant claim means it is the Court's role to create one (Rec. Doc. 67 at 6 and 12). Plaintiff further argues that providing Plaintiff with a *Bivens* remedy does not infringe upon the executive branch's policy making power, because he is not challenging a broad policy decision, but rather the implementation of policy by a select few (Rec. Doc. 11).

## II.     *Official Capacity Defendant's Motion to Dismiss*

Defendants' *Official Capacity Defendant's Motion to Dismiss* seeks dismissal of Plaintiff's Count One on both 12(b)(1) grounds and 12(b)(6) grounds, whereas Count Two is only opposed on 12(b)(6) grounds.

### *Part I-Subject Matter Jurisdiction for Count One*

Defendants assert that Count One must be dismissed because the Court does not have subject matter jurisdiction ("SMJ") over Plaintiff's claims for two reasons (Rec. Doc. 63 at 10). First, this Court lacks SMJ over an employment claim by a federal employee because the Civil Services Reform Act sets up a comprehensive scheme for dealing with such claims. *Id*. Within the Civil Services Reform Act, an

employee's right to judicial review is limited to the MSPB, followed by an appeal to the Federal Circuit. There is no place in the CSRA judicial review system for a United States District Court to hear a federal employment dispute. (Rec. Doc. 63 at 11).

As to Defendants' first argument for lack of SMJ, Plaintiff counters with the overarching principle that every colorable constitutional claim requires some form of judicial review (Rec. Doc 68 at 6). Congress does have the power to take away the power of District Courts to hear constitutional claims, but only if they have channeled that review power to another court (Rec. Doc. 68 at 7). Plaintiff argues that because the MSPB does not have the power to review the merits of a security clearance decision, there is no other available forum for Plaintiff to pursue his constitutional claim (Rec. Doc. 68 at 8).

Second, Defendants asserts that SMJ does not exist because the granting or revocation of security clearances is a matter exclusively devoted to executive branch discretion. (Rec. Doc. 63 at 14). The President has lawfully delegated this discretion to the FBI, an executive agency, and thus the FBI's decisions regarding security clearances are not subject to any judicial review. *Id.*

As to this second argument for lack of SMJ, Plaintiff counters that no court has ever held a pure constitutional claim unreviewable based on a national security decision (Rec. Doc. 68 at 10). Although the Supreme Court has explicitly held the MSPB[2] cannot hear a security clearance case (Rec. Doc. 68 at 9), and the United States Fifth Circuit has explicitly held that a federal district court has no jurisdiction

---

[2] The MSPB is the Merit Systems Protection Board. The MSPB is the quasi-judicial administrative established by the CSRA to hear federal employment disputes.

to hear Title VII claims involving security clearance issues (Rec. Doc. 68 at 10), that rationale has never been extended to a pure, non-Title VII, constitutional claim such as the instant claim. *Id*.

## *Part II – Failure to State a Claim Upon Which Relief Can Be Granted, Both Counts*

Defendants assert that Plaintiff has failed to state a claim upon which relief can be granted because Plaintiff's first amendment rights were not violated (Rec. Doc. 16). The government is not guilty of violating a federal employee's free speech rights if the federal employer has an interest in limiting that employee's speech to a greater degree than the general public (Rec. Doc. 63 at 17). This governmental interest is satisfied in a myriad of ways when the employee is privy to confidential information, and the potential speech touches on that confidential information (Rec. Doc 18).

Defendants also assert that Plaintiff violated his FBI employment contract and various FBI employment regulations by disclosing his letter (Rec. Doc. 63 at 19-20). Defendants seem to be implying that Plaintiff's violation of these employment regulations gives them legitimate interest in censoring the letter, thereby giving Plaintiff no colorable First Amendment claim. *Id*.

Particular to this case, Defendants argue the unique relationship between the FBI and the US Attorney's Office would be irreparably undermined if FBI agents were allowed to interfere with the US Attorney's prosecutorial discretion. (Rec. Doc. 63 at 23).

Plaintiff responds by focusing on his disclosure of alleged corruption and official misconduct of a member of the US Attorney's Office. (Rec. Doc. 68 at 16).[3] Essentially, the argument is there cannot be a legitimate government interest in preventing the disclosure of improper conduct within a government office. Id. Additionally, plaintiff asserts there was no classified information in his letter to the Judge, and the revocation of his security clearance was merely a pretext to suspend him without allowing him the opportunity to have a hearing before the MSPB (Rec. Doc. 68 at 18).[4] Therefore, the legitimate interest of protecting classified information was not present (Rec. Doc. 68 at 19).

Regarding the violation of FBI regulations and his employment contract, Plaintiff admits his actions did violate those rules, but that a viable Constitutional claim supersedes an employment contract or governmental regulations. (Rec. Doc. 68 at 19).

## LEGAL STANDARD

In deciding a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), "the district court is 'free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case.'" *Krim v. pcOrder.com*, Inc., 402 F.3d 489, 494 (5th Cir. 2005). The party asserting jurisdiction must carry the burden of proof for a Rule 12(b)(1) motion

---

[3] Judge Englehardt, at least, seemed to believe the letter contained valuable information on potential DOJ corruption, stating that he shared Plaintiff's concerns about whether the DOJ "is either unable or unwilling to self-police lapses of ethics, professionalism, and truthfulness in its ranks."

[4] Generally, FBI agents are one of the few government jobs excluded from the CSRA's scheme. However, any federal employee who is a veteran is entitled to CSRA protection, and thus MSPB review. Plaintiff is a veteran of the Iraq War. Thus, Plaintiff was entitled to MSPB review regarding any employment dispute other than one regarding his security clearance.

to dismiss. *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 762 (5th Cir.2011). The standard of review for a motion to dismiss under Rule 12(b)(1) is the same as that for a motion to dismiss pursuant to Rule 12(b)(6). *United States v. City of New Orleans*, No. 02–3618, 2003 WL 22208578, at *1 (E.D. La. Sept. 19, 2003). If a court lacks subject matter jurisdiction, it should dismiss without prejudice. *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 209 (5th Cir. 2010). When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. *Hill v. City of Pasadena*, 561 F.2d 606, 608 (5th. Cir. 1977) (per curiam)).

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (internal citations omitted). The allegations "must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1).

"Under Rule 12(b)(6), a claim may be dismissed when a plaintiff fails to allege any set of facts in support of his claim which would entitle him to relief." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002) (citing *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 561 (5th Cir. 1998)). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the

plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). The court is not, however, bound to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678. "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Taylor*, 296 F.3d at 378.

## DISCUSSION

### I. Whether This Court Has Subject-Matter Jurisdiction Over Plaintiff's Federal Employment Dispute

Defendants raise the issue of CSRA preclusion in both *Motions to Dismiss*. For Official Defendants the existence of the CRSA is raised in the 12(b)(1) context, whereas for Individual Defendants it is raised in the 12(b)(6) context. The Court agrees with the Defendants that CRSA preclusion is applicable in both cases, but here the distinction between Official and Individual defendants is unnecessary. Insofar as Plaintiff's claim arises out of his federal employment context, this Court lacks subject-matter jurisdiction.

The CSRA is a Congressional Act that provides qualified federal employees a system of "administrative and judicial review of adverse employment action." *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5 (2012). Adverse employment action includes removal and suspension for more than 14 days. Under the CSRA, a qualified employee is entitled to a review by the MSPB, followed by an appeal to the Federal

Circuit. The CSRA is the exclusive means by which a qualified federal employee can challenge an adverse employment action, even if the challenge to the action involves a constitutional claim. *Id.*

In *Bush v. Lucas*, 462 U.S. 367 (1983), the Supreme court refused to extend a *Bivens* remedy to a NASA employee fired in purported violation of his First Amendment rights. *See Rollins v. Marsh*, 937 F.2d 134, 139 (5th. Cir. 1991) ("*Bivens* actions by federal employees against their employers for First Amendment violations have been expressly precluded by this Court.") *Grisham v. United States*, 103 F.3d. 24, 26 (5th. Cir. 1997) (per curiam) (holding the same); *Gremillion v. Chivatero*, 749 F.2d 276, 278 (5th. Cir. 1985) (same).

Plaintiff has two counters to this weight of authority. First, Plaintiff reiterates the need for this Court to adjudicate a "colorable constitutional claim" in light of *Webster v. Doe*, 486 U.S. 492. However, in *Elgin,* 132 S.Ct. 2126, the Supreme Court reiterated that the CSRA scheme alone is sufficient to satisfy the constitutional concerns raised by *Webster.*

Second, Plaintiff asserts CSRA preclusion does not apply to a federal employee when that employee cannot raise his specific claim under the review scheme of the CSRA. There is some dispute between the parties as to whether Plaintiff is entitled to CSRA review for this claim, but that is ultimately a needless inquiry. Fifth Circuit precedent clarifies that CSRA preclusion applies to all federal employment disputes, regardless of whether the plaintiff or relief sought can actually be heard in the CSRA review scheme. *Gonzalez v. Manjarrez*, 558 Fed. Appx. 350, (5th Cir. 2014).

In *Gonzalez*, plaintiff raised a First Amendment claim when he was fired from his position as a Border Patrol Agent due to unpatriotic statements. Because plaintiff was on a probationary period, he was not entitled to CSRA review. *Id*. Nonetheless, the Fifth Circuit held that even federal employees "denied any judicial review under the CSRA," still fell within its exclusive umbrella. *Id* at 354; *see also Broadway v Block*, 694 F.2d 979, (5th. Cir. 1982) (indicating that the exclusion of certain employees from "the realm of the CSRA" is a "policy decision ... made by Congress, and it would be inconsistent with [a federal court's] place in the constitutional scheme to engraft a nonstatutory remedy onto the comprehensive framework of the CSRA).

Therefore, this Court lacks subject-matter jurisdiction to hear Plaintiff's First Amendment *Bivens* claim. *See Perez v. FBI*, 71 F.3d. 513 (5th.Cir. 1995) ("the district court also determined that it lacked such jurisdiction to address Mata's *Bivens* claims under the First and Fifth Amendments. In so doing, the court correctly relied on Supreme Court and Fifth Circuit precedent to the effect that Title VII provides both the exclusive cause of action and the exclusive remedy for federal employees who wish to assert claims of employment discrimination.").[5]

Next, the Court must determine if the Fifth Circuit's explicit holding about CRSA preclusion of *Bivens* claims should extend to Plaintiff's claims against Defendants in their Official Capacity. It does.

---

[5] Because the Court lacks subject-matter jurisdiction there is no need to address in-depth the similarly straight-forward issue of whether the Court should extend a *Bivens* remedy to the present case. It is sufficient to say that even if this Court had jurisdiction over such a claim, the required intrusion into national security determinations would counsel substantial hesitation in extending *Bivens* to a new context under Ziglar v. Abbasi, 137 S. Ct. 1843, (2017).

Here again, Plaintiff's main argument in support of judicial review of his claim is his belief that his particular claim will not be considered under the review scheme of the CSRA. Nonetheless, under the Fifth Circuit's rationale in *Gonzalez*, the sufficiency of the review is irrelevant. The existence of the scheme is all that matters. There is nothing in the CSRA to indicate Congress only intended the review scheme to be exclusive for *Bivens* claims, and thus the exclusivity of the CSRA bars jurisdiction over Plaintiff's claims against Defendants in their Official Capacity as well.

## II.     Whether This Court Has Jurisdiction Over a Security Clearance Revocation Claim

Even if this Court were to determine the existence of the CSRA was not a bar to its jurisdiction, the portion of Plaintiff's claim that implicates the merits of the FBI's security clearance revocation is similarly prohibited. In *Egan v. U.S. Department of Navy* 484 U.S. 518 (1988), the Supreme Court barred the MSPB, the CSRA's administrative review body, from hearing a claim requiring an inquiry into the merits of an executive branch security clearance revocation. Fifth Circuit precedent extends *Egan*'s holding beyond administrative review to all judicial review.

This is so despite a claim the security clearance revocation was pretextual and retaliatory, "(b)ecause the court would have to examine the legitimacy and the possibly pretextual nature of the FBI's proffered reasons for revoking the employee's

security clearance." *Perez*, 71 F.3d 513. The hesitation to pry into the executive branch's affairs is so strong that even when this stance results in a plaintiff having no judicial review of his claim, the court "inevitably comes to the same conclusion." *Id.* at 514.

Several other circuits have joined the Fifth Circuit in holding that *Egan* bars judicial review of security clearance decisions. *See Becerra v. Dalton,* 94 F.3d 145, 149 (4th Cir.1996), *cert. denied,* 519 U.S. 1151, 117 S.Ct. 1087, 137 L.Ed.2d 221 (1997); *Ryan v. Reno,* 168 F.3d 520 (DC Cir.1999), *cert. denied,* 517 U.S. 1234, 116 S.Ct. 1877, 135 L.Ed.2d 173 (1996); *Brazil v. United States Dep't of Navy,* 66 F.3d 193, 195 (9th Cir.1995), *cert. denied,* 517 U.S. 1103, 116 S.Ct. 1317, 134 L.Ed.2d 470 (1996). In the instant case, the crux of Plaintiff's request in Count One is that this Court inquire into the merits of Defendant's revocation of his security clearance and declare the revocation to be pretextual and thus invalid. This is precisely the sort of inquiry *Egan* and *Perez* say should not be undertaken.

Nonetheless, Plaintiff correctly points out that all of the above cases dealt with Title VII claims. The weight of authority applying *Egan* to independent constitutional claims outside of the Title VII context is much lighter, and all of them deal with a plaintiff bringing a due process claim under the Fifth Amendment. *See Williams v. Reilly*, 743 F. Supp. 168 (S.D.N.Y. 1990) and *Hill v. Dep't of Air Force*, 844 F.2d 1407 (10th Cir. 1988). In the absence of strong persuasive or binding authority prohibiting Plaintiff's exact constitutional claim, Plaintiff relies heavily on the holding and rationale of *Webster*.

In *Webster*, the CIA revoked the security clearance of a homosexual employee on the grounds that his homosexuality was a threat to national security and subsequently fired him. 486 U.S. 592, 595 (1988). The plaintiff asserted several First and Fifth Amendment claims. Not only did *Webster* involve revocation of a security clearance, but the CIA director was exclusively given personnel discretion over CIA employees by Congress in the National Security Act, even if those personnel actions were "repugnant to the Constitution." *Id* at 603. *Webster* held district courts possessed judicial review of an executive branch agency exercising national security discretion, explicitly authorized by Congress to do so, if it was a "colorable constitutional claim." *Id*.

*Egan* was decided on February 23, 1988, and *Webster* was decided on June 15, 1988. It is difficult on the surface to reconcile the two decisions. The Third Circuit was faced with this exact dilemma in *El-Ganayni*, 591 F.3d at 193. In *El-Ganayni*, plaintiff was a scientist employed by a defense contractor with the Department of Energy. In his spare time, he also worked as an imam, often going to prisons to preach.

After being asked by his employer to cease his preaching and refusing to stop, the Department of Energy revoked his security clearance. El-Ganayni brought a First Amendment claim, among others, alleging that his revoked security clearance was merely a pretext to retaliate against his constitutional exercise of speech and religion. The Third Circuit recognized that under the plain language of *Webster,* there had to be some forum where plaintiff's colorable constitutional claim could be heard, but also

under *Egan* they were forbidden from inquiring into the merits of the security clearance revocation in any way. They found a rather artful solution. Courts can hear "constitutional claims arising from the security revocation process, even though the merits of that revocation cannot be reviewed." *El-Ganayni*, 591 F.3d at 193. The same solution could apply here.

Plaintiff's Count One claim is a straight forward First Amendment retaliation claim, with the retaliation being the revocation of the security clearance. A First Amendment retaliation claim has three elements: 1) the employee's speech was on a matter of public concern, 2) the employee suffered an adverse employment action for exercising their First Amendment rights, and 3) the employee's exercise of free speech was a substantial or motivating factor in the adverse employment action. *Benningfield v. City of Houston*, 157 F.3d 369, 375 (5th Cir. 1998).

Assuming all of Plaintiff's allegations as true, the Plaintiff would have no issues with the first two elements of a retaliation claim. Alleged corruption by public officials is certainly a matter of public concern, and Plaintiff's suspension without pay is undoubtedly an adverse employment action. Unfortunately for Plaintiff, proving that his speech was a substantial or motivating factor in the FBI's decision to suspend him would inevitably require the Court to inquire as to the underlying merits of the FBI's security revocation decision. Any attempt by this Court to validate Plaintiff's claim his security clearance revocation was pretextual would by definition require an examination into the legitimacy of the FBI's proffered reasons. *See Perez*, 71 F.3d at 515 ("[T]he Supreme Court and several circuit courts have held that such scrutiny is

an impermissible intrusion by the Judicial Branch into the authority of the Executive Branch over matters of national security.").

In short, the merits of such decisions simply cannot be wholly divorced from a determination of whether they are legitimate or pretextual. *Brazil*, 66 F.3d at 197. Any claim for relief requiring a fact-finder to demand a federal agency explain their national security decisions and then subsequently weigh the merits of those decisions is doomed to fail. *See El-Ganayni*, 591 F.3d at 185. Therefore, even if Plaintiff is correct and *Webster* supersedes *Egan* in this case, Plaintiff's Count One claim would still be dismissed, albeit under 12(b)(6) instead of 12(b)(1).

## III.    Whether Plaintiff Has Stated a Claim Upon Which Relief Can be Granted for His Count Two Claim Against Official Capacity Defendants

Plaintiff's last remaining claim is against the Official Capacity Defendants for refusing to publish his unredacted letter to the public. Unlike Plaintiff's claims precluded by the CSRA, this claim does not arise out of an adverse employment action. The FBI's redaction of Plaintiff's letter came via their prepublication review process, which applies to anyone who wishes to publish information gained during employment but is not itself an employment action.

In another subtle but significant distinction, whereas Plaintiff's Count One requires an inquiry into the merits of the FBI's security revocation, Plaintiff's Count Two requires only an inquiry into the merits of the FBI's refusal to release the information contained in the letter. Although both decisions by the FBI implicate

national security, the jurisprudence clearly separates the two inquiries. Security clearance decisions are unimpeachable even under accusation of pretext; classified information redactions, on the other hand, require that the executive agency produce enough information to prove the redacted information was in fact classified.

The overarching framework for the government's restrictions on employee speech is established in *Pickering v. Board of Ed. of Tp. High School Dist. 205, Will County, Illinois*, 391 U.S. 563 (1968). *Pickering* establishes a two-part framework for analyzing the constitutional protections afforded to federal employee speech. First, there is a threshold question of whether the employee's speech was as a citizen on a matter of public concern. *Garcetti v. Ceballos* 547 U.S. 410, 418 (2006) (citing *Pickering*, 391 U.S. at 568). If the answer to that inquiry is yes, then the court should employ a balancing test, "balance[ing]…the interest of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 at 568.

Defendants first argue the Plaintiff's letter was not entitled to any constitutional protection at all because it was made in the Plaintiff's capacity as a public employee, rather than as a citizen. It is true that speech made pursuant to an employee's job is not entitled to constitutional protection. *Garcetti*, 547 at 420-21. However, there is a clear distinction between speech made pursuant to employment, and speech made about employment. Both Supreme Court and Fifth Circuit

precedent inform the conclusion that Plaintiff's disclosure in the instant case is disclosure about his employment, not pursuant to his employment.

In *Garcetti*, the plaintiff was an assistant district attorney who was disciplined for the contents of a memorandum he submitted to a court in his capacity as an assistant district attorney. *Id.* Conversely, in *Lane v. Franks*, 573 U.S. 228, (2014), plaintiff ran a community college program for underprivileged children. In the course of his employment he learned the program had been committing mail fraud in paying a state representative as an employee when in fact the man never worked for the program. He later testified about his knowledge in a criminal trial, and the Court found that his speech was as a private citizen. *Id.*

In *Anderson v. Valdez*, 845 F.3d 580 (5th Cir. 2016), plaintiff Anderson was a law clerk for a state court judge in Texas. In the course of his employment, he learned that Chief Judge Valdez may have been committing fraud, and he disclosed his beliefs to the authorities via letter.[6] The Fifth Circuit held that Anderson's letter was as a private citizen, and not pursuant to his employment under *Garcetti*. *Id* at 592-93 ("A public employee does not speak pursuant to his official duties merely because he speaks about work."). The court in Valdez went further in explaining the nuances of *Garcetti*, "the speech, the memorandum, was made for the benefit of the employer. It was the employer's speech, not the employee's own." *Id* at 596. In the present case, it is clear on the face of Plaintiff's complaint his letters could not be considered as being "for the benefit" of the FBI.

---

[6] Just for clarification, Anderson did not work for Chief Judge Valdez. He obtained the alleged information on Chief Judge Valdez in the course of his employment with a different judge in the same court.

Here, Plaintiff's routine employment duties do not include disclosing such information to a federal judge, nor was he ordered to do so by a supervisor in this specific instance. Indeed, the bulk of Defendants' argument in favor of dismissing Count Two is that Plaintiff had no right as an FBI agent to disclose the information he did. Therefore, Plaintiff's speech is constitutionally protected, and the inquiry shifts to whether the FBI's use of the prepublication review system violated Plaintiff's First Amendment rights.

It is undisputed that the general prepublication scheme operates as a prior restraint on speech. As such, the scheme is subjected to the highest levels of judicial scrutiny. *Snepp v. U.S.,* 444 U.S. 507, (1980). Prepublication review at intelligence agencies meets that heightened standard, however, because it is "a reasonable means for protecting the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service."[7] *Id.* Despite the victory for prepublication review in *Snepp*, the Court was careful to note that agency employment agreements and guidelines do not override a federal employee's constitutional right to publish unclassified information. *Id* at 511 ("The government does not deny-as a general principle-[Plaintiff's] right to publish unclassified information.").

*Snepp* is factually distinguished from the instant case because the plaintiff in *Snepp* never submitted his speech to the prepublication review system at all. The narrower question presented here is whether Plaintiff has raised a colorable claim by

---

[7] *Snepp* involved a challenge to the prepublication scheme of the CIA.

challenging the merits of a prepublication review decision after submitting proposed speech through the prepublication process. Based on a review of several persuasive cases, this Court answers in the affirmative.

In *McGehee v. Casey*, 718 F.2d. 1137 (D.C. Cir. 1983), the plaintiff, a CIA agent, "wishe[d] publicly to disclose information that he already possesse[d], and the government ruled that his secrecy agreement forbids disclosure." *Id* at 1147. The court noted the "strong first amendment interest in ensuring that CIA censorship of his article results from a *proper* classification of the censored portions." *Id.* Based on the strong First Amendment interest, the court stated that when a proper First Amendment challenge to the prepublication system was made, the burden shifted to the federal agency to "justify its claim of exemption." *Id.*

In *U.S. v. Marchetti*, 466 F.2d. 1309 (4th Cir. 1972), a former CIA agent wished to publish a book about his employment that was critical of the CIA. The CIA refused and Marchetti claimed a violation of his First Amendment rights. The court noted that although there are practical and constitutional reasons for judicial avoidance of security classifications, the ultimate holding in *Marchetti* was that judicial review is allowable to determine "whether or not the information was classified and, if so, whether or not, by prior disclosure, it had come into the public domain." *Id* at 1318.

Finally, the facts in the present case are most similar to *Wright v. FBI*, No. 02-915 2006 WL 2587630 (D.D.C., July 31, 2006). Here, two FBI agents, one former and one current, wished to publish several different items critical of the FBI's counter-terrorism tactics, including answers they had provided a New York Times reporter

during an interview. *Id.* The FBI prohibited the plaintiffs from publishing anything. The plaintiffs asserted that nothing in their proposed speech contained classified information or any other basis for censorship. *Id at* *8. On defendant-FBI's motion for summary judgement on plaintiff's First Amendment claim, the court held that in order to justify the prior restraint of prepublication censorship, the government needed to either prove the information was classified or prove the government's interest in censoring non-classified information was strong enough under the *Pickering* balancing test to defeat the "strong interest [p]laintiffs have in publication." *Id* at *9. The court further noted how strong the need was for a clear and detailed record to make that determination. *Id.*

To sum, there is persuasive circuit court precedent providing for judicial review, to some degree, of agency decisions to censor via prepublication review. *See McGehee* 718 F.2d 1137; *see also Marchetti*, 466 F.2d 1309. There is also Supreme Court dicta that supports that determination. *See Snepp* 444 U.S. 507. Fellow district courts addressing facts very similar to the instant case have found merit in the exact type of claim by other FBI agents, despite the same employment confidentiality agreement and guidelines referenced by Defendants' in the present case. *See Wright*, 2006 WL 2587630. Here, Plaintiff alleges that his letters contain no classified material or grand jury information, or any other official basis for government censorship. *See* AC *Exhibit B.* ¶ 1.

Furthermore, there is strong weight of authority that information pertaining to government corruption or malfeasance outweighs the government's interest in

censorship under *Pickering. See Lane*, 573 U.S. 228; *see also Brawner v. City of Richardson, Tex.*, 855 F.2d 187 (5th. Cir. 1988) ("[I]f allegations of internal misconduct are indeed true, the [speech] could not have adversely affected the proper functioning of the [police] department since the statements were made for the very reason that the department was not functioning properly due to malfeasance.").

Plaintiff has alleged that his letters contain no classified information. Plaintiff has also asserted two valid interests in publication on his side of the *Pickering* test: 1) his personal First Amendment interest in publishing non-classified information he has personally obtained, and 2) the societal interest in shining a light on potential government corruption.[8]

The Government's best argument for dismissing Plaintiff's Count Two Claim against Official Capacity Defendants is the strong interest in maintaining an efficient interplay between investigator and prosecutor. The FBI's role in the legal system is to investigate crimes. It is the USAO's job to prosecute crimes.

Plaintiff's actions in the present case arguably disrupt those clearly defined roles and implicate several other factors the Government is allowed to consider when restricting free speech. *Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (citing *Pickering*, 391 U.S., at 570-73) (Pertinent factors include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are

---

[8]*See also Lane* 528, at 542, in regard to the government arguing that critical speech affected a legitimate government interest ("There is no evidence, for example, that Lane's testimony at Schmitz' trials was false or erroneous or that Lane unnecessarily disclosed any sensitive, confidential, or privileged information while testifying."). This is further guidance that the government must offer some sort of affirmative proof that their censorship was truly necessary, or that the critical speech was false in some way.

necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.").

The Government argues that allowing a special agent to speak unfettered about his investigations to a judge would undermine the U.S. Attorney's prosecutorial discretion and invite federal courts to scrutinize prosecutor's charging decisions. *See United States v. Armstrong,* 517 U.S. 456, 464 (1996). The Government further asserts that Plaintiff knew the Government considered his information privileged, and specifically addressed potential government privileges in his letters. These are compelling arguments, but none of them persuade this Court to dismiss Plaintiff's claim for full publication of his letter under 12(b)(6).

There is undoubtedly a strong interest in maintaining an efficient working relationship between the FBI and the USAO. Plaintiff's actions can undoubtedly impair discipline, have a negative effect on working relationships, and impede the performance of speaker's duties. *See Rankin,* 483 U.S. 378. An FBI agent should not, as Defendants rightly conclude, have unfettered access to a judge presiding over one of the agent's cases.

In the present case, however, Plaintiff is seeking publication of his letters to the public, not a judge. The subject of Plaintiff's investigation has already been sentenced; the decision of this Court regarding Plaintiff's letter has no bearing on the USAO's charging decision on Harry Morel. The FBI has dealt with the workplace issues Plaintiff caused by revoking his security clearance and suspending him without pay, an action this Court cannot review.

Finally, if the information redacted by the Government is privileged then certainly the Government is well within its rights to redact it. However, Plaintiff's mere assertion that his letters were not privileged does not constitute proof that they were. On the contrary, under a 12(b)(6) standard of review it means the Court must view the letters as not containing privileged information in light of Plaintiff's assertions.

While passing no judgement on the ultimate success of Plaintiff's claim and the validity of FBI's redaction, this Court concludes that Plaintiff's statements, taken as true, establish a plausible claim upon which relief can be granted.[9]

## CONCLUSION

Accordingly, Defendants' Motion to Dismiss for Individual Capacity Defendants **(Rec. Doc. 64)** is hereby **GRANTED**.

It is further ordered that Defendants' Motion to Dismiss for Official Capacity Defendants **(Rec. Doc. 63)** is hereby **GRANTED** with regards **Count One**. Defendant's Motion to Dismiss for Official Capacity Defendants is **DENIED** with regards to **Count Two**

New Orleans, Louisiana this 5th day of September, 2019.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

---

[9] The Court emphasizes this denial is made only under the 12(b)(6) standard. The Court understands the deference owed an executive agency's security classifications. However, even that deference does permit the Court to require the executive agency to prove the information was classified, or otherwise privileged in some way.