**DELETION CODES**

F.     ADMINISTRATIVELY DESIGNATED FBI FILE NUMBERS, WHICH REPRESENT INDIVIDUALS OR MATTERS WHICH ARE NOT THE SUBJECT OF THIS FILE.

I.     INFORMATION, THE DISCLOSURE OF WHICH WOULD DIVULGE OPINIONS, RECOMMENDATIONS, AND ADVICE GENERATED IN THE DECISION-MAKING PROCESS OF THE GOVERNMENT.

K.     INFORMATION PROTECTED UNDER THE ATTORNEY-CLIENT PRIVILEGE.

L.     INFORMATION OR MATERIAL PROTECTED UNDER THE WORK PRODUCT DOCTRINE.

O-1.     REDACTIONS NOT MADE BY THE OFFICE OF GENERAL COUNSEL.

P.     THE PRIVACY ACT OF 1974, 5 U.S.C. § 552a.

S.     PERSONAL IDENTIFYING INFORMATION RELATED TO LAW ENFORCEMENT PERSONNEL AND THEIR FAMILY MEMBERS, THE DISCLOSURE OF WHICH IS ROUTINELY GUARDED FOR SECURITY REASONS.

Looks great !


Jeffrey S Sallet
Special Agent in Charge
FBI New Orleans Division
(Serving the State of Louisiana)
2901 Leon C. Simon Blvd
New Orleans, LA 70126
Tel: 504-816-3000


-------- Original message --------
From ███████ (P) ███████ (NO) (FBI)" ███████ (P) ███████ @ic.fbi.gov>
Date: 12/28/16 10:19 AM (GMT-06:00)
To: "Sallet, Jeffrey S. (NO) (FBI)" <Jeffrey.Sallet@ic.fbi.gov>
Subject: SA Zummer letter to Judge Engelhardt

Boss-

(I) (K) (L), (P)

Thanks,
(P)
SS ███████ (P) ███████
Chief Division Counsel
Federal Bureau of Investigation
New Orleans Division
W ███████ (P) ███████
(S)
F: 504 816 3595

AR000003

| | |
|---|---|
| **From:** | (P) (NO) (FBI) |
| **Sent:** | Wednesday, December 28, 2016 3:50 PM |
| **To:** | (P) USALAE) |
| **Subject:** | SA Zummer letter to Judge Engelhardt |
| **Attachments:** | image2421.pdf |

(P)

(K), (L)

Thanks,

(P)

SS (P)
Chief Division Counsel
Federal Bureau of Investigation
New Orleans Division
W (P)
(S)
F: 504 816 3595

AR0000017

Michael S. Zummer
2337 Magazine St. Unit D
New Orleans, LA 70130

August 15, 2016

The Honorable Kurt D. Engelhardt
United States District Court
 for the Eastern District of Louisiana
C-367 Hale Boggs Federal Building
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

Re:     *United States v. Harry J. Morel, Jr.*, Criminal No. 16-050

Dear Judge Engelhardt:

Although I am the Federal Bureau of Investigation (hereinafter "FBI") case agent on the current investigation into Harry Morel (hereinafter "Morel"), I am writing this Court in my capacity as a private citizen under the First Amendment. I do not represent the FBI or U.S. Government in any way. The views in this letter are mine alone. The purpose of my letter is to report misconduct by the United States Attorney's Office for the Eastern District of Louisiana (hereinafter "USAO") which has affected the prosecution of Morel. I believe that the USAO's misconduct has resulted in a plea agreement with Morel based more on its own interest in covering up its misconduct than in advocating for a just result. I believe these matters are of public concern and deserve First Amendment protections.

I am not alleging misconduct by every Assistant U.S. Attorney (hereinafter "AUSA") who has participated in the case. Some have performed admirably and ethically, including AUSA  (P)

With the exception of Ralph Capitelli's statements to the media about now-deceased witness Danelle Keim and me, which are not the subject of this letter, I am not alleging any misconduct on the part of Morel's attorneys.

When I asked to report the misconduct to this Court in my official capacity, I was barred from doing so. I was informed that the FBI does not communicate directly with the courts without permission from the Justice Department. At the FBI's direction, I submitted the letter to Justice Department entities to ask for permission to send the letter. The Justice Department entities determined that they were not in the position to grant me permission. The FBI then notified me that I could not submit the letter in my official capacity.

1

AR0000018

When I asked to disclose this letter to this Court as a private citizen under the First Amendment, I was notified that the FBI would not review this letter for prepublication review which FBI policy requires prior to any release. Even though I wrote in the letter that I was writing in my capacity as a private citizen under the First Amendment, the FBI determined that the disclosure to this Court was in the performance of my official duties and could not be reviewed. The FBI's position essentially asserts that I have no First Amendment right to disclose prosecutorial misconduct on a case to the presiding judge. Although the FBI's administrative appeals process has not been completed, I gave the FBI until the close of business on August 15, 2016 to make a final decision citing the August 17, 2016 sentencing hearing in this case. The FBI did not make a final decision. The FBI's refusal to authorize the release of this letter under its prepublication review policy violates my First Amendment rights which will be irreparably harmed if I do not take action before the August 17, 2016 sentencing hearing. I must treat their position on August 15, 2016 as a final decision.

Because this matter involves a dispute over Constitutional rights, it can only be resolved in the Federal courts. In the course of litigation, the disclosure would be submitted to a court anyway for a decision. Because the disclosures in dispute are letters to a court and part of my reason for disclosure under the First Amendment is to notify this Court of prosecutorial misconduct which is relevant to a hearing on August 17, 2016, I am submitting the full misconduct letter to this Court for a judicial determination on whether this disclosure is deserving of First Amendment protections. To that end, I am notifying the FBI of the submission to allow the FBI the opportunity to dispute the issue. If the FBI maintains the position it has taken, that this disclosure is within the performance of my official duties and not protected under the First Amendment, the FBI, after seeking permission from the Justice Department, can argue that issue before this Court and ask to have the letter returned or sealed. Although, by asserting that this letter is not within my First Amendment rights I believe the FBI has forfeited its opportunity to raise matters involving its prepublication review, the FBI will have an opportunity to raise those issues before this Court. If the FBI does not assert itself before this Court, or this Court determines that the FBI's legal position is incorrect, I request that this Court place the letter in the public record. I will not submit this letter to the media, unless this Court puts it in the public record. Therefore, any public release of this letter will be a judicial decision after the FBI has had the opportunity to communicate with this Court, if it chooses to do so.

Although this is not the normal procedure to handle this sort of legal issue, the FBI's conduct has left me no choice. I have consistently told FBI officials of Morel's sentencing hearing on August 17, 2016, which is when my disclosure is most important to this Court, although the larger public concerns will remain. Submitting the letter in this manner is the only way to allow a judicial determination over the legal question posed by the FBI's decision to deny me my First Amendment rights in time for my speech to get to the public entity immediately affected by it.

2

AR0000019

## 1. Background and Experience

I was first employed as an FBI special agent in 1999 after serving as a Marine Corps infantry officer. I was assigned to investigate white collar crime in New Orleans. My investigations resulted in twenty-one convictions. In 2003, I left the FBI to attend Stanford Law School. After my first year of law school, I interned at the Ministry of the Interior for the Republic of Georgia where I provided advice on combating corruption. I then volunteered to serve a tour in Al Anbar Province, Iraq as a Marine reservist where I was responsible for the development of the Iraqi Security Forces. During my tour, I also investigated corruption by Iraqi officials.

After graduating from Stanford Law School in 2007, I clerked for Judge Edith Brown Clement of the U.S. Court of Appeals for the Fifth Circuit from 2007 to 2008. I returned to the FBI as a special agent in 2008 and was assigned to investigate public corruption. My investigations have, so far, resulted in nine convictions, not including Morel's. I have also taught classes on public corruption investigations overseas to investigators, prosecutors, judges, and other public officials from thirteen countries. During the course of this instruction, I have been exposed to corruption problems in those countries.

In 2015, I was reassigned to the International Terrorism squad in New Orleans after making public comments critical of the USAO, but I continued to teach about corruption overseas and continued as the lead case agent on two corruption investigations, including the Morel case. Recently, I was reassigned to the Law Enforcement Corruption squad in New Orleans.

I have been continuously assigned as the lead case agent on the Morel investigation since the current case was opened in 2009.

## 2. Legal Issues

### A. First Amendment

The Supreme Court has "identified two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (internal citations omitted). "When an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences. When, however, the employee is simply performing his or her job duties, there is no warrant for a similar degree of

3

AR0000020

scrutiny." *Id.* at 423. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.

My situation is substantially different from the facts in *Garcetti*, where a prosecutor, Ceballos, alleged retaliation after conveying his opinion and recommendation to his supervisor regarding a search warrant affidavit that he believed contained serious misrepresentations. *Id.* at 420. The Court determined that the Ceballos "did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee." *Id.* at 422.

My disclosure to this Court is not part of my official duties. I have made specific assertions that I am writing this letter as a private citizen under the First Amendment, which Ceballos never did. This assertion by a government employee is important, because it tells the reader that the disclosure is not the official government position. Also, it is a decision by the employee about which form of legal protection the employee seeks, the First Amendment or whistleblower protections. Although I reported this prosecutorial misconduct to the appropriate authorities for whistleblowers, I am not claiming that protection in this disclosure to this Court.

Most importantly, the FBI has told me that I cannot make this disclosure in my official capacity without permission from the Justice Department and the Justice Department has not given me that permission. Therefore, according to the FBI, I do not have the authority to make this disclosure to this Court in my official capacity as an FBI agent. However, the FBI has also apparently decided that, despite my assertions to the contrary, any disclosure that I make to this Court about this case is within my official duties. The FBI is taking contradictory positions which prevent me from making this disclosure. Because I am reporting misconduct by the Justice Department, of which, the FBI is a part, the FBI has every reason to take such a position to prevent this letter from being disclosed to this Court and, ultimately, the public. The FBI's position essentially gives the Justice Department unbridled power over whether its employees can report misconduct by Justice Department prosecutors to a court affected by the misconduct.

If the FBI argues that I lost my First Amendment rights when I attempted to report this misconduct in my official capacity by following the process it outlined to me, I only followed that process because I was directed to do so. I have followed the FBI's procedures and orders, but the FBI has refused to follow its own policy and refused to review this letter even though I asserted my First Amendment rights. The vast majority of time writing this disclosure, even when I was attempting to make it in my official capacity, has been spent outside of working hours. The vast majority of time and resources spent at work on this matter have been expended

4

to follow the FBI's procedures to make this disclosure, whether in my official or private capacity.

My situation is close to the one in *Lane v. Franks*, 134 S.Ct 2369, 2378 (2014), where the Court held that, "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes. That is so even when the testimony relates to his public employment or concerns information learned during that employment." Although *Lane* involved sworn testimony under a subpoena, I am providing information to a court regarding a matter before it. Like the testimony in *Lane*, I believe this disclosure provides information relevant to this Court's upcoming decision and public policy matters far beyond it. (The only reason I am not providing this letter to the media at this time is because the FBI has refused to review this letter for prepublication review and I am attempting to give the FBI the opportunity to address this Court before it is placed in the public record.) "[P]ublic employees are uniquely qualified to comment on matters concerning government policies that are of interest to the public at large." *Id.* at 2380 (internal citations and quotations omitted). To quote *Lane*, "[t]he importance of public employee speech is especially evident in the context of this case: a public corruption scandal."

The purpose of my disclosure to this Court is not to address the facts of the Morel case but to notify this Court of corruption in the Justice Department over the handling of the case and the FBI in trying to prevent disclosure of the misconduct. This is not a personal grievance. I am not asking for any relief from this Court except to make it aware of what happened and to allow the public to see that. This Court should know the pattern of misconduct that led to the plea agreement before it. The prosecutorial misconduct in this case also concerns the victims and witnesses who have been attacked in public statements by defense counsel. It concerns the Saint Charles Parish Sheriff's Office which put itself at great risk to assist the investigation. The victims, witnesses, and investigative team should know, and they deserve to have the public know, why this plea agreement was made. In public statements, U.S. Attorney Kenneth Polite has blamed the victims in part for the decision to make the plea agreement. If the U.S. Attorney can publicly blame the victims, the victims deserve to have the prosecutorial misconduct by U.S. Attorney Polite and his office which led to the plea agreement aired in the public sphere. Finally, the public should know when there is corruption in the criminal justice system and attempts by the FBI to conceal that misconduct from public scrutiny.

I cannot forecast what the FBI will do to me. So, it is difficult to answer the Court's second question from *Garcetti* of "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti* at 418. However, after the FBI determined that I had no First Amendment right to make this disclosure, I took the only reasonably available route to make a limited disclosure to the entity which needed the information in a timely manner while giving the FBI the opportunity to assert itself to this Court. The FBI created this problem and this Court would have been

5

AR0000022

prejudiced if I did not make this disclosure. This Court should be involved in the decision-making and see the information at issue before the hearing on August 17, 2016.

I do not believe the FBI can have any justification, let alone an adequate one, if it takes administrative action against me for making this limited disclosure to this Court. I have shown far more respect for the FBI's policies and procedures than the FBI is showing for my assertion of my First Amendment rights. On August 15, 2016, another FBI agent informed me that an FBI manager allowed him to write a letter to a court in similar circumstances to my own without going through the procedures I was forced to follow. The FBI appears to pick and choose which disclosures it scrutinizes.

B. Grand Jury Material

As a general matter, I believe it is well-established that many Federal investigations include Grand Jury material which cannot be disclosed under Federal Rule of Criminal Procedure 6(e). The factual basis filed with this Court discloses that a Grand Jury subpoena was issued in the Morel case. To the best of my knowledge and understanding of Rule 6(e), I am not including anything in this letter that would violate my obligation as someone to whom there have been disclosures made under Rule 6(e)(3)(A)(ii).

The Supreme Court has "noted several distinct interests served by safeguarding the confidentiality of grand jury proceedings. First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment. Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule." *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 218-19 (1979).

The Fifth Circuit has described the Rule 6(e) secrecy requirement as applying "not only to information drawn from transcripts of grand jury proceedings, but also to anything which may tend to reveal what transpired before the grand jury." *In re Grand Jury Investigation*, 610 F.2d 202, 216 (5th Cir. 1980) (internal citations and quotations omitted). The court also "construe[d] the secrecy provisions of Rule 6(e) to apply not only to disclosures of events which have already occurred before the grand jury, such as a witness's testimony, but also to disclosures of matters which will occur, such as statements which reveal the identity of persons who will be called to testify or which report when the grand jury will return an indictment." *Id.* at 216-17.

However, the Fifth Circuit noted that "the disclosure of information obtained from a source independent of the grand jury proceedings, such as a prior government investigation, does not violate Rule 6(e). A discussion of actions taken by government attorneys or officials E.g., a

6

AR0000023

recommendation by the Justice Department attorneys to department officials that an indictment be sought against an individual does not reveal any information about matters occurring before the grand jury. Nor does a statement of opinion as to an individual's potential criminal liability violate the dictates of Rule 6(e). This is so even though the opinion might be based on knowledge of the grand jury proceedings, provided, of course, the statement does not reveal the grand jury information on which it is based." *Id.* at 217 (internal citations omitted).

Although FBI agents often receive disclosures under Rule 6(e)(3)(A)(ii), we also testify as fact witnesses. "Rule 6(e) does not prevent disclosures by a witness who testifies before the grand jury." *Id.* at 217 (internal citations omitted).

The D.C. Circuit has stated "internal deliberations of prosecutors that do not directly reveal grand jury proceedings are not Rule 6(e) material." *In re Sealed Case No. 99-3091*, 192 F.3d 995, 1003 (D.C. Cir. 1999). "It may be thought that when such deliberations include a discussion of whether an indictment should be sought, or whether a particular individual is potentially criminally liable, the deliberations have crossed into the realm of Rule 6(e) material. This ignores, however, the requirement that the matter occur before the grand jury. Where the reported deliberations do not reveal that an indictment *has been* sought or *will be* sought, ordinarily they will not reveal anything definite enough to come within the scope of Rule 6(e)." *Id.* at 1003 (emphasis in original).

This letter will not disclose any witnesses, whether or not they testified before a Grand Jury, and Morel has been charged and pleaded guilty, although to a lesser offense. My knowledge of his conduct comes from the FBI investigation. This letter will disclose potential charges discussed and approved by Justice Department attorneys, but none of the discussions or approvals I mention will be definite enough to come within the scope of Rule 6(e).

### C. Privacy Act

Because I am now submitting this letter through the FBI's prepublication review process, I will briefly address the potential Privacy Act issues. Simply stated, I am not disclosing anything in this letter that was retrieved from a system of records using personal identifiers. Most of what is in this letter has not even been entered into any system of records of which I am aware. I was a firsthand witness to anything in this letter that was placed into any system of records before a record was created or submitted.

This letter is primarily a description of the prosecutorial actions that I observed or of which I was told. I have attempted to remove factual issues about the case, but some issues have to be described to give context to the prosecutors' actions. The only possible witness named in this letter, Danelle Keim, aka Danelle McGovern (hereinafter "Keim"), is now deceased and has already been named publicly by the FBI and others as a witness. The details of her activity as a witness are part of the factual basis filed in the public record of this Court. Furthermore, several

7

AR0000024

public officials have made public statements about the results of the investigation into Morel's conduct.

### D. U.S. Attorney's Manual on Recusal

Although I do not believe that the Justice Department's rules for its attorneys are enforceable by the courts, they are instructive in showing when prosecutors have failed to follow the appropriate standards.

"When United States Attorneys, or their offices, become aware of an issue that could require a recusal in a criminal or civil matter or case as a result of a personal interest or professional relationship with parties involved in the matter, they must contact General Counsel's Office (GCO), EOUSA. The requirement of recusal does not arise in every instance, but only where a conflict of interest exists or there is an appearance of a conflict of interest or loss of impartiality." *United States Attorneys' Manual*, 3-2.170 – Recusals, Feb. 2004. "The same circumstances which require that a United States Attorney recuse himself/herself (see USAM 3-2.170) apply to an Assistant United States Attorney. Ordinarily, the fact that an Assistant United States Attorney recuses will not require that the United States Attorney or the office recuse itself and the case or matter may be reassigned to another Assistant." *United States Attorneys' Manual*, 3-2.220 – Recusals, Feb. 2004.

### 3. Conduct of Prosecution

#### A. Case Declination

The current investigation into Morel was initiated in June 2009. On November 29, 2012, AUSA $^{(P)}$ told me he was assigned to the case. Previous AUSAs removed themselves from the case after a disagreement over how to conduct the investigation covertly.

A few days after another agent and I attempted to interview Morel on December 10, 2012, which was the end of the covert phase of the investigation, Ralph Capitelli (hereinafter "Capitelli") called and said that he was representing Morel. I advised AUSA $^{(P)}$ of Capitelli's representation of Morel. At the time, I was working on a search warrant affidavit to search for evidence in Morel's office, specifically a camera memory card. On November 30, 2012, Keim, while cooperating with the FBI, recorded a conversation with Morel during which she gave a memory card to him in his office. I submitted a draft affidavit to AUSA $^{(P)}$ AUSA $^{(P)}$ later told me that his chain of command had reviewed the affidavit and all had said there was no probable cause to search Morel's office. (Unlike state officials, FBI agents, at least in the Eastern District of Louisiana, must obtain approval for a search warrant from the USAO before submitting an application to a judicial official.)

Because the USAO blogging scandal had recently caused the departure of U.S. Attorney (hereinafter "USA") James Letten and First Assistant U.S. Attorney (hereinafter "First AUSA")

8

AR0000025

(P) AUSA (P) chain of command had become AUSA (P) (Deputy Chief of Criminal), AUSA (P) (Chief of Criminal), First AUSA (P) and Interim USA Dana Boente. When I asked AUSA (P) what the specific issue was with the search warrant affidavit, he said that he had talked to First AUSA (P) and Interim USA Boente about it, but they had not provided specifics. AUSA (P) then provided other assistance to the investigation.

On January 11, 2013, even though the USAO had denied the FBI a search warrant for Morel's office, Louisiana 29th Judicial District Attorney Joel Chaisson consented to a search of Morel's office. As described in the factual basis, Morel was served with a Grand Jury subpoena to turn over the memory card. Through his attorney he claimed that agents had taken the card during their search. Agents had not found the card during the search. Morel was supposed to turn over the memory card by January 17, 2013. (Although the due date of the subpoena is not disclosed in the factual basis, I do not believe this additional information---a due date that was never followed---is sufficiently specific to disclose a matter likely to occur before a Grand Jury.)

During the week of February 4, 2013, AUSA (P) nformed me that he had spoken with Capitelli who denied that Morel had the memory card. AUSA (P) said that he told Capitelli that the government had a copy of the memory card anyway. (I had given Keim a copy of the original memory card to give to Morel. The FBI maintained custody of the original.)

On February 9, 2013, I was informed by Saint Charles Parish Sheriff Greg Champagne that Keim had been found dead that morning. There was no evidence to connect Morel to her death. She died immediately after a news report about the investigation. The report did not name Keim but provided sufficient information to identify her to Morel.

I notified AUSA (P) of Keim's death. In order to mitigate the loss of her potential testimony, I arranged to interview a potential witness (hereinafter "Witness 1") who was in custody. The morning of February 13, 2013, the prison called to tell me that Witness 1 had been transported to Saint Charles Parish. Sheriff Champagne informed me that then-Louisiana 29th Judicial District Court Judge Michele Morel (Morel's daughter) had issued a writ to have Witness 1 brought to court. An assistant district attorney (hereinafter "ADA") who had previously been employed by Morel was going to meet with Witness 1. Although I had no information indicating misconduct on the part of then-Judge Morel or the ADA, I was concerned about the potential for abuse. I called AUSA (P) and left a voicemail describing my concerns. I then contacted District Attorney Chaisson about the meeting. He immediately recused his office from any cases involving Witness 1. AUSA (P) never addressed the issue regarding Witness 1.

On February 15, 2013, AUSA (P) called me and told me that he had spoken to First AUSA (P) and Interim USA Boente. He said that after Keim's death the case against Morel which was difficult before was now impossible. I told him that I disagreed because we still had

9

AR0000026

solid evidence. I informed him that in the case against Congressman William Jefferson recordings were still admissible even though the source did not testify.

On February 18, 2013, I ran into AUSA (P) in downtown New Orleans. I told him that we should still meet with Capitelli about the evidence that we had. AUSA (P) said that he did not want to "bluff" Capitelli as he would have to work with Capitelli for the next "twenty years." I disagreed that we would be bluffing in any way and said that we still had a potential mail fraud against Morel for providing falsified community service letters to a court. AUSA (P) said that only my supervisor and I believed that was fraud. I told AUSA (P) that we had more evidence on Morel than we had on another official (hereinafter "Official A") whom I had investigated and AUSA (P) had prosecuted. AUSA (P) said that Morel had not come in and lied to us like Official A had. I said that Official A had not told a witness to destroy evidence on tape like Morel had. AUSA (P) said that he did not think there was any underlying Federal offense for Morel to obstruct. I said that Use of an Interstate Facility in Aid of Racketeering (ITAR) (Title 18 U.S.C. Sec. 1952) was the underlying offense. AUSA (P) made a gesture which I interpreted as dismissive of my suggested offense. (ITAR---specifically, using the telephone in aid of soliciting sexual bribes---had already been approved by FBI Headquarters and attorneys from the Justice Department as the basis of the investigation during the covert phase before AUSA (P) was assigned to the case.) AUSA (P) told me that he would be busy the following week on a sentencing and out of town the week after. He told me to get something "good" to bring his chain of command by the time he got back.

I did not understand why there was any time constraint and began doing research on various issues, including Fifth Circuit case law holding that labor was a property right within the meaning of the Hobbs Act which supported my mail/wire fraud argument. I prepared a Powerpoint presentation of audio and video clips to attempt to have a meeting with the USAO's management about the case. My supervisor, Supervisory Special Agent (hereinafter "SSA") (P) (no relation to AUSA (P) , and I discussed it and we were both concerned about First AUSA (P) because of his relationship with Capitelli. After speaking to other agents who were aware of the relationship, I checked public records in Gulf Shores, Alabama (Baldwin County) and found that Capitelli and First AUSA (P) were partners in a condominium which had a mortgage.

Upon learning this, I was informed by FBI management that (P) had previously been investigated for his relationship with Capitelli and that he had been told by USAO management, while Letten was USA, not to take part in cases involving Capitelli.

SSA (P) later told me that he had informed FBI Special Agent in Charge (hereinafter "SAC") Michael Anderson of the concern about (P) relationship with Capitelli. SAC Anderson was going to address the condominium issue with Interim USA Boente.

AR0000027

On March 7, 2013, after Keim died and Capitelli was advised that the government had a copy of the memory card anyway (actually the original), AUSA (P) told me that Capitelli had advised him that Morel had found the memory card.

Early in the week of March 25, 2013, I delivered a Powerpoint presentation regarding the Morel case to the USAO for AUSA (P) On March 28, 2013, AUSA (P) called me and told me that he and others had reviewed the presentation. He said he had spoken to AUSA (P) and First AUSA (P) and that AUSA (P) and First AUSA (P) had spoken to Interim USA Boente about the case. AUSA (P) had been told to decline the case because of Keim's death.

I did not understand why the case had been declined. I had not asked that it be prosecuted. I wanted to obtain records to identify potential victims for interviews. At the time, we were aware of three women, including Keim, and believed that there could be more victims. The sudden declination appeared to be designed to stop the overt investigation before it had the opportunity to start.

SSA (P) set up a meeting with AUSA (P) but ultimately met with First AUSA (P) AUSA (P) and AUSA (P) SSA told me that SAC Anderson would set up a meeting with Interim USA Boente. SSA (P) also said that he had made the USAO aware that the FBI would want another meeting regarding the Morel investigation.

Before an April 17, 2013 meeting, I received a declination letter from the USAO. From speaking to another AUSA, I became aware that AUSAs were clearing their cases in anticipation of the arrival of a new USA.

On April 17, 2013, SAC Anderson, SSA (P) and I met with Interim USA Boente, First AUSA (P) AUSA (P) (who came at my request), AUSA (P) AUSA (P) and AUSA (P) Various issues regarding the Morel case were discussed as follows:

- Regarding the falsified community service papers, First AUSA (P) made the point that Morel had been falsifying those papers for five years and concluded that the length of time that Morel had been providing false papers made the case against him weaker. (I did not understand how the frequency of falsifying records made those falsifications less illegal.)

- First AUSA (P) expressed his concern that Morel had been doing favors for lots of people without asking for sex, and, therefore, the case was weak. (First AUSA (P) did not reconcile this point with government officials who did political favors or other official acts for people without asking for bribes, but later asked for bribes in connection with other acts and were convicted for it. I am not aware of any requirement that a public official has to always or regularly ask for bribes in order to be convicted of doing it once.)

11

AR0000028

- First AUSA (P) said that he had reviewed the video clips of Morel's July 23, 2012 visit to Keim's apartment and said that Morel would not have had sex with Keim if she had agreed to have sex with him that day. (He did not explain how he could arrive at that conclusion with Morel arriving at her apartment with two bottles of wine, asking Keim to kiss him, repeatedly, and grabbing her breast and buttocks.)

- First AUSA (P) said that juries in the Eastern District of Louisiana did not like cases on sex or gambling.

- Interim USA Boente said that he had reviewed a printout of the Powerpoint presentation which he described as thorough. I told him that he needed to review the recordings. Interim USA Boente said that he would not do that. He would read transcripts though. Interim USA Boente said that in his opinion Morel was that guy in college who "could not close the deal."

- First AUSA (P) said that with Morel turning in the camera memory card the obstruction charge was like someone threatening to kill the president. The threat was chargeable, but they would not charge something like that. I said that Morel's return of the memory card after being told that the government had a copy and the witness dying was like a bank robber bringing the stolen money back after learning he has been caught.

- Interim USA Boente said that the return of the memory card hurt the obstruction case. During the course of the discussion, Interim USA Boente realized that the memory card that Keim had given Morel was a copy of the original memory card which was in evidence. (That fact had been in the Powerpoint presentation he reviewed.) Interim USA Boente theorized that providing a copy of an item already in evidence might mean there was no obstruction charge at all. (I later did research finding that the Supreme Court held that the language of the obstruction statutes covered such attempts at obstruction.)

- When I pointed out that Witness 1 could mitigate the loss of Keim's testimony, First AUSA (P) pointed out that Witness 1 was a drug dealer. I denied that he was. First AUSA said that Keim was doing drugs with Witness 1 just like she was doing drugs with her boyfriend when she died. I said that I did not know whether Keim had done drugs with Witness 1 because Witness 1 was in prison for burglary, not a drug-related offense.

- No one from the USAO discussed the separate obstruction of justice violation Morel committed by telling Keim to lie to investigators.

AR0000029

- First AUSA (P) said that the women were playing the system anyway. He did not reconcile this position with cases where government contractors "played the system" by paying monetary bribes to public officials to get contracts, yet public officials were prosecuted for it. He did not address the power disparity between Morel, an elected chief prosecutor, and women facing prosecution, whose loved ones faced prosecution, or who needed court-ordered child support.

At the conclusion of the meeting, the USAO agreed to review any new information gathered by the FBI regarding Morel's past conduct. The FBI would continue to investigate. However, the case was closed at the USAO. Although First AUSA (P) offered to provide investigative assistance if it was requested, I did not believe his offer was sincere.

Immediately after the meeting, SSA (P) and SAC Anderson expressed their disbelief at the meeting. SSA (P) described it as the "most irrational meeting" he had ever attended. I found most perplexing that the case had been declined before the overt phase of the investigation had been started. Without investigative assistance from the USAO, such as obtaining court orders and search warrants, it would be substantially more difficult to obtain records needed to identify more victims/witnesses.

### B. OIG Complaint

During May 2013, I met with the Department of Justice Office of Inspector General (OIG). I agreed to file a complaint against First AUSA (P) for failing to recuse himself from matters involving Capitelli.

During June 2013, I provided an affidavit to the OIG. I also agreed to have my identity revealed, because I was told it would assist the course of the investigation. The OIG asked for other examples of (P) favoring Capitelli. I provided two.

First, I had heard from another FBI agent about AUSA (P) had told the agent and USAO financial analyst to withhold higher financial loss amounts from a U.S. Probation Officer during a presentence investigation. (P) cited his need to maintain a relationship with Capitelli as the reason for withholding the information from the court.

Second, I had heard from another agent about a case where two related defendants were investigated for fraud. The defendant represented by Capitelli was not prosecuted and the other defendant pleaded guilty. In that plea agreement, the government agreed not to prosecute Capitelli's client. After the guilty plea, the AUSA wanted to give U.S. Probation the correct dollar amount for guidelines calculations, but an upper manager at the USAO, whom the AUSA would not identify to the agent, was pressuring the AUSA to reduce the dollar amount. Capitelli was reportedly still involved in the case.

13

AR0000030

I had limited contact with the OIG. After filing my complaint, an OIG agent told me that (P) had exchanged his ownership in the condominium he owned with Capitelli. I checked Baldwin County, Alabama probate records again and found an act of exchange between (P) and a woman whom I was told was his live-in girlfriend. (P) exchanged his portion of the condominium with Capitelli for other properties. The date of the exchange was March 21, 2013. That date was significant to me because it was a few days after I had been told that SAC Anderson was going to tell Interim USA Boente about the condominium.

### C. Continued Investigation and Reaction to OIG Complaint

Despite the declination of the Morel case, FBI management and I discussed how to get the case reopened by prosecutors. SAC Anderson said he trusted that when Kenneth Polite became the USA, Polite would be willing to have the USAO reopen this case. (Polite had been named but not confirmed as USA.) Based upon SAC Anderson's faith in Polite, the FBI did not approach other divisions of the Justice Department, such as the Civil Rights Division. Even if the FBI had approached those other divisions, the USAO could still prevent a prosecution by them.

During August 2013, I received a telephone call from AUSA (P) who was assigned to prosecute another investigation of mine. AUSA (P) began asking questions about actions the subject public official (hereinafter "Official B") had taken after receiving items of value from an individual seeking business with Official B's office (hereinafter "Individual B"). AUSA (P) expressed doubt that Official B had done enough in return for the payments from Individual B for Individual B to be charged with bribery. He insisted that I have interviews completed the following week to bolster that aspect of the case. When I reported the conversation to SSA (P) he told me that the OIG had recently begun conducting interviews at the USAO in connection with my complaint. I suspected that AUSA (P) sudden antipathy towards the case against Individual B was motivated, at least in part, by my reporting him to the OIG.

I suggested
AMD
redact

On August 29, 2013, the *Saint Charles Herald Guide* quoted Capitelli as saying that the case against Morel had been declined. Based upon my conversations with SSA (P) I believed Capitelli was notified of the declination by the OIG when he was interviewed.

During October 2013, shortly after Polite took over as USA, I was advised by FBI management that I would be briefing the Morel case to USA Polite. When I asked who would be present at the brief, I was told that First AUSA (P) and other AUSAs previously involved in the case would be present. I refused to brief USA Polite with First AUSA (P) present. First, I believed First AUSA (P) had a conflict of interest with any case involving Capitelli. Second, I believed First AUSA (P) had a conflict of interest with any case involving me. Third, I believed that I would be tacitly endorsing First AUSA (P) behavior if I agreed to brief him. Fourth, although I had no evidence First AUSA (P) had leaked anything to

14

Capitelli in the past, I suspected that he would. I did not want to take the chance of victims' identities being passed to Capitelli. Fifth, I feared that all of the AUSAs previously associated with the case now had a personal motive to see that their previous decision was not reversed, especially since the declination was now public knowledge. FBI management told USA Polite about the concerns and the brief was rescheduled. I was told by FBI officials that USA Polite avoided notifying his staff of my refusal by claiming the brief was rescheduled because he had decided to buy breakfast for his office that day.

I briefed USA Polite on the case on November 7, 2013. He was the only person from the USAO present. The brief was at the FBI office. After the brief, USA Polite commented, "This is disturbing."

On November 22, 2013, I was advised by another FBI agent that AUSA (P) had asked him when I was transferring. When told that I was not transferring, AUSA (P) said that no one would work with me at the USAO. I was also told that AUSA (P) commented about whether he had to worry about FBI agents filing OIG complaints against him. The agent asked him if he was doing anything that would necessitate an OIG complaint. (Before this, AUSA (P) had used me as a witness in the case against former New Orleans Mayor C. Ray Nagin (hereinafter "Nagin"). I had also been told that, before my OIG complaint, the Nagin prosecution team, including AUSA (P) wanted to use me at trial. I was not used as a witness in Nagin's trial.) Later, an FBI agent also quoted AUSA (P) to me as asking the question, "Who is going to prosecute a prosecutor?"

Despite the brief to USA Polite, the USAO took no action on the Morel matter. On January 16, 2014, SAC Anderson asked me to request assistance from the USAO in the case. The purpose of the request was to spur a decision by the USAO. The request was not fulfilled, despite First AUSA (P) offer of assistance on April 17, 2013.

Around this time, (P) was hired to become the First AUSA. I believe that AUSA (P) became a senior litigation counsel at the USAO. During February 2014, I briefed First AUSA (P) and USA Polite on the Morel case at the FBI office. They took no immediate action on the matter.

Meanwhile, on or about February 25, 2014, having conducted several interviews documenting actions Official B took to further Individual B's interests, I met with AUSAs (P) about the case against Individual B. (P) took the legal position that an individual could not be prosecuted for paying a bribe to a public official unless the public official did something in return and what the public official did in return for the payment was "nefarious." I reported the meeting to SSA (P) who set up a follow-up meeting with the AUSAs and AUSA (P) who had become head of the USAO's public integrity section.

On March 10, 2014, SSA (P) and I met with AUSAs (P) During the meeting, AUSA (P) pointed to a stack of legal research which he claimed

15

supported his legal positions. I asked him to e-mail me his research, which he did a few days later. Checking AUSA (P) cited case law, I found numerous errors and wrote an eighteen page response on the legal issues. The most egregious misquoted legal opinion was a Second Circuit case. (P) cited *United States v. Ganim*, 256 Fed. Appx. 399, 2007 WL 4233388 at *1 (2d Cir. Dec. 4, 2007)(unpublished) as "holding that government was required to prove official acts that the public official did in exchange for the benefits he received." Checking the citation, I found that (P) had removed the word "not" from the quoted holding. (The actual language from *Ganim* is "we…hold that the government was **not** required to prove a direct link between a benefit Ganim received and a specific act he performed, so long as the government proved that Ganim received benefits in exchange for his **agreement** to perform specific official acts or to do so as the opportunities arose." *Id.* at 401 (emphasis added).)

Based upon the number of errors, I suspected that AUSA (P) was intentionally misrepresenting case law in order to keep the case from being prosecuted. After sending my memorandum in response to AUSA (P) research, I was told by SSA (P) that AUSA (P) had complained to USAO management that I was disrespectful to AUSA (P) in the memorandum. When SSA (P) asked if the USAO manager had read the memorandum, he admitted that he had not. Later, the USAO manager conceded to SSA (P) that I had not been disrespectful to AUSA (P) in the memorandum.

On March 14, 2014, AUSA (P) was assigned to look into whether the case against Morel should be re-opened at the USAO. AUSA (P) was an experienced prosecutor who had been in Afghanistan when the case had been declined. SSA (P) vouched for AUSA (P)

Around this time period, FBI management offered to send me to the USAO as a Special Assistant U.S. Attorney (hereinafter "SAUSA") to prosecute FBI cases. I was later told that USAO management had refused to accept me as a SAUSA. USAO management had told FBI officials that my assignment there as a SAUSA would be "too much too soon" for the USAO. I understood that comment to mean that I was too controversial of a figure because of my OIG complaint.

During July 2014, a final meeting was held with AUSA (P) about the case against Individual B. His response to my memorandum was that, although it might "technically" be a violation, it was not a case that would be prosecuted in the Eastern District of Louisiana, as though there were a higher burden to prosecute corruption cases in the district. During August 2014, I was advised by FBI management that USAO management said that the case against Individual B would not be prosecuted. A high-level USAO manager was quoted by FBI management as saying that he did not have enough "political capital" within the USAO to get the case prosecuted.

16

I never received notification from the OIG about the results of their investigation. FBI management told me the OIG reported the results to the Justice Department Public Integrity Section and later the Executive Office of United States Attorneys.

### D. USAO Reopens Its File on Morel

Despite the controversy, AUSA (P) had the Morel case reopened at the USAO. Investigators began to obtain admissions from victims about sexual contact with, and sexual solicitations from Morel. Other than humorous remarks about fearing that another AUSA might take a sniper shot at him for taking the case, AUSA (P) provided all necessary support to the investigation. When we began finding large numbers of witnesses with pertinent information that was several years old, AUSA (P) thought of charging Morel under the Racketeer Influenced Corrupt Organizations Act ("RICO"), Title 18 U.S.C. Sec. 1962.

However, AUSA (P) appeared to be alone in his support of the case. On at least one occasion, AUSA (P) commented to me that no other AUSA would assist him in the case. He said, "It's just you and me, kid." I began looking for another AUSA to assist him and asked AUSA (P) who had recently joined the USAO, if he was interested. He was. I recommended him to AUSA (P) However, AUSA (P) did not bring AUSA (P) on the case at first.

Unfortunately, during 2015, AUSA (P) was reassigned to other duties and, along with other cases that he had in the Eastern District of Louisiana, he had little time to spend on the Morel case. By April 2015, the investigators had exhausted all logical leads. We had found more than twenty witnesses with whom Morel had oral sex, other sexual contact, or from whom Morel had asked for sex in connection with his position as district attorney or assistant district attorney between 1986 and 2012.

During May 2015, I was advised by SSA (P) who had been promoted to Assistant Special Agent in Charge (hereinafter "ASAC"), that USAO management told him that Morel had not had an "opportunity" to plead guilty. They intended to make a plea offer. Previously, AUSA (P) had told me that he intended to indict Morel on RICO and other charges and allow me to arrest him. (Although the FBI has statutory authority to arrest individuals who violate Federal crimes, FBI policy only allows agents to make arrests with the concurrence of Federal prosecutors. Thus, unlike the state criminal justice system, the public never knows when the FBI disagrees with Federal prosecutors.)

On July 23, 2015, I met with AUSA (P) ASAC (P) and SSA (P) the new public corruption supervisor. AUSA (P) said that he was making a plea offer to Morel which would include two counts of mail fraud, two counts of obstruction of justice, and two misdemeanor civil rights violations. I objected to the plea offer and said the victims deserved justice in the form of an indictment. Among other reasons, AUSA (P) commented that this was how "[his] office want[ed] [him] to handle it." When I asked about assigning AUSA (P)

17

AR0000034

to the case, AUSA (P) said that he was concerned about putting a new AUSA in that position considering, as AUSA (P) put it, "how this case has been handled" at the USAO. He then said, "You know what I'm talking about." I knew that he was referring to the case's declination and subsequent OIG complaint. After the meeting, AUSA (P) commented to me that half of him did not want Morel to take the deal.

Shortly after the July 23, 2015 meeting, despite AUSA (P) previously stated concerns, AUSA (P) was assigned to the case to assist AUSA (P) since he was spending the majority of his time away from Louisiana on another assignment.

Early in the week of August 17, 2015, USA Polite met with Saint Charles Parish Sheriff Champagne at the sheriff's request. (The Saint Charles Parish Sheriff's Office had been instrumental to the investigation, and Sheriff Champagne had taken great personal risk in bringing the case to the FBI in the first place.) During the meeting, USA Polite admitted that a plea offer was being made to Morel. USA Polite told the sheriff that if Morel did not take the offer, he would be indicted "by the end of the month." (Based upon subsequent events, I do not believe USA Polite's statement described a matter occurring or likely to occur before a Grand Jury.)

On August 21, 2015, I attended a meeting with AUSAs (P) and Capitelli, Brian Capitelli (hereinafter "Brian Capitelli," while Ralph Capitelli will continue to be referred to as "Capitelli"), and Steve London. Capitelli had previously told AUSA (P) that he did not want me present at the meeting. AUSA (P) had me attend anyway. I had prepared a brief Powerpoint presentation for the meeting showing a minimal amount of evidence against their client. During the discussions after the presentation, Capitelli claimed that I had made false accusations against him. I corrected him by saying that I had not made any accusations against him, that I had made an accusation against a First AUSA. Capitelli explained this was why he did not want me in the meeting. Later, he mentioned Morel taking a plea but asked about limiting the information that was given to U.S. Probation in the presentence report. When Capitelli expressed concern to the AUSAs about "the agent backdoor[ing]" them to probation, I smiled at him. Capitelli pointed at me and said that I would go to U.S. Probation. Capitelli asked if I would make a commitment that I would not provide information to probation. I said, "I'm not committing to anything." Capitelli objected. I then said, "I'm not withholding anything from probation." When the AUSAs then discussed indicting Morel, Capitelli claimed that there had been a number of improprieties with the investigation that he could bring out. I responded, "Let's have the whole truth come out about this case."

After the meeting, the AUSAs and I discussed the issue of my OIG complaint becoming public knowledge if the case were prosecuted. There was discussion about how the complaint would make the USAO look if it did. AUSAs (P) were not concerned, because they had not been at the office when the case was declined. AUSA (P) also said that nothing would be withheld from U.S. Probation. (In response to the USAO practice of withholding

18

AR0000035

relevant conduct from U.S. Probation, ASAC (P) has ordered agents to provide all relevant evidence to U.S. Probation. However, since then, I have heard of two other examples of AUSAs attempting to reduce relevant conduct information to make plea deals that are essentially Federal Rule of Criminal Procedure 11(c)(1)(C) agreements, except they are not disclosed to the court.)

Despite USA Polite's statement to the sheriff about indicting Morel "by the end of the month," Morel was not indicted.

AUSA (P) told me about another meeting between First AUSA (P) AUSA (P) and the Capitellis. He said the Capitellis had made various accusations about the investigation. They also wanted the names of victims, but I objected to the USAO giving them their names for fear of the victims' being harassed. (During the course of the investigation, private investigators had approached various women and had even lied to a witness by telling her that Keim was dead because the FBI had relentlessly pursued her. In reality, the FBI provided Keim with a great deal of support over an eighteen-month period.)

## E. Preparation of RICO Charge

*R^D will also redact*

I was not advised of any further plea negotiations and AUSA (P) and I worked together to prepare a RICO memorandum to obtain approval from the Justice Department's Organized Crime and Gang Section (OCGS) to charge Morel with RICO. (Department of Justice policy requires all RICO charges to be approved by OCGS and a memorandum providing specific information must be submitted.) The RICO charge was based on Morel's use of the Louisiana 29th Judicial District Attorney's Office for racketeering activity, specifically bribery and obstruction of justice. (Because approval of a RICO charge by OCGS is not a final decision to seek an indictment, I do not believe it is a matter occurring or likely to occur before a Grand Jury.)

On November 25, 2015, AUSA (P) advised me that the RICO memo and accompanying draft charges were provided to OCGS for review. Within a couple of weeks, AUSA (P) provided me with questions from an OCGS attorney. During December 2015, AUSA told me that OCGS tentatively approved the RICO charge pending the submission of final drafts from the USAO.

Around this time period, I learned that Morel's behavior was described by at least one AUSA as "just an old guy having fun." Having interviewed each victim, I found that characterization to be far from accurate.

During January 2016, SSA (P) advised me that she had spoken to First AUSA (P) (First AUSA (P) had left the USAO and AUSA (P) had taken over as First AUSA.) He told her that the final draft was at OCGS for approval. He also told her that an attorney from OCGS was interested in assisting in the prosecution of the case. Despite this reported interest, an OCGS attorney was never assigned to the case.

19

AR0000036

Around late January 2016, SSA (P) advised me that she had spoken to First AUSA (P) He told her that the USAO had held a review committee on the Morel case and the following resulted from the committee meeting:

- USA Polite had removed himself from the review committee, because he was in favor of prosecuting the case and did not want to prejudice the committee.

- AUSA (P) participated in the review committee despite the previous declination and OIG complaint.

- First AUSA (P) who had participated in the previous declination, also participated in the review committee.

- The committee decided to resume negotiations for a plea agreement with Morel.

- The committee selected an AUSA manager (hereinafter "AUSA Manager 1") to lead the negotiations.

- First AUSA (P) indicated his disapproval for the case to SSA (P) by saying that the FBI had to go find the victims with the exception of Keim. They had not come forward on their own. (In my interviews of witnesses, I found that they were humiliated by what had happened with Morel and feared that he was still a powerful man. Most interviewees believed that Morel had killed Keim, even though there was no evidence to connect him to her death.)

- First AUSA (P) said that USA Polite had held the review committee to "appease" his office.

- First AUSA (P) said the committee approved moving forward because USA Polite was in favor of the case.

When I was notified of this committee, I became aware that an AUSA with political connections which might favor Morel was taking part in consideration of the case. In my opinion, AUSAs with close connections to political figures raise the appearance of impartiality in any public corruption case.

I found AUSA Manager 1's involvement in the case unusual. I never spoke with AUSA Manager 1 about the case other than a few words on March 30, 2016. To my knowledge, AUSA Manager 1 did not have any direct contact with anyone from the FBI about the Morel investigation. Throughout my career in the FBI, an AUSA has never led plea negotiations

AR0000037

without consulting with me about what offers were being made to the defense and what the defense was saying.

I am not aware of any personal relationship between AUSA Manager 1 and AUSA (P), except that they have both been at the USAO since I arrived in New Orleans in 1999 and both served in USAO management for the last few years. When the Morel case was declined and AUSA (P) was First AUSA, AUSA (P) was superior to AUSA Manager 1 in the USAO chain of command. Also, AUSA (P) participated in the review committee which chose AUSA Manager 1 to lead plea negotiations.

On February 10, 2016, AUSA (P) advised me that OCGS approved charging Morel with RICO. He did not tell me which racketeering acts had been approved, but I believe it included more than thirty acts of soliciting sexual bribes and obstruction of justice.

### F. Plea Negotiations

After receiving authority to charge Morel with RICO, the USAO began plea negotiations in earnest. On February 14, 2016, AUSA (P) advised me that Morel was being offered a new plea under Federal Rule of Criminal Procedure 11(c)(1)(C) limiting his sentence to twenty-five months. I alerted FBI management to the negotiations.

On February 19, 2016, I briefed FBI SAC Jeffrey Sallet, who had taken over from SAC Anderson. Shortly after the brief, he called USA Polite and reported back that USA Polite had told him there would be no Rule 11(c)(1)(C), the offer would be the same as AUSA (P) with an additional civil rights violation (a total maximum sentence of eighty-three years), and that Morel's conduct would be publicly exposed instead of hidden in a reduced charge. SAC Sallet told me that the offer had been made on February 17, 2016 with a one-week deadline. SAC Sallet told me that USA Polite had said the case would be charged by the "end of the month" if Morel did not take the deal. USA Polite also claimed that the case would not have been re-opened it were not for him. (I took this statement as an indication that USA Polite was aware that members of the USAO were opposed to prosecuting the case because of the past declination and OIG complaint.)

When telling me and others what USA Polite had said, SAC Sallet somewhat rhetorically asked why the case had not been prosecuted. I answered, "Corruption."

On February 22, 2016, I spoke with AUSA (P) about the plea offer, because I was concerned that USAO middle management was not following what USA Polite had told SAC Sallet. AUSA (P) told me that the USAO had spoken with the Capitellis on February 17, 2016, but they were still negotiating. The USAO was supposed to hear from them that week. The USAO was considering reducing the two obstruction counts in the plea offer which each carried maximum sentences of twenty years to an obstruction of justice charge with a three-year maximum sentence, Title 18 U.S.C. Sec. 1512(d).

21

AR0000038

On February 24, 2016, the deadline reported by USA Polite to SAC Sallet passed without any word from the USAO.

On February 25, 2016, AUSA (P) told me that the Rule 11(c)(1)(C) had been removed from the plea offer because of concerns about the judge rejecting the sentence. (Recently, Judge Milazzo had rejected the government's Rule 11(c)(1)(C) plea agreement with Darren Sharper.) AUSA (P) told me that I was not going to like what the USAO had decided, Morel was going to get three to five years with a charge of violating 18 U.S.C. Sec. 1512(d).

On February 26, 2016, ASAC (P) contacted First AUSA (P) who confirmed that Morel was being offered a three-year maximum sentence.

On February 27, 2016, Sheriff Champagne contacted me after meeting with USA Polite. He confirmed that USA Polite approved of changing the obstruction charges from a maximum sentence of twenty years to a maximum sentence of three years. USA Polite was vague about the number of counts though, which left open the possibility that the offer had been made with multiple counts. USA Polite told Sheriff Champagne that the deadline was Wednesday, March 2, 2016 at 5:00 p.m.

Shortly after 5:00 p.m. on Wednesday, March 2, 2016, Sheriff Champagne advised me that USA Polite had told him he had not heard about Morel's response.

On March 3, 2016, I was advised by FBI management that First AUSA (P) had not heard a response to the latest offer. He confirmed that the plea offer had been for Morel to plead to one count with a maximum sentence of three years.

On March 4, 2016, SSA (P) advised me that she had heard from First AUSA (P) that there had been no deadline, because the USAO had not sent Morel a draft factual basis to sign. The USAO was meeting with the Capitellis that afternoon. Before the meeting, I asked AUSA (P) for a copy of the proposed factual basis which he sent. (In the past, I never had to request a copy of a factual basis. This was normally something prosecutors asked me to review to assist them.) I was told that USA Polite was reportedly insisting that Morel's full conduct be included in the factual basis. During the conversation, AUSA (P) said that he wanted to get a copy of the motion the Capitellis intended to file against me, suggesting that the Capitellis had made accusations against me. I was provided with no specific allegations.

After the meeting with the Capitellis on March 4, 2016, AUSA (P) called and asked for the recordings of conversations between Keim and Morel to play for the Capitellis. The USAO had agreed to give them some form of pre-indictment discovery. After consultation with FBI management, I agreed to give them to him.

On March 5, 2016, an FBI agent told me that AUSA (P) had been present for an interview in another investigation, separate from the Morel case, which has the potential to

22

AR0000039

embarrass the USAO. AUSA (P) expressed concerns after the interview that the investigation could be more embarrassing to the USAO than the blogging scandal.

On March 7, 2016, I ran into SAC Sallet in the FBI office. He told me that USA Polite had called him on Saturday (March 5, 2016) and told him that he had ordered his people to indict Morel. USA Polite also said the Capitellis threatened that they had "bombshells" about the FBI. Once again, I was not advised of any specific allegations.

Later that day, I gave AUSA (P) copies of the Keim recordings. He told me that the Capitellis were threatening to create substantial problems for the USAO if Morel were indicted. AUSA (P) provided no specific details.

I believe the Capitellis were testing the government's case by alleging wrongdoing. I was not concerned about their threats. However, my OIG complaint was likely to be disclosed if I took the witness stand. I intended to disclose (P) and Capitelli's relationship at the first opportunity I had.

On March 8, 2016, AUSA (P) asked for an agent to play the recordings to Morel and the Capitellis on March 11, 2016, but they refused to meet with me. I offered my co-case agent, Special Agent (P) On March 9, 2016, when I advised SSA (P) of AUSA (P) request, she refused the USAO's demand that an agent other than me meet with the Capitellis and Morel. I advised AUSA (P) via e-mail that the FBI insisted that I play the recordings since I was the case agent and that I was available the morning of March 11, 2016. That afternoon, SSA (P) received a call from First AUSA (P) AUSA Manager 1 had accused the FBI of refusing to send anyone to play the recordings. SSA (P) explained that I was available as I was the case agent. Ultimately, Morel was not available on March 11, 2016, and AUSA (P) played the recordings for them on or about March 15, 2016.

From March 19 through 26, 2016, I was in Budapest, Hungary teaching a course on public corruption investigations. While overseas, Sheriff Champagne let me know that he had heard from USA Polite that there would be no deal with Morel.

On March 28, 2016, AUSA (P) asked to meet with me on March 30, 2016 to prepare for testimony. On March 29, 2016, AUSAs (P) and (P) called to tell me that plea negotiations were on-going, but they would meet with me on March 30, 2016 at 1:00 p.m. to prepare me to testify. They warned me that the factual basis was being changed to limit the scope of Morel's conduct involving women other than Keim to between 2007 and 2009. Previously, the full scope of Morel's conduct, at least twenty-two women between 1986 and 2012 had been included.

On March 30, 2016, I met with AUSAs (P) AUSA (P) also joined the meeting after expressing an interest in the case. All three worked diligently to

23

AR0000040

prepare me to testify. During the preparation, I learned that if Morel were charged with RICO that the charge could not be dismissed without the approval of OCGS.

During the course of the meeting, I was told that Morel wanted a week to consider the deal. Later in the afternoon, I was told that Morel was contacting his family about the deal which we interpreted as a sign that he was going to accept it. Sometime between 5:00 p.m and 6:00 p.m., AUSA Manager 1 brought in documents, which I learned were the final factual basis to which Morel had agreed. AUSA Manager 1 told AUSA (P) to sign the documents. AUSA (P) expressed concern about signing the documents without reading them. I do not recall exactly what AUSA Manager 1 said after that, but AUSA Manager 1 stayed while AUSA (P) signed the documents without reading them. AUSAs (P) were also present. AUSA Manager 1 made a statement about the Capitellis possibly waiving a presentence investigation for the case. AUSA Manager 1 also made a comment about having the re-arraignment and sentencing on the same day, but he expressed doubt about that happening.

When I left the USAO that evening, I reviewed the portion of the factual basis involving Morel's conduct with women other than Keim. Based upon the previous conversation about this change from the proposed factual basis, I was not surprised to see this change. I did not read the rest of the factual basis until March 31, 2016. When I did, I saw that there were substantial changes to the portions of the factual basis involving Keim. Transcripts of portions of recorded conversations and other evidence were removed from the factual basis. The changes substantially minimized Morel's conduct, including evidence of crimes Morel committed other than the charged offense. I contacted AUSA (P) and expressed a concern about the factual basis. He told me that he had not drafted the document because he had been working on charging Morel. (He had been preparing me to testify through the whole afternoon of March 30, 2016.) I then did a more detailed comparison between the proposed factual basis and final factual basis and wrote a rough description of the pertinent differences between the documents. (Because one document was in Microsoft Word and the other an Adobe PDF, I could not do an electronic comparison.) I contacted AUSA (P) again later in the day and advised him to do a redline comparison of the documents to review. I told him that I would not want my name on that factual basis. Based upon AUSA (P) position in the office and how the negotiations had been handled by AUSA Manager 1 instead of AUSA (P) I do not believe that AUSA (P) was in a position to make any changes to the document or deal. I do not believe that AUSA (P) was aware of the changes that were made. I do not believe that AUSA (P) intended in any way to withhold anything from this Court. I believe he was simply following the orders of his superiors.

On April 1, 2016 around 2:56 p.m., I told ASAC (P) that I intended to write a letter to this Court describing the USAO's misconduct unless FBI management gave me a reason why I could not do so. Around 3:35 p.m., ASAC (P) told me he had relayed our concerns about Morel's sentencing occurring without a presentence investigation to First AUSA (P) First AUSA (P) said the USAO would oppose any attempt to avoid a presentence investigation. At

24

8:44 p.m. AUSA (P) called and told me that he had been tasked with writing a sentencing memorandum. At 10:27 p.m., ASAC (P) called me. He told me that if I wrote a letter to this Court disclosing the USAO's misconduct, the USAO could dismiss the charge against Morel entirely. I told him I would not send the letter then.

I decided to avoid dismissal by the USAO by notifying this Court after Morel pleaded guilty.

At the press conference after Morel's plea on April 20, 2016, SAC Sallet called Morel a "sexual predator" and officials disclosed that there were more than twenty witnesses against Morel. (Based upon what I observed, besides Keim, Morel had oral sex with five women, made some sexual physical contact with at least eight women, and solicited sexual activity from at least nine others between 1986 and 2012. All of these actions were in connection with his position as district attorney.) The press logically asked why Morel received the plea agreement he did, if his conduct was as significant as described. When USA Polite was asked by one reporter how he told victims the plea agreement was "justice", the USA responded, "In many of these circumstances, we are dealing with very significant evidentiary concerns. We are dealing with vulnerable victims that if exposed to the scrutiny of the media or the scrutiny of the courtroom would prove to be very difficult witnesses and may ultimately lead to no justice for this defendant." USA Polite did not disclose the ethical problems at his own office at the press conference. Nor did USA Polite disclose that OCGS had approved a RICO charge against Morel which would have made a conviction much easier, as the jury could rely on only Keim's tapes or a handful of the witnesses.

I did the legal research associated with the "evidentiary concerns" and found no serious concerns with getting the evidence admitted. Neither did OCGS since it approved the RICO charge. (To my knowledge, I am the only person to do any substantial legal research, on the Morel case before the RICO memo was submitted to OCGS.) To my knowledge, USA Polite never met any of the witnesses, and, other than AUSA (P) no AUSA met more than one witness. I met every witness and conducted almost all of the interviews. USA Polite's characterization of the witnesses is inaccurate and unfair. Several of the witnesses were prepared to testify and several did not have any "baggage" of any concern. Finally, sexual predators do not prey on the strong. Like his First AUSA, USA Polite blamed the victims and witnesses instead of admitting to his and his office's own failures in the case.

After Morel pleaded guilty on April 20, 2016, I notified FBI management again of my intention to write the misconduct letter to this Court. I was ordered to submit the misconduct letter to the FBI New Orleans Division's Chief Division Counsel. I submitted the misconduct letter for review on May 3, 2016. Although the Chief Division Counsel finished reviewing the misconduct letter that same day, I was not given an official response from the FBI's Office of General Counsel (hereinafter "OGC") for four weeks. I was instructed by OGC to send the misconduct letter to Justice Department entities that accepted complaints from whistleblowers,

25

AR0000042

such as the OIG or Office of Professional Responsibility (hereinafter "OPR"), and request permission to send the misconduct letter. On June 2, 2016, I expressed my desire to send the misconduct letter concurrently through prepublication review for disclosure as a private citizen under the First Amendment, but an FBI manager advised me against doing so. I submitted the misconduct letter to the OIG on June 2, 2016, approximately two days after receiving instructions from OGC. The OIG quickly acknowledged receipt of the letter and shortly thereafter advised me that the matter was transferred to OPR. (Throughout the past three years, the OIG has acted professionally and has been supportive of efforts to reform the Justice Department.) On August 11, 2016, OPR advised that it would be inappropriate for it to comment on whether I should send the letter to this Court and, consequently, the FBI advised me that I could not send the letter in my official capacity.

Because of the delay in a response from OPR, I began a concurrent process to disclose the misconduct letter to this Court under the First Amendment on August 8, 2016 by submitting two letters to the FBI's prepublication review program. One letter, a shorter notification letter, was submitted for review which was intended to notify this Court of the existence of the misconduct letter in case it could not be reviewed in time for the hearing on August 17, 2016. Both letters included the wording that I intended to make disclosures to this Court and the media as a private citizen under the First Amendment. In my e-mail submitting the letters for prepublication review, I wrote "I previously attempted to disclose this misconduct in my official capacity. I assumed the process outlined to me by management and OGC [FBI Office of General Counsel] would have worked. The process has not worked. I have received no word from DOJ, so I have chosen to do.this in my personal capacity." I also wrote in the e-mail, "[s]ince I am being forced to send this in my personal capacity under the First Amendment, I intend to submit the letters to members of the media as well as the court." FBI agents are not authorized to make disclosures to the media as part of their official duties.

On August 12, 2016, I was notified that the FBI would not review either of the two letters that I submitted for prepublication review because the FBI took the position that the disclosures would be made in the performance of my official duties and were outside the scope of the prepublication policy guide. I immediately asked what basis was used to make that determination considering I specifically asserted my First Amendment rights. I also asked if it was the FBI's position that an FBI employee has no right under the First Amendment to report prosecutorial misconduct to a Federal judge because that employee witnesses the misconduct in his official duties. I also requested an appeal of the decision as the agency's final determination on the matter. I asked for an answer by close of business on August 15, 2016 and cited the August 17, 2016 sentencing hearing as a reason for the short deadline. On August 15, 2016, I was notified that the FBI's August 12, 2016 decision only pertained to my request to disclose letters to this Court and that my request to disclose the letters to the media were under review. I replied that, because of the August 17, 2016 sentencing hearing, although the administrative

AR0000043

appeals process was not complete, I had to treat the FBI's position on August 15, 2016 as its final decision.

Conclusion

Based upon the above, with respect to the Morel case, I believe the following:

1. AUSA (P) involvement in the Morel case in 2013 caused at least an appearance of impartiality because of his property ownership with Capitelli.

2. After the unusual declination of the case in 2013, the members of the USAO at the time of the declination had at least an appearance of impartiality regarding the case. They had a personal interest to avoid seeing their previous decision publicly reversed.

3. After my OIG complaint against AUSA (P) consideration of the case by members of the USAO caused at least an appearance of impartiality. They had a personal interest in avoiding another scandal about the USAO becoming public.

4. Although USA Polite reopened the USAO's file in 2014 under pressure from investigative agencies, he failed to keep members of his office who lacked impartiality away from consideration of the matter, e.g. AUSA (P) Furthermore, it appears as though he invited their consideration of it.

5. The plea agreement between Morel and the USAO on March 30, 2016 is tainted by the USAO's lack of impartiality in the matter. The USAO has failed to represent the interests of the victims and the United States as a whole in this case.

6. This prosecutorial misconduct is relevant to this Court's consideration of the case, but the Justice Department and FBI has failed to notify this Court even though I requested to do so in my official capacity. Furthermore, the FBI managers have violated my First Amendment rights by refusing even to review my request to disclose this letter to this Court in my capacity as a private citizen.

Because I am writing this letter as a private citizen, I will make additional observations and recommendations that go beyond the scope of the case. The mishandling of the Morel matter is not an isolated incident. I have experienced firsthand, or heard from other agents, numerous examples of prosecutors mishandling cases especially, but not only, in corruption cases. Based upon what I have seen and heard, I believe that there is systemic corruption in the Justice Department. The FBI uncovers corruption, and the Justice Department covers it back up again. FBI managers advocate for prosecution of cases, but stifle attempts by agents to make the public aware of this systemic corruption in the Federal criminal justice system.

The law, in the form of Rule 6(e) and the Privacy Act, allows prosecutors to obscure their inaction on prosecutable cases. For example, one of the purposes of Rule 6(e) is to protect those

AR0000044

determined to be innocent by the Grand Jury, but the supposed independence of the Federal Grand Jury is a myth. Prosecutors decide what the Grand Jury hears and whom it considers as a target. If prosecutors do not put a case before the Grand Jury, the material collected in its name remains secret unless those same prosecutors seek authorization for its release. In reality, Rule 6(e) has the perverse effect of allowing one or a handful of Federal prosecutors to bury evidence of criminal behavior without even giving the Grand Jury the opportunity to determine a target's guilt or innocence. I have seen this several times---evidence of criminal conduct by public officials and contractors sealed from the public by Federal prosecutors using Rule 6(e). None of the evidence of which I write would identify or jeopardize a single witness, another important purpose of Rule 6(e).

Justice Department and FBI policies regarding whistleblowing and disclosing facts of investigations to the public also protect prosecutors. From my own experience, I can only describe the procedures as Byzantine and a concerted effort to conceal government misconduct. My most recent attempt to disclose prosecutorial misconduct to the judge presiding over the case was met with a bureaucratic runaround that had the effect of reducing my time to pursue my option to report under the First Amendment. That option was never presented to me by FBI OGC, although I never had direct contact with them. Ultimately, when I asserted my First Amendment rights, the FBI made contradictory assumptions that I could not disclose the misconduct as part of my official duties but any disclosure, even when made as a private citizen, was a part of my official duties. I believe this decision was an intentional effort by the FBI to keep these severe problems in the Federal criminal justice system from being disclosed.

The subtle punishment for speaking out and the antipathy against those who dare to try is daunting, even to someone with a law degree and experience as a Federal judge's clerk. Many of the best agents are disillusioned, angry, and demoralized, because of how prosecutors mishandle cases. Just a few days ago, I had a conversation with senior agents who suggested that the USAO should recuse itself from all FBI cases. Despite widespread abuse by prosecutors, agents must remain silent for fear that their next case will not be prosecuted. Their fear is justified. Since I filed my OIG complaint, I have had two cases subtly suffocated by prosecutors, and only one, Morel, prosecuted. I believe Morel was prosecuted because USA Polite feared public scrutiny if Sheriff Champagne arrested Morel on state charges, which he certainly would have with ardent FBI support. The USAO has no reason to fear the FBI alone, because the FBI cannot make arrests without its permission and the FBI will never speak out publicly against the Justice Department.

While these laws and policies have a valid purpose, they have become a refuge for scoundrels who are more interested in collecting a paycheck they have not earned than in zealously advocating for the United States. To borrow a phrase from Lord Acton, which was correctly applied to the FBI in the Whitey Bulger fiasco, "Every thing secret degenerates, even the administration of justice; nothing is safe that does not show how it can bear discussion and publicity." This decision-making shrouded in darkness has created a department which, at best,

AR0000045

is not working at optimal efficiency, or, as in the case of the USAO in the Eastern District of Louisiana, is one of the most corrupt government entities in its judicial district. I base that statement on having conducted or participated in corruption investigations in all thirteen parishes in the district, and using a broader definition of corruption to mean serving one's own interest over that of the public's, as opposed to outright bribery.

An effective USAO is desperately needed here. In the past few days alone, I have spoken with people from three parishes who have suffered at the hands of public officials abusing their power. There are some fantastic AUSAs at the USAO who can make a difference. I can think of several who bravely withstand withering fire in court to seek justice for the people of this district. Many of these talented dedicated AUSAs have been hired by USA Polite. However, the USAO cannot function properly if the USA does not have the courage to stand up to middle managers with conflicts of interest in cases, if the USA and First AUSA harbor a blame-the-victim mentality, and if other middle managers are more concerned about the office's reputation than seeking justice for victims.

The root cause of this systemic corruption is human nature. Human beings would rather not have their actions and decisions scrutinized. If prosecutors move forward with a case, they will be scrutinized, oftentimes unfairly, by defense attorneys, judges, and the media, especially if they dare to prosecute a powerful public official or other individual with connections. If Federal prosecutors do not take a case, there is little scrutiny and none of it is public. The secrecy of Federal prosecutorial decision-making lets Federal prosecutors take the easy way out if they choose. In the state system, on the other hand, where the police arrest and the district attorneys prosecute, the public can see what cases are and are not being prosecuted. There is public accountability for state prosecutors.

The lack of accountability for Federal prosecutors exacerbates the disparities in the Federal criminal justice system. Because Federal prosecutors can ignore the tougher cases without consequence, the less-committed prosecutors focus on the easier cases with less formidable defendants or more easily proven cases against the more formidable ones. I am convinced that if a police officer had done what Morel did, he would have been in prison a long time ago for much longer than the maximum three year sentence that the former district attorney faces, even with the exact same "evidentiary concerns" and "vulnerable victims" cited by USA Polite. Morel's conduct was far more odious than former District Attorney Walter Reed, but the USAO pounced on the fraud case which was already reported in the media. (I took no official part in the Reed case and base my comparison solely on what has been reported in the media.)

In the Marine Corps, I was taught to provide solutions when identifying a problem. I have three recommendations:

First, and most importantly, when Justice Department prosecutors decline a case which an investigative agency determines is prosecutable, the agency should be required by law to

AR0000046

provide a report to the public outlining the evidence against the subject. The report should be written in a manner which protects witnesses, sources, and methods. The American people should know when prosecutors and investigators disagree, so they can make their own decision about the effectiveness of both. In public corruption investigations, this recommendation would also shed light on the behavior of public officials believed by investigators to have committed a crime. Let the people see what their public "servants" are doing.

From my experience, management at investigative agencies will likely pressure case agents to agree with prosecutorial decisions in order to maintain peaceful working relationships with prosecutors. Therefore, case agents should have the legal duty to provide the report to a judge to decide whether it can be released, just like police officers who go directly to judges for warrants. Also, there should be serious consequences for managers who put undue pressure on agents to go along with prosecutors. A case agent who goes to a judge should receive whistleblower protections. He or she should not be sent on a fool's errand obtain permission from the Justice Department.

Second, U.S Attorneys should not have any influence on public corruption or civil rights cases. Political partisans with ambitions to become a mayor, congressman, or other official are the last people who should be making these decisions. Certainly, there are honest U.S. Attorneys, but the current system allows some foxes, or at least bravery-challenged watchdogs, to guard the henhouse.

Third, the Justice Department should hire prosecutors nationally instead of locally and force prosecutors to start out away from home. Also, it should rotate its managers within the local U.S. Attorney's Offices. This practice patterns the FBI and other Federal agencies. The FBI is far from perfect, but managers with fresh eyes and experience elsewhere in the nation can help turn around a rotting institutional culture. If the Justice Department is going to have career prosecutors, then it needs to take the same steps to combat their corruption as the investigative agencies have taken.

This letter will anger many powerful people, prosecutors, former prosecutors, defense attorneys, politicians, and FBI management. I have made more mistakes than I can count, and I am certain all of them, and some I have not made, will be used to discredit me. In reality, I mean nothing in all of this. I am just a messenger. If I am wrong, then I urge the Justice Department to prove it. Open up the files and let the American people see for themselves. I have a few cases in mind already which can be disclosed without violating Rule 6(e) or the Privacy Act.

I love fighting corruption in Louisiana. This is where I belong, but this letter most likely means my time is over here and possibly in the FBI. I am tired of having to accept corruption in order to fight corruption. I am tired of FBI managers pressuring me to accept corruption and cover up corruption by Federal prosecutors. More importantly, when I was in the Marine Corps, I learned the simple leadership lesson that I could not ask my Marines to do something that I

30

AR0000047

would not do myself. I see witnesses like I saw my Marines. I cannot ask others to expose corruption if I am not willing to do it myself. Danelle Keim faced far greater risks when she called 911 on April 16, 2010. I will never forget listening to her over a transmitter in her apartment while she waited for Morel to arrive on July 23, 2012. She was on the verge of breaking down from stress. She told me she was having flashbacks from Morel's sexual battery which prompted the emergency call more than two years earlier. She pulled herself together though and was a true hero. Danelle Keim was brave as anyone I have ever known. I will never forget the abuses the other women described to me. Nor will I forget their courage in disclosing them. One woman's description of what Morel did to her will haunt me for the rest of my life. The victims, the witnesses, the ones who told the truth in this case, deserve nothing less than the same from me. They certainly deserved better from the U.S. Department of Justice and the FBI.

Michael S. Zummer

*I suggested RMD redact*

AR0000048

Michael S. Zummer
2337 Magazine St. Unit D
New Orleans, LA 70130

August 15, 2016

The Honorable Kurt D. Engelhardt
United States District Court
  for the Eastern District of Louisiana
C-367 Hale Boggs Federal Building
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

Re:    *United States v. Harry J. Morel, Jr.*, Criminal No. 16-050

Dear Judge Engelhardt:

Although I am the Federal Bureau of Investigation (hereinafter "FBI") case agent on the current investigation into Harry Morel (hereinafter "Morel"), I am writing this Court in my capacity as a private citizen under the First Amendment. I do not represent the FBI or U.S. Government in any way. The views in this letter are mine alone. The purpose of my letter is to report misconduct by the United States Attorney's Office for the Eastern District of Louisiana (hereinafter "USAO") which has affected the prosecution of Morel. I believe that the USAO's misconduct has resulted in a plea agreement with Morel based more on its own interest in covering up its misconduct than in advocating for a just result. I believe these matters are of public concern and deserve First Amendment protections.

I am not alleging misconduct by every Assistant U.S. Attorney (hereinafter "AUSA") who has participated in the case. Some have performed admirably and ethically, including AUSA ⬛ (P)

With the exception of Ralph Capitelli's statements to the media about now-deceased witness Danelle Keim and me, which are not the subject of this letter, I am not alleging any misconduct on the part of Morel's attorneys.

When I asked to report the misconduct to this Court in my official capacity, I was barred from doing so. I was informed that the FBI does not communicate directly with the courts without permission from the Justice Department. At the FBI's direction, I submitted the letter to Justice Department entities to ask for permission to send the letter. The Justice Department entities determined that they were not in the position to grant me permission. The FBI then notified me that I could not submit the letter in my official capacity.

1

AR00000262

When I asked to disclose this letter to this Court as a private citizen under the First Amendment, I was notified that the FBI would not review this letter for prepublication review which FBI policy requires prior to any release. Even though I wrote in the letter that I was writing in my capacity as a private citizen under the First Amendment, the FBI determined that the disclosure to this Court was in the performance of my official duties and could not be reviewed. The FBI's position essentially asserts that I have no First Amendment right to disclose prosecutorial misconduct on a case to the presiding judge. Although the FBI's administrative appeals process has not been completed, I gave the FBI until the close of business on August 15, 2016 to make a final decision citing the August 17, 2016 sentencing hearing in this case. The FBI did not make a final decision. The FBI's refusal to authorize the release of this letter under its prepublication review policy violates my First Amendment rights which will be irreparably harmed if I do not take action before the August 17, 2016 sentencing hearing. I must treat their position on August 15, 2016 as a final decision.

Because this matter involves a dispute over Constitutional rights, it can only be resolved in the Federal courts. In the course of litigation, the disclosure would be submitted to a court anyway for a decision. Because the disclosures in dispute are letters to a court and part of my reason for disclosure under the First Amendment is to notify this Court of prosecutorial misconduct which is relevant to a hearing on August 17, 2016, I am submitting the full misconduct letter to this Court for a judicial determination on whether this disclosure is deserving of First Amendment protections. To that end, I am notifying the FBI of the submission to allow the FBI the opportunity to dispute the issue. If the FBI maintains the position it has taken, that this disclosure is within the performance of my official duties and not protected under the First Amendment, the FBI, after seeking permission from the Justice Department, can argue that issue before this Court and ask to have the letter returned or sealed. Although, by asserting that this letter is not within my First Amendment rights I believe the FBI has forfeited its opportunity to raise matters involving its prepublication review, the FBI will have an opportunity to raise those issues before this Court. If the FBI does not assert itself before this Court, or this Court determines that the FBI's legal position is incorrect, I request that this Court place the letter in the public record. I will not submit this letter to the media, unless this Court puts it in the public record. Therefore, any public release of this letter will be a judicial decision after the FBI has had the opportunity to communicate with this Court, if it chooses to do so.

Although this is not the normal procedure to handle this sort of legal issue, the FBI's conduct has left me no choice. I have consistently told FBI officials of Morel's sentencing hearing on August 17, 2016, which is when my disclosure is most important to this Court, although the larger public concerns will remain. Submitting the letter in this manner is the only way to allow a judicial determination over the legal question posed by the FBI's decision to deny me my First Amendment rights in time for my speech to get to the public entity immediately affected by it.

AR00000263

## 1. Background and Experience

I was first employed as an FBI special agent in 1999 after serving as a Marine Corps infantry officer. I was assigned to investigate white collar crime in New Orleans. My investigations resulted in twenty-one convictions. In 2003, I left the FBI to attend Stanford Law School. After my first year of law school, I interned at the Ministry of the Interior for the Republic of Georgia where I provided advice on combating corruption. I then volunteered to serve a tour in Al Anbar Province, Iraq as a Marine reservist where I was responsible for the development of the Iraqi Security Forces. During my tour, I also investigated corruption by Iraqi officials.

After graduating from Stanford Law School in 2007, I clerked for Judge Edith Brown Clement of the U.S. Court of Appeals for the Fifth Circuit from 2007 to 2008. I returned to the FBI as a special agent in 2008 and was assigned to investigate public corruption. My investigations have, so far, resulted in nine convictions, not including Morel's. I have also taught classes on public corruption investigations overseas to investigators, prosecutors, judges, and other public officials from thirteen countries. During the course of this instruction, I have been exposed to corruption problems in those countries.

In 2015, I was reassigned to the International Terrorism squad in New Orleans after making public comments critical of the USAO, but I continued to teach about corruption overseas and continued as the lead case agent on two corruption investigations, including the Morel case. Recently, I was reassigned to the Law Enforcement Corruption squad in New Orleans.

I have been continuously assigned as the lead case agent on the Morel investigation since the current case was opened in 2009.

## 2. Legal Issues

### A. First Amendment

The Supreme Court has "identified two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (internal citations omitted). "When an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences. When, however, the employee is simply performing his or her job duties, there is no warrant for a similar degree of

3

AR00000264

scrutiny." *Id.* at 423. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.

My situation is substantially different from the facts in *Garcetti*, where a prosecutor, Ceballos, alleged retaliation after conveying his opinion and recommendation to his supervisor regarding a search warrant affidavit that he believed contained serious misrepresentations. *Id.* at 420. The Court determined that the Ceballos "did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee." *Id.* at 422.

My disclosure to this Court is not part of my official duties. I have made specific assertions that I am writing this letter as a private citizen under the First Amendment, which Ceballos never did. This assertion by a government employee is important, because it tells the reader that the disclosure is not the official government position. Also, it is a decision by the employee about which form of legal protection the employee seeks, the First Amendment or whistleblower protections. Although I reported this prosecutorial misconduct to the appropriate authorities for whistleblowers, I am not claiming that protection in this disclosure to this Court.

Most importantly, the FBI has told me that I cannot make this disclosure in my official capacity without permission from the Justice Department and the Justice Department has not given me that permission. Therefore, according to the FBI, I do not have the authority to make this disclosure to this Court in my official capacity as an FBI agent. However, the FBI has also apparently decided that, despite my assertions to the contrary, any disclosure that I make to this Court about this case is within my official duties. The FBI is taking contradictory positions which prevent me from making this disclosure. Because I am reporting misconduct by the Justice Department, of which, the FBI is a part, the FBI has every reason to take such a position to prevent this letter from being disclosed to this Court and, ultimately, the public. The FBI's position essentially gives the Justice Department unbridled power over whether its employees can report misconduct by Justice Department prosecutors to a court affected by the misconduct.

If the FBI argues that I lost my First Amendment rights when I attempted to report this misconduct in my official capacity by following the process it outlined to me, I only followed that process because I was directed to do so. I have followed the FBI's procedures and orders, but the FBI has refused to follow its own policy and refused to review this letter even though I asserted my First Amendment rights. The vast majority of time writing this disclosure, even when I was attempting to make it in my official capacity, has been spent outside of working hours. The vast majority of time and resources spent at work on this matter have been expended

4

AR00000265

to follow the FBI's procedures to make this disclosure, whether in my official or private capacity.

My situation is close to the one in *Lane v. Franks*, 134 S.Ct 2369, 2378 (2014), where the Court held that, "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes. That is so even when the testimony relates to his public employment or concerns information learned during that employment." Although *Lane* involved sworn testimony under a subpoena, I am providing information to a court regarding a matter before it. Like the testimony in *Lane*, I believe this disclosure provides information relevant to this Court's upcoming decision and public policy matters far beyond it. (The only reason I am not providing this letter to the media at this time is because the FBI has refused to review this letter for prepublication review and I am attempting to give the FBI the opportunity to address this Court before it is placed in the public record.) "[P]ublic employees are uniquely qualified to comment on matters concerning government policies that are of interest to the public at large." *Id.* at 2380 (internal citations and quotations omitted). To quote *Lane*, "[t]he importance of public employee speech is especially evident in the context of this case: a public corruption scandal."

The purpose of my disclosure to this Court is not to address the facts of the Morel case but to notify this Court of corruption in the Justice Department over the handling of the case and the FBI in trying to prevent disclosure of the misconduct. This is not a personal grievance. I am not asking for any relief from this Court except to make it aware of what happened and to allow the public to see that. This Court should know the pattern of misconduct that led to the plea agreement before it. The prosecutorial misconduct in this case also concerns the victims and witnesses who have been attacked in public statements by defense counsel. It concerns the Saint Charles Parish Sheriff's Office which put itself at great risk to assist the investigation. The victims, witnesses, and investigative team should know, and they deserve to have the public know, why this plea agreement was made. In public statements, U.S. Attorney Kenneth Polite has blamed the victims in part for the decision to make the plea agreement. If the U.S. Attorney can publicly blame the victims, the victims deserve to have the prosecutorial misconduct by U.S. Attorney Polite and his office which led to the plea agreement aired in the public sphere. Finally, the public should know when there is corruption in the criminal justice system and attempts by the FBI to conceal that misconduct from public scrutiny.

I cannot forecast what the FBI will do to me. So, it is difficult to answer the Court's second question from *Garcetti* of "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti* at 418. However, after the FBI determined that I had no First Amendment right to make this disclosure, I took the only reasonably available route to make a limited disclosure to the entity which needed the information in a timely manner while giving the FBI the opportunity to assert itself to this Court. The FBI created this problem and this Court would have been

5

AR00000266

prejudiced if I did not make this disclosure. This Court should be involved in the decision-making and see the information at issue before the hearing on August 17, 2016.

I do not believe the FBI can have any justification, let alone an adequate one, if it takes administrative action against me for making this limited disclosure to this Court. I have shown far more respect for the FBI's policies and procedures than the FBI is showing for my assertion of my First Amendment rights. On August 15, 2016, another FBI agent informed me that an FBI manager allowed him to write a letter to a court in similar circumstances to my own without going through the procedures I was forced to follow. The FBI appears to pick and choose which disclosures it scrutinizes.

### B.  Grand Jury Material

As a general matter, I believe it is well-established that many Federal investigations include Grand Jury material which cannot be disclosed under Federal Rule of Criminal Procedure 6(e). The factual basis filed with this Court discloses that a Grand Jury subpoena was issued in the Morel case. To the best of my knowledge and understanding of Rule 6(e), I am not including anything in this letter that would violate my obligation as someone to whom there have been disclosures made under Rule 6(e)(3)(A)(ii).

The Supreme Court has "noted several distinct interests served by safeguarding the confidentiality of grand jury proceedings. First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment. Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule." *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 218-19 (1979).

The Fifth Circuit has described the Rule 6(e) secrecy requirement as applying "not only to information drawn from transcripts of grand jury proceedings, but also to anything which may tend to reveal what transpired before the grand jury." *In re Grand Jury Investigation*, 610 F.2d 202, 216 (5th Cir. 1980) (internal citations and quotations omitted). The court also "construe[d] the secrecy provisions of Rule 6(e) to apply not only to disclosures of events which have already occurred before the grand jury, such as a witness's testimony, but also to disclosures of matters which will occur, such as statements which reveal the identity of persons who will be called to testify or which report when the grand jury will return an indictment." *Id.* at 216-17.

However, the Fifth Circuit noted that "the disclosure of information obtained from a source independent of the grand jury proceedings, such as a prior government investigation, does not violate Rule 6(e). A discussion of actions taken by government attorneys or officials E.g., a

6

AR00000267

recommendation by the Justice Department attorneys to department officials that an indictment be sought against an individual does not reveal any information about matters occurring before the grand jury. Nor does a statement of opinion as to an individual's potential criminal liability violate the dictates of Rule 6(e). This is so even though the opinion might be based on knowledge of the grand jury proceedings, provided, of course, the statement does not reveal the grand jury information on which it is based." *Id.* at 217 (internal citations omitted).

Although FBI agents often receive disclosures under Rule 6(e)(3)(A)(ii), we also testify as fact witnesses. "Rule 6(e) does not prevent disclosures by a witness who testifies before the grand jury." *Id.* at 217 (internal citations omitted).

The D.C. Circuit has stated "internal deliberations of prosecutors that do not directly reveal grand jury proceedings are not Rule 6(e) material." *In re Sealed Case No. 99-3091*, 192 F.3d 995, 1003 (D.C. Cir. 1999). "It may be thought that when such deliberations include a discussion of whether an indictment should be sought, or whether a particular individual is potentially criminally liable, the deliberations have crossed into the realm of Rule 6(e) material. This ignores, however, the requirement that the matter occur before the grand jury. Where the reported deliberations do not reveal that an indictment *has been* sought or *will be* sought, ordinarily they will not reveal anything definite enough to come within the scope of Rule 6(e)." *Id.* at 1003 (emphasis in original).

This letter will not disclose any witnesses, whether or not they testified before a Grand Jury, and Morel has been charged and pleaded guilty, although to a lesser offense. My knowledge of his conduct comes from the FBI investigation. This letter will disclose potential charges discussed and approved by Justice Department attorneys, but none of the discussions or approvals I mention will be definite enough to come within the scope of Rule 6(e).

C. Privacy Act

Because I am now submitting this letter through the FBI's prepublication review process, I will briefly address the potential Privacy Act issues. Simply stated, I am not disclosing anything in this letter that was retrieved from a system of records using personal identifiers. Most of what is in this letter has not even been entered into any system of records of which I am aware. I was a firsthand witness to anything in this letter that was placed into any system of records before a record was created or submitted.

This letter is primarily a description of the prosecutorial actions that I observed or of which I was told. I have attempted to remove factual issues about the case, but some issues have to be described to give context to the prosecutors' actions. The only possible witness named in this letter, Danelle Keim, aka Danelle McGovern (hereinafter "Keim"), is now deceased and has already been named publicly by the FBI and others as a witness. The details of her activity as a witness are part of the factual basis filed in the public record of this Court. Furthermore, several

AR00000268

public officials have made public statements about the results of the investigation into Morel's conduct.

### D. U.S. Attorney's Manual on Recusal

Although I do not believe that the Justice Department's rules for its attorneys are enforceable by the courts, they are instructive in showing when prosecutors have failed to follow the appropriate standards.

"When United States Attorneys, or their offices, become aware of an issue that could require a recusal in a criminal or civil matter or case as a result of a personal interest or professional relationship with parties involved in the matter, they must contact General Counsel's Office (GCO), EOUSA. The requirement of recusal does not arise in every instance, but only where a conflict of interest exists or there is an appearance of a conflict of interest or loss of impartiality." *United States Attorneys' Manual*, 3-2.170 – Recusals, Feb. 2004. "The same circumstances which require that a United States Attorney recuse himself/herself (see USAM 3-2.170) apply to an Assistant United States Attorney. Ordinarily, the fact that an Assistant United States Attorney recuses will not require that the United States Attorney or the office recuse itself and the case or matter may be reassigned to another Assistant." *United States Attorneys' Manual*, 3-2.220 – Recusals, Feb. 2004.

### 3. Conduct of Prosecution

#### A. Case Declination

The current investigation into Morel was initiated in June 2009. On November 29, 2012, AUSA ___ (P) ___ told me he was assigned to the case. Previous AUSAs removed themselves from the case after a disagreement over how to conduct the investigation covertly.

A few days after another agent and I attempted to interview Morel on December 10, 2012, which was the end of the covert phase of the investigation, Ralph Capitelli (hereinafter "Capitelli") called and said that he was representing Morel. I advised AUSA ___ (P) ___ of Capitelli's representation of Morel. At the time, I was working on a search warrant affidavit to search for evidence in Morel's office, specifically a camera memory card. On November 30, 2012, Keim, while cooperating with the FBI, recorded a conversation with Morel during which she gave a memory card to him in his office. I submitted a draft affidavit to AUSA ___ (P) ___. AUSA ___ (P) ___ later told me that his chain of command had reviewed the affidavit and all had said there was no probable cause to search Morel's office. (Unlike state officials, FBI agents, at least in the Eastern District of Louisiana, must obtain approval for a search warrant from the USAO before submitting an application to a judicial official.)

Because the USAO blogging scandal had recently caused the departure of U.S. Attorney (hereinafter "USA") James Letten and First Assistant U.S. Attorney (hereinafter "First AUSA")

AR00000269

(P) AUSA (P) chain of command had become AUSA (P) (Deputy Chief of Criminal), AUSA (P) (Chief of Criminal), First AUSA (P) and Interim USA Dana Boente. When I asked AUSA (P) what the specific issue was with the search warrant affidavit, he said that he had talked to First AUSA (P) and Interim USA Boente about it, but they had not provided specifics. AUSA (P) then provided other assistance to the investigation.

On January 11, 2013, even though the USAO had denied the FBI a search warrant for Morel's office, Louisiana 29th Judicial District Attorney Joel Chaisson consented to a search of Morel's office. As described in the factual basis, Morel was served with a Grand Jury subpoena to turn over the memory card. Through his attorney he claimed that agents had taken the card during their search. Agents had not found the card during the search. Morel was supposed to turn over the memory card by January 17, 2013. (Although the due date of the subpoena is not disclosed in the factual basis, I do not believe this additional information---a due date that was never followed---is sufficiently specific to disclose a matter likely to occur before a Grand Jury.)

During the week of February 4, 2013, AUSA (P) informed me that he had spoken with Capitelli who denied that Morel had the memory card. AUSA (P) said that he told Capitelli that the government had a copy of the memory card anyway. (I had given Keim a copy of the original memory card to give to Morel. The FBI maintained custody of the original.)

On February 9, 2013, I was informed by Saint Charles Parish Sheriff Greg Champagne that Keim had been found dead that morning. There was no evidence to connect Morel to her death. She died immediately after a news report about the investigation. The report did not name Keim but provided sufficient information to identify her to Morel.

I notified AUSA (P) of Keim's death. In order to mitigate the loss of her potential testimony, I arranged to interview a potential witness (hereinafter "Witness 1") who was in custody. The morning of February 13, 2013, the prison called to tell me that Witness 1 had been transported to Saint Charles Parish. Sheriff Champagne informed me that then-Louisiana 29th Judicial District Court Judge Michele Morel (Morel's daughter) had issued a writ to have Witness 1 brought to court. An assistant district attorney (hereinafter "ADA") who had previously been employed by Morel was going to meet with Witness 1. Although I had no information indicating misconduct on the part of then-Judge Morel or the ADA, I was concerned about the potential for abuse. I called AUSA (P) and left a voicemail describing my concerns. I then contacted District Attorney Chaisson about the meeting. He immediately recused his office from any cases involving Witness 1. AUSA (P) never addressed the issue regarding Witness 1.

On February 15, 2013, AUSA (P) called me and told me that he had spoken to First AUSA (P) and Interim USA Boente. He said that after Keim's death the case against Morel which was difficult before was now impossible. I told him that I disagreed because we still had

9

AR00000270

solid evidence. I informed him that in the case against Congressman William Jefferson recordings were still admissible even though the source did not testify.

On February 18, 2013, I ran into AUSA (P) in downtown New Orleans. I told him that we should still meet with Capitelli about the evidence that we had. AUSA (P) said that he did not want to "bluff" Capitelli as he would have to work with Capitelli for the next "twenty years." I disagreed that we would be bluffing in any way and said that we still had a potential mail fraud against Morel for providing falsified community service letters to a court. AUSA (P) said that only my supervisor and I believed that was fraud. I told AUSA (P) that we had more evidence on Morel than we had on another official (hereinafter "Official A") whom I had investigated and AUSA (P) had prosecuted. AUSA (P) said that Morel had not come in and lied to us like Official A had. I said that Official A had not told a witness to destroy evidence on tape like Morel had. AUSA (P) said that he did not think there was any underlying Federal offense for Morel to obstruct. I said that Use of an Interstate Facility in Aid of Racketeering (ITAR) (Title 18 U.S.C. Sec. 1952) was the underlying offense. AUSA (P) made a gesture which I interpreted as dismissive of my suggested offense. (ITAR---specifically, using the telephone in aid of soliciting sexual bribes---had already been approved by FBI Headquarters and attorneys from the Justice Department as the basis of the investigation during the covert phase before AUSA (P) was assigned to the case.) AUSA (P) told me that he would be busy the following week on a sentencing and out of town the week after. He told me to get something "good" to bring his chain of command by the time he got back.

I did not understand why there was any time constraint and began doing research on various issues, including Fifth Circuit case law holding that labor was a property right within the meaning of the Hobbs Act which supported my mail/wire fraud argument. I prepared a Powerpoint presentation of audio and video clips to attempt to have a meeting with the USAO's management about the case. My supervisor, Supervisory Special Agent (hereinafter "SSA") (P) (no relation to AUSA (P) , and I discussed it and we were both concerned about First AUSA (P) because of his relationship with Capitelli. After speaking to other agents who were aware of the relationship, I checked public records in Gulf Shores, Alabama (Baldwin County) and found that Capitelli and First AUSA (P) were partners in a condominium which had a mortgage.

Upon learning this, I was informed by FBI management that (P) had previously been investigated for his relationship with Capitelli and that he had been told by USAO management, while Letten was USA, not to take part in cases involving Capitelli.

SSA (P) later told me that he had informed FBI Special Agent in Charge (hereinafter "SAC") Michael Anderson of the concern about (P) relationship with Capitelli. SAC Anderson was going to address the condominium issue with Interim USA Boente.

AR00000271

On March 7, 2013, after Keim died and Capitelli was advised that the government had a copy of the memory card anyway (actually the original), AUSA (P) told me that Capitelli had advised him that Morel had found the memory card.

Early in the week of March 25, 2013, I delivered a Powerpoint presentation regarding the Morel case to the USAO for AUSA (P) On March 28, 2013, AUSA (P) called me and told me that he and others had reviewed the presentation. He said he had spoken to AUSA (P) and First AUSA (P) and that AUSA (P) and First AUSA (P) had spoken to Interim USA Boente about the case. AUSA (P) had been told to decline the case because of Keim's death.

I did not understand why the case had been declined. I had not asked that it be prosecuted. I wanted to obtain records to identify potential victims for interviews. At the time, we were aware of three women, including Keim, and believed that there could be more victims. The sudden declination appeared to be designed to stop the overt investigation before it had the opportunity to start.

SSA (P) set up a meeting with AUSA (P) but ultimately met with First AUSA (P) AUSA (P) and AUSA (P) SSA (P) told me that SAC Anderson would set up a meeting with Interim USA Boente. SSA (P) also said that he had made the USAO aware that the FBI would want another meeting regarding the Morel investigation.

Before an April 17, 2013 meeting, I received a declination letter from the USAO. From speaking to another AUSA, I became aware that AUSAs were clearing their cases in anticipation of the arrival of a new USA.

On April 17, 2013, SAC Anderson, SSA (P) and I met with Interim USA Boente, First AUSA (P) AUSA (P) (who came at my request), AUSA (P) AUSA (P) and AUSA (P) Various issues regarding the Morel case were discussed as follows:

- Regarding the falsified community service papers, First AUSA (P) made the point that Morel had been falsifying those papers for five years and concluded that the length of time that Morel had been providing false papers made the case against him weaker. (I did not understand how the frequency of falsifying records made those falsifications less illegal.)

- First AUSA (P) expressed his concern that Morel had been doing favors for lots of people without asking for sex, and, therefore, the case was weak. (First AUSA (P) did not reconcile this point with government officials who did political favors or other official acts for people without asking for bribes, but later asked for bribes in connection with other acts and were convicted for it. I am not aware of any requirement that a public official has to always or regularly ask for bribes in order to be convicted of doing it once.)

11

AR00000272

- First AUSA (P) said that he had reviewed the video clips of Morel's July 23, 2012 visit to Keim's apartment and said that Morel would not have had sex with Keim if she had agreed to have sex with him that day. (He did not explain how he could arrive at that conclusion with Morel arriving at her apartment with two bottles of wine, asking Keim to kiss him, repeatedly, and grabbing her breast and buttocks.)

- First AUSA (P) said that juries in the Eastern District of Louisiana did not like cases on sex or gambling.

- Interim USA Boente said that he had reviewed a printout of the Powerpoint presentation which he described as thorough. I told him that he needed to review the recordings. Interim USA Boente said that he would not do that. He would read transcripts though. Interim USA Boente said that in his opinion Morel was that guy in college who "could not close the deal."

- First AUSA (P) said that with Morel turning in the camera memory card the obstruction charge was like someone threatening to kill the president. The threat was chargeable, but they would not charge something like that. I said that Morel's return of the memory card after being told that the government had a copy and the witness dying was like a bank robber bringing the stolen money back after learning he has been caught.

- Interim USA Boente said that the return of the memory card hurt the obstruction case. During the course of the discussion, Interim USA Boente realized that the memory card that Keim had given Morel was a copy of the original memory card which was in evidence. (That fact had been in the Powerpoint presentation he reviewed.) Interim USA Boente theorized that providing a copy of an item already in evidence might mean there was no obstruction charge at all. (I later did research finding that the Supreme Court held that the language of the obstruction statutes covered such attempts at obstruction.)

- When I pointed out that Witness 1 could mitigate the loss of Keim's testimony, First AUSA (P) pointed out that Witness 1 was a drug dealer. I denied that he was. First AUSA said that Keim was doing drugs with Witness 1 just like she was doing drugs with her boyfriend when she died. I said that I did not know whether Keim had done drugs with Witness 1 because Witness 1 was in prison for burglary, not a drug-related offense.

- No one from the USAO discussed the separate obstruction of justice violation Morel committed by telling Keim to lie to investigators.

12

AR00000273

- First AUSA (P) said that the women were playing the system anyway. He did not reconcile this position with cases where government contractors "played the system" by paying monetary bribes to public officials to get contracts, yet public officials were prosecuted for it. He did not address the power disparity between Morel, an elected chief prosecutor, and women facing prosecution, whose loved ones faced prosecution, or who needed court-ordered child support.

At the conclusion of the meeting, the USAO agreed to review any new information gathered by the FBI regarding Morel's past conduct. The FBI would continue to investigate. However, the case was closed at the USAO. Although First AUSA (P) offered to provide investigative assistance if it was requested, I did not believe his offer was sincere.

Immediately after the meeting, SSA (P) and SAC Anderson expressed their disbelief at the meeting. SSA (P) described it as the "most irrational meeting" he had ever attended. I found most perplexing that the case had been declined before the overt phase of the investigation had been started. Without investigative assistance from the USAO, such as obtaining court orders and search warrants, it would be substantially more difficult to obtain records needed to identify more victims/witnesses.

### B. OIG Complaint

During May 2013, I met with the Department of Justice Office of Inspector General (OIG). I agreed to file a complaint against First AUSA (P) for failing to recuse himself from matters involving Capitelli.

During June 2013, I provided an affidavit to the OIG. I also agreed to have my identity revealed, because I was told it would assist the course of the investigation. The OIG asked for other examples of (P) favoring Capitelli. I provided two.

First, I had heard from another FBI agent about AUSA (P) had told the agent and USAO financial analyst to withhold higher financial loss amounts from a U.S. Probation Officer during a presentence investigation. (P) cited his need to maintain a relationship with Capitelli as the reason for withholding the information from the court.

Second, I had heard from another agent about a case where two related defendants were investigated for fraud. The defendant represented by Capitelli was not prosecuted and the other defendant pleaded guilty. In that plea agreement, the government agreed not to prosecute Capitelli's client. After the guilty plea, the AUSA wanted to give U.S. Probation the correct dollar amount for guidelines calculations, but an upper manager at the USAO, whom the AUSA would not identify to the agent, was pressuring the AUSA to reduce the dollar amount. Capitelli was reportedly still involved in the case.

13

AR00000274

I had limited contact with the OIG. After filing my complaint, an OIG agent told me that (P) had exchanged his ownership in the condominium he owned with Capitelli. I checked Baldwin County, Alabama probate records again and found an act of exchange between (P) and a woman whom I was told was his live-in girlfriend. (P) exchanged his portion of the condominium with Capitelli for other properties. The date of the exchange was March 21, 2013. That date was significant to me because it was a few days after I had been told that SAC Anderson was going to tell Interim USA Boente about the condominium.

### C. Continued Investigation and Reaction to OIG Complaint

Despite the declination of the Morel case, FBI management and I discussed how to get the case reopened by prosecutors. SAC Anderson said he trusted that when Kenneth Polite became the USA, Polite would be willing to have the USAO reopen this case. (Polite had been named but not confirmed as USA.) Based upon SAC Anderson's faith in Polite, the FBI did not approach other divisions of the Justice Department, such as the Civil Rights Division. Even if the FBI had approached those other divisions, the USAO could still prevent a prosecution by them.

During August 2013, I received a telephone call from AUSA (P) who was assigned to prosecute another investigation of mine. AUSA (P) began asking questions about actions the subject public official (hereinafter "Official B") had taken after receiving items of value from an individual seeking business with Official B's office (hereinafter "Individual B"). AUSA (P) expressed doubt that Official B had done enough in return for the payments from Individual B for Individual B to be charged with bribery. He insisted that I have interviews completed the following week to bolster that aspect of the case. When I reported the conversation to SSA (P) he told me that the OIG had recently begun conducting interviews at the USAO in connection with my complaint. I suspected that AUSA (P) sudden antipathy towards the case against Individual B was motivated, at least in part, by my reporting him to the OIG.

On August 29, 2013, the *Saint Charles Herald Guide* quoted Capitelli as saying that the case against Morel had been declined. Based upon my conversations with SSA (P) I believed Capitelli was notified of the declination by the OIG when he was interviewed.

During October 2013, shortly after Polite took over as USA, I was advised by FBI management that I would be briefing the Morel case to USA Polite. When I asked who would be present at the brief, I was told that First AUSA (P) and other AUSAs previously involved in the case would be present. I refused to brief USA Polite with First AUSA (P) present. First, I believed First AUSA (P) had a conflict of interest with any case involving Capitelli. Second, I believed First AUSA (P) had a conflict of interest with any case involving me. Third, I believed that I would be tacitly endorsing First AUSA (P) behavior if I agreed to brief him. Fourth, although I had no evidence First AUSA (P) had leaked anything to

14

AR00000275

Capitelli in the past, I suspected that he would. I did not want to take the chance of victims' identities being passed to Capitelli. Fifth, I feared that all of the AUSAs previously associated with the case now had a personal motive to see that their previous decision was not reversed, especially since the declination was now public knowledge. FBI management told USA Polite about the concerns and the brief was rescheduled. I was told by FBI officials that USA Polite avoided notifying his staff of my refusal by claiming the brief was rescheduled because he had decided to buy breakfast for his office that day.

I briefed USA Polite on the case on November 7, 2013. He was the only person from the USAO present. The brief was at the FBI office. After the brief, USA Polite commented, "This is disturbing."

On November 22, 2013, I was advised by another FBI agent that AUSA      (P) had asked him when I was transferring. When told that I was not transferring, AUSA     (P) said that no one would work with me at the USAO. I was also told that AUSA     (P) commented about whether he had to worry about FBI agents filing OIG complaints against him. The agent asked him if he was doing anything that would necessitate an OIG complaint. (Before this, AUSA   (P)   had used me as a witness in the case against former New Orleans Mayor C. Ray Nagin (hereinafter "Nagin"). I had also been told that, before my OIG complaint, the Nagin prosecution team, including AUSA   (P)   wanted to use me at trial. I was not used as a witness in Nagin's trial.) Later, an FBI agent also quoted AUSA   (P)   to me as asking the question, "Who is going to prosecute a prosecutor?"

Despite the brief to USA Polite, the USAO took no action on the Morel matter. On January 16, 2014, SAC Anderson asked me to request assistance from the USAO in the case. The purpose of the request was to spur a decision by the USAO. The request was not fulfilled, despite First AUSA   (P)   offer of assistance on April 17, 2013.

Around this time,      (P)      was hired to become the First AUSA. I believe that AUSA  (P)  became a senior litigation counsel at the USAO. During February 2014, I briefed First AUSA   (P)   and USA Polite on the Morel case at the FBI office. They took no immediate action on the matter.

Meanwhile, on or about February 25, 2014, having conducted several interviews documenting actions Official B took to further Individual B's interests, I met with AUSAs        (P)        about the case against Individual B.     (P)     took the legal position that an individual could not be prosecuted for paying a bribe to a public official unless the public official did something in return and what the public official did in return for the payment was "nefarious." I reported the meeting to SSA   (P)   who set up a follow-up meeting with the AUSAs and AUSA      (P)      who had become head of the USAO's public integrity section.

On March 10, 2014, SSA   (P)   and I met with AUSAs        (P)        During the meeting, AUSA  (P)  pointed to a stack of legal research which he claimed

15

AR00000276

supported his legal positions. I asked him to e-mail me his research, which he did a few days later. Checking AUSA (P) cited case law, I found numerous errors and wrote an eighteen page response on the legal issues. The most egregious misquoted legal opinion was a Second Circuit case. (P) cited *United States v. Ganim*, 256 Fed. Appx. 399, 2007 WL 4233388 at *1 (2d Cir. Dec. 4, 2007)(unpublished) as "holding that government was required to prove official acts that the public official did in exchange for the benefits he received." Checking the citation, I found that (P) had removed the word "not" from the quoted holding. (The actual language from *Ganim* is "we…hold that the government was **not** required to prove a direct link between a benefit Ganim received and a specific act he performed, so long as the government proved that Ganim received benefits in exchange for his **agreement** to perform specific official acts or to do so as the opportunities arose." *Id.* at 401 (emphasis added).)

Based upon the number of errors, I suspected that AUSA (P) was intentionally misrepresenting case law in order to keep the case from being prosecuted. After sending my memorandum in response to AUSA (P) research, I was told by SSA (P) that AUSA (P) had complained to USAO management that I was disrespectful to AUSA (P) n the memorandum. When SSA (P) asked if the USAO manager had read the memorandum, he admitted that he had not. Later, the USAO manager conceded to SSA (P) that I had not been disrespectful to AUSA (P) in the memorandum.

On March 14, 2014, AUSA (P) was assigned to look into whether the case against Morel should be re-opened at the USAO. AUSA (P) was an experienced prosecutor who had been in Afghanistan when the case had been declined. SSA (P) vouched for AUSA (P)

Around this time period, FBI management offered to send me to the USAO as a Special Assistant U.S. Attorney (hereinafter "SAUSA") to prosecute FBI cases. I was later told that USAO management had refused to accept me as a SAUSA. USAO management had told FBI officials that my assignment there as a SAUSA would be "too much too soon" for the USAO. I understood that comment to mean that I was too controversial of a figure because of my OIG complaint.

During July 2014, a final meeting was held with AUSA (P) about the case against Individual B. His response to my memorandum was that, although it might "technically" be a violation, it was not a case that would be prosecuted in the Eastern District of Louisiana, as though there were a higher burden to prosecute corruption cases in the district. During August 2014, I was advised by FBI management that USAO management said that the case against Individual B would not be prosecuted. A high-level USAO manager was quoted by FBI management as saying that he did not have enough "political capital" within the USAO to get the case prosecuted.

16

AR00000277

I never received notification from the OIG about the results of their investigation. FBI management told me the OIG reported the results to the Justice Department Public Integrity Section and later the Executive Office of United States Attorneys.

### D. USAO Reopens Its File on Morel

Despite the controversy, AUSA **(P)** had the Morel case reopened at the USAO. Investigators began to obtain admissions from victims about sexual contact with, and sexual solicitations from Morel. Other than humorous remarks about fearing that another AUSA might take a sniper shot at him for taking the case, AUSA **(P)** provided all necessary support to the investigation. When we began finding large numbers of witnesses with pertinent information that was several years old, AUSA **(P)** thought of charging Morel under the Racketeer Influenced Corrupt Organizations Act ("RICO"), Title 18 U.S.C. Sec. 1962.

However, AUSA **(P)** appeared to be alone in his support of the case. On at least one occasion, AUSA **(P)** commented to me that no other AUSA would assist him in the case. He said, "It's just you and me, kid." I began looking for another AUSA to assist him and asked AUSA **(P)** who had recently joined the USAO, if he was interested. He was. I recommended him to AUSA **(P)** However, AUSA **(P)** did not bring AUSA **(P)** on the case at first.

Unfortunately, during 2015, AUSA **(P)** was reassigned to other duties and, along with other cases that he had in the Eastern District of Louisiana, he had little time to spend on the Morel case. By April 2015, the investigators had exhausted all logical leads. We had found more than twenty witnesses with whom Morel had oral sex, other sexual contact, or from whom Morel had asked for sex in connection with his position as district attorney or assistant district attorney between 1986 and 2012.

During May 2015, I was advised by SSA **(P)** who had been promoted to Assistant Special Agent in Charge (hereinafter "ASAC"), that USAO management told him that Morel had not had an "opportunity" to plead guilty. They intended to make a plea offer. Previously, AUSA **(P)** had told me that he intended to indict Morel on RICO and other charges and allow me to arrest him. (Although the FBI has statutory authority to arrest individuals who violate Federal crimes, FBI policy only allows agents to make arrests with the concurrence of Federal prosecutors. Thus, unlike the state criminal justice system, the public never knows when the FBI disagrees with Federal prosecutors.)

On July 23, 2015, I met with AUSA **(P)** ASAC **(P)** and SSA **(P)**, the new public corruption supervisor. AUSA **(P)** said that he was making a plea offer to Morel which would include two counts of mail fraud, two counts of obstruction of justice, and two misdemeanor civil rights violations. I objected to the plea offer and said the victims deserved justice in the form of an indictment. Among other reasons, AUSA **(P)** commented that this was how "[his] office want[ed] [him] to handle it." When I asked about assigning AUSA **(P)**

17

AR00000278

to the case, AUSA  (P)  said that he was concerned about putting a new AUSA in that position considering, as AUSA  (P)  put it, "how this case has been handled" at the USAO. He then said, "You know what I'm talking about." I knew that he was referring to the case's declination and subsequent OIG complaint. After the meeting, AUSA  (P)  commented to me that half of him did not want Morel to take the deal.

Shortly after the July 23, 2015 meeting, despite AUSA  (P)  previously stated concerns, AUSA  (P)  was assigned to the case to assist AUSA  (P)  since he was spending the majority of his time away from Louisiana on another assignment.

Early in the week of August 17, 2015, USA Polite met with Saint Charles Parish Sheriff Champagne at the sheriff's request. (The Saint Charles Parish Sheriff's Office had been instrumental to the investigation, and Sheriff Champagne had taken great personal risk in bringing the case to the FBI in the first place.) During the meeting, USA Polite admitted that a plea offer was being made to Morel. USA Polite told the sheriff that if Morel did not take the offer, he would be indicted "by the end of the month." (Based upon subsequent events, I do not believe USA Polite's statement described a matter occurring or likely to occur before a Grand Jury.)

On August 21, 2015, I attended a meeting with AUSAs  (P)  and Capitelli, Brian Capitelli (hereinafter "Brian Capitelli", while Ralph Capitelli will continue to be referred to as "Capitelli"), and Steve London. Capitelli had previously told AUSA  (P)  that he did not want me present at the meeting. AUSA  (P)  had me attend anyway. I had prepared a brief Powerpoint presentation for the meeting showing a minimal amount of evidence against their client. During the discussions after the presentation, Capitelli claimed that I had made false accusations against him. I corrected him by saying that I had not made any accusations against him, that I had made an accusation against a First AUSA. Capitelli explained this was why he did not want me in the meeting. Later, he mentioned Morel taking a plea but asked about limiting the information that was given to U.S. Probation in the presentence report. When Capitelli expressed concern to the AUSAs about "the agent backdoor[ing]" them to probation, I smiled at him. Capitelli pointed at me and said that I would go to U.S. Probation. Capitelli asked if I would make a commitment that I would not provide information to probation. I said, "I'm not committing to anything." Capitelli objected. I then said, "I'm not withholding anything from probation." When the AUSAs then discussed indicting Morel, Capitelli claimed that there had been a number of improprieties with the investigation that he could bring out. I responded, "Let's have the whole truth come out about this case."

After the meeting, the AUSAs and I discussed the issue of my OIG complaint becoming public knowledge if the case were prosecuted. There was discussion about how the complaint would make the USAO look if it did. AUSAs  (P)  were not concerned, because they had not been at the office when the case was declined. AUSA  (P)  also said that nothing would be withheld from U.S. Probation. (In response to the USAO practice of withholding

18

AR00000279

relevant conduct from U.S. Probation, ASAC **(P)** has ordered agents to provide all relevant evidence to U.S. Probation. However, since then, I have heard of two other examples of AUSAs attempting to reduce relevant conduct information to make plea deals that are essentially Federal Rule of Criminal Procedure 11(c)(1)(C) agreements, except they are not disclosed to the court.)

Despite USA Polite's statement to the sheriff about indicting Morel "by the end of the month," Morel was not indicted.

AUSA **(P)** told me about another meeting between First AUSA **(P)** AUSA **(P)** and the Capitellis. He said the Capitellis had made various accusations about the investigation. They also wanted the names of victims, but I objected to the USAO giving them their names for fear of the victims' being harassed. (During the course of the investigation, private investigators had approached various women and had even lied to a witness by telling her that Keim was dead because the FBI had relentlessly pursued her. In reality, the FBI provided Keim with a great deal of support over an eighteen-month period.)

### E. Preparation of RICO Charge

I was not advised of any further plea negotiations and AUSA **(P)** and I worked together to prepare a RICO memorandum to obtain approval from the Justice Department's Organized Crime and Gang Section (OCGS) to charge Morel with RICO. (Department of Justice policy requires all RICO charges to be approved by OCGS and a memorandum providing specific information must be submitted.) The RICO charge was based on Morel's use of the Louisiana 29th Judicial District Attorney's Office for racketeering activity, specifically bribery and obstruction of justice. (Because approval of a RICO charge by OCGS is not a final decision to seek an indictment, I do not believe it is a matter occurring or likely to occur before a Grand Jury.)

On November 25, 2015, AUSA **(P)** advised me that the RICO memo and accompanying draft charges were provided to OCGS for review. Within a couple of weeks, AUSA **(P)** provided me with questions from an OCGS attorney. During December 2015, AUSA told me that OCGS tentatively approved the RICO charge pending the submission of final drafts from the USAO.

Around this time period, I learned that Morel's behavior was described by at least one AUSA as "just an old guy having fun." Having interviewed each victim, I found that characterization to be far from accurate.

During January 2016, SSA **(P)** advised me that she had spoken to First AUSA **(P)** (First AUSA **(P)** had left the USAO and AUSA **(P)** had taken over as First AUSA.) He told her that the final draft was at OCGS for approval. He also told her that an attorney from OCGS was interested in assisting in the prosecution of the case. Despite this reported interest, an OCGS attorney was never assigned to the case.

AR00000280

Around late January 2016, SSA ▓(P)▓ advised me that she had spoken to First AUSA ▓(P)▓ He told her that the USAO had held a review committee on the Morel case and the following resulted from the committee meeting:

- USA Polite had removed himself from the review committee, because he was in favor of prosecuting the case and did not want to prejudice the committee.

- AUSA ▓(P)▓ participated in the review committee despite the previous declination and OIG complaint.

- First AUSA ▓(P)▓ who had participated in the previous declination, also participated in the review committee.

- The committee decided to resume negotiations for a plea agreement with Morel.

- The committee selected an AUSA manager (hereinafter "AUSA Manager 1") to lead the negotiations.

- First AUSA ▓(P)▓ indicated his disapproval for the case to SSA ▓(P)▓ by saying that the FBI had to go find the victims with the exception of Keim. They had not come forward on their own. (In my interviews of witnesses, I found that they were humiliated by what had happened with Morel and feared that he was still a powerful man. Most interviewees believed that Morel had killed Keim, even though there was no evidence to connect him to her death.)

- First AUSA ▓(P)▓ said that USA Polite had held the review committee to "appease" his office.

- First AUSA ▓(P)▓ said the committee approved moving forward because USA Polite was in favor of the case.

When I was notified of this committee, I became aware that an AUSA with political connections which might favor Morel was taking part in consideration of the case. In my opinion, AUSAs with close connections to political figures raise the appearance of impartiality in any public corruption case.

I found AUSA Manager 1's involvement in the case unusual. I never spoke with AUSA Manager 1 about the case other than a few words on March 30, 2016. To my knowledge, AUSA Manager 1 did not have any direct contact with anyone from the FBI about the Morel investigation. Throughout my career in the FBI, an AUSA has never led plea negotiations

AR00000281

without consulting with me about what offers were being made to the defense and what the defense was saying.

I am not aware of any personal relationship between AUSA Manager 1 and AUSA (P) except that they have both been at the USAO since I arrived in New Orleans in 1999 and both served in USAO management for the last few years. When the Morel case was declined and AUSA (P) was First AUSA, AUSA (P) was superior to AUSA Manager 1 in the USAO chain of command. Also, AUSA (P) participated in the review committee which chose AUSA Manager 1 to lead plea negotiations.

On February 10, 2016, AUSA (P) advised me that OCGS approved charging Morel with RICO. He did not tell me which racketeering acts had been approved, but I believe it included more than thirty acts of soliciting sexual bribes and obstruction of justice.

### F. Plea Negotiations

After receiving authority to charge Morel with RICO, the USAO began plea negotiations in earnest. On February 14, 2016, AUSA (P) advised me that Morel was being offered a new plea under Federal Rule of Criminal Procedure 11(c)(1)(C) limiting his sentence to twenty-five months. I alerted FBI management to the negotiations.

On February 19, 2016, I briefed FBI SAC Jeffrey Sallet, who had taken over from SAC Anderson. Shortly after the brief, he called USA Polite and reported back that USA Polite had told him there would be no Rule 11(c)(1)(C), the offer would be the same as AUSA (P) with an additional civil rights violation (a total maximum sentence of eighty-three years), and that Morel's conduct would be publicly exposed instead of hidden in a reduced charge. SAC Sallet told me that the offer had been made on February 17, 2016 with a one-week deadline. SAC Sallet told me that USA Polite had said the case would be charged by the "end of the month" if Morel did not take the deal. USA Polite also claimed that the case would not have been re-opened it were not for him. (I took this statement as an indication that USA Polite was aware that members of the USAO were opposed to prosecuting the case because of the past declination and OIG complaint.)

When telling me and others what USA Polite had said, SAC Sallet somewhat rhetorically asked why the case had not been prosecuted. I answered, "Corruption."

On February 22, 2016, I spoke with AUSA (P) about the plea offer, because I was concerned that USAO middle management was not following what USA Polite had told SAC Sallet. AUSA (P) told me that the USAO had spoken with the Capitellis on February 17, 2016, but they were still negotiating. The USAO was supposed to hear from them that week. The USAO was considering reducing the two obstruction counts in the plea offer which each carried maximum sentences of twenty years to an obstruction of justice charge with a three-year maximum sentence, Title 18 U.S.C. Sec. 1512(d).

21

AR00000282

On February 24, 2016, the deadline reported by USA Polite to SAC Sallet passed without any word from the USAO.

On February 25, 2016, AUSA (P) told me that the Rule 11(c)(1)(C) had been removed from the plea offer because of concerns about the judge rejecting the sentence. (Recently, Judge Milazzo had rejected the government's Rule 11(c)(1)(C) plea agreement with Darren Sharper.) AUSA (P) told me that I was not going to like what the USAO had decided, Morel was going to get three to five years with a charge of violating 18 U.S.C. Sec. 1512(d).

On February 26, 2016, ASAC (P) contacted First AUSA (P) who confirmed that Morel was being offered a three-year maximum sentence.

On February 27, 2016, Sheriff Champagne contacted me after meeting with USA Polite. He confirmed that USA Polite approved of changing the obstruction charges from a maximum sentence of twenty years to a maximum sentence of three years. USA Polite was vague about the number of counts though, which left open the possibility that the offer had been made with multiple counts. USA Polite told Sheriff Champagne that the deadline was Wednesday, March 2, 2016 at 5:00 p.m.

Shortly after 5:00 p.m. on Wednesday, March 2, 2016, Sheriff Champagne advised me that USA Polite had told him he had not heard about Morel's response.

On March 3, 2016, I was advised by FBI management that First AUSA (P) had not heard a response to the latest offer. He confirmed that the plea offer had been for Morel to plead to one count with a maximum sentence of three years.

On March 4, 2016, SSA (P) advised me that she had heard from First AUSA (P) that there had been no deadline, because the USAO had not sent Morel a draft factual basis to sign. The USAO was meeting with the Capitellis that afternoon. Before the meeting, I asked AUSA (P) for a copy of the proposed factual basis which he sent. (In the past, I never had to request a copy of a factual basis. This was normally something prosecutors asked me to review to assist them.) I was told that USA Polite was reportedly insisting that Morel's full conduct be included in the factual basis. During the conversation, AUSA (P) said that he wanted to get a copy of the motion the Capitellis intended to file against me, suggesting that the Capitellis had made accusations against me. I was provided with no specific allegations.

After the meeting with the Capitellis on March 4, 2016, AUSA (P) called and asked for the recordings of conversations between Keim and Morel to play for the Capitellis. The USAO had agreed to give them some form of pre-indictment discovery. After consultation with FBI management, I agreed to give them to him.

On March 5, 2016, an FBI agent told me that AUSA (P) had been present for an interview in another investigation, separate from the Morel case, which has the potential to

22

AR00000283

embarrass the USAO. AUSA (P) expressed concerns after the interview that the investigation could be more embarrassing to the USAO than the blogging scandal.

On March 7, 2016, I ran into SAC Sallet in the FBI office. He told me that USA Polite had called him on Saturday (March 5, 2016) and told him that he had ordered his people to indict Morel. USA Polite also said the Capitellis threatened that they had "bombshells" about the FBI. Once again, I was not advised of any specific allegations.

Later that day, I gave AUSA (P) copies of the Keim recordings. He told me that the Capitellis were threatening to create substantial problems for the USAO if Morel were indicted. AUSA (P) provided no specific details.

I believe the Capitellis were testing the government's case by alleging wrongdoing. I was not concerned about their threats. However, my OIG complaint was likely to be disclosed if I took the witness stand. I intended to disclose (P) and Capitelli's relationship at the first opportunity I had.

On March 8, 2016, AUSA (P) asked for an agent to play the recordings to Morel and the Capitellis on March 11, 2016, but they refused to meet with me. I offered my co-case agent, Special Agent (P) On March 9, 2016, when I advised SSA (P) of AUSA (P) request, she refused the USAO's demand that an agent other than me meet with the Capitellis and Morel. I advised AUSA (P) via e-mail that the FBI insisted that I play the recordings since I was the case agent and that I was available the morning of March 11, 2016. That afternoon, SSA (P) received a call from First AUSA (P) AUSA Manager 1 had accused the FBI of refusing to send anyone to play the recordings. SSA (P) explained that I was available as I was the case agent. Ultimately, Morel was not available on March 11, 2016, and AUSA (P) played the recordings for them on or about March 15, 2016.

From March 19 through 26, 2016, I was in Budapest, Hungary teaching a course on public corruption investigations. While overseas, Sheriff Champagne let me know that he had heard from USA Polite that there would be no deal with Morel.

On March 28, 2016, AUSA (P) asked to meet with me on March 30, 2016 to prepare for testimony. On March 29, 2016, AUSAs (P) called to tell me that plea negotiations were on-going, but they would meet with me on March 30, 2016 at 1:00 p.m. to prepare me to testify. They warned me that the factual basis was being changed to limit the scope of Morel's conduct involving women other than Keim to between 2007 and 2009. Previously, the full scope of Morel's conduct, at least twenty-two women between 1986 and 2012 had been included.

On March 30, 2016, I met with AUSAs (P) AUSA (P) also joined the meeting after expressing an interest in the case. All three worked diligently to

23

prepare me to testify. During the preparation, I learned that if Morel were charged with RICO that the charge could not be dismissed without the approval of OCGS.

During the course of the meeting, I was told that Morel wanted a week to consider the deal. Later in the afternoon, I was told that Morel was contacting his family about the deal which we interpreted as a sign that he was going to accept it. Sometime between 5:00 p.m and 6:00 p.m., AUSA Manager 1 brought in documents, which I learned were the final factual basis to which Morel had agreed. AUSA Manager 1 told AUSA **(P)** to sign the documents. AUSA **(P)** expressed concern about signing the documents without reading them. I do not recall exactly what AUSA Manager 1 said after that, but AUSA Manager 1 stayed while AUSA **(P)** signed the documents without reading them. AUSAs **(P)** were also present. AUSA Manager 1 made a statement about the Capitellis possibly waiving a presentence investigation for the case. AUSA Manager 1 also made a comment about having the re-arraignment and sentencing on the same day, but he expressed doubt about that happening.

When I left the USAO that evening, I reviewed the portion of the factual basis involving Morel's conduct with women other than Keim. Based upon the previous conversation about this change from the proposed factual basis, I was not surprised to see this change. I did not read the rest of the factual basis until March 31, 2016. When I did, I saw that there were substantial changes to the portions of the factual basis involving Keim. Transcripts of portions of recorded conversations and other evidence were removed from the factual basis. The changes substantially minimized Morel's conduct, including evidence of crimes Morel committed other than the charged offense. I contacted AUSA **(P)** and expressed a concern about the factual basis. He told me that he had not drafted the document because he had been working on charging Morel. (He had been preparing me to testify through the whole afternoon of March 30, 2016.) I then did a more detailed comparison between the proposed factual basis and final factual basis and wrote a rough description of the pertinent differences between the documents. (Because one document was in Microsoft Word and the other an Adobe PDF, I could not do an electronic comparison.) I contacted AUSA **(P)** again later in the day and advised him to do a redline comparison of the documents to review. I told him that I would not want my name on that factual basis. Based upon AUSA **(P)** position in the office and how the negotiations had been handled by AUSA Manager 1 instead of AUSA **(P)** I do not believe that AUSA **(P)** was in a position to make any changes to the document or deal. I do not believe that AUSA **(P)** was aware of the changes that were made. I do not believe that AUSA **(P)** intended in any way to withhold anything from this Court. I believe he was simply following the orders of his superiors.

On April 1, 2016 around 2:56 p.m., I told ASAC **(P)** that I intended to write a letter to this Court describing the USAO's misconduct unless FBI management gave me a reason why I could not do so. Around 3:35 p.m., ASAC **(P)** told me he had relayed our concerns about Morel's sentencing occurring without a presentence investigation to First AUSA **(P)** First AUSA **(P)** said the USAO would oppose any attempt to avoid a presentence investigation. At

24

AR00000285

8:44 p.m. AUSA (P) called and told me that he had been tasked with writing a sentencing memorandum. At 10:27 p.m., ASAC (P) called me. He told me that if I wrote a letter to this Court disclosing the USAO's misconduct, the USAO could dismiss the charge against Morel entirely. I told him I would not send the letter then.

I decided to avoid dismissal by the USAO by notifying this Court after Morel pleaded guilty.

At the press conference after Morel's plea on April 20, 2016, SAC Sallet called Morel a "sexual predator" and officials disclosed that there were more than twenty witnesses against Morel. (Based upon what I observed, besides Keim, Morel had oral sex with five women, made some sexual physical contact with at least eight women, and solicited sexual activity from at least nine others between 1986 and 2012. All of these actions were in connection with his position as district attorney.) The press logically asked why Morel received the plea agreement he did, if his conduct was as significant as described. When USA Polite was asked by one reporter how he told victims the plea agreement was "justice", the USA responded, "In many of these circumstances, we are dealing with very significant evidentiary concerns. We are dealing with vulnerable victims that if exposed to the scrutiny of the media or the scrutiny of the courtroom would prove to be very difficult witnesses and may ultimately lead to no justice for this defendant." USA Polite did not disclose the ethical problems at his own office at the press conference. Nor did USA Polite disclose that OCGS had approved a RICO charge against Morel which would have made a conviction much easier, as the jury could rely on only Keim's tapes or a handful of the witnesses.

I did the legal research associated with the "evidentiary concerns" and found no serious concerns with getting the evidence admitted. Neither did OCGS since it approved the RICO charge. (To my knowledge, I am the only person to do any substantial legal research, on the Morel case before the RICO memo was submitted to OCGS.) To my knowledge, USA Polite never met any of the witnesses, and, other than AUSA (P) no AUSA met more than one witness. I met every witness and conducted almost all of the interviews. USA Polite's characterization of the witnesses is inaccurate and unfair. Several of the witnesses were prepared to testify and several did not have any "baggage" of any concern. Finally, sexual predators do not prey on the strong. Like his First AUSA, USA Polite blamed the victims and witnesses instead of admitting to his and his office's own failures in the case.

After Morel pleaded guilty on April 20, 2016, I notified FBI management again of my intention to write the misconduct letter to this Court. I was ordered to submit the misconduct letter to the FBI New Orleans Division's Chief Division Counsel. I submitted the misconduct letter for review on May 3, 2016. Although the Chief Division Counsel finished reviewing the misconduct letter that same day, I was not given an official response from the FBI's Office of General Counsel (hereinafter "OGC") for four weeks. I was instructed by OGC to send the misconduct letter to Justice Department entities that accepted complaints from whistleblowers,

25

AR00000286

such as the OIG or Office of Professional Responsibility (hereinafter "OPR"), and request permission to send the misconduct letter. On June 2, 2016, I expressed my desire to send the misconduct letter concurrently through prepublication review for disclosure as a private citizen under the First Amendment, but an FBI manager advised me against doing so. I submitted the misconduct letter to the OIG on June 2, 2016, approximately two days after receiving instructions from OGC. The OIG quickly acknowledged receipt of the letter and shortly thereafter advised me that the matter was transferred to OPR. (Throughout the past three years, the OIG has acted professionally and has been supportive of efforts to reform the Justice Department.) On August 11, 2016, OPR advised that it would be inappropriate for it to comment on whether I should send the letter to this Court and, consequently, the FBI advised me that I could not send the letter in my official capacity.

Because of the delay in a response from OPR, I began a concurrent process to disclose the misconduct letter to this Court under the First Amendment on August 8, 2016 by submitting two letters to the FBI's prepublication review program. One letter, a shorter notification letter, was submitted for review which was intended to notify this Court of the existence of the misconduct letter in case it could not be reviewed in time for the hearing on August 17, 2016. Both letters included the wording that I intended to make disclosures to this Court and the media as a private citizen under the First Amendment. In my e-mail submitting the letters for prepublication review, I wrote "I previously attempted to disclose this misconduct in my official capacity. I assumed the process outlined to me by management and OGC [FBI Office of General Counsel] would have worked. The process has not worked. I have received no word from DOJ, so I have chosen to do this in my personal capacity." I also wrote in the e-mail, "[s]ince I am being forced to send this in my personal capacity under the First Amendment, I intend to submit the letters to members of the media as well as the court." FBI agents are not authorized to make disclosures to the media as part of their official duties.

On August 12, 2016, I was notified that the FBI would not review either of the two letters that I submitted for prepublication review because the FBI took the position that the disclosures would be made in the performance of my official duties and were outside the scope of the prepublication policy guide. I immediately asked what basis was used to make that determination considering I specifically asserted my First Amendment rights. I also asked if it was the FBI's position that an FBI employee has no right under the First Amendment to report prosecutorial misconduct to a Federal judge because that employee witnesses the misconduct in his official duties. I also requested an appeal of the decision as the agency's final determination on the matter. I asked for an answer by close of business on August 15, 2016 and cited the August 17, 2016 sentencing hearing as a reason for the short deadline. On August 15, 2016, I was notified that the FBI's August 12, 2016 decision only pertained to my request to disclose letters to this Court and that my request to disclose the letters to the media were under review. I replied that, because of the August 17, 2016 sentencing hearing, although the administrative

AR00000287

appeals process was not complete, I had to treat the FBI's position on August 15, 2016 as its final decision.

Conclusion

Based upon the above, with respect to the Morel case, I believe the following:

1. AUSA  (P)  involvement in the Morel case in 2013 caused at least an appearance of impartiality because of his property ownership with Capitelli.

2. After the unusual declination of the case in 2013, the members of the USAO at the time of the declination had at least an appearance of impartiality regarding the case. They had a personal interest to avoid seeing their previous decision publicly reversed.

3. After my OIG complaint against AUSA  (P)  consideration of the case by members of the USAO caused at least an appearance of impartiality. They had a personal interest in avoiding another scandal about the USAO becoming public.

4. Although USA Polite reopened the USAO's file in 2014 under pressure from investigative agencies, he failed to keep members of his office who lacked impartiality away from consideration of the matter, e.g. AUSA  (P)  Furthermore, it appears as though he invited their consideration of it.

5. The plea agreement between Morel and the USAO on March 30, 2016 is tainted by the USAO's lack of impartiality in the matter. The USAO has failed to represent the interests of the victims and the United States as a whole in this case.

6. This prosecutorial misconduct is relevant to this Court's consideration of the case, but the Justice Department and FBI has failed to notify this Court even though I requested to do so in my official capacity. Furthermore, the FBI managers have violated my First Amendment rights by refusing even to review my request to disclose this letter to this Court in my capacity as a private citizen.

Because I am writing this letter as a private citizen, I will make additional observations and recommendations that go beyond the scope of the case. The mishandling of the Morel matter is not an isolated incident. I have experienced firsthand, or heard from other agents, numerous examples of prosecutors mishandling cases especially, but not only, in corruption cases. Based upon what I have seen and heard, I believe that there is systemic corruption in the Justice Department. The FBI uncovers corruption, and the Justice Department covers it back up again. FBI managers advocate for prosecution of cases, but stifle attempts by agents to make the public aware of this systemic corruption in the Federal criminal justice system.

The law, in the form of Rule 6(e) and the Privacy Act, allows prosecutors to obscure their inaction on prosecutable cases. For example, one of the purposes of Rule 6(e) is to protect those

27

AR00000288

determined to be innocent by the Grand Jury, but the supposed independence of the Federal Grand Jury is a myth. Prosecutors decide what the Grand Jury hears and whom it considers as a target. If prosecutors do not put a case before the Grand Jury, the material collected in its name remains secret unless those same prosecutors seek authorization for its release. In reality, Rule 6(e) has the perverse effect of allowing one or a handful of Federal prosecutors to bury evidence of criminal behavior without even giving the Grand Jury the opportunity to determine a target's guilt or innocence. I have seen this several times---evidence of criminal conduct by public officials and contractors sealed from the public by Federal prosecutors using Rule 6(e). None of the evidence of which I write would identify or jeopardize a single witness, another important purpose of Rule 6(e).

Justice Department and FBI policies regarding whistleblowing and disclosing facts of investigations to the public also protect prosecutors. From my own experience, I can only describe the procedures as Byzantine and a concerted effort to conceal government misconduct. My most recent attempt to disclose prosecutorial misconduct to the judge presiding over the case was met with a bureaucratic runaround that had the effect of reducing my time to pursue my option to report under the First Amendment. That option was never presented to me by FBI OGC, although I never had direct contact with them. Ultimately, when I asserted my First Amendment rights, the FBI made contradictory assumptions that I could not disclose the misconduct as part of my official duties but any disclosure, even when made as a private citizen, was a part of my official duties. I believe this decision was an intentional effort by the FBI to keep these severe problems in the Federal criminal justice system from being disclosed.

The subtle punishment for speaking out and the antipathy against those who dare to try is daunting, even to someone with a law degree and experience as a Federal judge's clerk. Many of the best agents are disillusioned, angry, and demoralized, because of how prosecutors mishandle cases. Just a few days ago, I had a conversation with senior agents who suggested that the USAO should recuse itself from all FBI cases. Despite widespread abuse by prosecutors, agents must remain silent for fear that their next case will not be prosecuted. Their fear is justified. Since I filed my OIG complaint, I have had two cases subtly suffocated by prosecutors, and only one, Morel, prosecuted. I believe Morel was prosecuted because USA Polite feared public scrutiny if Sheriff Champagne arrested Morel on state charges, which he certainly would have with ardent FBI support. The USAO has no reason to fear the FBI alone, because the FBI cannot make arrests without its permission and the FBI will never speak out publicly against the Justice Department.

While these laws and policies have a valid purpose, they have become a refuge for scoundrels who are more interested in collecting a paycheck they have not earned than in zealously advocating for the United States. To borrow a phrase from Lord Acton, which was correctly applied to the FBI in the Whitey Bulger fiasco, "Every thing secret degenerates, even the administration of justice; nothing is safe that does not show how it can bear discussion and publicity." This decision-making shrouded in darkness has created a department which, at best,

AR00000289

is not working at optimal efficiency, or, as in the case of the USAO in the Eastern District of Louisiana, is one of the most corrupt government entities in its judicial district. I base that statement on having conducted or participated in corruption investigations in all thirteen parishes in the district, and using a broader definition of corruption to mean serving one's own interest over that of the public's, as opposed to outright bribery.

An effective USAO is desperately needed here. In the past few days alone, I have spoken with people from three parishes who have suffered at the hands of public officials abusing their power. There are some fantastic AUSAs at the USAO who can make a difference. I can think of several who bravely withstand withering fire in court to seek justice for the people of this district. Many of these talented dedicated AUSAs have been hired by USA Polite. However, the USAO cannot function properly if the USA does not have the courage to stand up to middle managers with conflicts of interest in cases, if the USA and First AUSA harbor a blame-the-victim mentality, and if other middle managers are more concerned about the office's reputation than seeking justice for victims.

The root cause of this systemic corruption is human nature. Human beings would rather not have their actions and decisions scrutinized. If prosecutors move forward with a case, they will be scrutinized, oftentimes unfairly, by defense attorneys, judges, and the media, especially if they dare to prosecute a powerful public official or other individual with connections. If Federal prosecutors do not take a case, there is little scrutiny and none of it is public. The secrecy of Federal prosecutorial decision-making lets Federal prosecutors take the easy way out if they choose. In the state system, on the other hand, where the police arrest and the district attorneys prosecute, the public can see what cases are and are not being prosecuted. There is public accountability for state prosecutors.

The lack of accountability for Federal prosecutors exacerbates the disparities in the Federal criminal justice system. Because Federal prosecutors can ignore the tougher cases without consequence, the less-committed prosecutors focus on the easier cases with less formidable defendants or more easily proven cases against the more formidable ones. I am convinced that if a police officer had done what Morel did, he would have been in prison a long time ago for much longer than the maximum three year sentence that the former district attorney faces, even with the exact same "evidentiary concerns" and "vulnerable victims" cited by USA Polite. Morel's conduct was far more odious than former District Attorney Walter Reed, but the USAO pounced on the fraud case which was already reported in the media. (I took no official part in the Reed case and base my comparison solely on what has been reported in the media.)

In the Marine Corps, I was taught to provide solutions when identifying a problem. I have three recommendations:

First, and most importantly, when Justice Department prosecutors decline a case which an investigative agency determines is prosecutable, the agency should be required by law to

29

AR00000290

provide a report to the public outlining the evidence against the subject. The report should be written in a manner which protects witnesses, sources, and methods. The American people should know when prosecutors and investigators disagree, so they can make their own decision about the effectiveness of both. In public corruption investigations, this recommendation would also shed light on the behavior of public officials believed by investigators to have committed a crime. Let the people see what their public "servants" are doing.

From my experience, management at investigative agencies will likely pressure case agents to agree with prosecutorial decisions in order to maintain peaceful working relationships with prosecutors. Therefore, case agents should have the legal duty to provide the report to a judge to decide whether it can be released, just like police officers who go directly to judges for warrants. Also, there should be serious consequences for managers who put undue pressure on agents to go along with prosecutors. A case agent who goes to a judge should receive whistleblower protections. He or she should not be sent on a fool's errand obtain permission from the Justice Department.

Second, U.S Attorneys should not have any influence on public corruption or civil rights cases. Political partisans with ambitions to become a mayor, congressman, or other official are the last people who should be making these decisions. Certainly, there are honest U.S. Attorneys, but the current system allows some foxes, or at least bravery-challenged watchdogs, to guard the henhouse.

Third, the Justice Department should hire prosecutors nationally instead of locally and force prosecutors to start out away from home. Also, it should rotate its managers within the local U.S. Attorney's Offices. This practice patterns the FBI and other Federal agencies. The FBI is far from perfect, but managers with fresh eyes and experience elsewhere in the nation can help turn around a rotting institutional culture. If the Justice Department is going to have career prosecutors, then it needs to take the same steps to combat their corruption as the investigative agencies have taken.

This letter will anger many powerful people, prosecutors, former prosecutors, defense attorneys, politicians, and FBI management. I have made more mistakes than I can count, and I am certain all of them, and some I have not made, will be used to discredit me. In reality, I mean nothing in all of this. I am just a messenger. If I am wrong, then I urge the Justice Department to prove it. Open up the files and let the American people see for themselves. I have a few cases in mind already which can be disclosed without violating Rule 6(e) or the Privacy Act.

I love fighting corruption in Louisiana. This is where I belong, but this letter most likely means my time is over here and possibly in the FBI. I am tired of having to accept corruption in order to fight corruption. I am tired of FBI managers pressuring me to accept corruption and cover up corruption by Federal prosecutors. More importantly, when I was in the Marine Corps, I learned the simple leadership lesson that I could not ask my Marines to do something that I

AR00000291

would not do myself. I see witnesses like I saw my Marines. I cannot ask others to expose corruption if I am not willing to do it myself. Danelle Keim faced far greater risks when she called 911 on April 16, 2010. I will never forget listening to her over a transmitter in her apartment while she waited for Morel to arrive on July 23, 2012. She was on the verge of breaking down from stress. She told me she was having flashbacks from Morel's sexual battery which prompted the emergency call more than two years earlier. She pulled herself together though and was a true hero. Danelle Keim was brave as anyone I have ever known. I will never forget the abuses the other women described to me. Nor will I forget their courage in disclosing them. One woman's description of what Morel did to her will haunt me for the rest of my life. The victims, the witnesses, the ones who told the truth in this case, deserve nothing less than the same from me. They certainly deserved better from the U.S. Department of Justice and the FBI.

Michael S. Zummer

AR00000292

Michael S. Zummer
2337 Magazine St. Unit D
New Orleans, LA 70130

September 6, 2016

The Honorable Kurt D. Engelhardt
United States District Court
 for the Eastern District of Louisiana
C-367 Hale Boggs Federal Building
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

Re:     *United States v. Harry J. Morel, Jr.*, Criminal No. 16-050

Dear Judge Engelhardt:

In order to aid this Court in its decision regarding the release or return of my letter dated August 15, 2016 (hereinafter "August 15th Letter"), I am submitting additional material to address legal privileges not covered in the August 15th Letter which I anticipate the Government will assert. I assume that the Government will assert the Deliberative Process Privilege, Attorney-Client Privilege, Work Product Doctrine, and Law Enforcement Privilege. As there was no classified material or issues affecting national security in the August 15th Letter, the State Secrets Privilege does not apply.

I request this Court treat this letter as an addendum to the August 15th Letter and only release it to the public after making a legal determination on the question of my First Amendment rights and the privileges asserted by the Government. There is no additional factual material is this letter.

1. The Privileges Asserted by the Government Do Not Apply to First Amendment Speech.

"Since the beginnings of our nation, executive officials have claimed a variety of privileges to resist disclosure of information the confidentiality of which they felt was crucial to fulfillment of the unique role and responsibilities of the executive branch of our government." *In re Sealed Case No. 96-3124*, 116 F.3d 550, 557 (D.C. Cir. 1997). "The most frequent form of executive privilege raised in the judicial arena is the deliberative process privilege; it allows the government to withhold documents and other materials that would reveal advisory opinions, recommendations and deliberations comprising part of the process by which governmental decisions and policies are formulated." *Id.* (internal citations and quotations omitted).

"The attorney-client privilege protects confidential communications made between clients and their attorneys when the communications are for the purpose of securing legal advice

1

AR00000293

or services." *In re Lindsey*, 148 F.3d 1100, 1103 (D.C. Cir. 1998) (internal citations omitted). The attorney-client privilege may apply to Government attorneys "when the Government is dealing with its attorneys as would any private party seeking advice to protect personal interests, and needs the same assurance of confidentiality so it will not be deterred from full and frank communications with its counselors...." *Id.* at 1105 (internal citations and quotations omitted). Related to the attorney-client privilege is the Work Product Doctrine which applies to "written materials obtained or prepared by an adversary's counsel with an eye toward litigation...." *Hickman v. Taylor*, 329 U.S. 495, 511 (1947).

"Federal common law recognizes a qualified privilege protecting investigative files in an ongoing criminal investigation or information which would reveal the identity of confidential informants, although if all information indicating the identity of an informant can be eliminated by excision, the document is discoverable." *Coughlin v. Lee*, 946 F.2d 1152, 1159-60 (5th Cir. 1991) (internal citations omitted).

These privileges are generally asserted by the Government in Grand Jury investigations of public officials and civil litigation. In the Freedom of Information Act (hereinafter "FOIA") context, Exemption 5 of FOIA states that an agency is not obligated to disclose "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." Title 5 U.S.C. Sec. 552(b)(5). "Congress enacted this exemption largely to ensure that agencies not lose the protection traditionally afforded through the evidentiary privileges simply because of the passage of FOIA." *Army Times Pub. Co. v. Department of Air Force*, 998 F.2d 1067, 1069 (D.C. Cir. 1993) (internal citations and quotations omitted). FOIA codifies the Law Enforcement Privilege as Exemption 7 at Title 5 U.S.C. Sec. 552(b)(7).

Without any statutory authority to do so, the Federal Bureau of Investigation (hereinafter "FBI") cites the discretionary privileges in FOIA as a means to prohibit disclosures by employees under the First Amendment. *See* Federal Bureau of Investigation, *Prepublication Review Policy Guide*, June 4, 2015, at p. 11, *available at* https://vault.fbi.gov/2015-prepublication-review-policy-guide. (Despite the admonition on p. ii that if the guide or its contents "are provided to an outside agency, it and its contents are not to be distributed outside of that agency without [] written permission...," it is posted on an FBI website.)

At least one circuit has disagreed with this application of FOIA exemptions to Federal employees' First Amendment speech. When deciding whether the Central Intelligence Agency (hereinafter "CIA") could censor classified material from a former employee, the D.C. Circuit noted that the CIA employee's secrecy agreement "does not extend to unclassified materials or to information obtained from public sources. The government may not censor such material, contractually or otherwise. The government has no legitimate interest in censoring unclassified materials." *McGehee v. Casey*, 718 F.2d 1137, 1141 (D.C. Cir. 1983) (internal citations and quotations omitted). The D.C. Circuit determined, "First, restrictions on the speech of

2

AR00000294

government employees must protect a substantial government interest unrelated to the suppression of free speech. Second, the restriction must be narrowly drawn to restrict speech no more than is necessary to protect the substantial government interest." *Id.* at 1142-43 (internal citations and quotations omitted).

The D.C. Circuit went on to distinguish the Government's response to a release under FOIA from censorship of employee speech. "In a FOIA case, an individual seeks to compel release of documents in the government's possession. Here, by contrast, McGehee wishes publicly to disclose information that he already possesses, and the government has ruled that his secrecy agreement forbids disclosure." *Id.* at 1147. "This difference between seeking to obtain information and seeking to disclose information already obtained raises McGehee's constitutional interests in this case above the constitutional interests held by a FOIA claimant. As a general rule, citizens have no first amendment right of access to traditionally nonpublic government information." *Id.* (internal citations omitted). "A litigant seeking release of government information under FOIA, therefore, relies upon a statutory entitlement---as narrowed by statutory exceptions---and not upon his constitutional right to free expression." *Id.* "In this case, however, McGehee wishes to publish information he possesses, and the CIA wishes to silence him. Although neither the CIA's administrative determination nor any court order in this case constitutes a prior restraint in the traditional sense upon McGehee or any other party, the entire scheme of prepublication review is designed for the purpose of preventing publication of classified information. McGehee therefore has a strong first amendment interest in ensuring that CIA censorship of his article results from a *proper* classification of the censored portions." *Id.* at 1147-48 (internal citations omitted) (emphasis in original). The court further reasoned that "[b]ecause the present case implicates first amendment rights, however, we feel compelled to go beyond the FOIA standard of review for cases reviewing CIA censorship pursuant to secrecy agreements....[C]ourts should require that CIA explanations justify censorship with reasonable specificity, demonstrating a logical connection between the deleted information and the reasons for classification." *Id.* at 1148.

In a case similar to my disclosure of the August 15th Letter to this Court, the U.S. District Court for the District of Columbia cited D.C. Circuit precedent and held that "censorship is prohibited even if the material falls within a FOIA Exemption, where the Government fails to show with reasonable specificity that its interest in censorship of Government employees, in order to promote the efficiency of public services, outweighs the interest of prospective speakers in free dissemination of those speakers' views. While FOIA provides a useful analytical tool for assessing the strength of the Government's interest under the *Pickering/NTEU* balancing test, it cannot negate or override the First Amendment inquiry." *Wright v. Federal Bureau of Investigation*, 613 F. Supp. 2d 13, 24-25 (D.D.C. 2009) (*referring to Pickering v. Board of Education*, 391 U.S. 563 (1968) and *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995)).

3

AR00000295

The difference between the case in *Wright* and my experience is that the August 15th Letter was denied any review at all for the purposes of submitting it to this Court. The D.C. District Court described the *Wright* case as "a sad and discouraging tale about the determined efforts of the FBI to censor various portions of a 500-page manuscript, written by a former long-time FBI agent, severely criticizing the FBI's conduct of [an investigation]...." *Wright* at 15. The court also wrote "[i]n its efforts to suppress this information, the FBI repeatedly changed its position, presented formalistic objections to release of various portions of the documents in question, admitted finally that much of the material it sought to suppress was in fact in the public domain and had been all along, and now concedes that several of the reasons it originally offered for censorship no longer have any validity." *Id.*

According to the Supreme Court, the "limited exemptions [to FOIA] do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act; consistent with the Act's goal of broad disclosure, these exemptions have been consistently given a narrow compass." *Department of Interior v. Klamath Water Users Protective Assn.*, 532 U.S. 1, 7-8 (2001) (internal citations and quotations omitted). Using the exemptions in FOIA to prohibit disclosures, as the FBI does, appears to pervert Congress's purpose of the Act. Therefore, this Court should apply the First Amendment balancing test described in Section 2.A. of the August 15th Letter to any Government requests for redaction.

2.  Even If Applied to First Amendment Speech, the Privileges Do Not Apply to the Information in the August 15th Letter.

A.  The Deliberative Process Privilege Does Not Apply to the August 15th Letter or the Material Within It.

"An inter- or intra-agency document may be withheld pursuant to the deliberative process privilege if it is: (1) predecisional, *i.e.*, prepared in order to assist an agency decisionmaker in arriving at his decision, and (2) deliberative, *i.e.*, actually related to the process by which policies are formulated." *National Council of La Raza v. Department of Justice*, 411 F.3d 350, 356 (2d Cir. 2005) (internal citations and quotations omitted). "The 'deliberative process' privilege is central among the privileges protected by Exemption 5. However, as with all exemptions under FOIA, the deliberative process privilege must be construed as narrowly as is consistent with efficient government operation." *Army Times* at 1069 (internal citations omitted).

Since the "deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news," *Klamath* at 8-9, there is no reason to prevent the author of the material from waiving the privilege. Without acknowledging the privilege applies, I waive the Deliberative Process Privilege for the August 15th Letter, the notification letter which I submitted for prepublication review, and any document I prepared which is included or referred to within the August 15th Letter, including the draft search warrant affidavit, my Department of Justice Office

4

AR00000296

of Inspector General complaint, my first draft of the Racketeer Influenced Corrupt Organizations Act (hereinafter "RICO") memorandum which was submitted to Assistant U.S. Attorney (hereinafter "AUSA") (P) my memorandum regarding AUSA (P) research, my analysis of the difference between the draft and final factual bases, my e-mail regarding playing recordings, and any communications I wrote regarding my request to send letters to this Court.

The August 15th Letter includes a description of the content of the following inter- or intra-agency documents written by others to which I had access: AUSA (P) e-mail to me regarding his legal research, the Morel plea agreement, a draft factual basis, a final factual basis, and communications to me regarding my request to send letters to this Court. (I was never given access to any written plea offers to Morel.) AUSA (P) e-mail and communications to me about my request to send letters to this Court were written to me. I am not an agency decision-maker; therefore, those e-mails cannot be predecisional. The draft factual basis was not given to an agency decision-maker, but to Morel and his attorneys as part of a plea agreement. (It may not even apply as an inter- or intra-agency document.) The plea agreement and final factual basis are in the public record.

The August 15th Letter refers to other inter- or intra-agency documents prepared by others without disclosing their content, including: the declination letter, revisions to my original RICO memorandum and other draft charges against Morel. The disclosure of the existence of documents would be part of a privilege log in a litigation context anyway. *See Colo. Wild Horse and Burro Coalition, Inc. v. Kempthorne*, 571 F. Supp. 2d 71 (D.D.C. 2008). Therefore, holding that the disclosure of a short description of documents can be withheld under the Deliberative Process Privilege would be an unprecedented expansion of it. The privilege should not be applied to a mere description of documents. (Also, the declination of the case was publicly disclosed by Morel's attorney, Ralph Capitelli, during August 2013 anyway.)

The remainder of the communications I describe in the August 15th Letter were oral. Some courts have recognized that the Deliberative Process Privilege may be considered to prevent testimony of government officials. S*ee Ridenour v. Kaiser-Hill Co., L.L.C.*, 397 F.3d 925, 938-39 (10th Cir. 2005). However, I could find no precedent to show that it could be applied to oral comments between government officials. Also, the oral communication that I had about my case work was not communicated to me in order to assist an agency decision-maker in arriving at a decision. Most importantly, FOIA Exemption 5 applies to "memorandums or letters." 5 U.S.C. Sec. 552(b)(5). Although the FBI is already expanding FOIA beyond its wording and intended purpose by using it to censor employees' First Amendment speech, the FBI should be limited in this illegal action to the scope stated in the Act.

None of the material in the August 15th Letter is related to the process by which policies are formulated. The material is related to individual case decisions. Thus, the second requirement for the Deliberative Process Privilege is not met.

5

AR00000297

Also, in the litigation context, courts have required an agency head, or a delegated representative, to determine whether to invoke the Deliberative Process Privilege. *See Marriott International Resorts, L.P. v. United States*, 437 F.3d 1302, 1306-08 (Fed. Cir. 2006). This requirement has not been applied in the FOIA context though. By applying FOIA exemptions to Government employee First Amendment speech without any statutory authority to do so, the Executive Branch has been able to strip its employees of a procedural protection when asserting their Constitutional rights that has been provided to litigants against the Government.

Finally, "when the decision-making process itself is the subject of the litigation, the overwhelming consensus and body of law within the Second Circuit is that the privilege cannot bar discovery, and it evaporates." *State v. Salazar*, 701 F. Supp. 2d 224, 237 (N.D.N.Y. 2010) (internal citations and quotations omitted). The subject of the August 15th Letter is the corrupt process by which the charging decision was made in the Morel case. Therefore, this Court should consider applying this persuasive authority from the Second Circuit.

The Deliberative Process Privilege does not apply.

B. Attorney-Client Privilege and Work Product Doctrine Does Not Apply to Federal Prosecutors' Decisions in Criminal Cases Outside of Litigation.

Federal prosecutors in criminal cases do not represent individual private clients. They represent the United States. Therefore, they should be accountable to it. "With respect to investigations of federal criminal offenses, and especially offenses committed by those in government, government attorneys stand in a far different position from members of the private bar. Their duty is not to defend clients against criminal charges and it is not to protect wrongdoers from public exposure." *Lindsey* at 1108.

This Attorney-Client Privilege and Work Product Doctrine are least applicable when the Government attorneys and officials have breached their duties to their client. The Fifth Circuit has held that "[t]he [attorney-client] privilege is not an inviolable seal upon the attorney's lips. It may be waived by the client; and where, as here, the client alleges a breach of duty to him by the attorney, we have not the slightest scruple about deciding that he thereby waives the privilege as to all communications relevant to that issue." *Laughner v. United States*, 373 F.2d 326, 327 (5th Cir. 1967).

Although I am not the Justice Department's client, the United States is, and my August 15th Letter alleges, at the very least, a breach of duty by members of the Justice Department to the United States. Assertions of Attorney-Client Privilege and related Work Product Doctrine in this case are an attempt by Federal prosecutors and other officials to shield themselves from any accountability to their client.

The purpose of the Work Product Doctrine is to shield an attorney's mental impressions from an adversary's counsel in litigation. *See Hickman* at 511-12. During the course of

6

AR00000298

litigation, the Government would be at an unfair advantage if prosecutors' work product were available to the defense. However, after litigation is over, there is no reason to keep prosecutors' work product secret from their client.

Finally, although I am a licensed attorney in Louisiana, I am not employed as such by the Government. I am not authorized to represent the United States in court, nor do I act as counsel for the FBI. Therefore, none of my communications are subject to the Attorney-Client Privilege or Work Product Doctrine.

Any assertion of the Attorney-Client Privilege or Work Product Doctrine to my August 15th Letter only proves my point that many Federal prosecutors have forgotten whom they serve.

C. An Analysis of the Law Enforcement Privilege Shows that Nothing from the August 15th Letter Should be Redacted, Because None of the Material in it Compromises a Source, Witness, or Law Enforcement Technique Beyond What Has Been Publicly Exposed by Government Officials.

"To determine whether this qualified [Law Enforcement] privilege bars discovery of given documents, the trial court should consider the ten factors articulated in *Frankenhauser v. Risso* (sic) in balancing the government's interest in confidentiality against the litigant's need for the documents." *Coughlin* at 1160 (internal citations omitted).

The factors from *Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D.Pa. Mar.13, 1973) (unpublished) were described by the Fifth Circuit as follows: "(1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any interdepartmental disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiff's suit is non-frivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; (10) the importance of the information sought to the plaintiff's case." *In re U.S. Department of Homeland Security*, 459 F.3d 565, 570 (5th Cir. 2006).

I recognize the importance of protecting sources and methods. However, the only additional facts regarding the Morel investigation in my August 15th Letter, other than what has already been disclosed in court filings and a press conference, is the breakdown of the manner in which Morel sexually abused or solicited women, his private investigators' activity, the consent given to search his office, and my communication with Danelle Keim on July 23, 2012. Morel was already aware of those facts except the July 23, 2012 conversation. Keim had already been

7

named as a witness by the media and Government officials. Other than Keim, I did not name any witnesses or provide any identifying information about them. Furthermore, the August 15th Letter is an attempt to provide some vindication or justice to the victims and witnesses by letting them know that the plea agreement was not a reflection of their quality as witnesses, but a result of improper influence over the U.S. Attorney's Office for the Eastern District of Louisiana. Hopefully, this disclosure will chill future prosecutorial misconduct. The August 15th Letter does not include any information which will affect any ongoing investigation or litigation. No sophisticated investigative techniques are disclosed. The criminal investigation into Morel has been completed. References to other investigations were made in a manner so as not to identify subjects or witnesses. Those references cannot jeopardize any investigation or litigation. The information in the August 15th Letter is not available from any other source and it is an important disclosure of Government misconduct. As to using the names of law enforcement officials and prosecutors in the August 15th Letter, no one's safety will be jeopardized by the use of their names. Criminal investigators are regularly exposed to public scrutiny during the course of investigations and prosecutions. The United States will benefit from additional scrutiny of its attorneys' decision-making, and courts should be notified of prosecutorial misconduct.

Therefore, I believe an analysis of the *Frankenhauser* factors shows that there is nothing in the August 15th Letter which should be redacted under the Law Enforcement Privilege.

3. The Government Has Waived Any Privileges.

    A. U.S. Attorney Kenneth Polite Waived Any Privileges by Publicly Discussing His Office's Rationale for the Plea Agreement with Morel.

On April 20, 2016, U.S. Attorney Kenneth Polite held a press conference after Morel's guilty plea. During that press conference, Polite made representations to the media about why the plea agreement with Morel was made. (The full video of the press conference is available at https://vimeo.com/163586549.) (As the attorney for the United States, Polite's ability to comment publicly on a criminal case begs the question of how there can be any Attorney-Client Privilege or Work Product Doctrine regarding a criminal case once it is concluded.)

"[V]oluntary disclosure of privileged material subject to the attorney-client privilege to unnecessary third parties in the attorney-client privilege context waives the privilege, not only as to the specific communication disclosed but often as to all other communications relating to the same subject matter." *Sealed Case No. 96-3124* at 562 (internal citations and quotations omitted). Polite's remarks at the press conference serve as a waiver to any privileges his office can claim now. Polite represented to the public that the decision to make the plea agreement was based on evidentiary issues and concerns about witnesses. However, Polite did not disclose misconduct that occurred within his office which also contributed to the decision to make the plea agreement with Morel.

AR00000300

Although "this all-or-nothing approach [to waiver of privilege in the Attorney-Client context] has not been adopted with regard to executive privileges generally, or to the deliberative process privilege in particular," *id.*, in this case, Polite discussed his office's process as a whole. For that reason, the Deliberative Process Privilege should be waived for all of the material in the August 15th Letter. A public official should not be able to make an incomplete representation to the media about the discussions his office had when making a decision and then hide behind privileges when a government employee exposes the full story behind the decision.

### B. The Government Waived Any Privileges by Violating My First Amendment Rights.

If this Court holds that I had a First Amendment right to send the August 15th Letter to this Court, I argue that the FBI violated that right by refusing to review the letter for privileges. Not only did the FBI refuse to review the long August 15th Letter, but also a much shorter letter seeking to notify this Court of the existence of the August 15th Letter. The Government should not be able to argue that one of its agencies can refuse to review an employee's free speech for privilege and then later claim privileges over that speech.

### 4. Whether Analyzed under a First Amendment Balancing Test or Qualified Privilege Analysis, the Benefit of Disclosing the August 15th Letter Outweighs the Benefit of Secrecy.

### A. Any Recognition of a Privilege Asserted by the Government is Qualified.

"[F]ederal courts do not recognize evidentiary privileges unless doing so promotes sufficiently important interests to outweigh the need for probative evidence." *Lindsey* at 1104 (internal citations and quotations omitted). "The Supreme Court has not articulated a precise test to apply to the recognition of a privilege, but it has placed considerable weight upon federal and state precedent and on the existence of a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth. That public good should be shown with a high degree of clarity and certainty." *Id.* (internal citations and quotations omitted). Thus, the "deliberative process privilege is a qualified privilege and can be overcome by a sufficient showing of need. This need determination is to be made flexibly on a case-by-case, ad hoc basis." *Sealed Case No. 96-3124* at 558 (internal citations omitted). Although the government attorney-client privilege exists, it can be overcome. *See Lindsey* at 1110. Also, "the attorney work product doctrine, like the law enforcement investigatory privilege, is a qualified immunity. It is designed to balance the needs of the adversary system to promote an attorney's preparation against society's general interest in revealing all facts relevant to the resolution of a dispute." *In re Sealed Case No. 87-5290*, 856 F.2d 268, 273 (D.C. Cir. 1988) (internal citations omitted).

### B. In This Context, the Deliberative Process Privilege, Attorney-Client Privilege, and Work Product Doctrine Do Not Encourage Frank and Candid Discussion. They Encourage Dishonesty and Corruption.

9

AR00000301

The purpose behind the Deliberative Process Privilege, Attorney-Client Privilege, and Work Product Doctrine is to promote frank and candid discussions in making decisions. *See Klamath* at 8-9 (regarding Deliberative Process Privilege), *Lindsey* at 1105 (regarding Attorney-Client Privilege), and *Hickman* at 510-11 (regarding Work Product Doctrine). However, I believe my August 15th Letter shows that privileges do not promote candid communications in the context of Federal criminal investigations. They shield Federal prosecutors from accountability which allows them to make any legal determination they want. Instead of promoting efficient government operation, they promote inefficiency and misconduct. Therefore, there is no positive effect to asserting these privileges over communications about criminal cases after the case has been litigated or at least a plea agreement has been reached.

> C. Any Conceivable Purpose of the Privileges is Outweighed by the Need to Expose Government Misconduct.

"[W]here there is reason to believe the documents sought may shed light on government misconduct, the privilege is routinely denied, on the grounds that shielding internal government deliberations in this context does not serve the public's interest in honest, effective government." *Sealed Case No. 96-3124* at 558. The August 15th Letter exposes Government misconduct. The importance of holding public officials, particularly prosecutors and FBI managers, accountable is paramount, because of the power they possess. They have vast power over not only defendants and investigation subjects, but also crime victims, witnesses, and criminal investigators. The importance of exposing the misconduct described in the August 15th Letter outweighs any benefit.

5. Conclusion

Privileges designed to give the Government a fair chance in litigation are used as excuses to deny employees' First Amendment rights when litigation is not at issue. These assertions of privilege force an employee who wants to speak out on a matter of public concern, including Government misconduct, to challenge his or her agency in the courts which is costly and jeopardizes that employee's career. This regime chills employee speech, insulates public officials from accountability, and fosters corruption.

I request that this Court protect Government employees' First Amendment rights to disclose misconduct, deny the Government's assertions of privilege, and release the August 15th Letter and this letter to the public.

I thank this Court for its time and effort.

Michael S. Zummer

10

AR00000302

| | |
|---|---|
| **From:** | ZUMMER, MICHAEL S. (NO) (FBI) |
| **Sent:** | Thursday, June 02, 2016 2:41 PM |
| **To:** | SALLET, JEFFREY S. (NO) (FBI) |
| **Cc:** | (P) (NO) (FBI); (P) (NO) (FBI); (P) |
| | (P) (NO) (FBI) |
| **Subject:** | RE: Filing of Letter:  Attached --- UNCLASSIFIED |

**SentinelCaseId:**    NON-RECORD

Classification: UNCLASSIFIED
========================================================

Thank you, Boss.                                            (O-1)

I have submitted the letter to DOJ OIG via Senior Special Agent ▆ in Houston.  He will forward it to DOJ OPR as well.

I will keep you all posted on the results.

Mike

_____

**From:** SALLET, JEFFREY S. (NO) (FBI)
**Sent:** Tuesday, May 31, 2016 6:32 PM
**To:** ZUMMER, MICHAEL S. (NO) (FBI)
**Cc:**    (P)    (NO) (FBI)    (P)    (NO) (FBI);    (P)    (NO) (FBI)
**Subject:** Filing of Letter:  Attached --- UNCLASSIFIED

Classification: UNCLASSIFIED
========================================================

Michael,

As per our discussion today between, you, myself and ASAC   (P)

Based on OGC's Legal Analysis we are directing you NOT to send the letter to the Court without prior authorization from the Department of Justice (DOJ).  We are further advising that you are free to provide your letter to any of the DOJ/FBI entities identified in the FBI Whistleblower Regulations, 28 C.F.R. Part 27, and seek authorization from any of the DOJ entities listed, including DOJ's Office of Inspector General (OIG) and DOJ's Office of Professional Responsibility (OPR), to send your letter to the Court.

Please let me know if you have any questions.

**From:** Zummer, Michael S. (NO) (FBI)
**To:** (P)  (NO) (FBI); (P)  (RMD) (FBI); Sallet, Jeffrey S. (NO) (FBI); (P)  (NO) (FBI); (P)  (NO) (FBI); (P)  (NO) (FBI)
**Subject:** RE: Notice of Letter Released to Judge Engelhardt
**Date:** Tuesday, August 16, 2016 9:17:18 AM

I was not aware that the FBI was in the process of obtaining another OGC opinion on the matter. I have looked back through my e-mails and do not see anything notifying me of that. If I have missed something, I apologize, but I have seen nothing.

Neither (P) nor (P) told me that they had any intention of discussing this with me.

Regardless, with the sentencing tomorrow morning at 9:00 a.m., if the FBI were to reverse its decision, the court would already be prejudiced by not having sufficient time to review the letter. The court needed the letter today.

The relevant conduct of the Defendant to be sentenced tomorrow is not properly before the Court in the form of a PSR. Because of the USAO's charging decision, the probation officer determined that all of the remaining victims were not considered relevant conduct for the purposes of the charge. The plea agreement and USAO's charging decision which severely diminished those victims' rights is the result of misconduct within the USAO and an attempt to cover up that misconduct. I believe that is relevant to the court's decision. Ultimately, the relevance of the information is a legal question which should be put before the court.

Furthermore, since the FBI's decision in this matter raises a First Amendment issue, the FBI's conduct in attempting to prevent the disclosure of this information to the court bears on the court's decision.

As to whether or not I can do this as a private citizen, that is a matter for the courts to decide.

I will not ask to retract the letter. I am asserting my First Amendment rights as a citizen to make the court aware of prosecutorial misconduct and the FBI's efforts to conceal that misconduct from the court.

**From:** (P)  (NO) (FBI)
**Sent:** Tuesday, August 16, 2016 10:43 AM
**To:** Zummer, Michael S. (NO) (FBI); (P)  (RMD) (FBI); Sallet, Jeffrey S. (NO) (FBI); (P)  (NO) (FBI); (P)  (NO) (FBI); (P)  (NO) (FBI)
**Subject:** RE: Notice of Letter Released to Judge Engelhardt

Mike-

As you are already aware, the FBI was in the process of obtaining yet another OGC opinion (further to the opinion obtained from OGC in May advising the misconduct letter should not be filed with the Court) regarding the propriety or impropriety of your filing the misconduct letter with the Court. (P) and (P) were planning to discuss OGC's opinion with you later this afternoon as they are both busy this morning assisting employees in the aftermath of the recent flooding. I write you now

to urge you to retract the letter based on the following OGC opinion. I share this opinion with you in this format because you have proceeded to file the letter with the Court despite being advised not to do so.

Please note, you are not familiar with the vast majority of the facts in your letter "as a private citizen". Rather, you've learned such information only in your official capacity as an FBI agent. You have been directed not to file such information with the Court without DOJ approval, which you have not received. You have been instructed that you are welcome to exercise your rights as a whistleblower and, as you represent in your letter, you have done so and, as a result, the matter is currently being reviewed by the DOJ-OPR.

The relevant conduct of the Defendant to be sentenced today is all properly before the Court in the form of a PSR. It is my understanding that you are aware of the PSR and its contents. Any alleged misconduct on the part of attorneys for the United States and/or defense attorneys is not relevant to the sentencing of this Defendant, only Defendant's conduct is relevant.

OGC's opinion received this morning from FBI Deputy General Counsel Brower:

"After reviewing ___(P)___ email and consulting with others in OGC, it is our opinion that SA Zummer can and should be instructed that because his proposed letter contains privileged and other confidential FBI information and because the FBI can only communicate with a court through the Department of Justice, he cannot submit it to the court. He should be reminded that he can submit his proposed letter to the OIG (which I understand he has already done). He should be further instructed that submitting his proposed letter to the court without DOJ authorization could subject him to disciplinary action."

Thanks,
(P)

SSA ____(P)____
Chief Division Counsel
Federal Bureau of Investigation
New Orleans Division
W:
C:  (O-1)
F:

**From:** Zummer, Michael S. (NO) (FBI)
**Sent:** Tuesday, August 16, 2016 10:08 AM
**To:** (P) RMD) (FBI); Sallet, Jeffrey S. (NO) (FBI); (P) (NO) (FBI); (P) (P) (NO) (FBI); (P) (NO) (FBI); (P) (NO) (FBI)
**Subject:** Notice of Letter Released to Judge Engelhardt

Because of the sentencing hearing on August 17, 2016, I can only treat the response I received yesterday as the FBI's final decision on my request for prepublication review of my letter to Judge Engelhardt. I believe that the FBI is violating my First Amendment right as a citizen to communicate with a judge about prosecutorial misconduct I have witnessed which is relevant to the case before that judge. This is a legal question which can only be resolved in the Federal courts. Also, my right

AR00000514

would not do myself. I see witnesses like I saw my Marines. I cannot ask others to expose corruption if I am not willing to do it myself.

(O-1)

The victims, the witnesses, the ones who told the truth in this case, deserve nothing less than the same from me. They certainly deserved better from the U.S. Department of Justice and the FBI.

Michael S. Zummer

31

| From: | (P) (NO) (FBI) |
|---|---|
| Sent: | Wednesday, May 1, 2019 4:08 PM |
| To: | (P) (NO) (FBI) |
| Subject: | Fwd: RE: Submissions for FBI Prepublication Review |
| Attachments: | 042019 Zummer Michael Appeal Response LETTER.pdf; 7-Information Not Subject to FBI PRP FINAL APPEAL Redacted.pdf; 8-FBI Information Subject to FBI-PRP FINAL APPEAL Redacted.pdf |

FYI. I also forwarded t (P) .

(P)

Chief Division Counsel
FBI, New Orleans

This e-mail may contain information protected by the attorney-client, work product, and/or deliberative process privilege(s).

---------- Forwarded message ----------
From (P) (NO) (FBI)" (P) @fbi.gov>
Date: May 1, 2019 7:37 AM
Subject: Fwd: RE: Submissions for FBI Prepublication Review
To: (P) (NO) (FBI) (P) @fbi.gov>
Cc:

FYI

(P)

Chief Division Counsel
FBI, New Orleans

This e-mail may contain information protected by the attorney-client, work product, and/or deliberative process privilege(s).

---------- Forwarded message ----------
From: "FBI.PREPUB" <FBIPREPUB@FBI.GOV>
Date: May 1, 2019 7:35 AM
Subject: RE: Submissions for FBI Prepublication Review
To: Mike Zummer <mzummer@aol.com>
Cc:

Good morning Mr. Zummer,
We have completed our review and you will find the resultant product attached to this email which includes the final redactions for DOC 7 and DOC 8, along with our response letter. Please let us know if you need anything further.
Respectfully,
FBI PREPUBLICATION OFFICE
FBIPREPUB@FBI.GOV

(P)

**From:** Mike Zummer [mailto:mzummer@aol.com]
**Sent:** Friday, April 26, 2019 6:11 PM
**To:** FBI.PREPUB <FBIPREPUB@FBI.GOV>
**Subject:** RE: Submissions for FBI Prepublication Review

Thank you. I really appreciate it. No problem on the delay with the paperwork. I look forward to hearing from you. I hope you all have a great weekend too.
Mike

---

**From:** FBI.PREPUB [mailto:FBIPREPUB@FBI.GOV]
**Sent:** Friday, April 26, 2019 12:34 PM
**To:** Mike Zummer <mzummer@aol.com>
**Subject:** RE: Submissions for FBI Prepublication Review

Good afternoon,
We are finalizing our response for both of the documents, however, we won't be able to get the package/letter signed until the first part of next week. Ultimately, I think you will be satisfied with the results.
Have a nice weekend!
Respectfully,
FBI PREPUBLICATION OFFICE
FBIPREPUB@FBI.GOV

(P)

---

**From:** Mike Zummer [mailto:mzummer@aol.com]
**Sent:** Tuesday, April 16, 2019 5:00 PM
**To:** FBI.PREPUB <FBIPREPUB@FBI.GOV>
**Cc:** Hardy, David M. (IMD) (FBI) <dmhardy@fbi.gov>
**Subject:** RE: Submissions for FBI Prepublication Review

Thank you for letting me know. I will wait to hear from you on a completion date by the end of next week.
I appreciate you working with me.
Mike Zummer

---

**From:** FBI.PREPUB [mailto:FBIPREPUB@FBI.GOV]
**Sent:** Tuesday, April 16, 2019 3:21 PM
**To:** Mike Zummer <mzummer@aol.com>
**Cc:** Hardy, David M. (IMD) (FBI) <dmhardy@fbi.gov>
**Subject:** RE: Submissions for FBI Prepublication Review

Hello Mr. Zummer,
We would like to ensure we address all of your concerns noted below. In order to do so thoroughly, I will need to push back the April 19th deadline. I will be sure to get back to you next week with a proposed completion date, and hopefully we can work together to clear up any concerns you have outlined below.
Respectfully,
FBI PREPUBLICATION OFFICE
FBIPREPUB@FBI.GOV

(P)

---

**From:** Mike Zummer [mailto:mzummer@aol.com]
**Sent:** Sunday, April 14, 2019 10:01 PM
**To:** FBI.PREPUB <FBIPREPUB@FBI.GOV>
**Cc:** Wray, Christopher (DO) (FBI) <cawray@fbi.gov>; Hardy, David M. (IMD) (FBI) <dmhardy@fbi.gov>
**Subject:** RE: Submissions for FBI Prepublication Review

Director Wray, Section Chief Hardy and Prepublication Review,
Thank you for your response. While I disagree with many of your redactions and your assertion of the authority to redact "7-Information Not Subject to FBI PRP" at all, I appreciate the limited nature of your redactions compared to my past submissions. Below is my response to your review. In summary, I am proposing a compromise regarding "7-Information Not Subject to FBI PRP." I demand a response no later than the close of business Friday April 19, 2019, but please let me know if you need a reasonable extension of time. Otherwise, I will release the unredacted document,

AR00000776

since it was information that I obtained as a private citizen. The attachments are exhibits confirming that some of the information you have redacted is public record.

I demand a response to my appeal regarding "8-FBI Information Subject to PRP" no later than May 6, 2019. :

I. "8-FBI Information Subject to PRP" (hereinafter "Document 8")

   I appeal the redaction of information identifying former-AUS         (P)         in Document 8. (I do not appeal the redaction of Footnote 4 of that document, as that was only submitted for RIDS's information. I will not publicize that information.) The basis for my appeal of the decision to concea      (P)      identity is quite simply that there is no legitimate justification to conceal a public official's identity unless it would jeopardize them in some way. As public servants they are subject to public scrutiny. In this case, releasin      (P)      identity is not barred by any of the factors authorizing the assertion of a law enforcement privilege in *In re U.S. Department of Homeland Security*, 459 F.3d 565, 570 (5th Cir. 2006).

   Most recently, Attorney General Barr testified before Congress regarding the Mueller report that redacting information that implicated the privacy or reputational interests of people peripheral to an investigation did not apply to public office holders. William P. Barr, Attorney General, Testimony before Senate Appropriations Subcommittee on April 10, 2019 at 28:33 *available at* https://www.c-span.org/video/?459640-1/attorney-general-barr-thinks-spying-occurred-trump-campaign. A     (P)     was a public office holder, there is no reason to redact her name.

   Finally, as I've explained before, since at least 1988 in the Fifth Circuit, "[i]t was clearly established that a public employee's speech revealing improper conduct by fellow employees was protected." *Brawner v. City of Richardson, Tex.*, 855 F.2d 187, 193 (5th Cir. 1988) (internal citations omitted). There is no principled basis to concea      (P)      name in association with her alleged misconduct, the leaking of a source's cooperation with the government to a public official targeted by the source.

   Per DOJ policy 28 C.F.R. § 17.18(j)(3), I demand a response to this appeal within 15 business days, no later than close of business Monday May 6, 2019.

II. "7-Information Not Subject to FBI PRP" (hereinafter "Document 7")

   As I have written to you many times, I deny that you have the authority to redact anything in this document. You have failed to provide me with any basis for your assertion of authority to review/redact information that I obtained as a private citizen, specifically since I have been suspended from my official duties with the FBI on September 30, 2016. Nor, do you have any authority or reason to redact information that is already publicly known.

   However, you have made limited and relatively reasonable redactions, and I believe many of those redactions have been made because I did not adequately explain to you that some information is already public. Therefore, before telling you that I refuse all of your redactions and invite you get an injunction to stop me from releasing the information, as the law requires of you, I would like to propose the following compromise and clarification. If you would like, you can treat this as an appeal to the Director or AD IMD, although I think we may be able to work this out at the section level. To make sure there is not an unreasonably long delay, I demand a response to this proposed compromise by close of business on April 19, 2019, or I will go ahead and release the unredacted version of Document 7. I am open to additional time if you can give me a reasonable completion date. My proposal/clarifications are as follows:

   A.  I WILL accept your redactions regarding the former-source's relationship to the FBI and the issue regarding FBI sources recruiting other sources, which are in Document 7 at the bottom of p. 9, the top of p. 10, and on p. 19 in comment W.

   B.  I WILL accept your redaction of AUS         (P)         name in Document 7 at p. 6.

   C.  I WILL NOT accept your redactions in Document 7 of the references to evidence available in the Morel case that were removed from Morel's factual basis, because that information is already publicly available. I believe you made these redactions in error because I did not point out that this specific information is already in the public sphere.

      1. Specifically, the fact that there were "twenty" other victims in the Morel case that you redacted on p. 29 of Document 7 was disclosed at the press conference regarding Morel's guilty plea. The entire press conference is available online here, https://vimeo.com/163586549, the fact that there were more than twenty victims was disclosed by SAC Sallet at approximately 7:10 on the video. This was also reported in the press. *See* Jim Mustian, *Former St. Charles DA Harry Morel was 'sexual predator' who victimized at least 20 women, feds say*, THE NEW ORLEANS ADVOCATE ONLINE EDITION, Apr. 21, 2016, *available at* http://www.theadvocate.com/new_orleans/news/article_c2fbfac8-fb29-598e-

AR00000777

[9114-4cc216150180.html](9114-4cc216150180.html) (Also, prepublication review already approved a reference to twenty victims in another submission of mine, "Draft Explanation to Media of August 15, 2016 letter" which you approved for release on May 8, 2017. Thus, there is no reason to redact it now.)

2. Regarding the reference to transcripts and recordings in the Morel case that you redacted on p. 28 of Document 7, not only is their existence already public information, but a large percentage of them have already been released to the public by the Saint Charles Parish Sheriff's Office. The media has reported on those materials, including posting recordings. *See* Littice Bacon-Blood, *Here's what the FBI had on Harry Morel, St. Charles' corrupt DA*, NOLA.COM, Sept. 21, 2016, *available at* [https://www.nola.com/crime/2016/09/fbi_evidence_harry_morel_corrupt_da.html](https://www.nola.com/crime/2016/09/fbi_evidence_harry_morel_corrupt_da.html); Anna Thibodeaux, *Several women detail sexual encounters with Morel in FBI report*, ST. CHARLES HERALD-GUIDE ONLINE EDITION, Sept. 19, 2016, *available at* [http://www.heraldguide.com/details.php?id=17519](http://www.heraldguide.com/details.php?id=17519); Rob Masson, *Newly released video shows former District Attorney's advances*, FOX8LIVE.COM, Sep. 20, 2016, *available at* [http://www.fox8live.com/story/33132360/newly-released-video-shows-former-das-advances](http://www.fox8live.com/story/33132360/newly-released-video-shows-former-das-advances)

D. I WILL NOT accept your redactions of the names of the following federal prosecutors or other attorneys, Capitelli, an ▓▓(P)▓▓ (she is a licensed attorney as well). My reasoning for each individual is as follows:

1 ▓▓▓▓(P)▓▓▓▓

    a. First, although I originally heard this information while an FBI agent, I obtained this information again while I was suspended from the FBI and had no official duties. The witnesses who provided that information abou ▓▓(P)▓▓ knew I was not an FBI agent when they spoke to me about it again after my suspension. You cannot censor information that I obtained as a private citizen while I was not even employed by the FBI. If you would like to contact those witnesses for confirmation, please let me know.

    b. Second ▓▓(P)▓▓ engaged in misconduct by lying to those witnesses to prevent them from speaking in court and embarrassing the U.S. Attorney's Office. Thus, in addition to having no legal authority to censor his name, even if you did, under Fifth Circuit precedent, as I have explained above, I have a right to disclose that information. There is no legitimate reason to conceal the name of a public official who has engaged in misconduct.

    c. Finally, I have an obligation as a licensed attorney in Louisiana to report another attorney's misconduct, particularly when I have no obligation to keep that information secret. (Since I learned of it while I was suspended from the FBI, I have no obligation to the FBI to keep it secret.) Thus, I am obligated under the Louisiana Rules of Professional Conduct to repor ▓▓(P)▓▓

2. Ralph Capitelli    Capitelli's representation o ▓▓(P)▓▓ was public record in the Morel case. He publicly commented about Morel in the capacity of his attorney for years, including public statements about me. Redacting his name as Morel's attorney is akin to redacting Morel's name. For a few examples, *se* ▓▓(P)▓▓ ▓▓(P)▓▓ *In 911 call, woman said St. Charles DA Harry Morel sexually abused her*, NOLA.COM, Aug. 22, 2013, *available at* [http://www.nola.com/crime/index.ssf/2013/08/in_911_call_st_charles_woman_a.html](http://www.nola.com/crime/index.ssf/2013/08/in_911_call_st_charles_woman_a.html); Kyle Barnett, *Former D.A. cleared in investigation, attorney says*, ST. CHARLES HERALD-GUIDE, Aug. 29, 2013, *available at* [http://www.heraldguide.com/details.php?id=12997](http://www.heraldguide.com/details.php?id=12997); Jim Mustian, *Records: Feds weighed filing racketeering charges against Harry Morel*, THE NEW ORLEANS ADVOCATE, Sept. 19, 2016, *available at* [http://www.theadvocate.com/new_orleans/news/courts/article_c389651c-7e9d-11e6-b800-c7cdf123ea17.html](http://www.theadvocate.com/new_orleans/news/courts/article_c389651c-7e9d-11e6-b800-c7cdf123ea17.html). For a further discussion of the public records regardin ▓▓(P)▓▓ and Capitelli's property ownership, see below.

3 ▓▓▓▓(P)▓▓▓▓

    a ▓▓(P)▓▓ name, along with Capitelli's, has already been publicly reported in relation to the Morel case and the concerns over his ownership of property with Morel's attorney. Senator Charles Grassley's publicly available letters on November 15, 2016 to then-Attorney General Lynch, then-DOJ OPR Counse ▓▓(P)▓▓, DOJ Inspector General Horowitz, and then-FBI Director Comey all described the conflict. *See* [https://www.judiciary.senate.gov/download/grassley-to-dept_-morel-case-conflict](https://www.judiciary.senate.gov/download/grassley-to-dept_-morel-case-conflict), [https://www.judiciary.senate.gov/download/grassley-to-fbi_-morel-case-conflict](https://www.judiciary.senate.gov/download/grassley-to-fbi_-morel-case-conflict), and [https://www.judiciary.senate.gov/download/grassley-to-dept-justice-dept-inspector-general_-morel-case-conflict](https://www.judiciary.senate.gov/download/grassley-to-dept-justice-dept-inspector-general_-morel-case-conflict). In addition to Senator Grassley's letters, the matter has been reported in the media and

AR00000778

former-U.S. Attorney Polite has made public comments about it. See Jim Mustian and David Hammer, *In 31-page letter, New Orleans FBI agent accuses Justice Department of 'systemic corruption'*, THE NEW ORLEANS ADVOCATE, Mar. 21, 2017, *available at* https://www.theadvocate.com/new_orleans/news/courts/article_b9a17214-0e54-11e7-9dfc-cbb0fbf2e17b.html; Littice Bacon-Blood, *In Harry Morel case, FBI agent challenged prosecutor's ethics*, NOLA.COM, Sept. 20, 2016, *available at* http://www.nola.com/crime/index.ssf/2016/09/in_ex-da_harry_morel_case_conf.html.

b ▓(P)▓ and Capitelli's property ownership is a matter of public record in Baldwin County, Alabama. I will attach those records for your benefit. (See attached Exhibits A, B, C, I, J, and K). I obtained all of them online as a private citizen. You cannot censor publicly available information.

c. Finally, in addition to your inability to censor information that is already in the public sphere ▓(P)▓ has engaged in misconduct by participating in the Morel case while he and/or his live-in girlfriend owned property with Morel's attorney. Thus, in addition to having no legal authority to censor his name, even if you did, under Fifth Circuit precedent, as I have previously explained, I have a right to disclose that information. There is no legitimate reason to conceal the name of a public official who has engaged in misconduct.

4 ▓(P)▓ ▓(P)▓ ownership of property with Capitelli an ▓(P)▓ exchange of property wit ▓(P)▓ as well a ▓(P)▓ residing wit ▓(P)▓ in Kenner, Louisiana is a matter of public record available in Baldwin County, Alabama and Jefferson Parish, Louisiana records, as well as through Anywho. (See attached Exhibits A, B, C, D, E, F, G, H, I, J, and K). I obtained all of these records as a private citizen. You cannot censor what is public record, nor can you censor what I obtained as a private citizen. I understand and appreciate your concern about identifying the loved ones of federal employees. However, like family members of other corrupt public officials ▓(P)▓ made the decision to participate in a corrupt property exchange that was filed in the public record and you have neither any authority, nor any rational basis, to stop me from naming her.

Thank you for your time and effort. Please let me know if you have any questions, need any clarification, or need any additional time.

Mike Zummer

---

**From:** FBI.PREPUB [mailto:FBIPREPUB@FBI.GOV]
**Sent:** Wednesday, April 10, 2019 11:11 AM
**To:** Mike Zummer <mzummer@aol.com>
**Cc:** Wray, Christopher (DO) (FBI) <cawray@fbi.gov>; Hardy, David M. (IMD) (FBI) <dmhardy@fbi.gov>
**Subject:** RE: Submissions for FBI Prepublication Review

Hello Mr. Zummer,

Our prepublication review is complete. Please refer to the following attachments for your records.

1) Final Prepublication Response Letter
2) Redacted Copy of "7-FBI Information Not Subject to FBI Prepublication Review Policy"
3) Redacted Copy of "8-FBI Information Subject to FBI Prepublication Review Policy (PRP)"

Respectfully,

FBI PREPUBLICATION OFFICE
FBIPREPUB@FBI.GOV
▓(P)▓

---

**From:** Mike Zummer [mailto:mzummer@aol.com]
**Sent:** Friday, April 05, 2019 5:38 PM
**To:** FBI.PREPUB <FBIPREPUB@FBI.GOV>; Hardy, David M. (IMD) (FBI) <dmhardy@fbi.gov>
**Cc:** Wray, Christopher (DO) (FBI) <cawray@fbi.gov>; Hardy, David M. (IMD) (FBI) <dmhardy@fbi.gov>
**Subject:** RE: Submissions for FBI Prepublication Review

Thank you.

---

**From:** FBI.PREPUB [mailto:FBIPREPUB@FBI.GOV]
**Sent:** Friday, April 5, 2019 11:49 AM
**To:** Mike Zummer <mzummer@aol.com>; Hardy, David M. (IMD) (FBI) <dmhardy@fbi.gov>

AR00000779

**Cc:** Wray, Christopher (DO) (FBI) <cawray@fbi.gov>; Hardy, David M. (IMD) (FBI) <dmhardy@fbi.gov>
**Subject:** RE: Submissions for FBI Prepublication Review
Good afternoon Mr. Zummer,
We are finalizing our review and there should be no problem providing our final response to you prior to April 12, 2019.
Respectfully,
FBI PREPUB
FBIPREPUB@FBI.GOV
(P)

**From:** Mike Zummer [mailto:mzummer@aol.com]
**Sent:** Friday, April 05, 2019 4:50 AM
**To:** FBI.PREPUB <FBIPREPUB@FBI.GOV>; Hardy, David M. (IMD) (FBI) <dmhardy@fbi.gov>
**Cc:** Wray, Christopher (DO) (FBI) <cawray@fbi.gov>; Hardy, David M. (IMD) (FBI) <dmhardy@fbi.gov>
**Subject:** RE: Submissions for FBI Prepublication Review
Section Chief Hardy and FBI Prepublication Review,
Your bald assertion that a document is subject to prepublication review does not make it so. Considering your past record with prepublication review matters and other false statements, your assertion of authority over my constitutional rights to review information that I obtained as a private citizen is all the more suspect.
As I wrote earlier, I submitted "7-Information Not Subject to FBI PRP" as a courtesy, hoping for a reasoned response or no response at all. After receiving your March 8, 2019 letter claiming the document was subject to the PRP, in an attempt to work with you, I sent my April 1, 2019 e-mail, asking for the reasoning behind your assertion and pointing out that, even if it were subject to the policy, it and the other document should have been reviewed by now.
Because you have failed to provide any legal basis to assert that "7-Information Not Subject to FBI PRP" must be reviewed, I will release it after close of business on April 12, 2019, unless you provide me with your reasons as to why you assert authority over it. If I accept those reasons, I will not release the information within it that is subject to the PRP.
Alternatively, as Supreme Court precedent actually requires of you, you can get with DOJ and file an injunction. (*See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 560 (1975) "[A] system of prior restraint runs afoul of the First Amendment if it lacks certain safeguards: First, the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. Second, any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo. Third, a prompt final judicial determination must be assured.") If you can explain to a federal judge how information obtained outside of my employment and my general opinions about my former employment are subject to FBI policies and the FBI employment agreement, I will certainly honor the court's decision. I look forward to the arguments.
Director Wray (or whoever reads this e-mail address),
It is this sort of behavior that makes lies of your and your predecessors' claims that the FBI upholds the Constitution. I understand you have a lot to deal with, but the concealment of FBI and DOJ malfeasance is why those institutions are becoming increasingly corrupt. The political appointees at the top will never be able to reform the institutions. They will only be kept in check through transparency.
I hope you all have a great weekend.
Mike Zummer

**From:** FBI.PREPUB [mailto:FBIPREPUB@FBI.GOV]
**Sent:** Friday, March 8, 2019 9:43 AM
**To:** Mike Zummer <mzummer@aol.com>
**Cc:** Wray, Christopher (DO) (FBI) <cawray@fbi.gov>; Hardy, David M. (IMD) (FBI) <dmhardy@fbi.gov>
**Subject:** RE: Submissions for FBI Prepublication Review
Good morning Mr. Zummer,
Please see the enclosed letter regarding the status of your request.
FBI PREPUB

**From:** Mike Zummer [mailto:mzummer@aol.com]
**Sent:** Tuesday, March 05, 2019 12:09 AM

AR00000780

**To:** FBI.PREPUB <FBIPREPUB@FBI.GOV>; Hardy, David M. (IMD) (FBI) <dmhardy@fbi.gov>
**Cc:** Wray, Christopher (DO) (FBI) <cawray@fbi.gov>
**Subject:** RE: Submissions for FBI Prepublication Review

To FBI Prepublication Review and Section Chief Hardy (if I have the wrong e-mail address for Section Chief Hardy, please forward this to him),

Thank you for your response. As a current or former-FBI employee, I am only required to submit "FBI Information" to RIDS. It is my belief that the first document I sent you is not FBI Information because the information within it was not "created and acquired…in connection with official FBI duties." Federal Bureau of Investigation, *Prepublication Review Policy Guide*, June 4, 2015, at p. 1 (with a similar definition in the FD-291). It includes information that I obtained while I had no official FBI duties and my personal opinions. Therefore, I had no obligation to submit it to you, and you cannot stop me from, nor take any action against me for, releasing it.

However, I provided it to you as a courtesy to give you the opportunity to raise any objections. Please provide me with any specific objections to my release of anything in the first document and why you believe it is "FBI Information" as defined in your policy and the FD-291, and, thus, subject to prepublication review, no later than close of business on March 11, 2019, or I will assume you have none.

Needless to say, your latest correspondence appears to me to be nothing but the usual efforts of the FBI to conceal Department of Justice misconduct from the American people. I will make that point when I speak to the press.

Please let me know if you have any questions.

Thank you for your time and effort.

Mike Zummer

---

**From:** FBI.PREPUB [mailto:FBIPREPUB@FBI.GOV]
**Sent:** Monday, March 4, 2019 4:14 PM
**To:** Mike Zummer <mzummer@aol.com>
**Cc:** Wray, Christopher (DO) (FBI) <cawray@fbi.gov>
**Subject:** RE: Submissions for FBI Prepublication Review

Good afternoon Mr. Zummer,

Please see the enclosed letter regarding the status of your request.

Thank you,

FBI PREPUB

---

**From:** Mike Zummer [mailto:mzummer@aol.com]
**Sent:** Saturday, February 09, 2019 6:25 AM
**To:** FBI.PREPUB <FBIPREPUB@FBI.GOV>
**Cc:** Wray, Christopher (DO) (FBI) <cawray@fbi.gov>
**Subject:** Submissions for FBI Prepublication Review

FBI Prepublication Review:

I am copying Director Wray on this, because I have sent him a related e-mail. I am submitting the below to documents for your review. The first document, titled "Information Not Subject to FBI Prepublication Review Policy," includes information that I believe is not subject to prepublication review, but out of an abundance of caution I am sending it to you anyway.

The second document, titled "FBI Information Subject to Prepublication Review Policy (PRP)," does need to be reviewed.

I am intending to use the information in these submissions in media interviews the close of business March 11, 2019, thirty calendar days from now. I demand clearance to release this information by then. Court precedent defines my Constitutional rights not your unconstitutional policy. Thus, I demand release in thirty calendar days as called for under court precedent.

If I have no response from you by close of business March 11, 2019, I will release the information in the first document, since I do not believe it is subject to prepublication review and I do not need your permission to release it. Please let me know if you have any questions.

Mike Zummer

AR00000781



**U.S. Department of Justice**

Federal Bureau of Investigation

Information Management Division
Winchester, VA 22602-4843

April 29, 2019

Mr. Michael S. Zummer
2337 Magazine Street Unit D
New Orleans, LA 70130

Re: APPEAL of FBI PPR 19-078 (Document #7 and Document #8)

Dear Mr. Zummer,

This letter is in response to your appeal of April 14, 2019, to reconsider the redactions proposed by this office for 'Document #7' and 'Document #8', formerly known as:

"7 – Information Not subject to FBI Prepublication Review Policy"
"8 – FBI information subject to Prepublication Review Policy (PRP)"

Upon further analysis of the previously redacted portions, along with the information and resources provided in your request letter, we have concluded our review and you will find the enclosed redacted copies for your records. This review represents our final determination pursuant to the Federal Bureau of Investigation's (FBI) Prepublication Review Policy (PRP) and Prepublication Review Policy Guide (0792PG).

Should you have any questions, please do not hesitate to contact the FBI Prepublication Review Office at _____ (P) _____ or via e-mail at FBIPREPUB@FBI.GOV. Thank you for your participation in the FBI's prepublication review process.

Sincerely,

David M. Hardy
Section Chief
Record/Information
Dissemination Section

AR00000782

<u>**INFORMATION NOT SUBJECT TO FBI PREPUBLICATION REVIEW POLICY**</u>

The below information was based on conversations and experiences I had after I had been suspended by the FBI on September 30, 2016.  Therefore, I did not have any official duties with the FBI at the time and I have no obligation to request the FBI's permission to release the information.  I am also including general comments that are my own opinions and not "FBI information."  (If my general comments and opinions are subject to prepublication review, then so are those of every former-FBI employee who has commented on the FBI.)  Based upon my past experience, though, I am submitting the below information to FBI Director Wray and FBI prepublication review out of an abundance of caution to allow them to raise any objections to its public release. (I have included as many general comments or opinions that I can think of, but I maintain that I have the right to express my opinion or make general comments without having to submit them to prepublication review.)  Please let me know if you disagree with my conclusion that this is not subject to the Prepublication Review Policy and what, if any, basis you have for that.  If you have no negative response or no legitimate reason to request me to withhold this information in thirty calendar days, by close of business March 11, 2019, I will release these to the media.

I.  **AUSA Lies and Intimidation of Sexual Assault Victim and Dead Victi's Mother to Prevent Them from Speaking in Court.**

Since my suspension on September 30, 201 ▢(P)▢ , the mother of deceased witness Danelle Keim, and a woman forced to perform oral sex on Morel in return for the collection of past due child support ("Victim 1") have both told me that on August 15, 2016, AUS ▢(P)▢ with the U.S. Attorney's Office for the Eastern District of

---

▢(P)▢ has been publicly identified. *See* Mike Perlstein, *Mother of sex-for-leniency victim speaks out*, WWLTV.COM, Aug. 16, 2016, *available at* http://www.wwltv.com/news/investigations/mother-of-sex-for-leniency-victim-speaks-out/300076562

AR00000783

Louisiana told both women separately that Judge Engelhardt had decided not to let anyone speak at Morel's sentencing hearing. AUS (P) also suggested that they would be subject to cross-examination if they did speak. When Victim 1 sent AUS (P) a copy of a letter she had written to the judge, the AUSA called her and said that she had said good things about Saint Charles Parish Sheriff Greg Champagne and the FBI case agent, but she had not said good things about the USAO. However, he told her he would take the letter to the judge anyway. Victim 1 e-mailed her letter directly to Judge Engelhardt instead after I gave her an e-mail address for his chambers.

The following day, August 16, 2016, AUS (P) called Victim 1. Apparently, in response to her e-mail to Judge Engelhardt, the judge had called the AUSA and told him to tell the victims that the court had not made the decision to keep the victims from speaking. The court would not stand in the way of any victim's healing process. Nonetheless, AUS (P) told Victim 1 that she could be subject to cross-examination and needed to meet at the USAO before the sentencing. He also told her that it would be her fault if Morel appealed his sentence and ultimately got less than three years. Victim 1 agreed to meet at the USAO the following morning before the hearing.

Whe (P) learned abo (P) lying to Victim 1 (P) called the court and asked to speak at the hearing. AUS (P) calle (P) after she called the judge. He told her that it had not been the judge's decision that she not speak. He admitted that he had said otherwise the previous day and apologized to her. AUS (P) tried to dissuade her from speaking in court, including telling her that if she spoke in court, the defendant could ultimately get less than a three-year sentence as a result. He also told her that she might be subject to cross-examination (P) decided against coming to court at all.

2

AR00000784

On August 17, 2016, Morel was sentenced to three years in prison. Before the sentencing, Victim 1 met with AUS [P] and another AUSA who question her about her letter to Judge Engelhardt. They asked her if Sheriff Champagne or the FBI case agent had written the letter for her. The AUSAs walked her to court and into the courtroom. She did not speak in court. Strangely, outside of court, when there were reporters from various media organizations present, AUS [P] showed Victim 1 which member of the media to whom she should speak. (The same reporter interviewe [P] but he did not include any o [P] complaints with the USAO's handling of the case.)

II.     **Abuse of Federal Witnesses by a District Attorney with Personal Interest in the Matter and U.S. Attorney's Failure to Take Action While Receiving Political Support from the District Attorney's Business Partner and Subject of FBI Investigation.**

Based on media reports, the FBI investigated District Attorney Charles Ballay of the Louisiana 25th Judicial District (Plaquemines Parish) and Louisiana Lieutenant Governor William Nungesser for the use of Plaquemines Parish Government personnel, equipment, and material to improve property owned by Ballay and Nungesser while Nungesser was the parish president.[2] Shortly after my suspension from the FBI on September 30, 2016, I learned that District Attorney Charles Ballay of the Louisiana 25th Judicial District (Plaquemines Parish) had initiated a state grand jury investigation into "public corruption." As part of Ballay's office's investigation, it was calling various witnesses in the FBI investigation to the state grand jury and questioning them about the FBI investigation, as well as civil lawsuits initiated by the parish government under Nungesser's successor as parish president.

---

[2] David Hammer, *Sources: FBI resumes probe of Nungesser in Plaquemines*, WWLTV.COM, May 23, 2017, *available at* https://www.wwltv.com/article/news/investigations/sources-fbi-resumes-probe-of-nungesser-in-plaquemines/442347011

AR00000785

While federal witnesses were being called to the state grand jury and questioned about matters involving the business of the same district attorney who empaneled the grand jury, I provided advice to at least one witnes (P) [3], to contact an FBI agent who had replaced me on the case (P) told me that the FBI would take no action in the matter.

(P) was served with a subpoena to testify before Ballay's grand jury (P) feared that Ballay would abuse the grand jury in a manner similar to Leander Perez, a longtime district attorney in Plaquemines and Saint Bernard Parishes from 1924 until 1960 who abused his power for political reasons and to amass personal wealth (P) feared that Ballay might indict her in retaliation for assisting the FBI. Her concerns were further exacerbated by Ballay's instruction to her approximately two years earlier that she was to report criminal activity to him instead of the FBI. He told her not to report criminal activity to the FBI (P) told me of this again after my suspension.) In light of Ballay's actions, she asked me to accompany her and her attorney to her grand jury appearance. She also told me that her attorney had requested my presence. I told her that I could not do so in my capacity as an FBI agent because I was suspended, but that I could as an attorney because I was licensed in Louisiana. (In retrospect, I could simply have attended as a private citizen without a law license since I made no court appearance and had no attorney-client relationship wit (P)

(P) also informed me that an attorney for Plaquemines Parish Government, Robert Barnett, and possibly other parish officials had met with then-U.S. Attorney for the Eastern District of Louisiana Kenneth Polite about Ballay's possible abuse of the grand jury. Polite took no action.

---

[3] Not only ha (P) given me permission to name her, she has demanded that I do so.

AR00000786

Prior t [(P)] grand jury appearance on December 13, 2016, I learned that Lieutenant Governor Nungesser was supporting Polite to continue as U.S. Attorney when President-elect Trump took office.[4]  I believe that USA Polite took no action to stop Ballay from questioning federal witnesses about a federal investigation into Nungesser, because Nungesser was supporting Polite's continued tenure as USA.  Whether or not Polite was influenced by Nungesser, Nungesser's support for Polite gave Polite a personal interest in the Nungesser matter.

On the day o [(P)] appearance, December 13, 2016, I was served with a subpoena to appear before the grand jury, ostensibly to answer questions about the matters that I had investigated as an FBI agent.  Ultimately, I did not testify because Ballay's DA's office did not provide the necessary request to the FBI.

On or about December 13, 2016, I also learned that Ballay had contacted local businessmen in Plaquemines Parish the previous week   before the special election for parish president on December 10, 2016.  Ballay reportedly told the businessmen th [(P)] was scheduled to appear before the grand jury and was going to testify that the businessmen were involved in drug trafficking.  During the phone calls, Ballay also reportedly expressed his desire for the businessmen's support of his preferred candidate for parish president.  (Ballay's preferred candidate would likely have ended the lawsuits regarding the improprieties that took place during Nungesser's term as parish president. [(P)] told me that she had no such information about the businessmen and believed that Ballay had lied to them.  Learning of this caused

---

[4] Jim Mustian, *Top La. Republicans urge Trump to retain Polite as U.S. Attorney in New Orleans*, THE NEW ORLEANS ADVOCATE, Dec. 4, 2016, *available at* http://www.theadvocate.com/new_orleans/news/politics/article_51142e3c-b97f-11e6-ba5b-4b25b4685836.html

AR00000787

[P] additional fear, including a fear of physical violence by the businessmen about whom Ballay falsely claimed she was providing information.

Below is my account of this incident in a different writing style. While it includes the above information, there is additional information included:

After my suspension became public knowledge, Plaquemines Parish DA Charles Ballay had convened a state grand jury to investigate public corruption in his parish. The problem was that Ballay and his business partner/political ally, Lieutenant Governor Nungesser, should have been the primary subjects of any investigation. Now, the DA was using the power of a grand jury to interrogate federal witnesses about what they had told the FBI and an attorney hired by the parish government to draft a lawsuit to recoup any misused funds. Maybe the use of public funds had been proper, but it was wholly improper for the DA to question witnesses who had reported the matter to the FBI.

[P] was scheduled to appear before the same grand jury on December 13, 2016.

"I need you to go with me. My lawyer wants you there too."

I mulled it over. I was still in limbo with the FBI and had no authority to go as an agent. Yet, I was a licensed attorney in Louisiana, and I wouldn't be getting paid for it, so I didn't consider it "employment" that required permission from the FBI. Still, if they found out I was assistin [P] outside the Plaquemines Parish grand jury, they would use it against me. *I'm sick and tired of being forced to feel like doing the right thing is wrong.*

*Fuck them. Sometimes, you have to draw fire on yourself to help people who deserve it.*

"Do you need me for legal advice?" I asked the witness whom I believed was being targeted for providing lawfully-obtained information to the FBI and for a lawsuit.

"Yes," she answered.

"I'll be there."

The real question was why hadn't the FBI or U.S. Attorney's Office done anything about a DA abusing federal witnesses in front of a state grand jury. Another agent had inherited my cases that were swamped with questionable prosecutorial motives [P] told the newly assigned agent what was going on, and he passed it up the chain of command. The silence from the management was unusual. *Something must be holding them back*, I theorized.

An attorney for the parish and an acting-parish president met with U.S. Attorney Polite [O-1] and AUSA ▮▮▮▮▮ about the harassment of their employees who were federal witnesses ▮▮▮▮ twice. The prosecutors claimed they were waiting on the FBI. *Why did they have to wait [P] would have had Charles Ballay appearing before a federal grand jury if she were still the first assistant. Did the phone only work one way?*

An article in the newspaper may have answered my questions.

Two weeks before the other Republicans had supported Polite, Louisiana Lieutenant Governor Billy Nungesser had provided a letter to Vice President-Elect Mike Pence asking the incoming administration to keep the U.S. Attorney.[5]

[5] Jim Mustian, *Top La. Republicans urge Trump to retain Polite as U.S. Attorney in New Orleans*, THE NEW ORLEANS ADVOCATE, Dec. 4, 2016, *available at* http://www.theadvocate.com/new_orleans/news/politics/article_51142e3c-b97f-11e6-ba5b-4b25b4685836.html

AR00000788

*What greater insult could a federal prosecutor receive than to be recommended to keep his or her job by the former (and should have been current) subject of an FBI corruption investigation?*[6]

Despite this new appearance of impropriety, Polite did not recuse himself from the Nungesser matter, and witnesses who had come forward were left swinging in the wind. Again.

I was reminded of a paragraph in my August 15th letter to Judge Engelhardt: "U.S Attorneys should not have any influence on public corruption or civil rights cases. Political partisans with ambitions to become a mayor, congressman, or other official are the last people who should be making these decisions. Certainly, there are honest U.S. Attorneys, but the current system allows some foxes, or at least bravery-challenged watchdogs, to guard the henhouse."

When I had written that paragraph, I envisioned Polite as a bravery-challenged watchdog. After the Plaquemines Parish inaction and seeing the Justice Department Public Integrity Section's annual reports to Congress, I changed my mind. The reports included the number of public corruption convictions in each judicial district for the past decade by year. Based on the 2016 and 2007 reports, during the period Jim Letten (a career prosecutor promoted from within the ranks) was U.S. Attorney for the Eastern District of Louisiana beginning in 2001, except for two years, the annual number of public corruption convictions never went below 20 with a high of 29 in 2004, 2007, 2011, and 2012. The two least productive years under Letten were 2002 and 2003 with 19 and 17 convictions, respectively. Letten stepped down at the end of 2012, and there were 20 corruption convictions in 2013, most likely holdovers from Letten's administration.[7]

On the other hand, after Polite (a defense attorney who already had at least one political appointment under his belt and only about three years of prosecutorial experience[8]) took over as U.S. Attorney towards the end of 2013, there were 10 corruption convictions his first full year in office, 2014.[9] There were 12 in 2015 and 16 in 2016 (which included the Morel case).[10] Polite's high number of 16, was lower than the lowest number of annual corruption convictions in the district under past U.S. Attorneys going back to 1998.[11] Polite's high number was only 55% of the number of corruption convictions Letten had in his last full year.

---

[6] Jim Mustian, *Sources: FBI revives probe of ex-Billy Nungesser's administration in Plaquemines Parish*, THE NEW ORLEANS ADVOCATE, Apr. 29, 2017, *available at*
https://www.theadvocate.com/baton_rouge/news/politics/article_5ef0a4c0-2a9c-11e7-8c28-bb270daa0ffa.html; Lee Zurik, *Lee Zurik Investigation: Nungesser confirms FBI subpoena*, FOX8LIVE.COM, Oct. 25, 2012, *available at* http://www.fox8live.com/story/19918867/2012/10/Thursday/lee-zurik-investigation/
[7] U.S. Department of Justice Public Integrity Section, Report to Congress on the Activities and Operations of the Public Integrity Section for 2016 (2017), at 24, *available at*
https://www.justice.gov/criminal/file/1015521/download, and U.S. Department of Justice Public Integrity Section, Report to Congress on the Activities and Operations of the Public Integrity Section for 2007 (2008), at 62, *available at* https://www.justice.gov/sites/default/files/criminal/legacy/2013/10/22/2007-Annual-Report.pdf
[8] Kenneth Allen Polite, Jr., Response to U.S. Senate Committee on the Judiciary Questionnaire for Non-Judicial Employees, Jul. 5, 2013 *available at* https://www.judiciary.senate.gov/imo/media/doc/Polite-Senate-Questionnaire-Final.pdf
[9] U.S. Department of Justice Public Integrity Section, Report to Congress on the Activities and Operations of the Public Integrity Section for 2016 (2017), at 24, *available at*
https://www.justice.gov/criminal/file/1015521/download.
[10] *Id.*
[11] U.S. Department of Justice Public Integrity Section, Report to Congress on the Activities and Operations of the Public Integrity Section for 2016 (2017), at 24, *available at*
https://www.justice.gov/criminal/file/1015521/download, and U.S. Department of Justice Public Integrity Section,

AR00000789

The youthful, inexperienced chief prosecutor couldn't blame the FBI for his failures. According to public comments by SAC Sallet, the FBI New Orleans Division had more open public corruption investigations per agent than any other office in the country.[12] Specifically, New Orleans had the third-highest number of corruption investigations open in the FBI.[13] Only New York and Los Angeles, the two largest cities in the U.S., had more cases.[14]

In a news report about Louisiana Republicans supporting Polite as U.S. Attorney, one New Orleans political analyst remarked, "He has done an excellent job by all accounts."[15] Based upon the numbers, Polite had done an excellent job    if one were a corrupt public official.

One former-AUSA told me that former-Senator Mary Landrieu, who had selected Polite, had pressured previous-U.S. Attorney Jim Letten to reduce the number of corruption cases he was prosecuting.[16] If true, Letten's numbers showed he hadn't listened. I had no idea what communication had occurred between Polite and Landrieu, but the dramatic reduction in prosecutions showed something was wrong.

Some of the good AUSAs remarked that they had expected Polite would step down immediately after Trump's election.[17] Yet, he clung to the post. The media reported that he was now a registered independent after Trump's victory,[18] but a report from his original nomination referred to him as a Democrat.[19]

It would be hard to "drain the swamp" in New Orleans with Polite standing on the plug.

Before her grand jury appearanc  (P)  told me about another twist in DA Ballay's use of the investigation. She heard that, in violation of state grand jury laws, the DA had called two powerful businessmen from "down the road" (closer to the mouth of the Mississippi River) and told them th  (P)  was going to testify in the grand jury that these businessmen were involved in drug trafficking. The DA promised to do what he could for the businessmen but asked for their support of his preferred candidate in the upcoming parish president's election. To make matters worse, it was a complete fabrication by the DA  (P)  had no such information, and falsely making her out to be a drug source to powerful people made her fear for her life. All at the hands of the chief prosecutor in her parish.

Ballay's abuses were all the more menacing because of a former-Plaquemines DA, Leander Perez, who used grand jury investigations to maintain his power to enforce an agenda of segregation and suppression of minority vote for more than thirty years. Ballay was using the same playbook, and the specter of Leander Perez was still fresh in parish residents' minds.

Report to Congress on the Activities and Operations of the Public Integrity Section for 2007 (2008), at 62, *available at* https://www.justice.gov/sites/default/files/criminal/legacy/2013/10/22/2007-Annual-Report.pdf
[12] David Hammer, *N.O. FBI agent accuses Justice Dept. of 'systemic corruption'*, WWLTV.COM, Mar. 21, 2017 *available at* http://www.wwltv.com/news/investigations/no-fbi-agent-accuses-justice-dept-of-systemic-corruption/424349390
[13] David Hammer, *Polite touts higher-impact prosecutions*, WWLTV.COM, Mar. 14, 2017, *available at* http://www.wwltv.com/news/crime/polite-touts-higher-impact-prosecutions/422576454
[14] Public Comments by SAC Jeffrey Sallet, Louisiana State Bar Association, 9th Annual White Collar Crime Symposium (Apr. 7, 2017)
[15] Wynton Yates, *Republicans ask Trump to keep Polite as top prosecutor in New Orleans*, WWLTV.COM, Dec. 5, 2016, *available at* http://www.wwltv.com/news/local/republicans-ask-trump-to-keep-polite-as-top-prosecutor-in-new-orleans/362829423
[16] I learned of this in my capacity as a private citizen while I was suspended.
[17] I learned of this in my capacity as a private citizen while I was suspended.
[18] *Id.*
[19] Bruce Alpert, *Landrieu promises 'open and efficient process' to find Letten successor*, NOLA.COM, Dec. 6, 2012, *available at* http://www.nola.com/crime/index.ssf/2012/12/landrieu_promises_open_and_eff.html

AR00000790

Much like the FBI suspending the security clearances of agents who refused to go along with immoral and unethical behavior, a DA could bleed a citizen financially by forcing him or her to hire an attorney during a baseless grand jury investigation.

On December 13, 2016, while I was standing outside the DA's office a ▒▒(P)▒▒ was testifying, one of the attorneys helping her advised me and her other supporters that Nungesser's "Lieutenant Governor" vehicle was parked at Ballay's private law office. We suspected he wanted an update on the not-so-secret proceedings.

Aft ▒▒(P)▒▒ testified for almost an hour, one of the DA's office's investigators came outside and questioned me about what I was doing there. I stammered for a few moments before declaring that I was representing her.

"You were fired from the FBI," the investigator responded.

*What does that have to do with me being here as a lawyer?* I thought.

"I was suspended," I maintained.

"You were fired."

*Had they fired me? At this point, it wouldn't surprise me if FBI Headquarters was taking its orders from Charles Ballay.*

A few minutes later, the investigator returned and asked for my "credentials."

*Credentials? I never said I was here as an FBI agent.*

I refused to show him anything or speak to him.

The investigator finally demanded to see my FBI identification because, he claimed, "You said you were here as an agent before."

"No, he didn't," two lawyers an ▒▒(P)▒▒ husband said in unison.

"Three witnesses," I said simply and gestured towards the men.

After the DA's employee sheepishly left, I suspected why the investigator had started accusing me of being fired before. He hadn't even heard me say that he was representing ▒▒(P)▒▒ He'd only heard what he'd wanted to hear, that I was there as an agent when they knew I was no longer at the FBI.

*They were so ready to spring their trap on me that they didn't even listen to what I said*, I concluded.

After the encounter with the investigator, it didn't take long for my phone to ring with the New Orleans FBI on the caller ID. *They won't lift a finger to protect witnesses, but they don't waste any time trying to stop me from helping them.*

Four FBI officials were on the line. I held back a quip about how it now took four of them to talk to me.[20]

One gingerly questioned me about what I was doing, and I admitted it. When he told me that I needed permission to represent someone, I said that I hadn't thought it was employment because I wasn't getting paid.

"Um, yeah, that includes doing anything *pro bono*. The Bu has pretty strict rules about that. You can basically only represent family members."

*The Bu?* In light of my recent experience with the FBI, his use of the affectionate nickname for the organization made me want to puke.

Based on the FBI manager's questions, I began to suspect how he was planning on covering his and the FBI's asses. I figured he was going to blame ████████████████  ████████████████████████████████████████

(O-1)

---

[20] Because I was suspended at the time and was acting as a private citizen, this conversation with FBI officials is not subject to prepublication review. However, for now, I have removed their names or identifying information.

AR00000791

███████████████████████████████████████████
███████████████████████████████████████████
███████████. *How could they do that and stay confidential?* It was a textbook case of FBI managers using bureaucratic rules to insulate themselves from any moral responsibility. They had no problem with breaking a few idiotic policy regulations to make cases, until you pursued someone they wanted to protect, like a high-ranking politician backing a desperate U.S. Attorney.

*You don't protect witnesses by hiding behind a rulebook.*

During the phone call, the DA's investigator returned and served a subpoena on me. When I announced my receipt of the compulsion to testify at the state proceeding in January, I enjoyed hearing another momentary silence on the other end. The FBI's lawyer quickly responded though that the DA's office would need to get the federal government's permission for me to testify.

*Now, they have to do something about this!* I gleefully thought.

A few weeks later, the DA's office released me from the subpoena after failing to respond to the FBI's calls for a description of what I would be asked. I figured that would be the response. Ballay probably didn't want to put what he was doing in writing.

Despite the release from testifying, on the day of my then-canceled appearance, another witness heard my name being called. After repeated unanswered calls, the DA's employee became irate. I suspected it was a ploy for the grand jury, possibly the DA planned to blame my not testifying for his cancellation of the investigation of "public corruption" in his parish.

Ultimately, a Louisiana appeals court did what the FBI and U.S. Department of Justice failed to do. On February 7, 2017, it ordered a new jurist to review whether the trial court judge, who was allowing Ballay to continue his grand jury investigation, should be recused. The appeals court also gave the parish government the authority to challenge the subpoenas of its employees.[21]

Maybe my stand had been of no help, but I was gratified that, even while suspended, I tried to stop the harassment of witnesses while a compromised U.S. Department of Justice and FBI management stood and watched.

## III.     Conversation with FBI Manager during My Suspension

The following is a description of a conversation that I had with an FBI manager. Because it occurred while I was suspended, the FBI has no authority to stop me from, or take action against me for, releasing it:

"Wait, she's FBI. Are you FBI?" The FBI supervisor's interest was piqued, as though he'd found a lost relative.

"I was," I said curtly.

Not appreciating the significance of my verb tense, the supervisor exclaimed, "Oh, so you're the same as me. You're an FBI agent?"

*I'm not the same as you*, I thought.

"I *used to be* an FBI agent. I was suspended for reporting prosecutorial misconduct to a federal judge."

---

[21] State v. "Public Corruption" [SIC], No. 2016-K-1157 (La. App. 4 Cir. 2/6/2017) (writ granted).

AR00000792

I observed the confused look on the FBI Headquarters supervisor's face as I explained the situation to him.

During my exposition, I editorialized, "The problem is that the prosecutors do whatever they want and management does nothing to stop them. They just manipulate things to get themselves promoted." From the side, I observed the listener rolling his eyes at the remark.

"Well, it sounds like you have a righteous case. I guess," the supervisor equivocated, but he attempted a defense. "You knew it was like this when you joined the FBI."

"Not when I joined in 1999," I retorted, knowing that my HQ superior was about ten years younger than me. Probably in high school when I first joined the FBI. *How does being the status quo make a wrong thing right anyway?*

I changed the subject. "So, what do you do at headquarters?"

"I'm in the civil rights unit."

*Some change of subject*, I thought as I silently berated myself for not figuring that out earlier. Human trafficking fell under the civil rights program, which fell under the Public Corruption and Civil Rights Section.

"So, do you know Sallet?"[22]

"Yeah," the supervisor said, "I like him." He paused. "I guess you don't."

I shied away from saying what I really thought. "He's unethical and incompetent," I declared instead. In my own mind, that was holding back.

"Oh, come on," the HQ agent protested. "He's a good guy."

"He covered up the U.S. Attorney's Office's wrongdoing."

"But, he's a *good guy*." The emphasis on "good guy" sounded like some sort of rationale that amiably chatting with people absolved an FBI manager of all sins. *It's like they've joined some fraternity and are bound to cover up for their buddies. No matter what.*

After a pause, I asked, "So, why did you do it? Go to headquarters."

In any other organization, the accusatory question would be considered odd or at least require some explanation, but the supervisor understood immediately. He bowed his head shamefully and held out his right hand while rubbing his fingers together. A silent confession that he'd sold out for money.

I nodded.

"So," the supervisor asked, "How do you win this?"

It was a strange question to me. I hadn't thought of it.

"What is winning?" I asked.

"Don't ask me that theoretical crap. You know, how do you win this?"

I smirked at the question. *It's always about winning for these guys. Money and titles. They don't understand that fighting the corruption is all that matters. Not letting the corrupt get away with it, not without a fight.*

Still apparently astonished by my story, the supervisor continued, "If they get you for violating policy, then you're done."

"Not if the policy is illegal," I countered.

---

[22] SAC Sallet's and my legal dispute, as is my dispute with RIDS and RMD managers, is a matter of public record. *Zummer v. Sallet*, No. 2:17-cv-07563-CJB-JCW Doc. 53 (E.D. La. Feb. 1, 2018) (First Amended Complaint).

AR00000793

The pain from cognitive dissonance flashed on the headquarters agent's face as intensely as if I had kicked him in the groin or said that J. Edgar Hoover wore a red dress.

*He can't conceive of the FBI's policy being illegal*, I thought with a quiet, scornful laugh. *They pray to the deity of their regulations but ignore what they swore before God to support and defend.*

"You know," I added, "After working corruption in New Orleans for eight years, I've seen how it starts. People begin compromising their integrity for money," I mimicked the hand gesture, "or for positions with a more prestigious title."

The supervisor got up and walked away without a word.

*He still thinks that the FBI are the good guys*, I mused. *There's a difference between pretending to be the good guys and actually doing good. He's a pretender like the rest of management.*

## IV. Comparisons of Publicly Available Information about the Morel Investigation

I intend to contrast the information in the factual basis regarding Morel's crimes that was filed in court in the case with the information that I, and members of the media, have obtained from the Saint Charles Parish Sheriff's Office pursuant to a public records request.[23] Although based on the FBI investigation, all of these records are publicly available and have been publicly released. Therefore, the FBI has no authority to take any action regarding my analysis of what was left out of Morel's factual basis.

## V. Statements by Public Officials and Former-Public Officials

A. Any quotes or comments that I have about statements by current or former-public officials, including anything James Comey has said publicly and Robert Mueller's habit of repeating a quote from a movie, "We're here to preserve democracy, not to practice it," is not subject to prepublication review.[24]

---

[23] Littice Bacon-Blood, *Here's what the FBI had on Harry Morel, St. Charles' corrupt DA*, NOLA.COM, Sept. 21, 2016, *available at* https://www.nola.com/crime/index.ssf/2016/09/fbi_evidence_harry_morel_corrupt_da.html

[24] Garrett M. Graff, *The Untold Story of Robert Mueller's Time in Combat*, WIRED, May 15, 2018, *available at* https://www.wired.com/story/robert-mueller-vietnam/

AR00000794

B.     I have heard the following from FBI employees in my private capacity, thus, the FBI has no authority to stop me from releasing it to the media or forcing me to disclose my source of this information:

1.     Former-FBI Deputy Director Andrew McCabe visited the New Orleans field office on or around September 2017.  When speaking to the field office employees, he complained about President Trump's firing of James Comey from the position of FBI Director by saying, "They took our Director from us."

2.     An FBI employee told me that I would be "crazy" to go on the record with the media.

3.     FBI Director Wray has been telling employees "to do the right thing for the right reasons."  Furthermore, employees have been required to take three hours of training for this.  Employees have complained that the employees are being punished for the actions of a corrupt management.

C.     I have heard the following comments by public officials at public events.  Thus, it is publicly available information and not subject to prepublication review:

1.     An SAC claimed that public corruption prosecutions had declined because it took so long to make those cases, but he did not explain how that would mean there was a sharp decline in 2014.

2.     An ASAC claimed that the disagreements between the FBI and U.S. Attorney's Office were "a good thing."

## VI.     Other Publicly Available Information

My complaint to the OIG about AUS ▓▓(P)▓▓ ownershiof a condominium with a defense attorney is publicly available because it was released by former-Chairman of the U.S.

13

Senate Judiciary Committee's letters to various officials that are on the committee's website and have been reported in the media.[25]  It was also described in documents provided to the public by the Saint Charles Parish Sheriff's Office.[26]  Finally, the applicable property records are publicly available from the appropriate entities in Baldwin County, Alabama and Jefferson Parish, Louisiana.

## VII.    General Comments about the FBI and DOJ

These general comments and opinions do not contain "FBI information" and are not subject to prepublication review, although I refer to public information about Andrew McCabe and James Comey:

A.    FBI managers abuse their power to protect their power. They intimidate and bully employees to conceal managerial malfeasance to further the managers' careers.

B.    FBI managers manipulate investigations to further their own career interests and protect the reputation of the FBI at the expense of the public interest.

C.    FBI managers are regularly away from their duties while they gain other career-enhancing experience.  Instead of focusing on their assignments, FBI managers engage in a sort of career scavenger hunt to get superficial experience in different areas that they can use to justify promotions.

D.    FBI managers use threats and intimidation to prevent employees from reporting misconduct.

---

[25] Letter from Senator Charles Grassley, Chairman, U.S. Senate Judiciary Committee, to Attorney General Loretta Lynch, U.S. Department of Justice, p. 2 (Nov. 15, 2016) *available at* https://www.judiciary.senate.gov/download/grassley-to-justice-dept_-morel-case-conflict
[26] Littice Bacon-Blood, *In Harry Morel case, FBI agent challenged prosecutor's ethics*, NOLA.COM, Sept. 20, 2016, *available at* http://www.nola.com/crime/index.ssf/2016/09/in_ex-da_harry_morel_case_conf.html

AR00000796

E.     FBI managers manipulate the release of public information to exaggerate the FBI's, and, consequently, the managers', successes and conceal embarrassing information to serve the managers' and FBI's interest at the expense of the public interest.  FBI managers are less managers than they are propagandists.

F.     Since an FBI SAC's tenure in a field office is usually between two or three years, about half the time of any significant public corruption investigation, it begs the question of how any SAC can claim credit for the results of any of those cases.

G.     FBI managers appear to tell local police to take security measures that are illegal or unrealistic in a "blame-shifting exercise" to allow themselves to blame local officials in case of a terrorist attack.

H.     FBI employees are unwilling or reluctant to go into management because they will be forced to compromise their integrity to do so.  Street-agents need to maintain their integrity to be effective in the criminal justice system, but the FBI incentivizes dishonesty amongst management by rewarding them for exaggerating their and the FBI's successes while concealing embarrassing information.

I.     FBI managers appear not to understand the difference between unclassified material and classified material, as they appear to conflate the two, assuming that one needs a security clearance to access unclassified material or that mishandling unclassified material affects an employee's handling classified material.

J.     FBI managers enforce the "party line" particularly about managerial and Justice Department failures and misconduct.  FBI managers are less FBI agents than they are the equivalent of the political officers in the Soviet military, enforcing institutional loyalty to the FBI and Justice Department at the expense of the public interest.

AR00000797

K.     Partisan political bias like Peter Strzok's an     (P)     is not widespread, but Strzok an   (P)   are typical of FBI managers and attorneys in that they are willing to abuse their power to further their personal interests.

L.     Because the FBI has no up-or-out promotion policy, agents can remain investigators their entire careers.  Thus, there is a self-selection bias amongst FBI management in which those employees with greater interest in power and money, as opposed to serving the public interest, go into management and progress through the ranks.  Loyalty to the institution is rewarded as opposed to integrity or competence.  Thus, the managerial class of the FBI is largely made up of employees who are less competent and more dishonest than employees who do not go into management.  Andrew McCabe's misconduct is the perfect example of the sort of people who rise to the top of the FBI.  Because protecting one's own reputation and the reputation of the FBI even at the risk of losing one's integrity is what is required for FBI managers, it is no surprise that McCabe would leak information to protect his reputation and then lie about it.

M.     Former-FBI Director James Comey failed to understand the importance of managers being competent, specifically having a thorough knowledge of how to conduct investigations.  Because of this failure, managers were put in charge of investigative squads or programs with which they had no experience and no understanding.  Essentially, Comey caused squads/programs to be coached by people who did not even know how to play the game, other than working their way up the FBI chain of command.

N.     FBI managers are reluctant to make decisions contrary to their fellow managers' interest.  Because FBI managers rise through the ranks at different speeds, one manager never knows if he/she may be working someday in the future for someone they anger today with an administrative decision.

AR00000798

O.     Based on my own experience investigating white collar crime and public corruption resulting in thirty convictions, the OIG's 2013 report was a whitewash of AUSA ▪▪▪(P)▪▪▪ misconduct, and OIG's 2018 reports were a whitewash of its own misconduct.  If ▪▪(P)▪▪ had been an assistant district attorney instead of an assistant U.S. attorney, the FBI would have been conducting an aggressive investigation of him.  Instead, the OIG cleared him.[27]

P.     Based upon my experience, many DOJ attorneys mistreat crime victims and/or witnesses.  Victims and witnesses are threats to those DOJ attorneys who are negligent, lazy, or unethical, because they challenge the attorneys' ability to decline prosecutable cases.  The same attorneys are hostile to FBI agents who challenge the attorneys' efforts to decline prosecutable cases.

Q.     Former-FBI Director James Comey's statements about the FBI and DOJ needing the American people to trust the FBI and DOJ in order for those institutions to do their job is improper and wrong.  Misleading the American people into believing that the FBI and DOJ are more honest and competent than they are is nothing less than propaganda.  The only legitimate way for the FBI and DOJ to earn the trust of the American people is for those institutions to be subject to as much public scrutiny as possible while allowing them to do their jobs.  Privileges and privacy are falsely asserted to conceal embarrassing information, including negligence, malfeasance, and corruption.  Such a means to earn the trust of the American people is anti-democratic and morally wrong.  The secrecy by the DOJ and FBI is akin to the censorship in a

---

[27] My comments here about the OIG are strictly related to my experience with them as a private citizen and the FBI has no authority to take any action related to my release of those comments ▪▪(P)▪▪ malfeasance is a matter of public record based on former-Chairman of the U.S. Senate Judiciary Committee's letters to various officials that are on the committee's website and have been reported in the media, as well as materials released to the public by the Saint Charles Parish Sheriff's Office, and publicly available property records in Baldwin County, Alabama and Jefferson Parish, Louisiana. The OIG provided its reports to me in my capacity as a private citizen, not as part of any official duties with the FBI, and the FBI has no authority to stop me from sharing it.

17

military dictatorship, and, based upon the experiences of other countries, such as South American nations, such secrecy fuels corruption.

R.      DOJ attorneys and FBI managers are a class of super-citizens in the United States. Because they are allowed to police themselves and control the release of embarrassing information about themselves, they appear to see themselves as not only above the law, but the embodiment of it.

S.      The FBI's censorship and abuse of its employees' free speech, as well as abuse of the Freedom of Information Act, are designed to allow the FBI and DOJ evade the accountability that comes with public scrutiny.  To some extent, it is also a result of the incompetence and cowardice of the officials responsible for the release of information.  They fear angering other FBI managers more than they fear any action taken by the public or employees seeking to exercise their free speech rights.  After all, the censors will be represented for free by the Department of Justice, and, under current law, they cannot be held individually accountable for abusing the law and Constitution.  Furthermore, they will likely be rewarded by other managers for being "team players" and abusing the law and Constitution to protect the institutions' reputations.

T.      After investigating corruption in New Orleans for eight years, I realized that the people tasked with prosecuting my cases and managing my employing agency were just as dishonest and self-serving as the people I was investigating.  Watching public statements from U.S. Attorneys, SACs, Attorneys General, Deputy Attorneys General, FBI Directors, and an Inspector General that are contradicted by my firsthand experience has made it impossible for me to remain silent.

AR00000800

U.    Another learning point for me has been during a recent trip to South America, I was shaken down by a Paraguayan cop.  Despite extorting me for not driving with my headlights on during the day and using the implied threat of a Paraguayan jail to do it, he was very nice.  I realized that the difference between the abuses of power by corrupt Paraguayan police officers and the U.S. Department of Justice/FBI managers/OIG is that the Paraguayan cop spared me the sanctimony of falsely claiming that his abuse of power was in the best interests of his country.  He didn't cloak his abuse of public power to serve his self-interest in false claims of national security and privileges like your institutions have.

V.    What makes the FBI effective and keeps its investigators honest is not its management, but that its actions are held to the scrutiny of defense attorneys, judges, juries, and the public.  Because FBI managers and DOJ attorneys are not held to this independent scrutiny, their integrity and effectiveness naturally has deteriorated and will continue to do so.

W.    FBI management uses DOJ and FBI guidelines regarding the handling of confidential sources to protect the institutions while leaving sources vulnerable to retaliation.  Sources are told to abide by certain rules, including keeping their relationship with the FBI confidential.  ████████████████████████████████████ (O-1)
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████,
FBI managers use the breaking of the confidentiality rule as an excuse to cut off contact with the source and leave them vulnerable.  FBI management is more likely to do this when the source is facing retaliation from politically powerful people.

19

X.   From watching DAG Rosenstein's past congressional testimony, particularly his exchange with Representative Jim Jordan, I know that he doesn't believe he's responsible for anything that he didn't personally do.  In the Marine Corps, they teach leaders otherwise.  We are responsible for everything our unit does or fails to do.  One of DOJ's problems is that no one is responsible for anything.

Y.   I'm not accusing any of the individuals involved in these decision-making positions of being evil.  They're just bureaucrats.  Much like how insurance companies spread risk, bureaucracies spread accountability.  Each bureaucrat does his or her job on a specific issue without any responsibility or influence over anyone else in the bureaucracy.  Ultimately, no one is responsible for anything, and the institutions steadily, inexorably decay.  It's lowest common denominator decision-making.

Z.   The U.S. Department of Justice is not the department of motor vehicles, it is the world's most powerful law firm, and absolute power corrupts absolutely.  The department uses its power to serve itself, not its clients, the American people.  In their zeal to cover their own asses, the Justice Department attorneys', FBI managers', and OIG personnel's misbehavior is so brazen that those officials appear to believe that they are not merely above the law, but that they are the embodiment of it.

AA.   For the past two and half years, despite my suspension, I have been doing the same thing that I used to do as an FBI agent, fighting corruption.  It's a shame that I had to be a private citizen before I could work the best corruption case I ever have.

AR00000802

BB.     In a March 21, 2017 article, defense attorney Ralph Capitelli, said I was "a disgruntled, rogue agent who's behaving like a spoiled kid who doesn't get his way."[28]  His comments are significant because it reflects the attitude of many defense attorneys and federal prosecutors in New Orleans, who are more of a cartel than they are adversaries.  There is generally no adversarial federal criminal justice system in New Orleans, particularly with white collar and corruption cases.  Defense attorneys and prosecutors make deals that serve their own self-interests at the expense of the public interest.  Investigative agents are expected to be like children, seen and not heard, while the cartel members make their deals.  When agents will not stay silent, it challenges this corrupt system of theirs.

CC.     While well-intentioned, FBI Director Wray's decision to have FBI employees receive three hours of training on "doing the right thing for the right reason" is the equivalent of a Band-Aid on a sucking chest wound.  Such training is meaningless without the institution putting controls in place that hold personnel accountable, particularly managers.  Because the FBI's management selection process incentivizes those interested in promotion to do the wrong thing for the wrong reasons, Bureau-wide training is most likely a waste of time and resources. The only way to reform the FBI is to take actions that will hold managers accountable, particularly making the institution transparent.

DD.     The internal disciplinary entities, like the OIG and DOJ OPR, selectively enforce regulations to serve their purposes.  They ignore regulations, like the U.S. Attorney's Manual or state bar rules, when tasked with investigating federal prosecutors, but when FBI agents, like myself, speak out, they develop a newfound zeal to enforce the same rules.  The OIG goes so far

---

[28] Jim Mustian and David Hammer, *In 31-page letter, New Orleans FBI agent accuses Justice Department of 'systemic corruption'*, THE NEW ORLEANS ADVOCATE, Mar. 21, 2017, *available at* https://www.theadvocate.com/new_orleans/news/courts/article_b9a17214-0e54-11e7-9dfc-cbb0fbf2e17b.html

AR00000803

as to rewrite the rules or misuse them to suit their needs. The OIG and DOJ OPR do this, because they want to conceal DOJ misconduct and intimidate FBI employees into remaining silent.

EE.    FBI managers want aggressive investigators to the extent that those investigators can make good cases and help the managers' careers, but they want investigators whom they can influence or intimidate to prevent the public from finding out embarrassing information about the FBI or DOJ. Ultimately, FBI managers would rather see corrupt officials go free of any charges or accountability than see any possibility of the FBI or DOJ being publicly embarrassed.

FF.    If Jim Comey was including FBI management in his testimony to Congress that "we are not weasels," he should be investigated for lying to Congress.

GG.    Because my lawsuit and suspension is public knowledge, many people have asked me if I was worried about FBI or DOJ personnel killing me, including when I've been in a foreign country. While I do not think those officials are capable of such abuse, I respond that the DOJ and FBI managers are too deluded by their own obsession with their institutions' righteousness to do anything like that. The "Cult of the DOJ" is based on a delusion that DOJ is an honest institution that always does the right thing. They think they are the "good guys." Thus, it is very difficult for them to do anything blatantly illegal. They prefer to reinterpret the law and regulations, and abuse the legal authority given to them, to conceal their malfeasance from the American people.

HH.    The Department of Justice does not represent the United States. The Department of Justice represents the Department of Justice.

**VII.    My Response to DOJ's Proposal to Report Me to the Louisiana Office of Disciplinary Counsel**

AR00000804

Below is my response to DOJ's proposal to report me to the Louisiana Office of Disciplinary Counsel.  I have redacted some facts from this letter that were obtained while I was an FBI agent.  The remainder is all information that I obtained as a private citizen and is not subject to prepublication review, as follows:

1)      Nothing provided to me by the OIG or DOJ OPR in my capacity as a private citizen, including my own comments about DOJ/FBI improprieties are "FBI information."  The OIG and DOJ OPR gave me that information and the FBI has no basis to censor its release.  This is particularly true when the OIG and DOJ OPR are using that information in an effort to report me to the Louisiana Office of Disciplinary Counsel.  Since my law license has nothing to do with my past FBI employment, that information is solely related to me as a private citizen.

2)      As discussed above, my information in the letter about DOJ attorney misconduct is from sources independent of my FBI employment, such as Senator Grassley, the OIG, DOJ OPR, and private citizen former-witnesses to whom I spoke as a private citizen after my suspension. Dana Boente's identity as the Interim Acting U.S. Attorney at the time is public knowledge.[29]

3)      As discussed above, Morel's plea agreement and factual basis are court record and the Powerpoint Presentation and transcripts and recordings related to the Morel investigation were publicly released by the Saint Charles Parish Sheriff's Office.

4)      AUS ▨(P)▨ property records are public information.

5)      The details of Morel's oral rape of a woman and the saying, "It's not who you know, it's who you blow," have been provided to me again as a private citizen.

---

[29] Ben Estes, *Dana Boente, named by Trump as acting attorney general, once ran the New Orleans U.S. attorney's office*, NOLA.COM/TIMES-PICAYUNE, Jan. 30, 2017, *available at* https://www.nola.com/politics/index.ssf/2017/01/dana_boente_acting_attorney_ge.html

AR00000805

My only redaction has been a disclosure that AUS ▒(P)▒ lied to me about victims

not speaking at Morel's sentencing, because I was an agent at the time he did that. Thus, that is

information subject to FBI prepublication review.

The letter is below:

Michael S. Zummer
2337 Magazine St. Unit D
New Orleans, LA 70130
(504) 717-5913
mzummer@aol.com

January 30, 2019

U.S. Department of Justice
Office of the Deputy Attorney General
Professional Misconduct Review Unit
▒(P)▒
Washington, DC 20535

De ▒(P)▒

I object to the U.S. Department of Justice Office of Professional Responsibility's ("DOJ

OPR") request to refer me to the Louisiana Office of Disciplinary Counsel ("LODC") for my

alleged violations of the Louisiana Rules of Professional Conduct ("La. ROPC") in sending my

letters to Judge Kurt D. Engelhardt of the U.S. District Court for the Eastern District of

Louisiana regarding prosecutorial misconduct in the investigation and prosecution of Harry J.

Morel Jr., a former district attorney of the Louisiana 29th Judicial District (Saint Charles Parish)

("the Morel case"). While I welcome the opportunity for the LODC to make a determination

about these allegations, I object to DOJ OPR making the referral. My objection is based on the

following:

    A.    DOJ OPR's request to refer me to the LODC for actions that the U.S.

Department of Justice ("DOJ") and the Federal Bureau of Investigation ("FBI") claim were in

24

the course of my official duties sets a precedent that could severely hamper investigations by every government investigator with a law license.

       B.     The allegations that I violated the La. ROPC are frivolous and appear to be motivated by the DOJ Office of the Inspector General's ("OIG") institutional interest in concealing its own negligence and/or malfeasance.

       C.     While seeking to refer me to the LODC, when I have never been an attorney for the government, the DOJ and OIG have failed to authorize me to refer other attorneys, including DOJ and former-DOJ attorneys, to the LODC and other state attorney disciplinary entities based, in part, on information I obtained during the course of my duties when I was an FBI agent.[30]  If I am not allowed to make my proposed bar complaint, it will raise the following issues:

       1.     The failure of DOJ/FBI to authorize me to report DOJ attorneys and others to state disciplinary entities would be in violation of federal law, as is the DOJ's concealment of misconduct allegations against its attorneys from state disciplinary entities.

       2.     The failure of DOJ/FBI to authorize me to report DOJ attorneys and others to state disciplinary entities would cause me to violate the La. ROPC, the same set of rules DOJ OPR seeks to report me for supposedly violating.

       3.     Any DOJ attorneys concealing the misconduct I have reported to them would be in violation of their ethical obligations to the bars in the states where they are licensed or practice.

---

[30] Of course, I have only recently provided a draft of my complaint to DOJ and only referred to my request in my communication with the OIG.  Thus, DOJ has not had sufficient time to consider my request.  To correct this, I will officially request permission from DOJ OPR and the FBI to file my bar complaint at the same time I provide this response.

AR00000807

I understand that this is a difficult issue for DOJ/FBI. To resolve it, I recommend and request that DOJ, DOJ OPR, and/or the FBI authorize me to report myself to the LODC along with all of the attorneys whom I, so far, believe have committed professional misconduct. In this manner, no precedent will be set suggesting that agent-attorneys have to be reported for allegations associated with their investigative duties, DOJ will not be violating federal law in this case by concealing its attorneys' misconduct from state licensing entities, and I will have no reason to believe that additional DOJ attorneys are violating the ethical obligations of the states where they are licensed or practice. Because DOJ OPR's request implicates the interests of the FBI and I am proposing filing a bar complaint against the General Counsel for the FBI, Dana Boente, I am sending this letter and an explanatory e-mail to FBI Director Wray and the Director and Chief Counsel of DOJ OPR, Corey Amundson. Also, since the DOJ Professional Misconduct Review Unit cannot authorize me to make a bar complaint, I am asking for permission from Director Wray and Director Amundson to do so.

## I. Applicable Law and Rules

### A. The McDade Amendment, 28 U.S.C. § 530B(a)

"An attorney for the Government shall be subject to State laws and rules…governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State."

### B. Louisiana Rules of Professional Conduct 8.3(a)

"A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a question as to the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the Office of Disciplinary Counsel."

## II. Discussion

AR00000808

A. DOJ OPR's Request to Refer Me to the LODC Sets a Dangerous Precedent for Federal Investigators with Law Licenses.

1. DOJ/FBI Have Taken the Position That My Alleged Violations of the Louisiana ROPC Were in My Official Capacity.

A threshold matter is whether I was acting as a private citizen or in my then-official capacity as an FBI Special Agent when I sent my letters to Judge Engelhardt. It has been and continues to be my position that, based on Supreme Court and Fifth Circuit precedent, I was acting as a private citizen when I sent those letters since I had no permission to do so in my official capacity.[31]

Despite clear precedent, the FBI and DOJ have taken the position in litigation that, even though I had no permission in my official capacity to send my letters to Judge Engelhardt, I was somehow acting in my official capacity.[32] Thus, DOJ OPR's request to refer me to the LODC for sending my letters is for an action that DOJ claims I took in my official capacity.

2. Referring Investigators with Law Licenses to State Bars for Actions in Their Official Capacities Sets a Dangerous Precedent.

Since I first joined the FBI in 1999, I have been told that agents are not required to follow bar rules even if the agent has a law license. Agents contact represented parties without notifying their attorneys and engage in undercover operations and other acts of deception that could be in violation of bar rules, *e.g.* La. ROPC 4.1, 4.2, and 4.3. Thus, any agent with a law license could lose his/her license if DOJ sets the precedent that investigative agents can be held accountable under bar rules for actions in their official duties. Furthermore, every agent with a

---

[31] *Lane v. Franks*, 134 S.Ct 2369, 2378 (2014) ("Truthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes. That is so even when the testimony relates to his public employment or concerns information learned during that employment.") and *Howell v. Town of Ball*, 827 F.3d 515, 523 (5th Cir. 2016) ("the proper inquiry is a practical one, and focuses solely on whether the speech at issue is ordinarily within the scope of the employee's professional duties.") (internal citations and quotations omitted).

[32] *Zummer v. Sallet*, No. 2:17-cv-07563-CJB-JCW Doc. 73 p. 6, (E.D. La. Jul. 3, 2018) (Reply Memorandum in Support of the Official Capacity Defendants' Motion to Dismiss Plaintiff's First Amended Complaint).

AR00000809

law license who observes DOJ attorney misconduct will be obligated to refer those DOJ attorneys to state disciplinary entities under La. ROPC 8.3(a), or the applicable rule in the state where the agent is licensed.

B. The Allegations That I Violated the La. ROPC Are Frivolous and Appear to Be Motivated by the OIG's Institutional Interest in Concealing Its Own Negligence and Malfeasance.

1. The Allegations that I Violated the La. ROPC Are Frivolous, As the Plain Wording of the Rules Do not Apply to My Conduct.

I have never been a lawyer for the government, nor was I acting as a lawyer for anyone in the Morel case. The rules I am alleged to have violated, Louisiana ROPC 3.5 and 8.4(d) only apply to actions by a "lawyer." Thus, the La. ROPC do not apply to the actions I took. However, even if I had been acting as a lawyer on the case, under La. ROPC 3.3(b) "[a] lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal." I knew that DOJ had engaged in fraudulent and possibly criminal conduct related to Morel's sentencing as follows:

a. The conflicts of interest, concealment of conflicts of interests, and other malfeasance by various DOJ attorneys who took part in the Morel case were possibly criminal and a fraud upon the court by falsely suggesting to the court that the Morel plea agreement was reached as the result of DOJ attorneys' zealous advocacy for the United States, when it was actually compromised by a series of personal interests held by those attorneys.

b. The selective removal of transcripts of recorded conversations and other evidence against Morel from the factual basis filed with the court

28

AR00000810

fraudulently conveyed to the court (and the public) that a deceased cooperating victim and the FBI were the aggressors in Morel's sexual bribery scheme and fraudulently minimized the extent of Morel's serial sexual abuse of women.

        c.     The removal of evidence of twenty other victims from the factual basis and the DOJ's compromised charging decision denied those victims from having any rights under the Crime Victims' Rights Act, 18 U.S.C. § 3771, including the right to speak at Morel's sentencing.

        d.     The then-U.S. Attorney publicly blamed Morel's victims and cited false claims of evidentiary issues to justify Morel's lenient plea agreement while concealing his office's malfeasance.

Considering DOJ's fraudulent and possibly criminal conduct above, under La. ROPC 3.3(b), I was authorized to send my letters to the court if I had been acting as a lawyer on the case.[33]

Furthermore, the plain wording of the La. ROPC, when correctly quoted, does not apply to my conduct. Louisiana ROPC 3.5(a) only prohibits attempts to influence a judge "by means prohibited by law." There is no law prohibiting me from sending my letters. The OIG did not cite one, and, as far as I know, neither has DOJ OPR.

Louisiana ROPC 3.5(b) prohibits *ex parte* communications "unless authorized to do so by law or court order." I was authorized under La. ROPC 3.3(b), and, to the extent that the DOJ attorneys' misconduct was criminal in nature, I was authorized under 18 U.S.C. § 4 (Misprision of a Felony). I was also authorized under the First Amendment. As discussed above, I was

---

[33] DOJ OPR could take the position that I was a lawyer but not acting as one, but that would lead to an absurd result, that Louisiana lawyers cannot report fraudulent conduct to a court when they are not representing a party in a case, but can when they are.

AR00000811

acting as a private citizen, and the Fifth Circuit has held that "because individuals working in law enforcement are often in the best position to know about the occurrence of official misconduct, it is essential that such well-placed individuals be able to speak out freely about official misconduct." *Kinney v. Weaver*, 367 F.3d 337, 361 (5th Cir. 2004) (en banc) (internal citations and quotations omitted).

The Fifth Circuit has held for the purposes of a qualified immunity analysis that:

[i]t was clearly established that a public employee's speech revealing improper conduct by fellow employees was protected. Thus, a reasonably objective public official would have known that [retaliation against] an employee for his speech concerning misconduct by public officials would violate a clearly established constitutional right.

*Brawner v. City of Richardson, Tex.,* 855 F.2d 187, 193 (5th Cir. 1988) (internal citations omitted).

Finally, the argument that reporting prosecutorial misconduct to a judge overseeing a case affected by the misconduct is prejudicial to the administration of justice in violation of La. ROPC 8.4(d) is nonsensical, especially considering the authorization for attorneys to report fraudulent conduct to a tribunal in La. ROPC 3.3(b). *Failing* to report the misconduct to the court would have been prejudicial to the administration of justice, especially considering the issues outlined above. Finally, as I will discuss below, the OIG and DOJ OPR's suggestion that my letters were prejudicial to the administration of justice while actions by other DOJ attorneys were not professional misconduct and, thus, not prejudicial to the administration of justice shows that the OIG and DOJ OPR's request to refer me to the LODC is a malicious attempt to harass me for speaking out against them.

       2.      The OIG Has an Institutional Interest in Concealing Its Mishandling of My 2013 Complaint.

              a.      The OIG Mishandled My 2013 Complaint against a DOJ Attorney and Its 2018 Investigation Whitewashed Its 2013 Failures.

AR00000812

The OIG mishandled its investigation of my 2013 complaint regarding Assistant U.S.

Attorney ("AUSA" ▮▮▮(P)▮▮▮ participation in the Morel case while owning property with

Morel's defense attorney Ralph Capitelli.  As a result of my complaint:

> On October 3, 2013, the OIG completed its investigation and found no evidence
> that First Assistant 1 had any substantive involvement in the Morel case or in the
> declination decision, or that First Assistant 1's relationship with the Defense
> Attorney improperly influenced the USAO's declination of the Morel case.  The
> OIG also found that First Assistant 1 began divesting his financial interests with
> the Defense Attorney in approximately November 2012 when First Assistant 1
> was promoted to First Assistant and that he completed the divestiture in March
> 2013.  The OIG found that at the request of the Interim U.S. Attorney, First
> Assistant 1 did participate in the April 17, 2013 meeting with the FBI about the
> Morel case, which occurred after the declination decision had already been made,
> but found no evidence that his participation impacted the USAO's April 9, 2013
> decision to decline prosecution.[34]

Setting aside my dispute with the OIG's factual conclusions for now, based on the above it is

clear that the OIG failed to evaluat ▮▮▮(P)▮▮▮ conduct under the La. ROPC.  The applicable rule

under the La. ROPC is not whether an attorney improperly influenced a proceeding, but whether

"there is a significant risk that the representation of one or more clients will be materially

limited…by a personal interest of the lawyer." La. ROPC 1.7(a)(2).  In one Louisiana case an

AUSA was held to have violated Rule 1.7(a)(2) "by placing his own interests, i.e., his need to

'vent' about the criminal cases being pursued by the U.S. Attorney's office, above the interests of

that office, his client, in having those cases proceed unimpeded."[35] ▮▮▮(P)▮▮▮ relationship with

Morel's defense attorney was a far greater risk that his representation of the United States would

be materially limited than an AUSA's interest in venting.  Based upon my firsthand experience,

---

[34] U.S. Department of Justice Office of the Inspector General, An Investigation of Alleged Retaliation Against FBI
Special Agent Michael Zummer (June 2018), at 8.
[35] *In re Perricone*, 2017-016, pp. 7-9, 11 (La. Atty. Disc. Bd. 7/17/2018).

AR00000813

not only was there a risk, b ▓(P)▓ representation of the interests of the United States was materially limited by his relationship with Morel's attorney.

Furthermore, contrary to the OIG's suggestion, then-Interim U.S. Attorney Dana Boente's inclusion o ▓(P)▓ in the matter did not absolv ▓(P)▓ of his obligations under La. ROPC 1.7(a)(2), because Boente was no ▓(P)▓ client, the United States was. Since DOJ attorneys must follow the Louisiana rules, it is up to the State of Louisiana to decide who can waive conflicts, not the OIG. DOJ would naturally take the position that it can waive its own conflicts for its attorneys, as that is the position most advantageous to DOJ. However, the Louisiana Supreme Court "ha[s] repeatedly held that public officials    and prosecutors in particular    are held to a higher standard than ordinary attorneys."[36]  Allowing DOJ attorneys to waive the conflicts for their fellow attorneys would no more satisfy the Louisiana rules than a law firm partner waiving an associate's conflict, instead of the client. Such a waiver would hold prosecutors to *lower* standards, not *higher* ones as mandated in Louisiana ▓(P)▓ and Boente also appear to have violated La. ROPC 1.7(b)(4), because, to my knowledge, no one provided any written consent fo ▓(P)▓ involvement in the matter. If any public official could have given a waiver t ▓(P)▓ it was me, as the FBI case agent on the matter    the official most qualified to decide whether a conflict should be waived because I was in contact with the women abused by Morel, the clients with the greatest interest in the matter. However, I objected to his involvement because of his personal interest with Capitelli. Thus, by includin ▓(P)▓ Boente violated his own obligations under La. ROPC 5.1(a), 5.1(b), and 5.1(c). (Although not licensed in Louisiana, because he was engaging in his duties in Louisiana at the time, Boente is subject to the La. ROPC under the McDade Amendment.)

---

[36] *In re Griffing*, 236 So.3d 1213, 1221-22 (La. 2017) (internal citations omitted).

AR00000814

The OIG also ignored the manner in whic ▓(P)▓ "divested" himself of the joint properties with Capitelli, by transferring them to his live-in girlfrien ▓(P)▓, in exchange for a portion of property he owned jointly with her.  (Public records show th ▓(P)▓ resides ▓(P)▓ address in Kenner, Louisiana.  Those records are attached to my proposed bar complaint.)  Whil ▓(P)▓ "divestment" appears to be a sham based upon his cohabitation with ▓(P)▓ alone, it further appears illegitimate becaus ▓(P)▓ property interest that he transferred t ▓(P)▓ was worth approximately three times as much ($123,550) as what she transferred to him ($36,000).[37]  The OIG either did not address or did not find the above issues wit ▓(P)▓ "divestment."

Based upon eight years of experience investigating public corruption in Louisiana, if ▓(P)▓ had been an assistant district attorney instead of an assistant United States attorney, the FBI would have uncovered that information and, if he were not referred for federal prosecution, he would have been referred for a malfeasance prosecution under state law.  Instead, because ▓(P)▓ is a DOJ attorney, he was investigated by an OIG that botched its investigation or, worse, intentionally withheld evidence of his misconduct from its report.  (Of course, a "divestment" of this nature does not eras ▓(P)▓ personal interest with Capitelli under La. ROPC 1.7(a)(2), since Capitelli still owned property with the woman who owne ▓(P)▓ residence.  Thus, if not prosecute ▓(P)▓ would have been referred to the LODC.)

The OIG's 2018 refusal to review the 2013 conclusions shows that its 2018 investigation was a whitewash of its 2013 mistakes motivated by an institutional interest in concealing its

---

[37] Based on the 2013 appraisals of the propertie ▓(P)▓ had owned one quarter of two properties with Capitelli, one appraised at $308,200 and the other at $186,000.  The property th ▓(P)▓ transferred t ▓(P)▓ was one half of an appraised value of $72,000.

33

AR00000815

negligence and/or malfeasance. In its 2018 final report on the retaliation against me, the OIG determined:

> In his written response to the draft report, Zummer "dispute[d] [this] conclusion" that there was no evidence that First Assistant 1's participation impacted the declination, asserting that "First Assistant 1 was involved in a number of meetings about the case prior to the declination decision;" that First Assistant 1 participated in the April 17, 2013 meeting with the FBI "to reconsider the declination decision;" and that during this meeting - First Assistant 1 made a "false offer of support for the investigation if the FBI needed it," which indicated that he had authority over the case. *In its reprisal investigation, the OIG did not re-investigate Zummer's 2013 allegations about First Assistant 1.*[38]

By refusing to review its own 2013 decision abo ██(P)██ in 2018, the OIG could continue to

ignore th ██(P)██ advocated strongly, and in some ways oddly, against the Morel case in the

2013 meeting with the FBI asking DOJ to reconsider the declination. It could also avoid

addressing the fact that the declination was unnecessary and stymied future investigation of

Morel. *There was no legitimate reason to decline a case that had only finished its covert*

*investigation and had a substantial overt investigation left to conduct.* The OIG also avoided

having to address its odd conclusion in 2013 th ██(P)██ did not "improperly influence" the

Morel case declination, when Morel was convicted in 2016 based on evidence that FBI/DOJ had

at the time of the 2013 declination. Thus, in 2018, the OIG not only had a strong institutional

interest in concealing its negligence and/or malfeasance from a court and from the public, but it

acted on this institutional interest by refusing to review its 2013 decision.

        b.      The OIG Concealed the Results of Its 2013 Investigation from Me and Was Aware That I Wrongly Believed It Had Referre ██(P)██ for Punishment When It Asked Me to Authorize It to Investigate Allegations of My Misconduct.

---

[38] U.S. Department of Justice Office of the Inspector General, An Investigation of Alleged Retaliation Against FBI Special Agent Michael Zummer (June 2018), at 8 FN 14 (emphasis added).

AR00000816

The OIG did not notify me of its conclusions in 2013, and I was led to believe by FBI managers that the OIG had reporte ██(P)██ for some form of punishment. I told the OIG's investigative counsel that I was under that impression on December 29, 2016 when I was first interviewed by them. I was still under that false impression and the OIG personnel were aware of that impression when those same OIG personnel asked me on January 25, 2017 whether I preferred to have the OIG investigate my alleged misconduct or the FBI Office of Professional Responsibility ("FBI OPR"). Because I was unaware of the OIG's conclusions in 2013, I was not aware that the OIG had an institutional interest in investigating my reporting o ██(P)██ misconduct to Judge Engelhardt. If I had known that, I would have asked FBI OPR to investigate the matter, but the OIG allowed me to make the decision under false pretenses. (I can only assume that the OIG investigative counsel knew the results of the 2013 investigation on January 25, 2017, because they had access to OIG records and would have been deficient in their duties if they had not reviewed those records before my December 29, 2016 interview. Based on the large number of prepared questions they had on December 29, 2016, I do not believe they were deficient that day.)

The OIG did not notify me of the results of its 2013 investigation until an April 5, 2017 interview regarding my alleged misconduct and retaliation against me, and then only by implication. I only received "official" notification of these results in April 2018 when I received the OIG's draft reports on retaliation against me and my alleged misconduct.

       c.      The OIG's Conclusions about My Alleged Misconduct Appear to Have Been Influenced by Its Institutional Interest in Concealing Its Mishandling of the 2013 Complaint.

The OIG's institutional interest in concealing its mishandling of the 201 ██(P)██ investigation appears to have influenced its allegations that I violated the La. ROPC. In its draft

AR00000817

report on my alleged misconduct, the OIG cited La. ROPC 3.5(a) as "prohibiting attorneys from seeking to influence a judge *by unauthorized means*."[39]  However, the actual wording of La. ROPC 3.5(a) only prohibits such influence "by means prohibited by law."  The replacement of "by means prohibited by law" with "by unauthorized means" substantially broadens the meaning of the rule, especially since the OIG has failed to cite any law that prohibited my letters to Judge Engelhardt.  Similarly, the OIG cited La. ROPC 3.5(b) as "prohibiting attorneys from communicating ex parte with a judge,"[40] while the actual wording prohibits attorneys from communicating *ex parte* with a judge "unless authorized to do so by law or court order."  As discussed above, I was authorized by the La. ROPC themselves, specifically La. ROPC 3.3(b), 18 U.S.C. § 4, and the First Amendment.  The OIG's rewriting of the La. ROPC suggests that the OIG is either grossly incompetent or maliciously claiming that I violated the La. ROPC. (The OIG corrected these misquotations in its final report after I pointed them out in my comments to its draft.)

The OIG's newfound interest in enforcing the La. ROPC also suggests it is motivated by an interest in concealing its mishandling of th ▉(P)▉ investigation.  The OIG did not bother to evaluat ▉(P)▉ or Boente's conduct under the La. ROPC in 2013, even though both were, and still are, practicing attorneys for the government.  However, after I reporte ▉(P)▉ misconduct to a judge, the OIG decided to enforce the La. ROPC even though I have never been an attorney for the government and was not a lawyer on the Morel case.  This selective enforcement shows the OIG has acted in its institutional interest to conceal its own failures.

---

[39] U.S. Department of Justice Office of the Inspector General, Draft Misconduct Report For Review by FBI Special Agent Michael Zummer (Apr. 2018), at 27 FN 42 (emphasis added).
[40] *Id.*

AR00000818

The OIG's behavior during the most recent investigation also shows that it wanted to conceal its mishandling of the 2013 complaint. During my interviews with the OIG, I was twice asked if I would accept a transfer to end the suspension of my security clearance. During my April 5, 2017 interview with the OIG, not only was I asked if I would accept a transfer, but I was told that I could work public corruption in "lots" of other places, which I believe was an attempt to encourage me to accept that deal. I declined. Considering an employee's fitness to handle classified material is not based on where he/she is located, it appears the OIG was working in concert with the FBI to abuse the security clearance process to force me to accept a transfer and end any review or discussion of its mishandling of the 2013 complaint again (P) By refusing to accept a transfer and end the investigation, as well as my decision to file suit, the OIG's negligence/malfeasance is still at risk of being exposed to public scrutiny.

Finally, in my review of the OIG's final report, I saw that the OIG ignored Supreme Court and Fifth Circuit precedents amongst other factual issues and arguments I had provided to it in my comments to its draft. While I would not expect the OIG to accept all of my arguments and I credit it for reasonably disposing of some, its decision to ignore clearly established court precedent in its final report shows that it has a strong institutional interest in preventing federal investigators from notifying courts of prosecutorial misconduct, particularly when the OIG previously cleared those prosecutors.

C.      If DOJ or FBI Fail to Authorize Me to File My Bar Complaint, DOJ Will Be Violating the McDade Amendment, Forcing Me to Violate the Same Rules DOJ OPR Is Referring Me for Allegedly Violating, and DOJ Attorneys Will Be Violating Their Ethical Responsibilities.

1.      DOJ and Its Entities Appear to Be Violating the McDade Amendment.

AR00000819

Under the McDade Amendment, DOJ attorneys are "subject to State laws and rules…governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B(a). However, since I first began reporting DOJ attorneys' misconduct to DOJ entities, none have been held to the standards of the La. ROPC and certainly not to the extent of other attorneys in Louisiana.  As I discussed above, the OIG failed to review whethe █(P)█ had violated the La. ROPC when investigating my 2013 complaint against him.

Based on its review of DOJ attorney misconduct in the Morel case in 2016, DOJ OPR also appears to be violating the McDade Amendment by failing to hold DOJ attorneys to state ethical standards  █(P)█ had an additional personal interest in the Morel case after I had reported him to the OIG for participating in the case in 2013.  Other DOJ attorneys, particularly those who had participated in the 2013 declination decision, also had personal interests in the matter after my OIG complaint, because it challenged their power to make decisions without any question or criticism of their motives.  However, DOJ OPR determined that there was "no evidence that the terms of the [Morel] plea resulted from improper influence, bias, or other misconduct."[41]  Setting aside DOJ OPR's willful blindness to the facts by coming to that conclusion, at the very least, DOJ OPR failed to revie  █(P)█  and others' conduct under La. ROPC standards.

Furthermore, regarding AUS █(P)█ lying to █(O-1)█ a rape victim, and a deceased victim's mother to prevent the victim and victim's mother from speaking at Morel's sentencing, DOJ OPR determined that further review was "not likely to result in a finding of

---

[41] U.S. Department of Justice Office of the Inspector General, Draft Misconduct Report For Review by FBI Special Agent Michael Zummer (Apr. 2018), at 12 FN 25.

38

AR00000820

professional misconduct by any Department of Justice attorney."[42]  Howeve███(P)███

behavior was "conduct involving dishonesty, fraud, deceit or misrepresentation" in violation of

La. ROPC 8.4(c).  It was also "prejudicial to the administration of justice" in violation of La.

ROPC 8.4(d) because he successfully intimidated a deceased victim's mother from speaking at

Morel's sentencing when she had the right to do so under 18 U.S.C. § 3771.

DOJ OPR's position that my letters reporting prosecutorial misconduct to a judge whose

court was affected by the misconduct were "prejudicial to the administration of justice" in

violation of La. ROPC 8.4(d) when it took the position th███(P)███ behavior, intimidating a

victim and dead victim's mother not to speak in court, was not, shows that DOJ OPR is abusing

its authority to silence agents who speak out against DOJ attorneys, while intentionally

concealing DOJ attorneys' misconduct.

Evidence of DOJ OPR violating the McDade Amendment is not limited to my firsthand

experiences.  The Louisiana Supreme Court suspended a DOJ attorney from the practice of law

for *six months* because of an inappropriate sexual relationship with an FBI agent.[43]  DOJ had

only suspended the attorney for *nineteen days*.[44]  Apparently, DOJ's standards for its attorneys

are too low for the State of Louisiana.  DOJ is certainly not holdings its attorneys to Louisiana's

rules "to the same extent and in the same manner" as other attorneys in Louisiana.

Based on the plain wording of 28 U.S.C. § 530B(a), it appears that DOJ is violating the

law not only by failing to hold its attorneys to state standards, but by failing to report all

allegations of DOJ attorney misconduct for investigation and adjudication by state authorities.

While having a separate disciplinary system will inherently result in unequal standards, the

---

[42] U.S. Department of Justice Office of Professional Responsibility letter to Michael S. Zummer (June 30, 2017), at 1.
[43] *In re Griffing*, 236 So.3d 1213, 1215, 1223 (La. 2017).
[44] *Id.* at 1217 FN 6.

AR00000821

McDade Amendment's requirement that government attorneys be held to state rules "in the same manner" mandates that state disciplinary entities have the opportunity to review misconduct allegations.

No government entity can police itself and believing one can, as it appears many DOJ and FBI officials do, runs contrary to our Constitution. Additionally, DOJ attorneys cannot police themselves because every DOJ attorney has a personal interest in concealing embarrassing information about DOJ. A falsely exaggerated public perception of DOJ competence and integrity gives DOJ attorneys greater prestige and power. It also gives former-DOJ attorneys greater private sector paychecks. Expecting DOJ attorneys to police themselves is like expecting a law firm to discipline its own attorneys for ethical violations. DOJ must be forced to obey the McDade Amendment and refer its own attorneys' misconduct allegations to state entities.

    2.      By Failing to Authorize Me to File My Bar Complaint, DOJ is Forcing Me to Violate the Same Set of Rules It Seeks to Report Me for Allegedly Violating.

Louisiana ROPC 8.3(a) requires me to report any lawyer whom I know "has committed a violation of the Rules of Professional Conduct that raises a question as to the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects" to the LODC. The rule is not satisfied by reporting it to DOJ OPR. I must make my complaint with the LODC. Thus, if DOJ/FBI prevent me from filing my complaint with the LODC, they will be forcing me to violate La. ROPC 8.3(a).

    3.      DOJ Attorneys Preventing Me from Reporting, or Failing to Report Attorney Misconduct That I have Reported to Them, Are Violating Their State Ethical Responsibilities.

The McDade Amendment is unequivocal, DOJ attorneys must be held to state rules to the same extent and in the same manner as other attorneys practicing in that state. DOJ attorneys

AR00000822

licensed or practicing in Louisiana are subject to La. ROPC 8.3(a). DOJ attorneys licensed or practicing in other states are required to follow the applicable provisions for those states. Thus, the attorneys who have investigated, or to whom I have reported this misconduct, have an ethical obligation to refer these matters to the appropriate state authorities as well. Insofar as they are failing to report them or stopping me from doing so, they are violating the ethics rules that they are mandated by the McDade Amendment to follow.

## IV.    Conclusion and Proposal

While district attorney, Morel had grabbed a woman by the neck, shoved her face into his crotch, and forced her to perform oral sex on him. His office had just recovered a substantial amount of child support for her, and she was still owed a large amount. On the afternoon of January 18, 2019, this victim told me that her father, a former supporter of Morel's who is now aware of what Morel did to his daughter, saw Morel in church this past Christmas Eve. (Although Morel reported to prison four days before my suspension, Morel has completed his sentence, while I am still suspended by the FBI.) According to the victim's father, some people surrounded Morel at church and welcomed him back, treating him like a "rock star." Meanwhile, his victims are shunned. I attribute this despicable result to DOJ's lenient plea deal with Morel in which DOJ attorneys were putting their personal and institutional interests over that of their clients, the American people.

When Morel was the district attorney in Saint Charles Parish, many women facing criminal justice issues said, "It's not who you know, it's who you blow." Based on my experience in the federal system, it's all about who you know, so far. Morel and his lawyer knew the right people in DOJ, and DOJ cannot and will not police itself. It is breaking the laws

AR00000823

that it is supposed to enforce and violating the Constitution it is supposed to support and defend in order to conceal its own failures.

The best course of action to resolve DOJ OPR's request to refer me to the LODC is for DOJ/FBI to give me permission to file my bar complaint that I have attached. In it, I report myself and seven practicing attorneys. In this way, DOJ avoids setting the precedent that it will refer investigators with law licenses to state bars for actions they take in their official capacity. It will also avoid any further violations of the McDade Amendment and state ethics rules by DOJ/DOJ OPR/FBI. Finally, it may provide some justice to Harry Morel's victims who were

also victimized by the DOJ. The federal government certainly cannot be trusted to do anything for them.

Michael S. Zummer

AR00000824

**<u>FBI INFORMATION SUBJECT TO PREPUBLICATION REVIEW POLICY (PRP)</u>**

I am submitting the following for release to the public, specifically media interviews, under the PRP.  Because the below writing includes three different types of FBI information, I have divided this submission into three groups.  I demand authority to release this material in thirty calendar days, after close of business March 11, 2019, as required by court precedent.[1]

The first group of FBI information is made up of specific acts of malfeasance/misconduct/negligence by public officials in the FBI, DOJ, and DOJ OIG that I learned in my capacity as an FBI agent, but I have removed any names or identifying information.  With one exception, all of the cases or investigations below are closed to my knowledge. (That case, comment Number 39, is not identified and has been taken to trial, so its existence and the evidence it collected is already public record.)

The second group of information is made up of statements made by James Comey when he was the director.  No FBI cases or other employees are identified.

The third group of information relates to a former-AUSA in New Orleans.  Some of the information about her was previously approved for release under the PRP in 2006, except for her name. (My submission in 2006 was titled *The Forgotten West*).  I will insert the already approved passage below.  I now want to identify her to the public.  Additionally, I am inserting below more information about the AUSA that has not been approved for release before.  The

---

[1] The Supreme Court has made clear that "a system of prior restraint runs afoul of the First Amendment if it lacks certain safeguards: First, the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. Second, any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo. Third, a prompt final judicial determination must be assured." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 560 (1975) (internal citation omitted); *see also Marchetti*, 466 F. 2d at 1317 ("Because we are dealing with a prior restraint upon speech, we think that the CIA must act promptly to approve or disapprove any material which may be submitted to it by Marchetti. Undue delay would impair the reasonableness of the restraint, and that reasonableness is to be maintained if the restraint is to be enforced. We should think that, in all events, the maximum period for responding after the submission of material for approval should not exceed thirty days.").

AR00000825

former-AUSA's name i ▓▓(P)▓▓. I believe there is no basis to conceal her name at all, but

there is further no basis because I believe she engaged in misconduct that I described. Also, she

is no longer a DOJ employee and has not been one for several years. She is now a public figure,

specifically t ▓▓▓▓▓▓(P)▓▓▓▓▓▓ in New Orleans. Finally, she has made public

statements to the media disputing my accusations of systemic corruption in the Justice

Department.[2] Thus, I believe that her decision to claim there is no corruption in the Justice

Department invites examples of her own misconduct and malfeasance.

When reviewing these proposed references to FBI information, includin ▓▓(P)▓▓ name

and misconduct, for release to the public through the media, RIDS personnel should be aware

that the U.S. Court of Appeals for the Fifth Circuit has held that "because individuals working in

law enforcement are often in the best position to know about the occurrence of official

misconduct, it is essential that such well-placed individuals be able to speak out freely about

official misconduct." *Kinney v. Weaver*, 367 F.3d 337, 361 (5th Cir. 2004) (en banc) (internal

citations and quotations omitted).

The Fifth Circuit has held for the purposes of a qualified immunity analysis that:

[i]t was clearly established that a public employee's speech revealing improper
conduct by fellow employees was protected. Thus, a reasonably objective public
official would have known that [retaliation against] an employee for his speech
concerning misconduct by public officials would violate a clearly established
constitutional right.

*Brawner v. City of Richardson, Tex.,* 855 F.2d 187, 193 (5th Cir. 1988) (internal citations omitted).

Thus, I recommend that you approve the release of this information without any redactions

and that you do so within thirty calendar days.

---

[2] *See* Jim Mustian and David Hammer, *In 31-page letter, New Orleans FBI agent accuses Justice Department of 'systemic corruption'*, THE NEW ORLEANS ADVOCATE, Mar. 21, 2017, *available at*
https://www.theadvocate.com/new_orleans/news/courts/article_b9a17214-0e54-11e7-9dfc-cbb0fbf2e17b.html

AR00000826

## I.  Acts of Misconduct/Malfeasance by Unnamed Officials

1.     When investigating a major public official, DOJ political appointees stymied the investigation by putting unnecessary restrictions on the case, specifically a confidential source was not allowed to initiate any contact at all with the predicated subjects of public corruption investigations, not just preventing the source from initiating criminal conduct. (Although, under the law regarding entrapment, a source can initiate conversations about criminal conduct if a subject is properly predicated.)  I do not believe these decisions were partisan, but they were designed to prevent DOJ from having to deal with the usual controversy when investigating high-level officials.

2.     When investigating a Congressional staffer, high-level DOJ civil servants denied permission to record conversations with the staffer, even though permission would have been granted to do so for other public officials.  I believe this was for partisan political reasons.

3.     I was told that one investigation of a Congressman was only able to go forward and be successfully prosecuted, because the lead agent and prosecutor ignored DOJ policies requiring approval from Main Justice.  The lead investigator and the AUSA on the case believed that Main Justice would have stopped the investigation for political reasons, possibly partisan ones.

4.     FBI managers have ordered wiretaps to further their career interests even though there was no reasonable investigative need for them. Specifically, an SAC ordered that there be two public corruption wiretaps during an upcoming year, ostensibly for career purposes.  It did not matter in which cases the wiretaps were.  Pursuant to the order, an agent was tasked with performing a wiretap on a case, but the agent refused because it was unnecessary.  Another agent was asked to do a wiretap on another case and the agent consented, even though it was unnecessary for the investigation.  The wiretap was so unnecessary that it was allowed to go down for about three

3

weeks, because the investigative team had not bothered to pursue a timely renewal. In the process of this wiretap, thousands of labor hours were wasted and thousands of taxpayer dollars wasted on extra pay (night differential, Sunday pay, and Holiday pay) solely for the purpose of furthering FBI managers' career interests.

5.      An FBI manager ordered investigations to benefit a private corporation while he was seeking employment with that corporation.

6.      FBI managers prioritized an undercover operation at the expense of other corruption investigations ostensibly to further their career interests.

7.      FBI managers receive a career benefit from pushing "sophisticated investigative techniques" like wiretaps and undercover operations.

8.      SACs are rumored to receive bonuses for achieving benchmarks that they set for themselves with FBI Headquarters, thus causing many employees to believe that investigations are being manipulated for the SAC's personal financial benefit. To my knowledge, these benchmarks are not shared with the public or even FBI employees. This secrecy over the issue of bonuses prevents any sort of accountability for them, or even acknowledgment that they exist.

9.      An FBI manager has insisted on giving awards to federal prosecutors for political reasons even when prosecutors have failed to prosecute cases. Specifically, the prosecutors were so slow in prosecuting cases that the FBI case agent took the case to a local district attorney's office. The local ADA learned that he could have solved several murder cases had the information been brought to him earlier. Also, an honest FBI supervisor believed that subjects had committed murders while the FBI waited for federal prosecutors to prosecute the subjects. At the conclusion of the case, the U.S. Attorney falsely claimed in public statements that the decision to involve the

4

local DA's office had been his office's to make the prosecution "dream team." In reality, the FBI case agent had made the decision because the U.S. Attorney's Office was so bad.

10.     An SAC instructed FBI employees to include state prosecutors when answering the question on the FBI's annual climate survey about the relationship with federal prosecutors. Because FBI personnel were taking more and more cases to state prosecutors because of the federal prosecutors' failure to do their jobs, including the state prosecutors in the question would have made the federal prosecutors look far better on the survey than they actually were. This effort by the SAC was ostensibly to minimize the bad relationship with the local U.S. Attorney's Office and conceal the problems with that office from FBI Headquarters.

11.     An SAC complained to employees about answers to the annual climate survey in an apparent effort to influence their answers. Specifically, his complaints appeared to be an attempt to intimidate employees into not being candid on the survey and an effort to conceal problems in that office.

12.     An FBI manager leaked to the U.S. Attorney's Office the fact that I had made a complaint to the OIG about the U.S. Attorney's Office.

13.     FBI managers have advocated strongly to name an Assistant U.S. Attorney ("AUSA") as the subject of an FBI criminal investigation. Because of the AUSA's political influence over the U.S. Attorney, I believe the FBI managers abused their power to name the AUSA as a subject so the U.S. Attorney would not have to risk political capital to take administrative action which would have been the appropriate way to address the issues with the AUSA.

14.     During internal investigations, an FBI manager attempted to persuade a witness to take a position advantageous to management by suggesting that by reporting misconduct another employee had "thrown everyone, including [the witness] under the bus."

AR00000829

15.     FBI managers impeded the investigation of an FBI task force officer accused of corruption, specifically paying kickbacks on a business transaction that he had separate from his public employment.  One of the managers played softball with the task force officer and claimed that the suspect transactions were a "hook-up" and told the case agent, "Don't hate the player, hate the game."

16.     An SAC reorganized the corruption squads in a manner that made them less effective and efficient ostensibly so he could claim credit for the change on his internal resume regardless of the results of his decision.

17.     An SAC identified his top-three public corruption cases and reportedly expressed his confidence in them to FBIHQ, while the agents working the cases, who had actual experience investigating corruption were far less confident of the cases' likelihood of success.  I believe the SAC was exaggerating the potential of those investigations to FBIHQ in an effort serve his own career purposes.

18.     FBI managers have told local police to ban backpacks and ice chests from public areas during public events for security purposes.  When police said they could not do that, FBI managers told the police to declare the public areas subject to search and conduct warrantless searches of citizens' property at will.

19.     An SAC wasted thousands of dollars for police from his last duty station to travel to his new field office and advise local officials how to prepare for a public event, the size and magnitude of which the out-of-state police had no experience.

20.     FBI managers claimed to the New Orleans mayor that the FBI would know about any terrorist attack, other than a lone-wolf attack, before it happened at a particular event.  Such a statement was irresponsible, since there is no way to guarantee that the FBI can predict any terrorist

AR00000830

attack, regardless of the size of the group committing it. I believe the FBI managers' stupidity in making the promise gave the New Orleans mayor the ability to blame the FBI in case there were a terrorist attack.

21.    FBI managers placed resources on routes of egress from a public event that was a potential terrorist target, so that investigators could identify attackers afterwards. They did not consider placing them on routes of ingress to identify possible attackers entering a target area and increasing the possibility of preventing an attack.

22.    In contrast to numerous private statements to the contrary, when speaking in public an ASAC claimed that the FBI's disagreements with the U.S. Attorney's Office were "a good thing." (His public statements are public information, but the fact that he made private statements to the contrary are subject to the PRP.)

23.    An ASAC admitted that the reason he wanted to become an ASAC was because it was time for him to do something for himself.

24.    Shortly after an SAC's arrival in New Orleans, New Orleans agents volunteered for transfers to hardship posts, especially public corruption agents, at a disproportionately high rate compared to other offices.

25.    An SAC told an agent going to Guam, "No one in the Bureau cares about Hawaii, and no one in Hawaii cares about Guam," in an ostensible effort to get him to reconsider the transfer.

26.    One supervisor had been absent so much from his regular duties in order to check boxes for his FD-954, internal resume and application for higher-level positions, that one of his agents did not know the supervisor had transferred to FBI Headquarters until two weeks after the supervisor had left.

7

AR00000831

27.    After engaging in a group punishment session by yelling at an entire office for the actions of a few, FBI managers then ordered the employees not to discuss that the managers had yelled at the employees.

28.    An SAC has discussed a sensitive public corruption case at a bar with employees that had no need to know the information, particularly not at a bar.  One of the employees was dating an employee of the subject of the public corruption case.

29.    FBI Office of General Counsel attorneys' opinions are cut and pasted into e-mails from managers before being sent to employees, ostensibly to conceal the attorneys' identities.  Such behavior is similar to practices from the former-Soviet Union.

30.    An SAC used a bean-counting method to judge public corruption cases based upon the date the cases were opened and whether there had been any prosecution.  This method failed to take into account the difficulty and importance of each case, indicating the SAC's incompetence.

31.    An AUSA with a good reputation commented that he was against my sending my letters to Judge Engelhardt because he believed in "keeping things in the family."

32.    An AUSA with a bad reputation commented that I had been wrong to send my letters because I had "talked out of school."

33.    An AUSA responsible for counterterrorism prosecutions admitted that she did not know what Al Qaeda was.  However, during meetings with foreign officials when an FBI agent explained that the FBI conducted investigations, not prosecutors, the same ignorant AUSA claimed that the FBI could not do anything without her "say-so," a demonstrably false statement considering the lack of AUSA involvement in day-to-day investigative matters, particularly counterterrorism cases.

AR00000832

34.     FBI employees, other than myself, have compared being in the FBI to being a Soviet citizen under a management that is similar to the KGB.

35.     FBI managers accuse FBI employees of cynicism if they openly question managers' motives.  They also accuse employees of being too close to or involved in cases if the employees have strong disagreements with the U.S. Attorney's Office.  While agents may lose perspective at times, FBI managers are not unbiased arbiters of issues with the U.S. Attorney's Office, because their career interests depend upon them capitulating to prosecutors and preventing any disagreements from being made public.

36.     FBI managers regularly speak of protecting the FBI's reputation and have stymied investigations to protect the "Bureau brand."

37.     After dealing with incompetent FBI supervisors with little knowledge of the investigative programs they were tasked with managing, junior agents referred to squad supervisors as the "administrative supervisor," while senior investigative agents were the "operational supervisor."

38.     When I was conducting an investigation of fraud related to a U.S. DOJ program, OIG officials asked me for permission to participate in the case. (The case was prosecuted and closed, which is a matter of public record that has been reported in the media.[3])  Never having dealt with the OIG before and barely knowing of their existence, frankly, I asked where their agents were.  I was told Houston.  I denied the OIG permission to participate in the case.  Their agents were too far away and would only hamper the investigation, not help it.  I believe the OIG official wanted his agents to be involved, so the OIG could claim statistical accomplishments and, essentially, falsely justify its existence.

---

[3] Michelle Hunter, *Former Harahan police officer pleads guilty to fraud*, NOLA.COM | THE TIMES-PICAYUNE, Apr. 6, 2011, *available at* https://www.nola.com/crime/index.ssf/2011/04/former_harahan_police_officer_2.html

AR00000833

39.     The OIG was involved in another case to which I was assigned.  During that case, OIG agents traveled from Houston to participate.  Although some of the agents were friendly, they were largely inexperienced, some had previously been Diplomatic Security Service agents with little investigative experience.  The OIG investigators conducted interviews in an overly formal manner, did not know how to handle sources or witnesses, and had no knowledge of using covert techniques.  They were good at accomplishing minor tasks at the direction of prosecutors, but did not understand how to conduct complex public corruption investigations.

40.     An FBI ASAC ordered all agents working criminal investigations to receive a full day of training on seizure and asset forfeiture, even though the office had received the same training two years earlier.  The ostensible reason for this decision was because the field office's asset forfeiture and seizure stats were down.  The reason for the decline in stats was the U.S. Attorney's Office's decline in prosecutions, but, instead of taking up these issues with the U.S. Attorney's Office, the ASAC forced agents who were already trained in asset forfeiture/seizure to take the training again. I believe that the ASAC forced this training on employees, so he could include it on his FD-954 and falsely claim that he had provided a solution to a problem.  In reality, he just wasted employee-labor hours and avoided taking any action   such as addressing the issue with prosecutors   that could actually solve the problem.

## II.     Statements Attributed to Then-FBI Director James Comey

1.     Regarding the selection of managers in the FBI, or as he called it "leadership", then-FBI Director James Comey told the FBI that the best players do not necessarily make the best coaches.

2.     It was rumored that then-Director Comey had said of SACs in the FBI that a third are good SACs, a third shouldn't be SACs, and a third shouldn't be FBI agents.

AR00000834

**III.** **Malfeasance/Misconduct by Then-AUS** ▮(P)▮

A. The below passage was approved for release under the PRP in 2006 in my submission entitled, *The Forgotten West*, I now request to identif ▮(P)▮ as the then-prosecutor described:

> Several months later, I sat next to the other prosecutor on the case as she read through a series of documents I had prepared. I was tutoring her on the facts of the investigation that she had been assigned to for over a year, because we had two defendants left who might go to trial. Two weeks earlier, she and her partner that I had verbally abused had rolled over and given the international fugitive a sweetheart deal that significantly undercut our ability to force him to return funds to victims. When this Harvard-educated attorney that collected a government paycheck happened upon a document that was particularly damning of the recipient of the deal, she read it carefully and remarked with surprise, "oh, I wish I'd seen that a few weeks ago." I responded in an emotionless monotone, "you did, I sent it to you in reports about him." She looked at me with a sweet insincere smile and giggled, "oh, I guess I should have read those." Such was a lawyer's sense of duty.

B. Additional Malfeasance/Misconduct b ▮(P)▮ Not Previously Submitted under the PRP

While I was a co-case agent on a confidential source ("the source"), specifically a cooperating subject operating under a plea agreement, I was working with the source in the covert investigation of several high-level public officials, including some national figures and high-level federal officials in Louisiana.▮(O-1) When I was at lunch with two AUSAs who were working on a fraud case that I had, one of the AUSAs asked about the criminal investigation into the source, which had been public knowledge at the time. That AUSA apparently did not know the source was cooperating, nor should he have, because the source's cooperation was confidential from all but the top levels of the U.S. Attorney's Office. The other AUSA at lunch wa ▮(P)▮.

---



AR00000835

Despite being junior in the U.S. Attorney's Office to the other AUSA and having less of a reason to know about the source's cooperatio [(P)] warned the other AUSA to remain quiet about the source as he was cooperating with authorities. I do now know how she knew that, but she was not supposed to know about the source's cooperation.

During the same time period, as part of his covert assistance, the source had been tasked with approaching a high-level federal official in Louisiana. Suddenly, the high-level official refused to have any contact with the source. Shortly afterwards, a Louisiana State Police detective notified me that he had see [(P)] at Harrah's Casino in New Orleans socializing with the same high-level official. In fac [(P)] introduced the detective to the official.

Based on the above, I, and others in the investigative team, believed th [(P)] had leaked the source's cooperation to the high-level official causing him to cut off contact with the source and impeding any investigation of the official.

12

AR00000836

**From:**        (P)     . (NO) (FBI)
**Sent:**       Thursday, August 25, 2016 4:43 PM
**To:**         (P)    (IMD) (FBI)
**Subject:**    RE: Short Deadline - Review Request

Good deal.

---

**From**    (P)    (RMD) (FBI)
**Sent:** Thursday, August 25, 2016 3:42 PM
**To**    (P)    (NO) (FBI)
**Subject:** RE: Short Deadline - Review Request

No problem. The actions are in the mill waiting signature.

---

**From**    (P)    (NO) (FBI)
**Sent:** Wednesday, August 24, 2016 5:16 PM
**To**    (P)    . (RMD) (FBI)
**Subject:** RE: Short Deadline - Review Request

(P)

(K) (L)

Thanks,
(P)

---

**From**    (P)    (RMD) (FBI)
**Sent:** Tuesday, August 23, 2016 8:48 AM
**To**    (P)    (NO) (FBI)
**Subject:** RE: Short Deadline - Review Request

Thx!



(P)
Assistant Section Chief
FBI RMD/RIDS
Office     (P)
Cell     (S)



-------- Original message --------
From:     (P)    (NO) (FBI)"    (P)    @ic.fbi.gov>
Date: 08/23/2016 9:46 AM (GMT-05:00)

AR00000999

To: ▓▓▓ (P) ▓▓▓ G. (RMD) (FBI)" ▓▓▓ (P) ▓▓▓ @ic.fbi.gov>
Subject: RE: Short Deadline - Review Request

(K) (L)

--

-------- Original message --------
From: ▓▓▓ (P) ▓▓▓ . (RMD) (FBI)" ▓▓▓ (P) ▓▓▓ @ic.fbi.gov>
Date: 08/23/2016 8:44 AM (GMT-06:00)
To: ▓▓▓ (P) ▓▓▓ (NO) (FBI) ▓▓▓ (P) ▓▓▓ @ic.fbi.gov>
Subject: RE: Short Deadline - Review Request

(P), (K)

Thx,

(P)

**From** ▓▓▓ (P) ▓▓▓ (NO) (FBI)
**Sent:** Monday, August 22, 2016 1:43 PM
**To** ▓▓▓ (P) ▓▓▓ . (RMD) (FBI)
**Subject:** FW: Short Deadline - Review Request

(P)

(K) (L)

Thanks,

(P)

**From:** Zummer, Michael S. (NO) (FBI)
**Sent:** Friday, August 12, 2016 3:56 PM
**To:** FBI.PREPUB ▓▓▓ (P) ▓▓▓ (RMD) (FBI)
**Cc** ▓▓▓ (P) ▓▓▓ (NO) (FBI) ▓▓▓ (P) ▓▓▓ (NO) (FBI) ▓▓▓ (P) ▓▓▓ (NO) (FBI); Sallet, Jeffrey S. (NO) (FBI) ▓▓▓ (P) ▓▓▓ (NO) (FBI)
**Subject:** RE: Short Deadline - Review Request

A/ ▓▓▓ (P) ▓▓▓ ,

What is the basis for your office's determination that this letter was made in the performance of my official duties, when the letter specifically says that it was written in my private capacity?

2

**(NO) (FBI)**

| | |
|---|---|
| **From:** | (P) (NO) (FBI) |
| **Sent:** | Tuesday, August 16, 2016 7:53 AM |
| **To:** | (P) (RMD) (FBI); (P) (NO) (FBI) |
| **Cc:** | (P) (RMD)(FBI); HARDY, DAVID M. (RMD) (FBI); (P) (NO) (FBI); SALLET, JEFFREY S. (NO) (FBI) |
| **Subject:** | RE: New Orleans Pre-publication request --- UNCLASSIFIED//FOUO |
| | |
| **SentinelCaseId:** | NON-RECORD |

Classification: UNCLASSIFIED//FOUO
DELIBERATIVE PROCESS PRIVILEGED DOCUMENT
=========================================================

Mike-

Thanks for allowing the New Orleans Field Office to comment on the proposed release. Please see my responses in red to your questions below. Please feel free to call me at (P) (desk) or (S) (cell) to discuss further.

Thanks,
(P)


SSA (P)
Chief Division Counsel
New Orleans
(P)

_____

| | |
|---|---|
| **From:** | (P) (RMD) (FBI) |
| **Sent:** Monday, August 15, 2016 12:02 PM |
| **To:** | (P) (NO) (FBI); (P) (NO) (FBI) |
| **Cc** | (P) (RMD)(FBI); HARDY, DAVID M. (RMD) (FBI) |
| **Subject:** FW: New Orleans Pre-publication request --- UNCLASSIFIED//FOUO |

Classification: UNCLASSIFIED//FOUO
DELIBERATIVE PROCESS PRIVILEGED DOCUMENT
-----------------------------------------------------

(I), (K), (P)

AR000001460

**From:** _____ (P) _____ (USALAE)
**Sent:** Tuesday, April 9, 2019 12:35 PM
**To:** _____ (P) _____ (NO) (FBI)
**Subject:** RE: RE: SA Mike Zummer Proposed Disclosure

_____ (K) _____

---

**From** _____ (P) _____ (NO) (FBI _____ (P) _____ @fbi.gov>
**Sent:** Tuesday, April 9, 2019 11:34 AM
**To** _____ (P) _____ (USALAE _____ (P) _____ @usa.doj.gov>
**Subject:** RE: RE: SA Mike Zummer Proposed Disclosure

(K), (L), (P)

_____ (P) _____
Chief Division Counsel
FBI, New Orleans

This e-mail may contain information protected by the attorney-client, work product, and/or deliberative process privilege(s).

On Apr 9, 2019 11:30 AM _____ (P) _____ (USALAE)" _____ (P) _____ @usdoj.gov> wrote:

(P)

(K), (L), (P)

(P)

---

**From** _____ (P) _____ (NO) (FBI _____ (P) _____ @fbi.gov>
**Sent:** Tuesday, April 9, 2019 11:27 AM
**To** _____ (P) _____ (USALAE _____ (P) _____ @usa.doj.gov>
**Subject:** Fwd: RE: SA Mike Zummer Proposed Disclosure

(K), (L), (P)

Thanks,
(P)

_____ (P) _____
Chief Division Counsel

FBI, New Orleans

This e-mail may contain information protected by the attorney-client, work product, and/or deliberative process privilege(s).

---------- Forwarded message ----------
From [ (P) ] (USALAE)" [ (P) ] @usdoj.gov>
Date: Mar 28, 2019 2:06 PM
Subject: RE: SA Mike Zummer Proposed Disclosure
To [ (P) ] (NO) (FBI) [ (P) ] @fbi.gov>
Cc:

[ (P) ]

[ (K), (L) ]

[ (P) ]
Civil Chief - EDLA
[ (P) ]

-----Original Message-----
From [ (P) ] (NO) (FBI) [ (P) ] @fbi.gov>
Sent: Wednesday, March 6, 2019 4:58 PM
To [ (P) ] (USALAE [ (P) ] @usa.doj.gov>
Cc [ (P) ] (NO) (FBI [ (P) ] @fbi.gov>
Subject: SA Mike Zummer Proposed Disclosure

[ (K), (L), (P) ]

Thanks,
[ (P) ]

SS [ (P) ]
Chief Division Counsel
FBI, New Orleans

This e-mail may contain attorney-client, deliberative process, or work product privileged information.

AR000002179

(I) (K) (L) (P)

AR000003138