

E2017002

June 20, 2018

**VIA ELECTRONIC MAIL**
Michael Zummer
2337 Magazine Street, Unit D
New Orleans, LA 70130
mzummer@aol.com

Re:  Termination of OIG Whistleblower Reprisal Investigation

Dear Mr. Zummer:

Attached you will find the final written statement of the Office of the Inspector General (OIG) of its investigation into your allegations that you were retaliated against in violation of 5 U.S.C. § 2303 and the FBI Whistleblower Regulations, 28 C.F.R. pt. 27, for making disclosures to the OIG in 2013 and for making disclosures to a federal judge in a letter dated August 15, 2016.  We provided to you the written status report on April 24, 2018 for your comment, and we received your written comments by email on May 11, 2018 and May 17, 2018.  We reviewed and considered all of your comments and in some instances made revisions in response to your comments.

We concluded in our investigation that your 2013 disclosures to the OIG constituted protected disclosures under 5 U.S.C. § 2303 and the FBI Whistleblower Regulations.  However, we found that the decision by the U.S. Attorney's Office for the Eastern District of Louisiana not to appoint you as a Special Assistant U.S. Attorney did not constitute a personnel action.  Likewise, we found that the U.S. Attorney's Office's decision not to prosecute two of your cases did not constitute a personnel action.  With respect to your 2016 disclosure to a federal judge, we found that this disclosure was not a protected disclosure as federal judges are not one of the entities designated to receive protected disclosures under 5 U.S.C. § 2303 and the FBI Whistleblower Regulations.  Accordingly, we concluded that there are not reasonable grounds to believe that any reprisal occurred in violation of 5 U.S.C. § 2303 and the FBI Whistleblower Regulations.  See 28 C.F.R. §§ 27.1-27.4.

This letter serves as the written statement required by 28 C.F.R. § 27.3(h) of the FBI Whistleblower Regulations.  Pursuant to 28 C.F.R. §

27.4(c)(1), you may present a request for corrective action directly to the Director of the Office of Attorney Recruitment and Management within 60 calendar days of receipt of this final written statement. With your consent, we have also provided a copy to the FBI.

Please note that the attached written statement, as well as the written status report and the draft misconduct report that we also provided to you for comment, may contain sensitive law-enforcement or privacy-protected information and are intended for authorized recipients only. Do not disseminate any of these documents without the express written authorization of the OIG.[1]

If you have any questions concerning this matter, please contact Investigative Counsel Jennifer Maceda at (202) 307-1007.

Sincerely,

Daniel C. Beckhard
Assistant Inspector General
Oversight and Review Division

Attachment

cc:  Robert McDuff (rbm@mcdufflaw.com)
     Meredith Grabill (mgrabill@lawla.com)

---

[1] This provision is consistent with and does not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive Order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive Orders and statutory provisions are incorporated herein and are controlling.



# Office of the Inspector General
U.S. Department of Justice

**OVERSIGHT ★ INTEGRITY ★ GUIDANCE**



# An Investigation Of Alleged Retaliation Against FBI Special Agent Michael Zummer

**■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■**

### NOTICE

*This report may contain sensitive law-enforcement or privacy-protected information and is for authorized recipients only.  Do not disseminate this report without the express written authorization of the U.S. Department of Justice Office of the Inspector General.  This provision is consistent with and does not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive Order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of any violation of any law, rule, or regulation, or gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection.  The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive Orders and statutory provisions are incorporated herein and are controlling.*

**■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■**

*This report may contain sensitive law-enforcement or privacy-protected information and is for authorized recipients only. Do not disseminate this report without the express written authorization of the U.S. Department of Justice Office of the Inspector General. Regarding this provision, please review the notice page of this report for additional information about your rights and obligations.*

# Table of Contents

I.     Introduction ........................................................................................... 1

II.    Legal Standards...................................................................................... 2

    A.   5 U.S.C. § 2303 and the FBI Whistleblower Regulations.................... 2

    B.   PPD-19 and Department Procedures................................................ 4

    C.   50 U.S.C. § 3341(j) ...................................................................... 5

III.   Background Regarding Zummer................................................................ 5

IV.    Zummer's 2013 Disclosure and Retaliation Complaint ............................... 6

    A.   Detailed Chronology of Key Events.................................................. 6

        1.   Morel Case – 2013 Declination and Zummer's Complaint to OIG6
        2.   Actions Taken Against Zummer ............................................. 9
        3.   Zummer's Reassignment in New Orleans Division ................. 11

    B.   Analysis of 2013 Disclosure and Retaliation Allegations................... 12

        1.   Protected Disclosure.......................................................... 12
        2.   Retaliatory Personnel Actions ............................................. 14

V.     Zummer's 2016 Disclosures and Complaints........................................... 17

    A.   Zummer's Disclosure to the Judge in the Morel Case ...................... 17

    B.   Actions Taken Against Zummer Following His Letter ....................... 24

        1.   Actions Taken Regarding Zummer in August and September .. 24
        2.   Zummer's Suspension ....................................................... 27
        3.   The AIU Suspension Case File and Associated Documents ...... 29
        4.   Revocation of Zummer's Security Clearance ......................... 33

    C.   Analysis of 2016 Disclosures and Associated Allegations ................. 35

        1.   5 U.S.C. § 2303 and the FBI Whistleblower Regulations......... 35
        2.   50 U.S.C. § 3341(j), PPD-19, and Associated Policies ............ 35

    D.   Observations on the Process to Suspend and Revoke Zummer's Clearance .............................................................................. 36

VI.    Conclusion ........................................................................................... 41

## I. Introduction

This report describes the Office of the Inspector General's (OIG) investigation of a complaint by Michael S. Zummer, Special Agent (SA) in the New Orleans Division of the Federal Bureau of Investigation (FBI), that he was retaliated against for protected whistleblower activities in violation of 5 U.S.C. § 2303, and 28 C.F.R. Pt. 27 (the FBI Whistleblower Regulations); Presidential Policy Directive 19 (PPD-19), *Protecting Whistleblowers with Access to Classified Information*; and 50 U.S.C. § 3341, *Security Clearances.*

Zummer alleged two separate and distinct instances of reprisal, occurring in 2013 and 2016. The first allegation relates to a disclosure that Zummer made in May 2013 to OIG investigators concerning an alleged financial conflict of interest between the then-First Assistant United States Attorney (First Assistant 1) in the Eastern District of Louisiana, and a local defense attorney (Defense Attorney), arising out of a financial relationship between them. Zummer alleged that First Assistant 1 should have been recused from involvement in a case against the Defense Attorney's client, former St. Charles Parish District Attorney Harry Morel, Jr. Zummer alleged that in retaliation for his disclosures to the OIG, the United States Attorney's Office for the Eastern District of Louisiana (the USAO) improperly denied him the opportunity to serve as a Special Assistant United States Attorney (SAUSA) and improperly declined to prosecute two of his cases.

Zummer's second allegation of reprisal arises from a letter Zummer sent to the judge in the Morel case in 2016. In May 2016, Zummer drafted a letter outlining alleged prosecutorial misconduct within the USAO related to the Morel case and, based on advice from his supervisors, attempted to obtain FBI or Department of Justice authorization to release it. When he ultimately was unable to obtain definitive guidance, Zummer sent the letter to the judge on August 15, 2016, two days before Morel's sentencing. Citing this unapproved release of the letter, New Orleans Division management subsequently removed Zummer from investigative duties, moved his workspace to the Division's empty nurse's office on a different floor of the building, restricted his access to the investigative floors of the building, and ordered him not to discuss the Morel case or his complaint with anyone in the division but his supervisory chain. On September 30, 2016, the FBI Security Division (SecD) suspended his security clearance, resulting in the FBI Human Resources Division's suspension of Zummer from work without pay on the same day. On January 3, 2018, Zummer received a letter dated November 27, 2017 revoking his security clearance.

On October 5, 2016, Zummer sent an email to the OIG describing facts that he believed implied that the FBI had subjected him to retaliation for sending the letter to the federal judge in the Morel case.

The OIG opened an investigation of Zummer's retaliation claims on January 27, 2017. This investigation included a review of hundreds of records pertaining to

Zummer's complaint, including personnel and security clearance records, emails from multiple individuals at FBI Headquarters and the New Orleans Division, and contemporaneous documents from the FBI and the USAO. The OIG interviewed multiple individuals with knowledge of the circumstances of Zummer's complaint, including Zummer, New Orleans Division executive management, Zummer's supervisors, FBI Headquarters personnel, and USAO senior leadership.

As detailed in this report, with regard to Zummer's allegation that he was retaliated against in response to his 2013 OIG complaint, we found that neither of the two actions, the USAO's declination of two of his cases and his non-selection for a SAUSA position, were personnel actions as defined in the FBI Whistleblower Regulations. Consequently, we found no legal basis for Zummer's reprisal claim regarding the protected disclosure.

We also concluded that Zummer's 2016 disclosures to the judge did not support a legally cognizable whistleblower reprisal claim. Pursuant to the FBI Whistleblower Regulations, Presidential Policy Directive 19 (PPD-19), and 50 U.S.C. § 3341, we found that Zummer did not make a protected disclosure when he sent his August 2016 letter to a federal judge because a federal judge is not one of the entities designated to receive a protected disclosure under these provisions.

Section II of this report provides the legal standards set forth in the FBI Whistleblower Regulations, PPD-19, and 50 U.S.C. § 3341. Section III provides background information regarding Zummer. Section IV provides our factual findings and analysis of Zummer's retaliation complaint in response to his 2013 disclosures. Section V provides our findings and analysis of Zummer's complaints related to his letter to Judge Engelhardt in 2016. Section VI summarizes our conclusions.

This report is one of two reports produced from this investigation. The other report examines related misconduct allegations made against Zummer between August and December 2016.

This report serves as the written statement required by 28 C.F.R. § 27.3(h). The complainant submitted written comments to the OIG on a draft of this report on May 14, 2018.

## II.   Legal Standards

In this section, we set forth the legal standards concerning the relevant U.S. Code provisions, the FBI Whistleblower Regulations, and PPD-19 with its related Department and FBI implementing guidance.

### A.    5 U.S.C. § 2303 and the FBI Whistleblower Regulations

Section 2303 of Title 5 of the United States Code and the Whistleblower Regulations prohibit Department employees who have authority to take, direct others to take, recommend, or approve any personnel action, from taking or failing

to take, or threatening to take or fail to take, a personnel action in reprisal for a protected disclosure.[1] A complainant can establish a prima facie case of unlawful reprisal by showing that he made a protected disclosure to a qualifying individual or office, and that the disclosure was a contributing factor in a personnel action about which he complained.[2] If the complainant meets his burden of showing by a preponderance of the evidence that his protected disclosure was a contributing factor in a personnel action, the burden shifts to the agency to show by clear and convincing evidence that it would have taken the personnel action in the absence of the protected disclosure.[3]

For a disclosure to be considered "protected" under Section 2303 and the Regulations, it must meet two requirements. First it must be made to one of the offices or officials designated to receive it, including a supervisor in the direct chain of command of the employee, up to and including the head of the employing agency, the OIG, DOJ OPR, FBI OPR, the FBI's Inspection Division (INSD), Congress, the Office of Special Counsel, or any other entity designated to receive such disclosures by the offices or officials enumerated above.[4] Second, the person making the disclosure must reasonably believe that it evidences a violation of any law, rule, or regulation, or that it evidences gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public safety.[5]

The Merit Systems Protection Board (MSPB) and the courts have held that security clearance revocations and suspensions are not personnel actions under analogous statutes to the FBI Whistleblower Regulations – the Whistleblower Protection Act (WPA) and its successor, the Whistleblower Enhanced Protection Act (WEPA).[6] Likewise, the MSPB and the courts have declined to review actions closely intertwined with clearance suspensions, such as a necessary detail to another section not requiring a clearance, indefinite suspension from work due to suspension of a security clearance, or termination due to termination of a security

---

[1] 5 U.S.C. § 2303(a); 28 C.F.R. § 27.2(a).

[2] 28 C.F.R. § 27.4(e)(1).

[3] *See* 28 C.F.R. § 27.4(e)(2).

[4] 5 U.S.C. § 2303. Zummer's disclosures were made before passage of the FBI Whistleblower Protection Enhancement Act of 2016 (FBI WPEA), which expanded the list of designated officials and offices to include supervisors within the employee's direct chain of command. However, we will provide Zummer with the benefit of the FBI WPEA's expanded list of designated officials and offices in our analysis.

[5] 5 U.S.C. § 2303.

[6] *See, e.g. Weber* v. *United States*, 209 F.3d 756 (D.C. Cir. 2000) (agreeing with the Merit Systems Protection Board that a security clearance revocation was not a personnel action as nobody has a "right" to a security clearance); *McCabe* v. *Dept. of Air Force*, 62 M.S.P.R. 641, 647-48 (1994), *aff'd*, 62 F.3d 1433 (Fed. Cir. 1995) (revocation of employee's access to classified information was not a personnel action under the WPA).

*This report may contain sensitive law-enforcement or privacy-protected information and is for authorized recipients only.  Do not disseminate this report without the express written authorization of the U.S. Department of Justice Office of the Inspector General.  Regarding this provision, please review the notice page of this report for additional information about your rights and obligations.*

clearance.[7]  Claims for retaliatory suspensions and revocations of security clearances are addressed by other authorities, discussed below.

## B.    PPD-19 and Department Procedures

PPD-19 protects federal employees with clearances who make qualified protected disclosures from retaliation by any actions affecting the employee's eligibility for access to classified information.[8]  PPD-19 requires agencies to establish a process for its employees to obtain relief if the agency takes action affecting their security clearance as a reprisal for a protected disclosure.  PPD-19 requires the agency's Inspector General to conduct a review of such retaliation allegations and provide recommendations for corrective actions as needed.  If an employee exhausts his or her agency's appeal process without success, PPD-19 allows an employee to request an external review by a three-member Inspector General panel chaired by the Inspector General of the Intelligence Community.  If the external panel finds a violation of PPD-19, the panel may recommend corrective action to the agency head.

As with the FBI Whistleblower Regulations, PPD-19 requires a protected disclosure to be made to a designated entity and mandates that the employee must reasonably believe it evidences a violation of any law, rule, or regulation; gross mismanagement; a gross waste of funds; an abuse of authority; or a substantial and specific danger to public health or safety.  PPD-19 protects disclosures made by an employee to a supervisor in his or her direct chain of command up to the head of their agency, to the agency OIG, to the Intelligence Community Inspector General, the Director of National Intelligence, or their designees.

Within the Department, Department of Justice Policy Memorandum #2013-02 covering access to classified information sets forth review and appeals procedures for the denial and revocation of security clearances and implements the procedural requirements of PPD-19.[9]  DOJ Policy Memorandum #2013-02 requires that when

---

[7]  *See, e.g., Wilson* v. *Dept. of Energy*, 63 M.S.P.R. 228, 231 (1994) (finding that the MSPB lacked authority to investigate a detail because it would entail also delving into the reasons for suspension of the employee's security clearance); *Roach* v. *Dept. of Army*, 82 M.S.P.R. 464, 471-84 ¶¶ 17-54 (1999) (finding that the 1994 expansion in the definition of a personnel action to include "any other significant change in duties, responsibilities or working conditions" still did not allow the MSPB to review security clearance determinations); *Weber* v. *United States*, 209 F.3d 756, 759-60 (D.C. Cir. 2000) (finding that the Office of Special Counsel had no duty to investigate an Army civilian's termination due to the Army's revocation of his security clearance because the root of the action – the revocation of the individual's security clearance – was not a personnel action); *Hesse* v. *Dep't of State*, 217 F.3d 1372 (Fed. Cir. 2000) (affirming MSPB's upholding of petitioner's indefinite suspension from his job due to suspension of his security clearance as the MSPB lacked authority to review security clearance determinations).

[8]  Presidential Policy Directive-19, "Protecting Whistleblowers with Access to Classified Information," October 10, 2012.

[9]  Letter from Attorney General Eric. H. Holder, Jr. to the Honorable James R. Clapper, Director of National Intelligence, September 25, 2013.  The Department requirements are also outlined in

the Department revokes an employee's eligibility for access to classified information, that the employee be advised of the following:

- The employee's right to request documents forming the basis of the revocation, which will be provided within 30 days of the request;

- The employee's right to be represented by legal counsel;

- The employee's right to request reconsideration of the revocation decision within 30 days of receipt of the documents or receipt of the notice of revocation – whichever is later.

### C.    50 U.S.C. § 3341(j)

Also, under 50 U.S.C. §§ 3341(j)(1)(A) and (B), agency personnel cannot take any action with regard to an employee's security clearance in retaliation for a disclosure to the Director of National Intelligence, the head of the employee's agency, the agency's Inspector General, or any of their designees.[10]  As with the FBI Whistleblower Regulations, to qualify as a protected disclosure under 50 U.S.C. §§ 3341(j)(1)(A) and (B), the employee must make the disclosure to a designated official or office and must reasonably believe that his disclosure evidences a violation of federal law, rule, or regulation; gross mismanagement; a gross waste of funds; an abuse of authority; or a substantial and specific danger to public health or safety.  However, 50 U.S.C. § 3341(j)(4)(A) does not allow for an appeal of an agency's decision to suspend a security clearance if the purpose of the suspension is to allow for an investigation and the suspension lasts 1 year or less.

The procedures for agency adjudication of complaints under 50 U.S.C. § 3341(j)(4) mirror the FBI Whistleblower Regulations as to the contributing factor analysis, but differ with regard to the agency's burden should the disclosure be found as a contributing factor.  Instead of the agency having to show by clear and convincing evidence that it would have taken the same action with the security clearance in absence of the disclosure, under 50 U.S.C. § 3341(j)(4), the agency only has to meet this standard by a preponderance of the evidence.

## III.    Background Regarding Zummer

After graduating from Duke University in 1993, Zummer served as an officer in the Marine Corps from 1993 to 1998.  He joined the FBI as a Special Agent in

---

Chapter 2 of the Department's Security Program Operating Manual, which can be found at https://dojnet.doj.gov/jmd/seps/spom.pdp.

For FBI employees, FBI Corporate Policy Notice 0693D sets forth the procedures and policy for denying or revoking an employee's access to sensitive compartmented information (SCI).  This policy would apply if the FBI were only removing Zummer's access to SCI, but leaving intact his access to collateral classified information.

[10]  Subparagraph (j) of 50 U.S.C. § 3341 was added to the statute in the Intelligence Authorization Act for Fiscal Year 2014, PL 113-126, July 7, 2014, 128 Stat 1390, and amended by the Intelligence Authorization Act for Fiscal Year 2015, PL 113-293, December 19, 2014, 128 Stat 3990.

1999 and was assigned to the white collar crime squad in the New Orleans Division.  In 2003, Zummer resigned from the FBI to attend Stanford Law School.  From 2004 to 2005, Zummer took a break from law school and voluntarily returned to active duty with his Marine Corps reserve unit to deploy to Iraq for seven months.  After completing law school in 2007, he clerked for Judge Edith Brown Clement at the U.S. Court of Appeals for the Fifth Circuit in New Orleans for a year.

Zummer told the OIG that during his clerkship, he decided to return to the FBI because he missed working as an FBI agent.  He returned to duty with the FBI in September 2008 and was assigned to squad 5 in the New Orleans Division working on public corruption investigations.  Upon return to the FBI and as a veteran of Operation Iraqi Freedom, Zummer became a preference-eligible employee with the FBI under 5 U.S.C. § 2108(3)(B).  As a requirement of his employment with the FBI, Zummer completed an employment agreement upon his entry on duty; however, the copy in his personnel file in the New Orleans Division was not dated or witnessed.  According to Zummer's personnel file, he held a Top Secret security clearance at the times relevant to this report and was approved for access to sensitive compartmented information (SCI) in 2015.

Prior to the occurrence of the events described in this report, Zummer was well-regarded within the FBI's New Orleans Division.  From 2012 to 2014, Zummer received an Outstanding summary rating in his Performance Appraisal Report from his Supervisory Special Agent (SSA), who is now the criminal Assistant Special Agent in Charge (ASAC 1).  In 2015, he was rated as Excellent by his next supervisor following his transfer to the counter-terrorism squad.  He last received an individual cash award and a time off award in March 2013.  At the time of his suspension, Zummer was a GS-13, step 6.

## IV.    Zummer's 2013 Disclosure and Retaliation Complaint

This section sets forth our factual findings and analysis relevant to Zummer's 2013 disclosure and retaliation complaint.

### A.    Detailed Chronology of Key Events

#### 1.    Morel Case — 2013 Declination and Zummer's Complaint to OIG

Zummer provided the following background information to the OIG regarding the Morel case, which is the backdrop for Zummer's retaliation claims.[11]  The FBI opened an investigation into former St. Charles Parish District Attorney Harry Morel, Jr. in June 2009.  The investigation involved allegations that Morel propositioned

---

[11]  Zummer provided this information in an affidavit and memorandum that he provided to the OIG in the Spring of 2013 in support of his allegation that First Assistant 1 had a financial relationship with defense counsel in the Morel case that created a conflict of interest requiring First Assistant 1's recusal, as discussed below.  The OIG opened an investigation into these allegations in May 2013.

female defendants for sex in exchange for assisting them to set up pre-trial interventions or obtaining fake community service letters.

On February 9, 2013, the primary witness who was allegedly a victim of Morel's conduct died of a drug overdose. Zummer told the OIG that he had a phone conversation with an Assistant U.S. Attorney (AUSA) assigned to the case on February 15, 2013 regarding the impact of the witness's death on the Morel case. Zummer stated that the AUSA said he spoke to the First Assistant at the time (First Assistant 1) and the Interim U.S. Attorney. According to Zummer, the AUSA told him that "after [the witness's] death the case against Morel which was difficult before was now impossible." Zummer said he responded that he disagreed as the FBI still possessed solid evidence against Morel.

Zummer told the OIG that both he and ASAC 1 became concerned about First Assistant 1's involvement in the case because of First Assistant 1's relationship with Morel's attorney, the Defense Attorney. Zummer said that sometime in February 2013 ASAC 1 told him that First Assistant 1 co-owned a condominium with the Defense Attorney, that First Assistant 1's relationship with the Defense Attorney had been previously investigated, and that USAO leadership ordered First Assistant 1 to recuse himself from the Defense Attorney's cases. Zummer stated that he spoke with other agents who were aware of First Assistant 1's relationship with the Defense Attorney and, on February 19, 2013, found property records for the condominium First Assistant 1 and the Defense Attorney jointly owned and which still had an active mortgage.[12] Zummer provided a copy of these records to OIG investigators.

Zummer told the OIG that the AUSA assigned to the case called him on March 28, 2013. According to Zummer, the AUSA stated that he and others in the USAO had discussed the case and reviewed a PowerPoint presentation of evidence against Morel provided by Zummer. According to Zummer, the AUSA told him that the group that discussed the case included First Assistant 1, the Criminal Chief (Criminal Chief 1), and the Interim U.S. Attorney. According to Zummer, the AUSA stated that he had been told to decline the case due to the witness's death.[13]

On April 9, 2013, Criminal Chief 1 approved declining the Morel case. Shortly thereafter, Zummer received the USAO's declination letter.

---

[12] The property records showed that First Assistant 1's girlfriend and the Defense Attorney's wife also jointly owned the condominium.

[13] It is unclear from the OIG's 2013 report whether the AUSA expressly corroborated Zummer's account of this phone call and the related events. The AUSA stated in his 2013 affidavit that he talked to First Assistant 1 on occasion about the Morel case, but stated that he did not discuss the Defense Attorney with First Assistant 1. The AUSA's internal declination memorandum noted that the AUSA had talked to First Assistant 1 and Criminal Chief 1 concerning the case and the primary witness's death, but only stated that their conclusion was "there was insufficient evidence to charge Morel federally and therefore the case must be declined."

*This report may contain sensitive law-enforcement or privacy-protected information and is for authorized recipients only. Do not disseminate this report without the express written authorization of the U.S. Department of Justice Office of the Inspector General. Regarding this provision, please review the notice page of this report for additional information about your rights and obligations.*

Zummer told us that on April 17, 2013, USAO senior leadership, including the Interim U.S. Attorney and First Assistant 1, met with his Special Agent in Charge at the time (SAC 1), the SSA, and Zummer to discuss the Morel case. Zummer described several comments First Assistant 1 made at the meeting critical of the Morel case, which led Zummer to believe First Assistant 1 should have been conflicted out of the case due to his relationship with the Defense Attorney. For example, Zummer stated First Assistant 1 opined that the case was weak because Morel had been doing favors for many people without asking for sex in return and had been providing falsified community service papers for a long period of time. Zummer also said that First Assistant 1 remarked that Morel was unlikely to have sex with the primary witness, even if she had been willing.

On May 7, 2013, while being interviewed by the OIG regarding an unrelated matter, Zummer made allegations against First Assistant 1, claiming, on the basis of the facts described above, that First Assistant 1's personal and financial relationship with the Defense Attorney created a conflict of interest and that First Assistant 1 should have recused himself from the Morel case. In response, the OIG opened an investigation. The OIG reviewed documents from the Morel case file, as well as First Assistant 1's property records, work text messages, emails, and phone calls. In addition to Zummer, the OIG also interviewed First Assistant 1, the Defense Attorney, Criminal Chief 1, the AUSA assigned to the Morel case, and the Deputy Criminal Chief, who was the AUSA's immediate supervisor.

On October 3, 2013, the OIG completed its investigation and found no evidence that First Assistant 1 had any substantive involvement in the Morel case or in the declination decision, or that First Assistant 1's relationship with the Defense Attorney improperly influenced the USAO's declination of the Morel case. The OIG also found that First Assistant 1 began divesting his financial interests with the Defense Attorney in approximately November 2012 when First Assistant 1 was promoted to First Assistant and that he completed the divestiture in March 2013. The OIG found that at the request of the Interim U.S. Attorney, First Assistant 1 did participate in the April 17, 2013 meeting with the FBI about the Morel case, which occurred after the declination decision had already been made, but found no evidence that his participation impacted the USAO's April 9, 2013 decision to decline prosecution.[14]

---

[14] In his written response to the draft report, Zummer "dispute[d] [this] conclusion" that there was no evidence that First Assistant 1's participation impacted the declination, asserting that "First Assistant 1 was involved in a number of meetings about the case prior to the declination decision;" that First Assistant 1 participated in the April 17, 2013 meeting with the FBI "to reconsider the declination decision;" and that – during this meeting - First Assistant 1 made a "false offer of support for the investigation if the FBI needed it," which indicated that he had authority over the case. In its reprisal investigation, the OIG did not re-investigate Zummer's 2013 allegations about First Assistant 1.

## 2. Actions Taken Against Zummer

In this section, we describe the adverse personnel actions Zummer alleged the USAO took in retaliation for his 2013 complaint to the OIG. First, we describe the two cases that Zummer alleged the USAO improperly declined to prosecute. Second, we describe the SAUSA position that Zummer alleged the USAO denied to him.

### a. Declination of Other FBI Cases Assigned to Zummer

Zummer alleged that the USAO retaliated against him for his disclosures to the OIG in 2013 by refusing to prosecute two cases that Zummer investigated.

The first case was a political corruption case involving the potential bribery of a public official. Zummer and ASAC 1 (when he was still an SSA) investigated the case with two AUSAs (AUSAs 1 and 2). According to Zummer, AUSA 1's attitude about the case changed after Zummer met with the OIG in 2013.[15] He said that AUSA 1 claimed that there was insufficient evidence to support a bribery conviction. Over a period of months, AUSA 1 and Zummer exchanged emails and memoranda evidencing their disagreement over whether the case was prosecutable.[16] AUSAs 1 and 2 ultimately recommended declination of the case in memoranda to USAO executive management in June and September 2014. Criminal Chief 1 and the new First Assistant (First Assistant 2) concurred and declined the case on September 23, 2014.[17]

Zummer and AUSAs 1 and 2 arranged to release evidence from the case to the Louisiana Attorney General's Office for possible state prosecution. The Louisiana Attorney General's Office ultimately declined the case as well.

The second case was an investigation of a parish president for corruption in connection with the cleanup of the BP oil spill in 2010 and for false statements. Zummer told the OIG that this case was neglected and "subtly suffocated" by prosecutors in response to his 2013 OIG complaint. Zummer told the OIG that the

---

[15] Zummer suggested that AUSA 1 may have become aware of Zummer's disclosure to the OIG as a result of OIG interviews that were conducted in the USAO. This disclosure included a recounting of an incident Zummer learned from another FBI agent concerning AUSA 1's alleged minimization of the amounts of a defendant's "kickbacks" in a different public corruption case that pled. According to Zummer, this minimization by AUSA 1 was allegedly to "maintain a good relationship with [the Defense Attorney]." The OIG did not interview AUSA 1 in its 2013 investigation of Zummer's allegations about First Assistant 1.

[16] In his comments to the draft report, Zummer stated that "the OIG ignores statements made regarding the reasoning for the declination, including grossly incorrect legal research and one AUSA manager's statement that he did not have enough 'political capital' in the office to have the case prosecuted."

[17] On February 3, 2014 after the new U.S. Attorney took office, he announced First Assistant 2 as his new First Assistant and named Criminal Chief 1 into his position. As a result, First Assistant 1 returned to being an AUSA.

case was initially assigned to an AUSA who became the Administrative AUSA under the new U.S. Attorney (who started in the fall of 2013).  Zummer stated when she moved into this position, she reassigned her cases, but this one "wasn't assigned…for about a year," but Zummer stated he "wasn't worried about [this] because [he] was worried about Morel" and another case.  Zummer told the OIG that he was removed from the case when he was transferred to to the counterterrorism squad in May 2015 and another agent was immediately assigned.

On February 1, 2017, approximately 6 years after the FBI began its investigation, and 1.5 years after Zummer's removal from the second case, the USAO's Acting Chief of the Criminal Division approved declining the case.  According to the declination memorandum, the FBI investigation did not reveal enough evidence to substantiate the allegations and the new case agent agreed with the USAO's assessment and requested the USAO close the case.[18]

### b. Denial of New Orleans Division's Proposal for Zummer to Become a SAUSA

Zummer told the OIG that in February 2014, SAC 1 and ASAC 1 proposed to USAO senior management the idea of sending over an FBI agent from the New Orleans Division to serve as a SAUSA to assist in prosecutions of violent crime cases.  ASAC 2 explained to the OIG that the New Orleans Division proposed establishing this position as a liaison between the FBI and the USAO to address the perceived slowness in prosecuting the FBI's cases.

ASAC 2 told the OIG that he and SAC 1 spent several months negotiating with the USAO in an attempt to establish the program, starting in the spring of 2014.  According to ASAC 2, the USAO leadership was "guarded" about the proposal, which he understood to be because the new U.S. Attorney was cautious about "alienating his workforce" by bringing in outside attorneys.  Despite the USAO leadership's lack of agreement to establish the position, ASAC 2 stated New Orleans Division executive management assembled a list of volunteers to serve as SAUSA after an informal meeting.

According to Zummer, ASAC 1 suggested that Zummer volunteer for the proposed SAUSA detail and told him that he was the New Orleans Division's first choice for the position.  Zummer told the OIG that it was his impression that FBI management considered him to be a strong candidate because of his prestigious legal education, clerkship experience, and their belief that he would aggressively prosecute cases and not be easily influenced by the USAO culture.

---

[18] In his written comments to the draft report, Zummer noted that "the crime in question had a five-year statute of limitations…[and] the new case agent had no reason to disagree with the declination since the statute of limitations had passed while the USAO failed to take action."  The USAO's declination memorandum did not mention the statute of limitations.  However, even if the case were declined due to the expiration of the statute of limitations, it would not change our analysis concerning whether the declination of this case and one other constitutes a personnel action.  *See* Section IV.B.2.b(1) below.

*This report may contain sensitive law-enforcement or privacy-protected information and is for authorized recipients only. Do not disseminate this report without the express written authorization of the U.S. Department of Justice Office of the Inspector General. Regarding this provision, please review the notice page of this report for additional information about your rights and obligations.*

Zummer said he attended an informational meeting about the SAUSA concept at the New Orleans Division on February 14, 2014 and that sometime later he told ASAC 1 he was interested in volunteering for the position. He told the OIG that the SAUSA opportunity was informal, a position was never formally established, and he was not required to submit an application.

On April 1, 2014, SAC 1 emailed ASAC 1 stating that he orally pitched Zummer for the SAUSA position to the USAO that afternoon, adding that he told the USAO he was primarily interested in Zummer working cases involving gangs and public corruption. Zummer stated that sometime in April 2014, ASAC 2 told him the USAO was not interested in appointing Zummer as a SAUSA. According to Zummer, ASAC 2 relayed the message he heard from either the U.S. Attorney or First Assistant 2 that Zummer's presence at the USAO would be "too much too soon." Zummer said that when he asked ASAC 2 what the "too much too soon" comment meant, ASAC 2 responded that Zummer was "too controversial." Zummer told the OIG that he understood this comment to refer to his 2013 OIG complaint. ASAC 2 told the OIG that although he could not recall the USAO leaders' exact verbiage, they felt that Zummer would not be "a good fit" for the office based on his interactions with some of the AUSAs and his resistance to compromise with other attorneys.

Zummer told the OIG that, after the USAO denied him the SAUSA position, he was aware that the New Orleans Division pitched the name of another FBI agent for a SAUSA appointment, but the USAO also rejected that agent. Zummer stated that no other FBI agent in the New Orleans Division had been a SAUSA since SSA Evans, who was a SAUSA at the USAO over ten years ago.[19] ASAC 2 told the OIG that after the FBI pitched several names, the USAO leadership told SAC 1 and ASAC 2 that they were not willing to establish a SAUSA position for the FBI.

In his April 2017 OIG interview, the U.S. Attorney stated that he remembered SAC 1 and ASAC 2 proposed the FBI SAUSA concept during one of his monthly scheduled meetings with First Assistant 2, SAC 1, and ASAC 2. The U.S. Attorney said he rejected the offer. He told the OIG that every couple of months agencies would ask if the USAO was interested in SAUSA opportunities, but he generally rejected these offers because he felt that the USAO had the resources to handle the caseload brought by the other agencies. He also stated that the USAO was in the process of forming a new Public Integrity Unit focused on civil rights and public corruption cases that included new AUSAs, and he wanted these AUSAs to do the work, not attorneys from other agencies.

### 3.    Zummer's Reassignment in New Orleans Division

In May 2015, after Zummer made negative comments about the USAO at a continuing legal education (CLE) class with local AUSAs and local defense counsel

---

[19] During his April 2017 OIG interview, ASAC 1 confirmed that he was a SAUSA from 2003 to 2004 and that he was the last FBI agent from the New Orleans Division appointed as a SAUSA for the USAO.

present, New Orleans FBI leadership transferred Zummer to the counter-terrorism squad, squad 7. The OIG was told by the FBI official who became SAC in the New Orleans Division in October 2015 (SAC 2), after Zummer's reassignment, that at a similar CLE event on April 8, 2016, Zummer was "disrespectful and sarcastic" toward the U.S. Attorney. SAC 2 said that he admonished Zummer after the CLE event for his behavior and talked to him about being professional and keeping his negative opinion of USAO attorneys to himself. Zummer told the OIG that his supervisor at the time, ASAC 3, also counseled him for being disrespectful toward the U.S. Attorney and SAC 2.

## B. Analysis of 2013 Disclosure and Retaliation Allegations

In this section, we address whether Zummer's 2013 disclosure alleging a conflict of interest between First Assistant 1 and the Defense Attorney qualifies as "protected" under the FBI Whistleblower Regulations. We next examine whether the two case declinations and denial of the SAUSA position qualify as personnel actions under the FBI Whistleblower Regulations.

### 1. Protected Disclosure

#### a. Legal Standards

For a disclosure to be considered "protected" under the applicable whistleblower regulations, it must meet two requirements: first, it must be made to one of the offices or officials designated in 28 C.F.R. § 27.1(a); second, the person making the disclosure must reasonably believe that it evidences a violation of a law, rule, or regulation, or that it evidences mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health of safety.[20] To satisfy the "reasonable belief" requirement, it is not necessary that the matter disclosed actually constitute any of the conditions specified in 28 C.F.R. § 27.1(a). Rather, the appropriate test is whether "a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably could conclude that the actions of the government evidence the wrongdoing in question."[21]

#### b. Disclosure to a Designated Office or Official

Zummer's 2013 disclosure satisfies the first requirement because the OIG is a designated office to receive disclosures under the FBI Whistleblower Regulations.[22] As described above, Zummer first disclosed information to the OIG on May 7, 2013, while being interviewed by the OIG regarding an unrelated matter,

---

[20] 28 C.F.R. § 27.1(a).

[21] *Lachance* v. *White*, 174 F.3d. 1378, 1381 (Fed. Cir. 1999) (interpreting identical language under the Whistleblower Protection Act); *Johnson* v. *Dep't of Def.*, 87 M.S.P.R. 454, 458 (2000).

[22] *See* 28 C.F.R. § 27.1(a).

*This report may contain sensitive law-enforcement or privacy-protected information and is for authorized recipients only. Do not disseminate this report without the express written authorization of the U.S. Department of Justice Office of the Inspector General. Regarding this provision, please review the notice page of this report for additional information about your rights and obligations.*

and made subsequent disclosures to the OIG in writing on May 17, 2013, June 5, 2013, and June 6, 2013.

### c.     Reasonable Belief

Zummer alleged that First Assistant 1's personal and financial relationship with the Defense Attorney created a conflict of interest and that First Assistant 1 should have recused himself from the Morel case. For the reasons explained below, we found that Zummer had a reasonable belief that the information he reported to the OIG evidenced that First Assistant 1 had a conflict of interest with regard to cases involving the Defense Attorney.

Zummer's disclosure is best characterized as an allegation of a violation of Section 502 of the Standards of Ethical Conduct for Employees of the Executive Branch, 5 C.F.R. § 2635.502(a). Section 502 prohibits an employee from participating in a matter without prior approval from the agency's designee in instances when a party to the matter or someone who represents a party in the matter has a "covered relationship" with the employee, where the matter is likely to have a "direct and predictable effect" on the financial interest of the other party, and where the employee determines that "the circumstances would cause a reasonable person with knowledge of the relevant facts to question his impartiality in the matter."[23] An employee has a "covered relationship" with another whom "the employee has or seeks a business, contractual or other financial relationship that involves other than a routine consumer transaction."[24] A "direct and predictable effect" on an individual's financial interest is defined in the Standards as a "close causal link between any decision or action to be taken in the matter and any expected effect of the matter on the financial interest."[25] Further, the U.S. Attorney's Manual, Section 1-4.310, *Outside Activities Generally*, prohibits employees from engaging in any outside activity that may "create or appear to create a conflict of interest with their official duties." This section cites specifically to 5 C.F.R. § 2635.502 as an example of when this conflict could exist, namely if the outside activity would "create an appearance that the employee's official duties were performed in a biased or less than impartial manner (5 C.F.R. § 2635.502)."

The primary basis for Zummer's allegation against First Assistant 1 was the financial relationship between First Assistant 1 and the Defense Attorney, specifically the property records Zummer found showing that First Assistant 1 and the Defense Attorney co-owned a condominium still encumbered by a mortgage. The financial relationship between First Assistant 1 and the Defense Attorney as co-owners of real estate qualified under 5 C.F.R. § 2635.502 as a "covered relationship" between them. The Defense Attorney represented Morel, and Zummer believed First Assistant 1 knew this, especially after a meeting in April 2013 in which First Assistant 1 participated and the Defense Attorney's

---

[23] 5 C.F.R. § 2635.502(a).

[24] 5 C.F.R. § 2635.502(b)(1).

[25] 5 C.F.R. § 2635.402(b)(1)(i).

representation of Morel was discussed. Any official decision or action in a prosecution involving the Defense Attorney's legal practice would be likely to have a "direct and predictable effect" on the Defense Attorney's finances.

Because First Assistant 1 participated in the April 2013 meeting with the FBI about the Morel case, Zummer believed that First Assistant 1 had previously participated in the case in a meaningful way, even though the OIG later found that not to be the case and that he had no impact on the declination decision. Nevertheless, we concluded that Zummer had a reasonable basis to believe that the information he provided to the OIG evidenced violations of the ethical provisions in the C.F.R. Therefore, we found that Zummer reasonably believed that his disclosure evidenced a violation of a law, rule, or regulation.

## 2. Retaliatory Personnel Actions

### a. Legal Standards

Under 5 U.S.C. § 2303, it is unlawful for the FBI to take or fail to take a personnel action because of a protected disclosure. Section 2303 defines a personnel action as "any action described in clauses (i) through (x) of section 2302(a)(2)(A) of this title with respect to an [FBI] employee." The FBI Whistleblower Regulations, on the other hand, prohibit retaliatory personnel actions by the FBI or employees of any other Department component, and define "personnel action" as "any action described in clauses (i) through (xi) of section 2302(a)(2)(A)." By further contrast, § 2302(a)(2)(A), the statute generally applicable to non-FBI whistleblowers, contains 12 – not 10 or 11 – definitions of personnel action:

> (i) an appointment; (ii) a promotion; (iii) an action under chapter 75 of this title or other disciplinary or corrective action; (iv) a detail, transfer, or reassignment; (v) a reinstatement; (vi) a restoration; (vii) a reemployment; (viii) a performance evaluation under chapter 43 of this title[]; (ix) a decision concerning pay, benefits, or awards, or concerning education or training if the education or training may reasonably be expected to lead to an appointment, promotion, performance evaluation, or other action described in this subparagraph; (x) a decision to order psychiatric testing or examination; (xi) the implementation or enforcement of any nondisclosure policy, form, or agreement; and (xii) any other significant change in duties, responsibilities, or working conditions.

Hence, neither § 2303 nor the Regulations currently parallel § 2302(a)(2)(A)'s 12-part definition of personnel action. The OIG understands that the Department has proposed to revise the Regulations in order to, among other things, encompass all definitions of personnel action found in § 2302(a)(2)(A), including clause (xii),

currently outside the Regulations' ambit.[26]  In light of the expected change to the Regulations, and in keeping with Congress's clear intent to legislate broadly in this area and the OIG's general jurisdiction over the Department's operations, the OIG will assume for purposes of this review that the definition of personnel action includes "any other significant change in duties, responsibilities, or working conditions."

### b.     Personnel Actions

### (1)     Declination of Cases

A decision by the USAO to decline prosecution of a case is not specifically listed as a "personnel action" in § 2302 or under the FBI Whistleblower Regulations, and a declination decision most directly impacts the subject of the case rather than the employment status of the investigating agent.  However, we considered whether the case declinations by the USAO qualified as "significant changes in duties, responsibilities or working conditions" under 28 C.F.R. § 27.2(b) and 5 U.S.C. § 2302(a)(2)(A)(xii).  Not every change in an employee's work routine or specific assignments will qualify as "significant."[27]

We do not believe that the USAO's decision to decline these two cases constituted a "significant change in working conditions" amounting to a personnel action.  Notably, we found that the USAO's declinations of the two cases were not part of a broader effort to interfere with Zummer's criminal investigations or otherwise force him out of criminal investigative work, nor did it have that effect.  After declination of the first case in September 2014, Zummer's duties and responsibilities did not change regarding investigating public corruption cases until his leadership moved him to the counter-terrorism squad in May 2015 for unrelated reasons.  Zummer has not alleged that this reassignment was in retaliation for his

---

[26]  In 1978, when Congress first enacted 5 U.S.C. § 2303, "Prohibited Personnel Practices in the Federal Bureau of Investigation," § 2302 contained only 10 definitions of "personnel action," the tenth of which, operating as a kind of catch-all provision, defined "personnel action" to include "any other significant change in duties, responsibilities, or working conditions."  In 1994, Congress added an eleventh definition of "personnel action" to § 2302, "a decision to order psychiatric testing or examination," which became clause (x), while the "significant change in duties" catch-all provision became clause (xi).  Congress did not, however, at that time – or at any time since – similarly amend the language of § 2303 to reflect § 2302's expanded definition of "personnel action."  Nevertheless, on November 1, 1999, the Department amended the FBI Whistleblower Regulations to, among other things, restore the "significant change in duties" provision – which became clause (xi) under the amended Regulations – and thereby realign the Regulations with § 2302's expanded definition of "personnel action."  Thirteen years later, in 2012, Congress added a twelfth definition of "personnel action" to § 2302, "the implementation or enforcement of any nondisclosure policy, form, or agreement," which it codified at clause (xi) moving the catch-all provision to clause (xii).  The Department has not, until now, undertaken to amend the Regulations to reflect the addition of another clause to § 2302 and once again realign the Regulations with § 2302's expanded definition.

[27]  *See, e.g.*, *Pyron* v. *Dep't of Transp.*, SF-1221-15-0076-W-1, 2016 WL 686888, ¶ 13 (M.S.P.B. Feb. 19, 2016).

protected disclosures, and we did not find evidence to support such an allegation in any event.

Moreover, even after declination of the first case, AUSA 2 assisted Zummer to continue fulfilling his normal FBI duties by obtaining authorization to release the grand jury records to the Louisiana Attorney General's Office for investigation and prosecution of state violations for the declined case.  As described below, Zummer continued to work on the Morel case and was eventually successful in convincing the USAO to reopen the Morel case, which ultimately led to Morel's guilty plea in April 2016.[28]

The declination of the second case did not occur until well after Zummer had been reassigned to another squad, so it had no impact on his working conditions.

Accordingly, we found that the USAO's decision to decline prosecution of these cases did not create a significant change in working conditions for Zummer amounting to a personnel action under 28 C.F.R. § 27.2(b) and 5 U.S.C. § 2302(a)(2)(A)(xii).[29]

## (2)    Denial of SAUSA Opportunity

As stated, Zummer further alleged that he was denied a detail opportunity as a SAUSA in retaliation for his protected disclosures.  However, we found that the detail opportunity in question consisted of preliminary discussions between FBI and USAO officials.  The USAO's decision not to support the FBI's request to establish a detail opportunity does not constitute a personnel action or a failure to take a personnel action under 5 U.S.C. § 2302(a)(2)(A)(iv) ("a detail, transfer, or reassignment") or  relevant case law.  Therefore, the denial is not subject to redress under 5 U.S.C. § 2303 and the FBI Whistleblower Regulations.

In *Ruggieri* v. *Merit Sys. Prot. Bd.*, 454 F.3d 1323, 1326-1327 (Fed. Cir. 2006), the Court found that the cancellation of an advertised vacancy constituted a personnel action under section 2302(a).  In *Ruggieri*, the agency announced the vacancy, accepted applications, and interviewed Mr. Ruggieri before canceling the announcement and sending him a letter advising he was not selected.  *Id.* at 1324, 1326.

In this case, the SAUSA detail was never formalized into an actual position or detail to meet the court's threshold for an actual detail or reassignment

---

[28]  Zummer and his leadership briefed the U.S. Attorney on the Morel case on November 7, 2013, shortly after the U.S. Attorney started in the USAO.  By March 14, 2014, the U.S. Attorney assigned a different AUSA to work with Zummer to determine whether to reopen the USAO's prosecution against Morel.  This new AUSA and Zummer worked together closely from 2014 through April 2015 to uncover more than 20 additional victims.  *See* Section V of this report for more details on Morel's conviction.

[29]  In his written comments to the draft report, Zummer stated that he "agree[d] with the OIG's conclusions that...the declination or mishandling of criminal cases are not personnel actions that would constitute retaliation under 5 U.S.C. § 2303."

opportunity. Instead, we found that the New Orleans Division leadership sought to set up a detail or a manpower authorization for a SAUSA program at the USAO to improve the prosecution of FBI cases, but their efforts were not approved at any time by either the USAO or FBI HQ. While the USAO executive leadership listened to SAC 1's and ASAC 2's proposal to establish an FBI SAUSA and fielded a few potential names for the proposed position, they never agreed to the concept, or worked to develop an actual position description for an FBI SAUSA position or detail.

The SAUSA opportunity never ripened to the point where Zummer was required to submit an application or compete for the detail. There were no vacancy announcements, resumes or writing samples submitted, or interviews conducted. As a result, we found the SAUSA position was not established as an FBI detail within the USAO. Accordingly, we found the USAO's decision not to establish a SAUSA position was not a personnel action that would support a reprisal claim under the FBI Whistleblower Regulations.[30]

## V.  Zummer's 2016 Disclosures and Complaints

### A.  Zummer's Disclosure to the Judge in the Morel Case

From 2013 to 2015 Zummer and the New Orleans Division continued to investigate Morel to develop additional evidence concerning Morel's sexual propositioning of female defendants. In 2014, at the direction of the U.S. Attorney, a new AUSA assisted Zummer to further develop the Morel case for potential prosecution. Plea negotiations with Morel began in May 2015, but Zummer "objected to the plea offer" because "the victims deserved justice in the form of an indictment."[31] On March 30, 2016, the USAO reached a plea agreement with Morel under which Morel would plead guilty to one count of Obstruction of Justice in violation of 18 U.S.C. § 1512(d)(1), which carries a maximum penalty of 3 years confinement and/or a fine of $250,000. Morel's sentencing was scheduled for August 17, 2016.

Zummer told the OIG that on April 20, 2016, he asked SAC 2 whether he could send a letter to Judge Kurt Engelhardt, the judge in the Morel case, about his concerns with potential prosecutorial misconduct in the USAO that negatively influenced the Morel case. Zummer stated to the OIG that SAC 2 told him to

---

[30] As noted above, in his written comments to the draft report, Zummer stated that he "agree[d] with the OIG's conclusion[] that the denial of the Special Assistant U.S. Attorney position…are not personnel actions that would constitute retaliation under 5 U.S.C. § 2303."

[31] Zummer noted in his written comments to the draft report that he "would not have objected to a plea agreement with a potential sentence commensurate with Morel's crimes and a factual basis that disclosed his full misconduct instead of concealing it from the public." Zummer also noted that the Morel plea agreement "with only a three-year maximum sentence was the lowest of all maximum sentences for any of the thirty or so felony convictions for which [he had] been the case agent, but Morel committed the worst crimes [he] had investigated."

*This report may contain sensitive law-enforcement or privacy-protected information and is for authorized recipients only. Do not disseminate this report without the express written authorization of the U.S. Department of Justice Office of the Inspector General. Regarding this provision, please review the notice page of this report for additional information about your rights and obligations.*

consult with the Chief Division Counsel (CDC) for the FBI's New Orleans Division about the letter.

In May 2016, Zummer drafted a detailed letter to Judge Engelhardt alleging misconduct by the USAO in connection with the Morel investigation and plea agreement. His draft letter alleged, among other things, that:

- First Assistant 1's involvement in the Morel case in 2013 caused the appearance of a lack of impartiality due to First Assistant 1's financial relationship with Morel's attorney;

- Members of the USAO present for the 2013 declination had created an appearance of a lack of impartiality regarding the case due to the USAO's allegedly improper 2013 declination decision, and therefore should have recused themselves from further participation in the case;

- Any USAO consideration of the case after Zummer's 2013 OIG complaint against First Assistant 1 raised the appearance of a lack of impartiality because the USAO had an interest in avoiding a public scandal;

- Morel's plea agreement and associated factual basis were tainted by the USAO's lack of impartiality in the matter. As a result of this bias, the factual basis for the plea was changed to omit relevant facts about Morel's conduct with other women;

- Criminal Chief 2 intentionally modified the factual basis to withhold details of Morel's uncharged conduct because of concern that the judge would reject the plea if the presentence investigation report contained evidence of such conduct; and

- Zummer was retaliated against for his 2013 OIG complaint as described in the previous section.

Zummer shared his draft letter with the CDC, who forwarded it to an FBI Office of the General Counsel (OGC) Deputy General Counsel (DGC) on May 10.

On May 31, an OGC Assistant General Counsel (AGC 1) responded to the CDC, stating as a "bottom line" that:

New Orleans should direct SA Zummer NOT to send the letter to the Court without prior authorization from the Department of Justice (DOJ). New Orleans should further advise SA Zummer that he is free to provide his letter to any of the DOJ/FBI entities identified in the FBI Whistleblower Regulations, 28 C.F.R. Part 27, and seek authorization from any of the DOJ entities listed, including DOJ's Office of Inspector General (OIG) and DOJ's Office of Professional Responsibility (OPR), to send his letter to the Court.

Citing part 2 of the FBI's Manual of Investigative Operations and Guidelines (MIOG), § 6-13, AGC 1 also stated that "the FBI does not have independent litigating

authority and must communicate with Courts in pending matters through the Department of Justice." Lastly, AGC 1 identified information in the letter that was "legally privileged/protected," including information about USAO deliberations that "are clearly subject to the Deliberative Process privilege and may also constitute Attorney Work Product," as well as personal information that is protected from disclosure under the Privacy Act.

On the basis of this advice from OGC, SAC 2 told Zummer in an email on May 31 that:

> Based on OGC's Legal Analysis we are directing you NOT to send the letter to the Court without prior authorization from the Department of Justice (DOJ). We are further advising that you are free to provide your letter to any of the DOJ/FBI entities identified in the FBI Whistleblower Regulations, 28 C.F.R. Part 27, and seek authorization from any of the DOJ entities listed, including DOJ's Office of Inspector General (OIG) and DOJ's Office of Professional Responsibility (OPR), to send your letter to the Court.

SAC 2's email followed an in-person meeting with Zummer and ASAC 1 in which the same instruction was conveyed orally to Zummer.[32]

Zummer sent his draft letter to the OIG on June 2, requesting authorization by July 8, 2016 to submit it to the court. With Zummer's consent, the OIG forwarded his April 2016 complaint about the new Criminal Chief (Criminal Chief 2)[33] and draft letter to OPR on June 16 because it related to the conduct of Department attorneys in connection with pending litigation. After several inquiries from Zummer, on August 11 a DOJ OPR attorney emailed Zummer, stating that it was "inappropriate for DOJ/OPR to comment on whether … you should send your proposed letter to the court for its consideration. That is a matter for you and your supervisors, and for FBI management, to resolve in accordance with applicable Department policies and procedures."

In the meantime, on July 24, the squad 12 SSA requested Zummer's reassignment from the counter-terrorism squad to squad 12 to assist with a highly

---

[32] Zummer was never provided with the original May 31, 2016 FBI OGC response that was sent to the CDC (which was three pages long), but only the e-mail described in this paragraph. Zummer told us that the SAC and CDC had the OGC response during the meeting and read at least some of it to him but that he did not see OGC's original e-mail and did not remember anything except being provided instructions on to whom to send his letter.

[33] In April 2016, Zummer sent an email complaint to OIG investigators detailing prosecutorial misconduct allegations against Criminal Chief 2 concerning the Morel plea agreement negotiations. The OIG advised Zummer the OIG would refer his complaint to OPR and requested Zummer's consent to reveal his identity to OPR. Once the OIG received Zummer's consent, the OIG sent both the April 2016 complaint and the draft letter to OPR in the same referral package.

sensitive joint public corruption investigation with the OIG, referred to in this report as the DEA case.

On August 8, while he was still awaiting DOJ OPR's response, Zummer sought review of his draft letter to the judge, which Zummer referred to as the "misconduct letter" as well as a shorter letter to the judge, which he referred to as a "notification letter,"[34] by the Records/Information Dissemination Section (RIDS) within the Records Management Division (RMD) for "prepublication review." Zummer requested permission from RIDS to release both letters to the judge and to the media.[35] Zummer's submission to RIDS stated that he was acting "in my personal capacity under the First Amendment" rather than in his official capacity. Zummer told us that he previously discussed requesting prepublication review with the CDC in June, but that she had strongly discouraged him from doing so. He said he decided to request it in August because he was frustrated with the lack of a response from DOJ OPR and the sentencing hearing in the Morel case was just over a week away.

On August 11, after receiving DOJ OPR's email declining to opine on his request, Zummer submitted an updated version of the misconduct letter to RIDS, and, in it, noted that DOJ OPR "advised that it would be inappropriate for it to comment on whether [Zummer] should send the letter" to the Court. The draft misconduct letters that Zummer submitted to RIDS contained essentially the same allegations that were in the version of the letter he submitted to the CDC in May, described above.

During an email exchange with FBI New Orleans leadership on August 11, Zummer stated, "I will not send the letter in my official capacity if the FBI orders me not to" and that he would not file anything in his personal capacity unless he obtained approval through the prepublication review process.

On August 11, the RIDS Assistant Section Chief (ASC) contacted the Assistant Director (AD) of FBI's Office of Integrity and Compliance (OIC), asking for

---

[34] The notification letter alerted the judge that he was seeking permission from the FBI and the Department "to send a letter to the court describing prosecutorial misconduct associated with the Morel case" and described the efforts he had undertaken to that point to obtain permission to send the longer misconduct letter. Zummer told the OIG that because he was inside the 30 business days required by policy for a prepublication review, he provided the shorter notification letter hoping that RIDS would review it first and allow him to release it to the judge to alert him of the pending, longer misconduct letter. Zummer was hopeful that, meanwhile, RIDS could review the misconduct letter.

[35] Under the prepublication process, RIDS reviews disclosures of FBI information "outside of official use" to protect disclosure of FBI information while "ensur[ing] adequate protections for FBI personnel's constitutionally protected rights as citizens." FBI policy sets forth that "[a]ll information created and acquired by current and former employees…in connection with official FBI duties, as well as all official material to which FBI personnel have access, is property of the United States." As such, current and former FBI personnel must submit any proposed disclosure of FBI information outside of their official duties (such as for inclusion in books, articles, or lectures) to RIDS for review under the prepublication process. Zummer was familiar with the prepublication review process because he had previously submitted a manuscript about his experience as a Marine for prepublication review.

OIC's "insight" on how to handle Zummer's request.[36]  The ASC did not provide OIC with Zummer's letters but instead described the letters stating:

> [i]n a nutshell, these entail letters to a federal judge from the agent alleging prosecutorial misconduct in a case the agent worked on.…The agent feels compelled to write to the Judge directly before sentencing…because (he alleges) he's not getting the green light to raise his concerns via the DOJ-OIG/OPR/management, etc and thus is being "silenced" by DOJ.

> …The agent presents the letters to the Judge as his own "first amendment" [sic] viewpoints and not those of DOJ/FBI to the Judge but the substance of his misconduct allegations, of course, are inseparable from the performance of his official duties as the agent on the case.

> The Prep-pub policy guide(4.1.3) [sic] prescribes that it doesn't apply to writings in the performance of official duties which begs the question, are the letters "in the performance of official duty."

In response, the OIC AD stated:

> Here's my thoughts on this.  First, and perhaps foremost, is to advise the agent that he doesn't need any given "green light" to convey his concerns to the DOJ IG or DOJ OPR.…He may and perhaps should, of course, first report such allegations to his SAC but he is not required to do so and may go directly to the IG/DOJ-OPR.  Second, if he feels compelled to bring certain matters regarding the case to the judge directly because he believes a miscarriage of justice would otherwise occur, then he may do so but it is highly advisable to first inform his SAC, so that the latter can provide such information and counsel as may be appropriate and of which the agent may be unaware.  The SAC can then make the decision as to what advance notice of the proposed disclosures are necessary or appropriate to give to the U.S. Attorney's office.  It will hardly be conducive to the working relationship between the field office and the USA office if the prosecution is "blindsided" in addition to being accused of misconduct.  Additionally, if the agent proceeds with disclosure to the court, he must first consider whether disclosure would violate a statute…whether the information in question is classified, would compromise a confidential human source, or otherwise be problematic and, if so, take such measures as may be feasible to avoid or mitigate the adverse consequences.  That may be why he is seeking pre-publication [sic] review but, I agree that this is not a matter for routine prepublication review since the contemplated

---

[36]  OIC provides ethics advice within the FBI and oversees the FBI's compliance program to identify risk areas where the FBI may be at risk of violating a law, regulation, or policy during mission operations.

"publication" here would take place in the course of the performance of his duties. In my view, the best course, for him to pursue is to inform his SAC and to convey his allegations to DOJ OPR (or the DOJ IG although I think DOJ OPR would have jurisdiction here). DOJ OPR can then decide whether and how the court should be notified.

The OIC AD stated to the OIG that he only "skimmed" Zummer's proposed letter. The OIC AD explained that he looked at whether Zummer could release it to the judge and had concluded, "if no one is objecting [to the release of the letter], then okay, fine. But I didn't buy his argument that he could step out of his official capacity at the drop of a hat and say this is in my personal capacity, particularly,...in the context of an ongoing trial." The OIC AD told the OIG that this email was not official advice to RMD or OGC about the matter and the email was the end of his involvement. The OIC AD stated he never spoke to Zummer concerning the release of the letter. Zummer told us he never received OIC's input to RMD, and our review of emails did not indicate it was ever forwarded to him.

On August 12, the ASC advised Zummer by letter that Zummer's two letters, as submitted on August 8, 2016, were not subject to prepublication review with regard to their release to the judge as the proposed release related to his official duties under paragraph 4.1.3 of the Prepublication Review Policy Guide. The ASC also advised Zummer that RIDS' letter did not constitute release authorization.

According to Zummer and the FBI's lead agent for the DEA case, they met over the weekend of August 13-14 to discuss Zummer's letter.[37] According to Zummer and the lead agent, the lead agent recommended to Zummer that he remove a particular name from the letter because of potential implications for a different, sensitive investigation.[38] The lead agent told the OIG that he also told Zummer, "I think it's probably wise not to put anybody's name in there" and "as a general practice, I don't know that it's good to list anybody's names in there."[39] According to the lead agent, Zummer responded, "I will remove your guy's name." As a result of the conversation with the lead agent, Zummer replaced one name in the letter with "AUSA Manager 1," but left everyone else's names in the letter.

On August 15, at 10:07 p.m., Zummer sent a further updated version of his letter from his personal email account to Judge Engelhardt's clerk (August 15

---

[37] At that time, Zummer was working on the DEA case with the FBI's lead agent and this agent knew about Zummer's draft letter. Zummer told the OIG that the FBI's lead agent for the DEA case was concerned about having AUSA Manager 1's name in the letter as AUSA Manager 1 was related to the DEA case.

[38] The squad 12 SSA told the OIG, "I think, I know...we had had discussions concerning, you can't name [AUSA Manager 1] in this letter." However, Zummer told the OIG that the squad 12 SSA "never had a conversation or conversations with [him] about [his] letter to Judge Engelhardt in which [squad 12 SSA] told [Zummer] not to name AUSA Manager 1 and not to discuss anything regarding AUSA Manager 1 in the letter."

[39] Zummer stated in his written comments to the draft report that he did not recall the lead agent suggesting that he remove all the names from the letter.

letter). Zummer's August 15 letter to the judge included the same allegations described above, plus an allegation that the Department and the FBI failed to notify the Court of his initial allegations and violated Zummer's First Amendment rights to disclose his letter to the Court. In his letter, Zummer used his home mailing address, but identified himself as the FBI case agent in the Morel investigation. He noted he was writing the Court "as a private citizen under the First Amendment" and stated he did not represent the FBI or the government. He stated that his purpose in writing the letter was to report misconduct by several attorneys in the USAO that he believed impacted Morel's prosecution, resulting in an unjust plea agreement that covered up the USAO's misconduct.

Zummer stated in the August 15 letter that he was "notifying the FBI of the submission to allow the FBI the opportunity to dispute the issue" of whether his letter was protected under the First Amendment and stated that the FBI "[could] argue that issue before this Court and ask to have the letter returned or sealed." Zummer asked the Court in the letter to place it in the public record should the FBI not seek to have it returned or sealed or should the Court determine that Zummer's letter be protected under the First Amendment. He further stated in the letter that he "[would] not submit [the] letter to the media, unless this Court puts it in the public record."

In his August 15 letter to the judge, Zummer acknowledged that he did not have permission from anyone in the Department or the FBI to send his letter to the judge. He told the OIG that he decided to send the letter on August 15 because he had not received a clear answer to his requests for permission and he thought he should give the judge at least a full day before the sentencing hearing scheduled for August 17 to review the letter. Zummer told us that he hoped the letter would cause the judge to reject the plea agreement at sentencing or take other steps to further examine the plea.

On August 16, the day after Zummer sent the letter to the judge, the CDC received another legal opinion from another FBI Deputy General Counsel (DGC 2) with additional analysis as to why Zummer should not be allowed to send his letter to the Court. Among other things, DGC 2 stated that Zummer should be instructed not to submit the letter because it contained privileged and confidential FBI information. Further, DGC 2 noted that the New Orleans Division should advise Zummer that the FBI may only communicate with the court through the Department.

On that same day, August 16, Zummer emailed a copy of the letter he sent to the judge to SAC 2, ASAC 1, the CDC, the ASC, and others explaining that he asked the court not to release the letter as part of the public record until the FBI had an opportunity to be heard. There is no evidence Zummer provided a copy of his letter to the Defense Attorney. The CDC responded that Zummer only learned the information contained in his letter in his official capacity and that he had been directed not to file it without the Department's approval. The CDC "urged" Zummer to retract the letter. She also shared with him DGC 2's advice from earlier that

day, as described above. Zummer replied to the CDC, maintaining that not all of the relevant sentencing information was before the court due to the USAO's charging decisions. Zummer wrote in response that he refused to retract his letter.

The FBI New Orleans Division provided a copy of Zummer's letter to the U.S. Attorney. The U.S. Attorney sent an *in camera* letter to the Court on August 16, asserting privileges over matters discussed in Zummer's letter, stating that Zummer filed it without authorization from the USAO or the FBI and that all pertinent sentencing information was submitted to the U.S. Probation Office, and requesting the immediate return of the letter. The judge acknowledged receiving Zummer's letter at the sentencing hearing the next day, August 17, but said he would not make it available as part of the public record until he heard first from the government concerning the issue. The USAO filed a response on September 6, arguing that Zummer's letter did not constitute private citizen speech protected by the First Amendment and that the United States timely and properly asserted privileges over the majority of the letter. The response urged the Court not to allow "Zummer to use the Court's criminal docket as a platform to air his internal, work-related grievances against the Department of Justice (DOJ)." Zummer filed a second letter with Judge Engelhardt on September 6, which addressed legal privileges not covered in his first letter that he anticipated the USAO would assert in their response. Zummer did not obtain pre-approval with the FBI or the Department to file this letter.

Judge Engelhardt issued a ruling on September 15, 2016, declining to order any public disclosure of Zummer's August 15 letter but not returning it to the government either. Judge Engelhardt stated in his order that Zummer's letter presented no new information relative to the charge Morel pled guilty to and thus had "no relevance" on the issues before the court. With regard to the extrinsic information Zummer presented in his letter and his disagreement with the USAO, Judge Engelhardt noted that "the record of this criminal case is not the appropriate venue for publication of such information."

## B. Actions Taken Against Zummer Following His Letter

The following section details the allegedly retaliatory actions the FBI took against Zummer as a reprisal for his August 15 letter to the judge. Zummer told us that he did not believe the FBI retaliated against him for any of his 2016 communications with the OIG or DOJ OPR prior to the release of his letter to the judge.

### 1. Actions Taken Regarding Zummer in August and September

According to Zummer, the squad 12 SSA told Zummer on August 16, 2016 to cease his participation in the sensitive DEA case. Zummer stated to the OIG that during the week of August 22, the squad 12 SSA advised him that he (Zummer) was in a "holding pattern" regarding investigative duties upon his return from teaching a course in New Mexico. Zummer told the OIG that after he returned to

*This report may contain sensitive law-enforcement or privacy-protected information and is for authorized recipients only. Do not disseminate this report without the express written authorization of the U.S. Department of Justice Office of the Inspector General. Regarding this provision, please review the notice page of this report for additional information about your rights and obligations.*

New Orleans, the squad 12 SSA again advised him on August 29 that he was not to engage in any investigative activities. Zummer told OIG investigators that on August 30, the squad 12 SSA and the squad 5 SSA (who oversaw the Morel case) told Zummer he was suspended from investigative activities due to his unauthorized disclosure to Judge Engelhardt and instructed him to move his desk to the Division's empty nurse's office on a different floor away from his current squad, squad 12. None of the other investigative squads are located on the second floor with the nurse's office. Zummer stated to the OIG that he had access to his computer in the nurse's office, but his access to any prohibited and restricted public corruption case files was revoked, and all his sources except one were reassigned to other agents. However, Zummer stated that he still had access to the terrorism cases from his prior squad during this time.

Zummer told the OIG that he believed his reassignment to the nurse's office on the second floor and removal of his access to the public corruption cases were in retaliation for releasing his letter to Judge Engelhardt. Zummer further told the OIG that he did not believe these actions to be retaliation for providing information to the OIG. He recalled the squad 12 SSA telling him on the day these actions occurred that they were taken because the division management believed he would continue to improperly disclose information, and they could no longer trust him not to do so.

The squad 12 SSA, ASAC 1, and SAC 2 explained that these actions were all taken because they were concerned Zummer would continue to leak sensitive case information.[40] The squad 12 SSA told the OIG:

> So what concerned me about [Zummer's release to the judge] was that he was laying out his frame of mind of reference that if, if Mike felt today that anything that he learned yesterday…that he could tell because he exerts the ability to do that….
>
> ….
>
> So the concern was for this case, but also the DEA case that was going on and any other cases that he had exposure to in working public corruption matters on the squad.

---

[40] In his written response to the draft report, Zummer stated:

Based upon the process that I went through, the limited disclosures that I made, and that my only *public* disclosures have been through prepublication review, the SAC, ASAC, and Squad 12 SSA's concerns that I would suddenly, rashly release sensitive information to the public without permission are baseless. (Emphasis in original).

Zummer released his letter publicly in March 2017 after completing the prepublication review process. We note that the squad 12 SSA, ASAC 1, and SAC 2 provided the OIG their reasoning for their actions with respect to Zummer immediately following his August 15, 2016 disclosure to the judge. At that point, the FBI was awaiting the Court's decision on how it would handle Zummer's letter, which was not resolved until the Court issued its decision on September 15, 2016.

*This report may contain sensitive law-enforcement or privacy-protected information and is for authorized recipients only. Do not disseminate this report without the express written authorization of the U.S. Department of Justice Office of the Inspector General. Regarding this provision, please review the notice page of this report for additional information about your rights and obligations.*

The squad 12 SSA stated to the OIG that the mere fact Zummer wanted to discuss case material with someone outside the investigation or prosecution team was troubling, so they removed him from the DEA case and other public corruption cases. The squad 12 SSA explained that along with the other steps taken, moving Zummer away from the rest of his squad was "necessary to limit his exposure to other sensitive material" until the FBI could address Zummer's unauthorized disclosure to the judge. According to the squad 12 SSA, the division was running 5 to 6 sensitive public corruption investigations and agents often talked freely about these cases in the squad area, so they wanted Zummer away from these discussions.

ASAC 1 told the OIG that Zummer's removal from the DEA case and from all public corruption investigations was due to their "concerns about what else he may one day…or any day think that he needs to release to the public." ASAC 1 further explained that these concerns emanated from Zummer's release of the letter to the court and his desire to release the letter to the media. ASAC 1 stated that the decision to remove him from public corruption cases was made by the management team, up to and including SAC 2.

SAC 2 told the OIG the following about his concerns with Zummer's decision to release the letter to the judge:

> I had an employee that…after this letter was disclosed that I believe was a risk because [Zummer] made the decision that,…without approval, that he could release any information that he came into…the hold of, if he believed that something improper was happening or whatever his view of the world was.

SAC 2 told the OIG that he was concerned about the appropriateness of having Zummer on the DEA case as SAC 2 believed the letter contained information regarding the DEA case. SAC 2 was also concerned with having Zummer involved in any sensitive public corruption cases after Zummer released the letter "based on his own belief of the law and his position in our view to disclose information, which meant he was a risk to our cases, and [there] was a risk to having him walking around our squad area."

Zummer told the OIG that when he was initially removed from his investigations, he had little work to do from the nurse's office for about a month. According to Zummer, this changed when the squad 12 SSA informed Zummer that he would be representing the FBI on a fraud task force in another judicial district instead of working on public corruption cases. Zummer explained to the OIG that he did not believe his assignment to the fraud task force to be retaliatory, but an attempt to allow him to work in another district. The squad 12 SSA told the OIG that squad 12 was also responsible for frauds against the government, so this task force was part of the squad's mission.

Zummer stated to the OIG that on September 14, ASAC 1 and another ASAC notified him that he was to remain on the first and second floors of the building

unless specifically required elsewhere for his current assignment. The Unit Chief for one of the OGC Employment Law Units (OGC Unit Chief), who was consulted on this decision, told the OIG that he advised the CDC on this issue and the main concern was that Zummer was being disruptive on the squad floors after he was assigned to the nurse's office. The OGC Unit Chief stated that Zummer was "trying to buttonhole people and rally them to his cause…[a]nd so we were restricting him from going back up to the floor that he was working on." SAC 2 confirmed the issue the OGC Unit Chief described with the OIG, stating that Zummer was "creating a major morale issue in the division" by "walking around and being a jailhouse lawyer."[41] However, ASAC 1 told the OIG that they were not having any behavior issues with Zummer that prompted his restriction to the lower two floors of the building, but that division leadership was concerned that by being on the squad floors, "he may become privy to information that he may decide he's going to…tell the public about."

Zummer told OIG investigators he asked ASAC 1 on September 16 to be returned to investigative work after promising to ASAC 1 that he would not send any more letters to judges on other cases. Zummer again asked ASAC 1 by email to be returned to investigative work on September 23, but ASAC 1 responded that:

> [B]ecause you have taken the position that information you personally gather in the performance of your duties as an FBI Special Agent may be disclosed by you as a private citizen should you determine there is a need despite being instructed not [to] do so and without authorization, you have made it impossible for us to assign you [to] investigative work.

## 2. Zummer's Suspension

On August 22, 2016, the OGC Unit Chief referred Zummer to SecD, Analysis and Investigations Unit (AIU), with a recommendation that Zummer's security clearance be suspended for violations of Adjudicative Guideline E (Personal Conduct) and Guideline K (Handling Protected Information) due to his August 15, 2016 letter to Judge Engelhardt. The OGC Unit Chief forwarded copies of several emails concerning Zummer's efforts with DOJ OPR and RIDS to obtain permission to release his letter, and the August 15, 2016 letter filed with Judge Engelhardt. The OGC Unit Chief also forwarded FBI OGC's advice to the CDC stating that Zummer should not release his letter to Judge Engelhardt; the CDC's August 16, 2016 advice to Zummer after he forwarded the letter to the judge; and FBI OGC's and FBI OIC's guidance to RIDS on handling Zummer's initial prepublication review request.

---

[41] SAC 2 provided this information in response to an inquiry about his September 9, 2016 e-mail to OGC requesting a progress update concerning SecD's evaluation of Zummer's clearance. In the e-mail, SAC 2 told OGC that Zummer was "creating a very challenging situation for us in the Division."

*This report may contain sensitive law-enforcement or privacy-protected information and is for authorized recipients only. Do not disseminate this report without the express written authorization of the U.S. Department of Justice Office of the Inspector General. Regarding this provision, please review the notice page of this report for additional information about your rights and obligations.*

The AIU Unit Chief notified INSD of FBI OGC's referral and forwarded INSD the details on August 24, 2016. Later that same day, the OGC Unit Chief also forwarded INSD the same documents and evidence he forwarded to AIU.

On September 6, 2016, AIU opened an investigation on Zummer which culminated in SecD's decision on September 27 to suspend Zummer's clearance. From interviews and a review of AIU's case file, we determined that AIU's investigation of Zummer consisted of a document-only review of: the OGC Unit Chief's forwarded emails; Zummer's August 15 letter; the USAO's response to the Court on September 6; the September 6 letter Zummer filed with the judge, along with FBI OGC's emails regarding Zummer's letter; Judge Engelhardt's order regarding Zummer's letters; and a synopsis drafted by ASAC 1 outlining the division's concerns about how portions of Zummer's August 15 letter "identif[ied] facts material to an ongoing public corruption investigation" other than the Morel investigation – specifically the sensitive DEA case.

AIU did not interview any personnel or seek any additional information from Zummer or any other source regarding FBI OGC and the New Orleans Division's concerns regarding his continued ability to maintain a clearance.[42] The AIU SSA who worked on the matter explained to the OIG that he was new in the office when Zummer's case came through and so he "push[ed] it through" for his division leadership to sign. He told the OIG that AIU relied on OGC's interpretation of events with Zummer, particularly information and advice from the OGC Unit Chief and another OGC attorney. The AIU SSA explained to the OIG that he believed Zummer's case to be "simple" and that Zummer's actions indicated a "lack of judgment" warranting a suspension under the adjudicative guidelines. Further, the AIU Unit Chief explained to the OIG that he thought "there was more than enough" in Zummer's case to suspend, so they did not interview Zummer before proceeding with his suspension.

The AIU Unit Chief stated to the OIG that AIU often allows INSD to investigate allegations against a person before AIU will decide whether to perform its own security investigation. However, the AIU Unit Chief explained to the OIG that, depending on the situation, AIU will recommend suspending an individual's

---

[42] The AIU Unit Chief explained to the OIG that there are no specific criteria for when AIU and SecD will proceed with a clearance suspension before an investigation is complete, but he noted that if the person is a threat to national security or a threat to his or her office, then AIU and SecD will act to quickly remove someone. The AIU Unit Chief explained that AIU normally lets INSD conduct the interviews and then AIU will take information from those interviews. He told the OIG that they prefer to wait until whichever investigative entity is conducting an investigation is done before moving on to decide on what to do with the individual's clearance. The AIU Unit Chief also added in a case "when it's clear," they will not wait on an investigation, but will use the adjudicative guidelines and make a decision. He also told the OIG that they may use a suspension "just to remove them from the office right away" while the investigation continues. AGC 2 stated to the OIG that even with the baseline issue of whether Zummer wrongfully released protected information, he deferred to the CDC's and OGC's analysis and conclusions that there was protected information in Zummer's letter.

clearance before INSD completes an investigation.[43] The AIU Unit Chief said he could not define the types of cases for which SecD would suspend clearances without waiting for INSD's investigation, but noted, "if it's clear, when we're working a case, we'll, we'll do it [suspend the clearance], we'll do it almost immediately if the information is there, if we have enough, enough information."

During the pendency of AIU's investigation, SAC 2, both directly and through one of his subordinates, inquired with SecD and OGC about the progress of SecD's review of Zummer's clearance. In these communications, SAC 2 expressed the belief that Zummer was a risk to disclose additional information outside of the FBI.

SecD suspended Zummer's security clearance, effective September 30, 2016. On that day, ASAC 1, another ASAC, the squad 12 SSA, and the division security officer met with Zummer and notified him that his security clearance was suspended, and that as a result, he was indefinitely suspended without pay from work. The security suspension letter, signed by the SecD AD, explained that Zummer's suspension was based on security concerns relating to Adjudicative Guideline E (Personal Conduct) and Adjudicative Guideline K (Handling Protected Information). The letter stated that the suspension of his security clearance was due to Zummer's "deliberate failure to comply with rules and regulations when [he] divulged sensitive and protected information without prior authorization." The letter stated that the suspension would continue pending completion of the FBI's investigation of the allegations against Zummer and re-evaluation of his clearance based on the results of that investigation. The Employee Services Section Chief's (ESS SC) September 30, 2016 letter concerning Zummer's suspension from duty and pay explained that the suspension was based on the SecD AD's suspension of his security clearance and access to classified information.

Pursuant to the options presented to him in the suspension from duty and pay letter, Zummer elected to use his accrued annual leave in lieu of suspension. As a result, his suspension was effective on November 14, 2016.

### 3.     The AIU Suspension Case File and Associated Documents

OIG investigators reviewed the AIU case file on Zummer and the associated documents AIU drafted.[44] After a complete review of AIU's case file and interviews

---

[43] INSD did not investigate the allegations against Zummer. The INSD AD stated INSD recognized Zummer as a whistleblower and raised the issue with the OIG due to concerns of potential retaliation against Zummer. In a conversation between the OIG and SecD's senior leadership, SecD advised the OIG that SecD would wait on the results of the OIG's investigation before making a decision on whether to revoke Zummer's clearance. With Zummer's concurrence, the OIG agreed to investigate the misconduct allegations against Zummer as well as Zummer's reprisal complaint. Our companion report addresses whether Zummer committed misconduct in releasing of his letter and other associated misconduct allegations against him.

[44] AIU staff attempted to provide a copy of the suspension case file to the OIG in March 2017, but the original version of the case file provided to the OIG was missing documents, was out of order, and was haphazardly labelled and inventoried. In addition, AIU personnel referred in interviews to documents and information that were not in the case file and promised to look to see if they had

with AIU personnel, we determined that the only original substantive documents that were assembled by AIU were 1) the suspension electronic communication (EC), dated September 27, 2016, and drafted by a contractor,[45] and 2) a January 2017 "white paper" on Zummer's case, written by the AIU SSA with assistance from the OGC attorney supporting SecD.

According to the AIU Unit Chief and the AGC supporting SecD (AGC 2), the white paper was requested by the Human Resources Branch Executive Assistant Director (HRB EAD) to have background on the case. The white paper was distributed to the SecD AD, the HRB EAD and the FBI General Counsel. When asked about the white paper during interviews, AIU personnel noted that the white paper was not technically part of the case file at the time of their interviews.[46]

Several of AIU's documents and emails concerning Zummer's case contained inaccurate information or contained inadequate analysis of the facts known to AIU at the time. The inaccurate information appears to originate from a September 14, 2016 email from the AIU SSA to the AIU Unit Chief. The email was later sent by the Unit Chief to the SecD Deputy AD. AGC 2 assisted the AIU SSA in drafting this e-mail summary. Subsequently, inaccurate information from this initial email summary of the case appeared to filter into the suspension EC and the January 2017 white paper. This inaccurate information was ultimately included in the revocation EC and a summary email to then-Associate Deputy Director David Bowdich.

First, in various documents, AIU set forth an inaccurate list of the entities that advised Zummer regarding his draft letter. AIU also incorrectly described the advice he was given. For example, the suspension EC incorrectly stated that Zummer was "explicitly" told not to file the letter by OGC and RIDS. An internal September 2016 e-mail drafted by the AIU SSA incorrectly stated that Zummer was prohibited by "FBI Headquarters and DOJ" from releasing the letter. The January white paper also incorrectly stated that Zummer released the letter "despite being prohibited by his management, FBI Headquarters, and DOJ" and incorrectly stated that Zummer was denied authorization to file the letter by OIC and RIDS.

Zummer never personally received any communication or advice from FBI OGC or OIC, and none of these entities explicitly denied him permission to file the letter. FBI OGC communicated directly with the CDC in May 2016, who passed the

---

additional documents that should be in the case file. After following up with the AIU witnesses multiple times, OIG investigators ultimately received a full copy of the case file, but none of the additional documents the AIU witnesses referenced in interviews were in the case file.

[45] The 10-page suspension EC provided AIU's summary of the facts and justification for suspending Zummer's clearance, and the approval of the suspension EC provided the basis for the suspension letter and the letter informing Zummer he was indefinitely suspended from work without pay, as described above.

[46] Immediately following his interview with the OIG, the AIU SSA requested that one of his contractors place the white paper into the Zummer case file.

advice to SAC 2 and ASAC 1 that Zummer should not file the letter without prior authorization from the Department, but should seek permission from the OIG or DOJ OPR. No FBI OGC attorneys communicated directly with Zummer concerning his request to file the letter with the court. The OIC AD was consulted via email by the ASC in the RIDS process, but never provided an official opinion or talked with Zummer, and actually opined that Zummer *could* submit his letter under certain circumstances, as noted above.[47] AGC 2 acknowledged to the OIG that OIC's involvement in advising Zummer was not supported in the AIU case materials and the error likely originated with him. Further, AGC 2 told the OIG that improperly stating in the paperwork that OIC told Zummer that he could not send the letter to Judge Engelhardt made the case sound much worse than it was.

Zummer also did not receive denials from "DOJ" or RIDS, the two entities with which he corresponded directly. DOJ OPR told him that OPR could not comment on whether it was appropriate to send the letter to the judge. Accordingly, DOJ OPR did not deny or provide him authorization to release the letter. RIDS likewise determined this question to be out of their jurisdiction as the letter would be disclosed in the performance of his official duties – once again, neither a denial nor approval to release the letter. In an interview with the OIG, AGC 2 acknowledged to the OIG that RIDS did not opine on whether Zummer could or could not release the letter. The AIU Unit Chief, however, in an interview with the OIG, explained that because RIDS did not approve Zummer's release request, that he interpreted it as a denial and not a deferral to another entity.

Second, the January 2017 white paper contained additional errors. Although Zummer's letter was dated and sent to the judge on August 15, 2016, the white paper referenced the FBI OGC's August 16, 2016 advice (which the CDC only forwarded to Zummer after Zummer sent the letter to the judge) as direct support for the conclusion that Zummer released the letters "despite being prohibited by his management, FBI Headquarters, and DOJ" and was "in direct insubordination." AIU did not take steps to determine exactly what the New Orleans Division personally instructed Zummer. When asked why so much importance was being placed on the August 16, 2016 OGC advice to the CDC, AGC 2 told the OIG that he did not realize that Zummer had already sent his letter to the judge before OGC issued its advice.

The white paper also concluded that Zummer's August 15, 2016 letter was part of the court record that may be accessed by the public, thereby increasing the risk that the information Zummer released would be available to the public at large. However, the white paper disregarded Judge Engelhardt's actual ruling on

---

[47] The OIC AD's e-mail to the ASC, in fact, stated that, if the agent "feels compelled to bring certain matters regarding the case to the judge directly because he believes a miscarriage of justice would otherwise occur, then he may do so but it is highly advisable to first inform this SAC, so that the latter can provide such information and counsel as may be appropriate and of which the agent may be unaware." The OIC AD also advised that if the disclosure violated a statute or the information was classified, compromised a confidential source, or otherwise problematic, that the agent would need to take measures to avoid or mitigate these issues.

Zummer's letter – that it would not be part of the case record or released to the public by the court. Zummer had not released his letter to the media at that point,[48] nor had he even provided a copy to the Defense Attorney.

Third, the suspension EC, white paper, and email summaries of the case contained additional inconsistencies. For example, in the suspension EC, AIU revised the description of OGC's initial advice, which SAC 2 provided to Zummer. AIU stated that Zummer was advised to generally send his letter to the offices designated to receive protected disclosures, omitting the remainder of that advice – that the purpose would be to seek their permission to release the letter to the judge. The fact that Zummer was told to seek *permission* from the OIG or DOJ OPR is significant because those entities declined to act on that request, frustrating Zummer's efforts to comply with instructions.

Finally, in addition to the errors we identified, we also found that the suspension EC contained little to no actual analysis of Zummer's case, but consisted primarily of material taken directly from the adjudicative guidelines and the associated desk reference. The EC quotes heavily from guidelines that could be applicable to Zummer's case, but does not provide facts or analysis in support of the decision to suspend Zummer based on these guidelines.

For example, in a section labeled "Adjudication of Security Issues," the suspension EC stated that AIU is required to use a "whole person and common sense approach" to assess risk in the adjudication process. But this section contains no further analysis or information regarding AIU's application of this standard to Zummer's suspension. It is unclear from the text of the EC whether or how the "whole person" approach was applied. Additionally, the EC does not discuss whether Zummer's letter included sensitive information. Finally, the section on mitigation also lacks any description or analysis of mitigating evidence and repeats the inaccurate assertion that Zummer was explicitly told not to disclose the letter by DOJ entities.

During the course of our investigation, OIG investigators identified that Zummer's September 30, 2016 suspension from duty and pay did not properly reflect his status as a preference eligible veteran, which afforded him the right to respond to a proposed suspension before it took effect. After the OIG brought this error to the attention of the FBI, on March 20, 2017, the ESS SC provided Zummer with a letter acknowledging this error and rescinding his indefinite suspension from duty and pay. The letter stated that Zummer would be retroactively returned to duty for pay and record purposes effective November 14, 2016, but that his security clearance remained suspended and he would not be allowed to return to work. The letter also proposed to reinstate his indefinite suspension without pay,

---

[48] On January 26, 2017, Zummer did receive permission from RIDS to release a redacted version of his August 15 letter to the media. Zummer did release the redacted version of the letter to the media, and on March 21, 2017, media outlets in New Orleans published the RIDS-approved redacted copy of Zummer's letter and related articles on their websites.

and further notified Zummer of the process by which he could review the materials relied upon for the basis of his suspension and respond to the proposal.

On April 20, 2017, Zummer responded to the proposal to indefinitely suspend him, arguing that the action was in response to his constitutionally protected actions under the First Amendment and thus amounted to improper retaliation. Zummer requested to be placed on administrative leave pending the OIG's investigation of the matter and the FBI's subsequent adjudication. Further, he argued that a suspension without pay while also restricting his outside employment opportunities violated his First Amendment and due process rights.[49] On May 22, 2017, Zummer received a May 12, 2017 letter from the HRB EAD indicating that she had reviewed and considered Zummer's submission of matters and oral presentation regarding his proposed suspension, and had decided to indefinitely suspend him without pay in accordance with 5 U.S.C. § 7513.

### 4. Revocation of Zummer's Security Clearance

On January 3, 2018, Zummer was notified that his security clearance was revoked. The letter Zummer received was dated November 27, 2017. On January 5, 2018, we requested a copy of AIU's file relating to revocation of his clearance and re-interviewed the AIU SSA and AGC 2. The following section summarizes relevant information from that file and the two interviews.

The file contained an EC dated November 21, 2017 drafted by an AIU contractor[50] and approved by the AIU SSA titled, "Investigation update – 2017 Q4." This EC stated that AIU's investigative efforts included a review of "reports, interviews, DOJ OIG reports, OGC, and clearance suspension and revocation details." It also noted that "[t]he case [was] in the approval chain regarding clearance suspension." The EC stated that the next steps for AIU's investigation included checking the status of the revocation package and notifying Zummer of his revocation, and then checking with INSD on the status of INSD's investigation of Zummer. When questioned about the items that the EC indicated that AIU had reviewed, the AIU SSA could not explain what "DOJ OIG reports" or what other "reports" or "interviews" referred to in the EC. Instead, he stated, this EC was probably a "pony" EC, and the AIU contractor did not take out inapplicable information. The AIU SSA stated, contrary to what was written in the EC that he approved, no action had been taken since the suspension.

---

[49] In December 2016, Zummer began coordinating with OIC to obtain approval for long-term employment during his suspension. After extensive coordination between OIC and Zummer regarding which jobs would meet Zummer's experience, but not cause ethical issues with his continuing status (despite his suspension) as an FBI employee, OIC and Zummer finally agreed on a specific job and OIC indicated that it would not oppose his outside employment request for this job when Zummer officially submitted the paperwork. Zummer told the OIG that he subsequently submitted the required FBI paperwork to obtain approval for outside employment in this OIC-approved position, but the FBI ultimately denied his request.

[50] This AIU contractor was not the same one who drafted the suspension EC.

According to the AIU SSA, AGC 2 informed AIU that AIU did not have to wait until the OIG's investigation was complete to process Zummer's revocation, at which point the AIU SSA directed the AIU contractor to begin assembling the revocation package. AGC 2 told the OIG that he advised the AIU SSA that he did not have to wait on OIG's investigation to process Zummer's case. AGC 2 stated to the OIG that he would not have advised AIU specifically to revoke Zummer's clearance, but only told the AIU SSA that he could proceed.

The next item in the file was an EC dated November 29, 2017 that included three attachments: the signed revocation letter, the associated routing slip for the letter, and an October 12, 2017 AIU EC recommending revocation of Zummer's clearance (revocation EC). The routing slip alerted AIU leadership through the SecD AD that INSD did not have an open investigation, but the "case was on hold due to the pending DOJ-OIG investigation [and] OGC recently recommended AIU reinitiate the revocation process."

The revocation EC in the file was similar to the suspension EC, but not identical. It contained even less analysis concerning the application of the adjudicative guidelines and mitigating factors to Zummer's case than the suspension EC. The revocation EC listed Zummer as not being a preference eligible veteran – an error we alerted the FBI to in March 2017 and HRD addressed at that time. Next, the EC incorrectly stated that Zummer was denied permission to release the letter by RIDS and OIC. As previously noted, RMD declined to comment on whether he could release it, and OIC never provided any advice to Zummer or the New Orleans Division leadership on the issue. Further, as noted above, OIC's advice to RMD indicated instead that Zummer *could* possibly release the letter to the judge, but that there were potential drawbacks to doing so. The EC also stated that his SAC advised him he was free to send his letter to "any of the DOJ/FBI entities identified in the FBI's whistleblower regulations." When OIG investigators questioned AGC 2 concerning these errors and asked how they were repeated, he responded that he missed seeing these errors and noted that he should have caught them given his previous interview with the OIG investigators. When asked the same question, the AIU SSA attempted to explain away the errors by stating that these errors did not really change the underlying facts or otherwise impact Zummer's case.

The remainder of the AIU case file consisted of ECs dated January 10, 2018 and later and addressed Zummer's January 3, 2018 request to obtain a copy of the investigative file and AIU's first attempts to deliver the letter to Zummer in December.[51] The file did not detail any new investigative steps, information,

---

[51] The ECs in the AIU file repeatedly stated that the original letter was sent via FedEx directly to Zummer's home address, but that he did not accept delivery. However, the FedEx tracking history shows that FedEx attempted delivery three times, but noted "customer not available or business closed." As AIU shipped it requiring signature for delivery, the package was returned after three failed delivery attempts.

details, or other evidence related to Zummer's case after his suspension on September 30, 2016.

### C.    Analysis of 2016 Disclosures and Associated Allegations

#### 1.    5 U.S.C. § 2303 and the FBI Whistleblower Regulations

As discussed earlier, for a disclosure to be considered "protected" under the statute and the Regulations, it must meet two requirements. First, it must be made to one of the offices or officials designated to receive it, and, second, the person making the disclosure must reasonably believe that it evidences a violation of any law, rule, or regulation, or that it evidences gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public safety.[52]

The disclosure Zummer alleged he was retaliated for was his August 15, 2016 release of his letter to Judge Engelhardt. He specifically told the OIG that he did not believe that the FBI retaliated against him for his communications to the OIG and DOJ OPR prior to his release of his letter, and the interviews we conducted and documents we reviewed similarly focused on the letter as the basis for the actions taken against him. However, a federal district court judge is not one of the officials designated to receive protected disclosures under the FBI Whistleblower Regulations. As a result, we found that Zummer's August 15, 2016 letter did not qualify as a protected disclosure, and his claim fails under the FBI Whistleblower Regulations.

Moreover, even if Zummer had made his disclosure to a designated official, the suspension or revocation of a security clearance is not a "personnel action" within the meaning of the FBI Whistleblower Regulations and is not reviewable under that authority.[53] Therefore we turn next to the authorities that explicitly address reprisals involving access to classified information.

#### 2.    50 U.S.C. § 3341(j), PPD-19, and Associated Policies[54]

As noted above, PPD-19 protects whistleblowers from reprisals affecting their access to classified information. However, it requires the disclosure to be to one of

---

[52] 5 U.S.C. § 2303.

[53] As mentioned in section II.A., footnotes 6 and 7, the MSPB and the courts have held that security clearance revocations and suspensions are not personnel actions under analogous statutes to the FBI Whistleblower Regulations. Likewise they have declined to review actions closely intertwined with clearance suspensions, such as a necessary detail to another section not requiring a clearance, indefinite suspension from work due to a security clearance suspension, or termination from employment due to termination of a security clearance.

[54] We also examined Zummer's claim under FBI Policy Directive 0727D, Non-Retaliation for Reporting Compliance Risks, dated September 23, 2014. For a communication to be covered under this directive, the employee must report his or her concern to: persons designated under the FBI Whistleblower Regulations; any member of OIC or the OIC helpline, FBI division compliance officers,

*This report may contain sensitive law-enforcement or privacy-protected information and is for authorized recipients only. Do not disseminate this report without the express written authorization of the U.S. Department of Justice Office of the Inspector General. Regarding this provision, please review the notice page of this report for additional information about your rights and obligations.*

the designated officials listed in PPD-19, Section F, para 5(a). A federal district judge is not one of the designated officials under PPD-19.[55]

Under 50 U.S.C. § 3341(j), employees may appeal actions taken with regard to their security clearances in retaliation for a protected disclosure.[56] As with PPD-19 and the FBI Whistleblower Regulations, Zummer's disclosure is not protected under this statute because it was made to a federal district judge, who is not listed as one of the entities designated to receive protected disclosures under 50 U.S.C. § 3341(j).

Accordingly, we found that Zummer does not have a viable whistleblower retaliation claim under PPD-19, 50 U.S.C. § 3341(j), or any of the associated Department policies.

### D. Observations on the Process to Suspend and Revoke Zummer's Clearance

Although we found that Zummer does not have a viable whistleblower retaliation claim in relation to the release of his August 15, 2016 letter to the judge, the OIG found troubling errors and omissions in the record of the decision to suspend and revoke Zummer's clearance that we believe merit a second look at the suspension and revocation.

AIU's case file contained multiple errors regarding the advice and direction given to Zummer from May to August 2016. As detailed above, the facts are more complex and the instructions communicated to Zummer were delayed and potentially confusing, circumstances that we believe were relevant to the assessment of whether Zummer's actions merited suspension and revocation of his clearance. In particular, there is evidence that Zummer made a good faith effort to obtain permission, that he removed the identity of one individual at the behest of the lead agent on a pending case, and that he provided the letter to the Court but did not disseminate it otherwise beyond the FBI without the FBI's approval.[57] In

---

any member of an the FBI's Division Compliance Council; or any supervisor in his or her chain of command. This list does not include communications to a federal judge. Further, paragraphs 7, 8.3.1, and 16.2 only cover communications about the FBI's violation of or compliance with its own policies. As a result, the subject of Zummer's communications would not be covered by this policy directive.

[55] Presidential Policy Directive 19 (PPD-19), Protecting Whistleblowers with Access to Classified Information, October 10, 2012, p 7, at F(5)(a). PPD-19 limits protected disclosures to a supervisor in the employee's direct chain of command, certain Inspectors General, the Director of National Intelligence, or to an employee designated by any of these officials for the purpose of receiving protected disclosures.

[56] 50 U.S.C. § 3341(j)(1).

[57] On September 16, 2016, Zummer submitted his August 15 letter for prepublication review for release to the media. RIDS responded on January 15, 2017, with permission for Zummer to release a redacted version of the letter to the media. For more information on the redactions and Zummer's continued utilization of the prepublication review process after his suspension, see the companion report.

addition, although he did not obtain permission from anyone, he was not told clearly by any of the offices to which he had been directed that permission to provide the letter to the Court was denied.

Contrary to the statement made in the suspension EC and revocation EC, OGC never denied permission directly to Zummer (or for that matter communicated with him in any fashion directly), but rather advised his managers to direct him not to send the letter without permission from the Department. OGC advised Zummer's managers to tell Zummer that he should obtain permission from the OIG or DOJ OPR in advance of making such a disclosure. Based on OGC's advice, Zummer's managers directed him that he should not submit his letter to the judge unless he received authorization from the Department to do so and that he could send his letter to the DOJ entities listed in the FBI Whistleblower Regulations, such as the OIG and DOJ OPR, to obtain the necessary permission. Even if OGC's advice was well-intended it was erroneous, because neither the OIG nor OPR was in a position to grant "permission" for Zummer to release his letter to the judge. Neither of these offices' functions include providing advisory opinions to FBI or Department employees regarding compliance with DOJ or component disclosure policies.

Although Zummer ultimately disregarded SAC 2's direction (which mirrored OGC's advice), Zummer initially sought to comply with SAC 2's direction by seeking permission from the OIG. The OIG referred his draft letter and his April 2016 complaint to DOJ OPR because Zummer's allegations pertained to the conduct of Department attorneys in the course of litigation. Over 2 months after Zummer sought this permission, DOJ OPR told him that DOJ OPR would not comment on whether he should submit his letter to the judge. DOJ OPR told him to consult his supervisors – precisely the people who had advised him to go to DOJ OPR for permission.

Likewise, OIC also never communicated with Zummer about his request. Instead the OIC AD provided guidance to RIDS on handling Zummer's prepublication review request stating that it was not a matter for prepublication because Zummer's proposed release "would take place in the course of the performance of his duties." And, far from advising RIDS that Zummer was prohibited from sending the letter, the OIC AD stated to RIDS that if Zummer "feels compelled to bring certain matters regarding the case to the judge directly because he believes a miscarriage of justice would otherwise occur, *then he may do so* but it is highly advisable to first inform this SAC, so that the latter can provide such information and counsel as may be appropriate and of which the agent may be unaware."[58] (Emphasis added.)

---

[58] As noted in Section V.A., the OIC AD told the OIG he quickly "skimmed" Zummer's proposed letter to the judge before he drafted his email to the RIDS ASC. The OIC AD stated that he was okay with Zummer releasing the letter "if no one [was] objecting" to its release, but that he did not agree with Zummer's argument that Zummer could file the letter in his personal capacity.

Most importantly, in his statement to the OIG, AGC 2 *conceded* that the incorrect statements in Zummer's AIU file about OIC made Zummer's conduct sound much worse than it actually was. As noted earlier, this error dated back prior to the January white paper, originating in a September 14, 2016 email summarizing the Zummer case, a summary which was ultimately forwarded to the SecD DAD the same day. Further, despite OIG investigators pointing out these incorrect statements in March 2017 to AGC 2, the AIU SSA, and the AIU Unit Chief, the November 2017 revocation EC still contained these incorrect statements.

Moreover, RIDS's advice to Zummer was that prepublication review was not required. RIDS did not determine, or clearly convey to Zummer, that he was prohibited from submitting his letter to the judge; nor did RIDS tell him who needed to approve his request. RIDS only determined that the issue of permission was outside its jurisdiction as the letter would be disclosed in the performance of Zummer's official duties – once again, neither a denial nor approval to release the letter. In an interview with the OIG, AGC 2 *acknowledged* to the OIG that RIDS did not opine on whether Zummer could or could not release the letter. The AIU Unit Chief, however, in an interview with the OIG, explained that because RIDS did not approve Zummer's release request, he interpreted it as a denial and not a deferral to another entity. Nothing in the AIU case file supports this conclusion. Despite OIG investigators identifying this error in March 2017 to AGC 2, the AIU SSA, and the AIU Unit Chief, the November 2017 revocation EC still contained this error.

Further, we found no evidence that anyone articulated to Zummer specific concerns about privileged information at any point during the time he was attempting to obtain permission to send the letter.[59] The identification of specific concerns, similar to the paragraph-by-paragraph review the CDC, the USAO, and RIDS performed later, could have enabled Zummer to revise his letter to exclude such information while still making his allegations about prosecutorial misconduct.

We recognize that Zummer did not have permission from anyone in the Department or the FBI to send his letter to the judge when he did so. Zummer told us that he disclosed the letter to the court on August 15 because he had not received a clear answer to his requests for permission and he wanted to give the judge a full day before the sentencing hearing scheduled for August 17 to review the letter.

Many of these facts could have been clarified for AIU had it interviewed Zummer and his managers or conducted any independent analysis before suspending his clearance – or if AIU and SecD had waited for our investigation to

---

However, these insights by the OIC AD were not in the documentation provided to AIU, leaving AIU with only the above-quoted email.

[59] As noted above, Zummer demonstrated his willingness to make these types of changes to his letter after receiving advice from the FBI's lead agent for the DEA case to Zummer to remove a particular name from the letter due to the potential implications for the sensitive DEA case.

be complete before revoking Zummer's clearance.  Other facts would have been clarified by consulting OIC or by more accurately describing facts known to AIU.

We also found AIU failed to identify and analyze any potential conditions that could mitigate Zummer's actions.  The suspension and revocation ECs contained sections called "Unable to Mitigate/Lack of Mitigation," where AIU briefly discussed how Zummer's actions were wrong, but did not address whether the potential mitigating conditions that are listed in the Adjudicative Guidelines applied to Zummer's case or whether other considerations potentially mitigated his actions.  The January 2017 "white paper" likewise concluded, in summary fashion, that there were no facts mitigating Zummer's conduct.  In addition, the AIU SSA told the OIG that AIU does not fully consider any mitigation evidence during the suspension or revocation process, but instead AIU waits until the individual's clearance has been revoked and the employee asks for reconsideration to consider mitigation evidence.[60]

We found the following factors and considerations that should have been considered in analyzing Zummer's case:

- Zummer's long military and FBI career without similar conduct;
- Zummer's initial attempts to comply with instructions from SAC 2 and the CDC, (based on good faith but flawed advice from FBI OGC) to seek permission from the OIG or DOJ OPR;[61]
- Zummer's adherence to the lead DEA case agent's advice to remove AUSA Manager 1's name from the letter to alleviate the lead DEA case agent's concerns with the letter;
- Zummer's belief that he could seek permission from RIDS, consistent with the requirements of his employment agreement, to disclose the contents of his letter in his personal rather than official capacity;
- Zummer's inability to get a prompt answer to his request for permission from DOJ OPR;

---

[60] When asked about the lack of identification of mitigating evidence and analysis in the mitigation section of the revocation EC, the AIU SSA told the OIG that mitigation is considered once AIU proceeds to revocation if the employee obtains an attorney and submits mitigation evidence as rebuttal to the revocation in the employee's request for reconsideration.  He explained that if reconsideration is sought, the FBI would then look at Zummer's employment record, past performance, and other facets of the whole person concept.  AGC 2 also told the OIG that there has been "an across-the-board [issue in AIU] where they're just not doing extensive analysis" to address mitigation factors prior to revocation.  AGC 2 stated that he had observed mitigation analysis in the AIU's response to requests for reconsideration.  AGC 2 stated to the OIG that he had raised with SecD management his concern that AIU was not "putting [mitigation] much into these revocation ECs," and he believed his concern was being "looked at."

[61] AGC 2 told the OIG that if Zummer received improper advice, it would be a potential mitigating factor under the adjudicative guidelines.

- The absence of further instructions from the ASC on where to seek guidance next once RIDS decided Zummer's request to file the letter with the judge was not a matter for the pre-publication review process (although RIDS was under no obligation to do so);

- Zummer's not initially releasing the letter to defense counsel or the media, and his subsequent compliance with RIDS's instructions with respect to the public release of his letter;

- Zummer's efforts to alert the FBI that he filed the August 15 letter so that the FBI could take steps with the USAO to oppose its public release and Judge Engelhart's subsequent decision not to publicly release either of Zummer's letters or make them part of the case file;

- Zummer's disclosure to his leadership that he sent the letter to Judge Engelhardt and provision of a copy of the letter to them;[62]

- Zummer's suggestion to Judge Engelhardt's chambers that the government be provided an opportunity to address whether it should be included in the public record;

- The uniqueness of Zummer's case, specifically the fact he was trying to make a disclosure to a court concerning what he believed to be prosecutorial misconduct that was highly relevant to an imminent sentencing decision, a disclosure that he expected the prosecutors would not make themselves;

- Zummer's September 6, 2016 letter to Judge Engelhardt expressing his belief that his letter did not contain any protected or privileged information; and

- The precedent in the New Orleans Division for agents sending letters to the federal district court without having to seek permission to do so and without facing any repercussions.[63]

We do not, of course, substitute our judgment for that of AIU in assessing Zummer's conduct in this matter or the potential mitigating factors with respect to the suspension or revocation of his security clearance. In fact, as detailed in our companion report, we found that Zummer committed misconduct by sending his

---

[62] Zummer's step to alert his leadership that he filed the letter with Judge Engelhardt allowed the New Orleans Division to send a copy to the USAO, thus allowing the USAO to make a timely objection to it being part of the public record.

[63] Zummer stated in his August 15 letter that "another FBI agent informed me that an FBI manager allowed him to write a letter to a court in similar circumstances to my own without going through the procedures I was forced to follow. The FBI appears to pick and choose which disclosures it scrutinizes." As discussed in the companion report, Zummer was aware that ASAC 1 and another New Orleans Division public corruption Special Agent sent a complaint letter to the federal district court's disciplinary committee in March 2014 alleging prosecutorial misconduct after prosecutors dismissed a case. Neither ASAC 1 nor the Special Agent were disciplined. In July 2015, this other special agent also sent a separate letter directly to the judge in the case following DOJ OPR's investigation of his and the prosecutors' allegations against each other.

*This report may contain sensitive law-enforcement or privacy-protected information and is for authorized recipients only. Do not disseminate this report without the express written authorization of the U.S. Department of Justice Office of the Inspector General. Regarding this provision, please review the notice page of this report for additional information about your rights and obligations.*

letter to the judge. The question of whether Zummer's conduct was sufficient to justify a suspension or revocation of his clearance is delegated in the first instance to SecD. However, as detailed above, we believe that the facts are substantially more complex and equivocal than the way in which they are presented in the suspension EC, the revocation EC, and the AIU file relating to the suspension and revocation of Zummer's clearance. We further believe that it is essential that AIU base its ultimate decision on whether to revoke Zummer's clearance on a complete, accurate, and fair record of the circumstances and reasons for his decision to disclose the letter without permission from the Department.

## VI.    Conclusion

For the reasons stated above, we found insufficient evidence to support Zummer's claims of retaliation under the FBI WPEA or the FBI Whistleblower Regulations. We found that Zummer did make a protected disclosure to the OIG in 2013 concerning information that he reasonably believed evidenced conflicts of interest within the USAO. However, we did not find that the USAO's declination of two of Zummer's cases for prosecution or its decision not to accept the New Orleans Division's offer to allow Zummer to be a SAUSA qualified as personnel actions. Therefore, we found insufficient evidence to support Zummer's claims of retaliation in response to his 2013 complaint to the OIG.

We found, for the reasons stated above, that Zummer's August 15, 2016 letter to Judge Engelhardt was not a protected disclosure under the FBI WPEA, PPD-19, or 50 U.S.C. § 3341(j) because a federal judge is not an entity designated to receive protected disclosures under any of these provisions. As a result, the actions taken by the FBI against Zummer in response to his disclosure are not subject to the FBI Whistleblower Regulations, PPD-19, or 50 U.S.C. § 3341(j).

Nevertheless, we found troubling errors and omissions in the AIU suspension and revocation ECs and the associated file. We therefore recommend that the FBI reexamine their clearance decisions in this case so that SecD bases any future decision regarding the revocation of Zummer's clearance on a full and accurate record that takes into account the findings of this and the OIG's companion misconduct report.



The Department of Justice Office of the Inspector General (DOJ OIG) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice, and to promote economy and efficiency in the Department's operations.

To report allegations of waste, fraud, abuse, or misconduct regarding DOJ programs, employees, contractors, grants, or contracts please visit or call the **DOJ OIG Hotline** at oig.justice.gov/hotline or (800) 869-4499.

**U.S. DEPARTMENT OF JUSTICE OFFICE OF THE INSPECTOR GENERAL**
950 Pennsylvania Avenue, Northwest
Suite 4760
Washington, DC  20530-0001

| **Website** | **Twitter** | **YouTube** |
|---|---|---|
| oig.justice.gov | @JusticeOIG | JusticeOIG |

Also at Oversight.gov